UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA

     v.         25 Cr. 176 (MMG)

LUIGI MANGIONE,

       Defendant.
------------------------------------------------------X


## DEFENDANT LUIGI MANGIONE'S MOTION CHALLENGING
## THE CONSTITUTIONALITY OF THE DEATH PENALTY

Karen Friedman Agnifilo
Marc Agnifilo
Jacob Kaplan
AGNIFILO INTRATER LLP
445 Park Ave., 7th Fl.
New York, NY 10022


Avi Moskowitz
Eylan Schulman
Christopher Neff
MOSKOWITZ COLSON
GINSBERG & SCHULMAN
80 Broad Street, Suite 1900
New York, NY 10004

## TABLE OF CONTENTS

PROCEDURAL AND FACTUAL SUMMARY ............................................................................ 1

    1.      Brief Background of Luigi Mangione................................................................... 1

    2.      Brief Case Background ......................................................................................... 2

    3.      The Six Ways Mangione's Constitutional Rights Have Been Violated ................. 3

    4.      UnitedHealthcare ................................................................................................. 4

    5.      The Shooting of Brian Thompson........................................................................ 4

    6.      The NYPD Press Leaks and the Arrest of Mangione ........................................... 5

    7.      Mangione Agrees to Waive Extradition to New York........................................... 5

    8.      District Attorney's and Police Commissioner's Press Conference ....................... 6

    9.      Mangione is "Perp Walked" In Shackles Surrounded by Scores of Law
           Enforcement Officials Including the New York City Mayor Before
           Hundreds of Reporters and TV Cameras ............................................................. 7

    10.     The Mayor's and Police Commissioner's Press Conference After the Perp
           Walk .................................................................................................................... 8

    11.     The Progress of the Federal Case After the Initial Appearance ............................ 9

    12.     Counsel Is Given Five Days After Being in the Case for Three-Weeks to
           Make a Submission to the Prior Administration's Capital Committee .................. 9

    13.     The Virtual Meeting with the Capital Committee and SDNY Prosecutors .......... 11

    14.     President Trump Orders A Change in Death Penalty Policy................................. 12

    15.     The February 4th Call ......................................................................................... 12

    16.     The Attorney General's February 5, 2025, First-Day Memorandum.................... 13

    17.     February 6th Email .............................................................................................. 14

    18.     The Attorney General's April 1, 2025, Press Release .......................................... 15

    19.     The Attorney General's Instagram Posts............................................................. 17

    20.     The Attorney General's Televised Appearance on Sunday, April 6, 2025............ 18

    21.     The April 11, 2025, Emergency Motion and the April 17, 2025, Indictment ....... 20

ARGUMENT ....................................................................................................................... 22

1.  The False, Damaging, Public Statements of the Attorney General, in Violation of Rule 6(E) And Local Rule 23.1, In Combination with the Staged Perp Walk, the NYPD Leaks, and the Public Statements of the Mayor and Police Commissioner, Violated Mangione's Right to Due Process Such That This Death Penalty Case Should Be Dismissed .................... 22

2.  By Indicting This Case While a Motion Regarding Grand Jury Prejudice Was Pending and Where the Defense Explicitly Requested the Grand Jurors to Be Screened for Exposure to the Attorney General's Illegal and Prejudicial Statements, the Government Violated Mangione's Due Process Rights Such That the Indictment Should Be Dismissed ....................................... 33

3.  By Refusing to Permit the Defense to Present Mitigating Factors and Instead Seeking the Death Penalty for Explicitly Political Reasons, the Government Seeks to Apply the Death Penalty In an Unconstitutionally Arbitrary Manner ................................................................................................. 37

4.  Returning a Death Eligible Indictment Through Unconstitutional and Prejudicial Conduct Permits the Government to Try Mangione with a Death-Qualified Jury in Violation of His Due Process Rights............................. 50

5.  The Federal Death Penalty Is Imposed in an Arbitrary and Capricious Fashion in Violation of the Fifth and Eighth Amendments ................................. 55

    A.  The Federal Death Penalty is Unconstitutional Because it Continues to be Imposed and Carried Out in an Arbitrary and Capricious Manner Post-*Furman* and *Gregg* ............................................................. 58

    B.  No principled rubric separates death penalty cases from non-death cases, rendering the federal death penalty unconstitutionally arbitrary.................................................................................................... 71

    C.  THE FDPA bifurcated trial procedures violate due process because jurors cannot reach a reasoned choice between life and death sentences ................................................................................................ 80

6.  The FDPA Lacks Constitutional Procedures Approved by the legislature and the Government's Efforts to "Gap-Fill" Through Procedures Not Authorized by Congress Cannot Pass Constitutional Muster .............................. 87

    A.  Introduction and Summary of the Argument ........................................... 87

    B.  The FDPA's Aggravating Factors are "Elements" of a Capital Offense Under *Ring* and Must be Presented to and Found by a Grand Jury.......................................................................................................... 88

    C.  The Indictment's "Special Findings" Cannot Cure the FDPA's Constitutional Shortcomings................................................................... 91

CONCLUSION.................................................................................................... 97

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Apprendi v. New Jersey*,
  530 U.S. 466 (2000)........................................................................................................87, 89, 96

*Atkins v. Virginia*,
  536 U.S. 304 (2002).................................................................................................................62, 70

*Bank of Nova Scotia v. United States*,
  487 U.S. 255 (1988).......................................................................................................................23

*Bouie v. City of Columbia*,
  387 U.S. 347 (1964).......................................................................................................................94

*Bousley v. United States*,
  523 U.S. 614 (1998).......................................................................................................................93

*Boyde v. California*,
  *494 U.S. 370 (1990)*.....................................................................................................................86

*Buchanan v. Kentucky*,
  483 U.S. 402 (1987).......................................................................................................................50

*Callins v. Collins*,
  510 U.S. 1141 (1994).....................................................................................................................67

*Chapman v. United States*,
  500 U.S. 453 (1991).......................................................................................................................55

*City of Sacramento v. Lewis*,
  523 U.S. 833 (1998).......................................................................................................................39

*Crandon v. United States*,
  494 U.S. 152 (1990).......................................................................................................................94

*Degarmo v. Texas*,
  106 U.S. 337 (1985).......................................................................................................................40

*District of Columbia v. Heller*,
  554 U.S. 570 (2008).......................................................................................................................35

*Eddings v. Oklahoma*,
  455 U.S. 104 (1982)........................................................................................................... *passim*

*Evitts v. Lucey,*
  469 U.S. 387 (1985)..................................................................................................39

*Ex Parte Wilson,*
  114 U.S. 417 (1885)..................................................................................................35

*Field v. Clark,*
  143 U.S. 649 (1892)..................................................................................................95

*Furman v. Georgia,*
  408 U.S. 238 (1972)...........................................................................................*passim*

*Gardner v. Florida,*
  430 U.S. 349 (1977)..................................................................................................57

*Glossip v. Gross,*
  576 U.S. 863 (2015)...........................................................................................*passim*

*Godfrey v. Georgia,*
  446 U.S. 420 (1980).....................................................................................37, 69, 80

*Graham v. Florida,*
  560 U.S. 48 (2010)....................................................................................................56

*Gregg v. Georgia,*
  428 U.S. 153 (1976)...........................................................................................*passim*

*Harris v. United States,*
  53 6 U.S. 545 (2002).................................................................................................88

*In re Kemmler,*
  136 U.S. 436 (1890)..................................................................................................56

*Jones v. United States,*
  526 U.S. 227 (1999).......................................................................................87, 90, 96

*Jurek v. Texas,*
  428 U.S. 262 (1976).......................................................................................23, 37, 58

*Kennedy v. Louisiana,*
  554 U.S. 407 (2008)............................................................................................68, 71

*Lauro v. Charles,*
  219 F.3d 202 (2d Cir. 2000).....................................................................8, 23, 28, 29

*Locket v. Ohio,*
   438 U.S. 586 (1978)..............................................................................*passim*

*Lockhart v. McCree,*
   476 U.S. 162 (1986)....................................................................................50, 51

*Logan v. United States,*
   144 U.S. 263 (1982)...........................................................................................94

*Lowenfield v. Phelps,*
   484 U.S. 231 (1988)...........................................................................................56

*McCulloch v. Maryland,*
   17 U.S. 316 (1819) ............................................................................................35

*Miller-El v. Dretke,*
   545 U.S. 231 (2005)...........................................................................................54

*Mistretta v. United States*,
   488 U.S. 361 (1989) ......................................................................................94, 95

*Morgan v. Illinois,*
   504 U.S. 719 (1992)...........................................................................................50

*N.W. Hampton, Jr., & Co. v. United States,*
   276 U.S. 394 (1928)...........................................................................................95

*Penry v. Lynaugh,*
   492 U.S. 302 (1989)...........................................................................................41

*Powers v. Ohio,*
   499 U.S. 400 (1991)...........................................................................................54

*Proffit v. Florida,*
   428 U.S. 242 (1976)..............................................................................23, 37, 58

*Ring v. Arizona,*
   536 U.S. 584 (2002)..............................................................................65, 69, 87

*Roberts v. Louisiana,*
   428 U.S. 325 (1976)......................................................................................23, 58

*Roper v. Simmons,*
   543 U.S. 551 (2005)......................................................................................61, 70

*Simmons v. South Carolina*,
   512 U.S. 154 (1994)..................................................................................80

*Stanford v. Kentucky*,
   492 U.S. 361 (1989)..................................................................................61

*Staples v. United States*,
   511 U.S. 600 (1994))................................................................................93

*State v. Santiago*,
   318 Conn. 1 (2015)..............................................................................57, 65

*Thompson v. Oklahoma*,
   487 U.S. 815 (1988)..................................................................................70

*Touhy v. United States*,
   500 U.S. 160 (1991)..................................................................................95

*Tuilaepa v. California*,
   512 U.S. 967 (1994)..............................................................................68, 86

*Turner v. Murray*,
   476 U.S. 28 (1986)....................................................................................69

*United States v. Allen*,
   406 F.3d 940 (8th Cir. 2005) ....................................................................91

*United States v. Billie Allen and Norris Holder*,
   97-CR-00141-ERW-TCM (E.D. Mo. 1997)............................................76

*United States v. Aquart*,
   912 F.3d 1 (2d Cir. 2018) .........................................................................58

*United States v. Azibo Aquart*,
   06 CR 160 (PCD) (D. Conn. 2006) ..........................................................76

*United States v. Azikiwe Aquart*,
   06 CR 160 (PCD) (D. Conn. 2006)...........................................................76

*United States v. Vincent Basciano*,
   05-CR-00060-NGG (E.D.N.Y. 2005) .......................................................73

*United States v. John Bass*,
   97-CR-80235-AJT-ALL (E.D. Mich. 1997) .............................................77

*United States v. Anthony Battle,*
  No. 95-CR-528-ODE (N.D. Ga. 1995) ...................................................................72

*United States v. Dean Anthony Beckford,*
  96-CR-00066-REP-EWH (E.D. VA. 1996)...........................................................76

*United States v. Douglas Black and Steven Riddle,*
  98-CR-00196-DBS (D. Co. 1998) .........................................................................74

*United States v. LaFawn Bobbitt and Rashi Jones,*
  97-CR-00169-JAG (E.D. VA. 1997) ....................................................................76

*United States v. Bowers,*
  No. CR 18-292, 2020 WL 1675916 (W.D. Pa. Apr. 6, 2020) ...........................42, 56

*United States v. Brown,*
  441 F.3d 1330 (11th Cir. 2006) .............................................................................91

*United States v. Fu Xin Chen, Jai Wu Chen and You Zhong Peng,*
  95-CR-00870-ERK-ALL (E.D.N.Y. 1995) ............................................................5

*United States v. Cole,*
  No. 2023-cr-0016, 2025 WL 2592515 (D. V.I. Sept. 7, 2025)................................38

*United States v. Jessie Con-Ui,*
  No. 3:13-cr-00123 (M.D. Pa. 2013) ......................................................................72

*United States v. Billy Cooper,*
  01-CR-00008-CWR-FKB (S.D. Miss. 2001) ........................................................74

*United States v. Costanza-Galdomez,*
  No. SAG-22-409, 2025 WL 1712436 (D. Md. June 18, 2025) ........................... 38-39, 46, 49

*United States v. Cotton,*
  535 U.S. 625 (2002)...............................................................................................90

*United States v. Christopher Dean,*
  98-CR-00063-WKS (D. Vt. 1998).........................................................................74

*United States v. Claude Dennis,*
  96-CR-00066-REP-EWH (E.D. VA. 1996)...........................................................77

*United States v. Gurmeet Singh Dhinsa,*
  97-CR-00672-ERK (E.D.N.Y. 1997) .....................................................................75

*United States v. Edgar Diaz and Emile Fort,*
  05-CR-00167-WHA (N.D. Ca. 2005) ....................................................................74

*United States v. Walter Diaz and Tyrone Walker*
  94-CR-00328-TJM (N.D.N.Y. 1994) ...................................................................77

*United States v. Emile Dixon,*
  01-CR-00389-RJC-ALL (E.D.N.Y. 2001) ...........................................................77

*United States v. Anh Duong,*
  01-CR-20154-JF (N.D. Ca. 2001) ................................................................. 73-74

*United States v. Tommy Edelin,*
  98-CR-00264-RCL (D.D.C. 1998) ......................................................................77

*United States v. Fell,*
  217 F. Supp. 2d 469 (D. Vt. 2002) ................................................................ 57-58

*United States v. Fell,*
  224 F. Supp. 3d 327 (D. Vt. 2016)................................................................ 51-52, 57

*United States v. Juan Raul Garza,*
  93-CR-00009 (S.D. Tex. 1993)...........................................................................77

*United States v. Gibson,*
  175 F. Supp. 2d 532 (S.D.N.Y. 2001)................................................................30

*United States v. Kristen Gilbert,*
  98-CR-30044-MAP (D. Mass. 1998)...................................................................75

*United States v. Roy C. Green,*
  No. 98-337-CBM (C.D. Ca. 1998) ....................................................................72

*United States v. Kee,*
  2000 WL 863119 (S.D.N.Y. June 27, 2000) ................................................. 46-47

*United States v. Kevin Grey and Rodney Moore,*
  00-CR-00157-RCL (D.D.C. 2000) ......................................................................77

*United States v. David Paul Hammer,*
  96-CR-00239-JHS (M.D. Pa.1996) ....................................................................74

*United States v. Clarence Heatley and John Cuff,*
  96-CR-00515-MBM-ALL (S.D.N.Y. 1996)..........................................................76

*United States v. Hudson,*
    7 Cranch 32 (1812) ...........................................................................93

*United States v. Trinity Ingle and Jeffrey Paul,*
    96-CR-60023-JLH (W.D. Ark. 1996)...............................................75

*United States v. Jackson,*
    390 U.S. 570 (1968)......................................................................91-92

*United States v. Jacques,*
    2011 WL 1675417 (D. Vt. May 4, 2011) .........................................61

*United States v. Michael Jacques*,
    08-CR-00117-WKS (D. Vt. 2008).....................................................75

*United States v. Corey Johnson, James Roane, and Richard Tipton*,
    92-CR-00068-JRS (E.D. VA. 1992)...................................................76

*United States v. Darryl Johnson,*
    96-CR-00379 (N.D. Ill. 1996)............................................................77

*United States v. Shahem Johnson and Raheem Johnson,*
    97-CR-00314-GBL (E.D. VA. 1997)..................................................77

*United States v. Anthony Jones,*
    96-CR-00458-GLR (D. Md. 1996) .....................................................77

*United States v. Louis Jones,*
    95-CR-00047-C-1 (N.D. Tex. 1995)..................................................75

*United States v. Theodore Kaczynski,*
    96-CR-00259-GEB-GGH (E.D. Ca. 1996) ........................................73

*United States v. Chevie Kehoe and Daniel Lee,*
    97-CR-00243-KGB (E.D. Ark. 1997).................................................75

*United States v. Lanier,*
    520 U.S. 259 (1997).........................................................................94

*United States v. Littrell*,
    478 F. Supp. 2d 1179 (C.D. Cal. 2007)......................................... *passim*

*United States v. Jared Loughner,*
    11 Cr. 0187 (TUC LAB) (D. Az. 2011)..............................................73

*United States v. Larry Lujan,*
    No. 05-CR-00924-RB (D.N.M. 2005) ........................................................................ 72-73

*United States v. Mechanic,*
    475 U.S. 66 (1986).........................................................................................................30

*United States v. Timothy McVeigh,*
    96-CR-00068-RPM (D. Co. 1996) ................................................................................73

*United States v. Barry Mills, et al,.*
    02-CR-00938-RGK (C.D. Ca. 2002) ............................................................................75

*United States v. Joseph Minerd,*
    99-CR-00215-MBC (W.D. Pa. 1999) ............................................................................74

*United States v. Khalfan Mohamed and Daoud Rashed al`-Owhali,*
    98-CR-01023-LAK (S.D.N.Y. 1998) ............................................................................73

*United States v. Zacharias Moussaoui,*
    01-CR-00455-LMB (E.D. Va. 2001) ............................................................................73

*United States v. Myers,*
    510 F. Supp. 323 (E.D.N.Y. 1980) ..............................................................................23

*United States v. Terry Nichols,*
    No. 96-CR-00068-RPM (D. Co. 1996) ........................................................................73

*United States v. Michael O'Driscoll,*
    01-CR-00277-MM (M.D. Pa. 2001) ............................................................................74

*United States v. Thomas Pitera,*
    90-CR-00424-RJD (E.D.N.Y.) ....................................................................................76

*United States v. Alan Quinones and Diego Rodriguez,*
    00-CR-00761-JSR (S.D.N.Y. 2000) ............................................................................76

*United States v. R. Enters., Inc.,*
    498 U.S. 292 (1991).......................................................................................................30

*United States v. Peter Rollack,*
    97 CR 1293 (S.D.N.Y. 1997).........................................................................................77

*United States v. Eric Rudolph,*
    00-CR-00422-CLS-TMP (N.D. Al. 2000) ....................................................................73

*United States v. Joseph Sablan and William Guerrero,*
  08-CR-00259-PMP (C.D. Ca. 2008) .......................................................72

*United States v. William Sablan and Rudy Sablan,*
  00-CR-00531-WYD (D. Co. 2000) ......................................................75

*United States v. Saipov,*
  17-CR-722 (VSB), 2019 WL 624176 (S.D.N.Y. Feb. 14, 2019) ....................... 46-49

*United States v. Saipov,*
  17-CR-722 (VSB), 2023 WL 371531 (S.D.N.Y. Jan. 24, 2023) .....................80, 87

*United States v. Sampson,*
  Cr. No. 01-10384-MLW, 2015 WL 6511247 (D. Mass., Oct. 28, 2015) ..............56

*United States v. Sampson,*
  2015 WL 7962394 (D. Mass. 2015) ....................................................61

*United States v. Gary Sampson*,
  01-CR-10384-LTS (D. Mass. 2001) .....................................................74

*United States v. Silver,*
  103 F. Supp. 3d 370 (S.D.N.Y. 2015)........................................ 28, 30-32

*United States v. German Sinisterra and Arboleda Ortiz,*
  98-CR-00311-GAF (W.D. Mo. 1998) ..................................................76

*United States v. Spurlock,*
  782 F. Supp. 3d 987 (2025*)* ................................................ 38-39, 46, 49

*United States v. Gregory Storey,*
  96-CR-40018-DES-ALL (D. KS. 1996) ...............................................74

*United States v. Dzohkhar Tsarnaev,*
  No. 13-CR-10200-GAO (D. Mass. 2013) .............................................73

*United States v. Christopher Vialva and Brandon Bernard,*
  99-CR-00070-ADA (W.D. Tex.1999) .................................................74

*United States v. Reynaldo Villarreal and Baldemar Villarreal,*
  91-CR-00004-JH (E.D. Tex. 1991)......................................................77

*United States v. Elijah Williams and Michael Williams,*
  00-CR-01008-NRB (S.D.N.Y. 2000) ..................................................76

*United States v. Williams,*
   504 U.S. 36 (1992)....................................................................30

*United States v. Worrall,*
   2 U.S. (2 Dall.) 384 (1798) .......................................................3

*United States v. Wiltberger,*
   18 U.S. 76 (1820)............................................................87, 93

*Viereck v. United States,*
   318 U.S. 236 (1943)...............................................................94

*Wainwright v. Witt,*
   469 U.S. 412 (1985)...............................................................50

*Walker v. Georgia,*
   129 S. Ct. 453 (2008) ............................................................79

*Walton v. Arizona,*
   497 U.S. 639 (1990) ...................................................65, 67, 69

*Woodson v. North Carolina,*
   428 U.S. 280 (1976)..............................................23, 39, 58, 80

*Zant v. Stephens,*
   462 U.S. 862 (1983)..........................................................37, 63

## Rules & Statutes

U.S. Const., Art. I, § 1 ....................................................................94

U.S. Const., Amend. V ...............................................................34, 91

18 U.S.C. § 3592(c)(9)....................................................................10

18 U.S.C. § 3593(a) ............................................................87, 91, 93

21 U.S.C. § 848(e)(1)(A) .................................................................59

21 U.S.C. § 848(e)(1)(B) .................................................................59

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181 (1988).................................59

Federal Rule of Criminal Procedure 6(e)........................................ *passim*

Federal Rule of Criminal Procedure 6(e)(2)(B)(vi) ..............................25

Federal Rule of Criminal Procedure 7(c)(1) .................................................................96

Local Criminal Rule 23........................................................................................ *passim*

## **Other Authorities**

Brian Serr, *Of Crime and Punishment, Kingpins, and Foot Soldiers, Life and Death: The
Drug War and the Federal Death Penalty Provision--Problems of Interpretation and
Constitutionality*, 25 Ariz. St. L.J. 895, 914 (1993) ................................................59

Bureau of Justice Statistics Bulletin, Capital Punishment 1994, available at
https://bjs.ojp.gov/content/pub/pdf/cp94.pdf.........................................................62

B. Sarma, Furman's Resurrection: Proportionality Review and the Supreme Court's
Second Chance to Fulfill Furman's Promise, 2009 Cardozo L. Rev. de novo 238
(2009)........................................................................................................................79

C. Haney, L. Sontag and S. Constanzo, Deciding to Take a Life: Capital Juries,
Sentencing Instructions, and the Jurisprudence of Death, 50 Journal of Social Issues
149 (1994)..................................................................................................................82

Charles Kenneth Eldred, *The New Federal Death Penalties*, 22 Am. J. Crim. L. 293, 293
n.2 (1994)...................................................................................................................60

Claudia L. Cowan, William C. Thompson & Phoebe C. Ellsworth, *The Effects of Death
Qualification on Jurors' Predisposition to Convict and on the Quality of
Deliberation*, 8 Law and Human Behavior 53 (1984) .............................................51

Emily Hughes, *The Empathic Divide in Capital Trials: Possibilities for Social
Neuroscientific Research*, 2011 Mich. St. L. Rev. 541, 571 (2011).......................51

G. Ben Cohen. & Robert J. Smith, *The Racial Geography of the Federal Death Penalty*,
85 Wash. L. Rev. 425, 431 (2010)............................................................................67

John P. Cunningham, *Death in the Federal Courts: Expectations and Realities of the
Federal Death Penalty Act of 1994*, 32 U. Rich. L. Rev. 939, 953–54 (1998) ......60

Juan A. Lozano, PBS Newshour, available at https://www.pbs.org/newshour/nation/for-
thefirst-time-more-americans-believe-death-penalty-is-applied-unfairly-report-finds ..........62

Katie Morgan & Michael J. Zydney Mannheimer, *The Impact of Information Overload
on the Capital Jury's Ability to Assess Aggravating and Mitigating Factors*, 17 Wm.
& Mary Bill of Rts. J. 1089, 1089 (2009)................................................................53

Mary Sigler, *Contradiction, Coherence and Guided Discretion in the Supreme Court's
Capital Sentencing Jurisprudence*, 40 Amer. Crim. L. Rev. 1151 (2003) ..............67

Mona Lynch & Craig Haney, *Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the "Empathic Divide,"* 45 Law & Soc'y Rev. 69, 70 (2011) ............51

Mona Lynch, *Institutionalizing Bias: The Death Penalty, Federal Drug Prosecutions, and Mechanisms of Disparate Punishment*, 41 Am. J. Crim. L. 91 (2013) ............................51

Peter Meijes Tiersma, *Dictionaries and Death: Do Capital Jurors Understand Mitigation?*, Utah L. Rev. 1 (1995) ........................................................................................83

Richard L. Wiener, *Death Penalty Research in Nebraska: How Do Judges and Juries Reach Penalty Decisions?,* 81 Neb. L. Rev. 757, 768-69 (2002) (reviewing several studies concerning juror comprehension of mitigating circumstances) ..................................53

Robert Dunham, Death Row USA, LEGAL DEFENSE FUND (July 1, 2025), www.naacpldf.org/our-thinking/death-row-usa/ ......................................................................62

S.P. Garvey, Aggravation and Mitigation in Capital Cases: What do Jurors Think?, 98 Columbia L. Rev. 1538 (1998) .................................................................................................84

Steven G. Gey, *Justice Scalia's Death Penalty*, 20 Fla. St. U. L. Rev. 67 (1992) .......................68

"Struck by Lightning: The Continuing Arbitrariness of the Death Penalty Thirty-Five Years After Its Re-instatement in 1976" (Death Penalty Information Center Washington, DC 2011). ..........................................................................................................66-67

T. Eisenberg and M. T. Wells, *Deadly Confusion: Juror Instructions in Capital Cases*, 79 Cornell L. Rev. 1, 12, 38 n.12 (1992) .........................................................................................84

T. Eisenberg, S. P. Garvey & M. T. Wells, *Jury Responsibility in Capital Sentencing: An Empirical Study*, 44 Buff. L. Rev. 339, 360 (1996) ....................................................................84

The Death Penalty in 2024, Death Penalty Information Center, available at https://deathpenaltyinfo.org/research/analysis/reports/year-end-reports/the-death-penalty-in-2024 ..........................................................................................................................62

The Federal Death Penalty: *History and Some Thoughts About the Department of Justice's Role*, 26 Fordham Urb. L.J. 347, 450-90 (1999) .......................................................84

U. Bentele and W.J. Bowers, How Jurors Decide on Death: Guilt is Overwhelming; Aggravation Requires Death; and Mitigation is No Excuse, 66 Brooklyn L. Rev. 1011, 1031-41 (2001) ..................................................................................................................83

W. J. Bowers, M. Sandys & B. Steiner, "Foreclosing Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making," 83 Cornell L. Rev. 1476 (1998) ...............................................................................................................84

W.J. Bowers, *The Capital Jury Project: Rationale, Design & Preview of Early Finding*s, 70 Ind. L.J. 1043, 1079 (1995) ................................................................................................83

W. Bowers and W. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 Crim. Law Bulletin 51 (2003) ...........................85

W. S. Geimer & J. Amsterdam, "Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Trials" 15 Am. J. Crim. L. 1, 41 (1989) .......................................83

## MOTION TO DISMISS THE INDICTMENT AND NOTICE OF INTENTION

Luigi Mangione, through his counsel, moves to dismiss the Indictment filed against him, and in the alternative to strike the Notice of Intention to Seek the Death Penalty.

## PROCEDURAL AND FACTUAL SUMMARY

### 1.    Brief Background of Luigi Mangione

Luigi Mangione is a 27-year-old Italian American dual citizen whose beautiful, promising life has been derailed. Born in Maryland into a large, close, loving family, he is now fighting for his life against a government that seeks to execute him.

From an early age, Mangione's intellect and character stood out. He excelled in Catholic elementary school, where one teacher wrote that she could "still see his sweet face" from her classroom years ago. When he needed a greater academic challenge, he earned admission to the rigorous Gilman School in Baltimore. He has been described by family, friends, school staff and peers as kind, intelligent, a leader, and someone who thinks of others before himself. He was athletic, excelling in several sports including soccer, track and wrestling. He taught himself to code, built a gaming app adopted by a company, founded Gilman's robotics program and competed against other schools' robotics programs, advancing to the national semifinals.

Teachers and friends describe him as bright, humble, curious, funny and authentically himself. His advisor called him "intellectually curious" and a "hard worker." Mangione was genuinely surprised when he was told he was Gilman's valedictorian because achievement for him was a byproduct of curiosity rather than a goal. In his valedictory speech to his classmates and the school, he praised others, spoke of their accomplishments and never once talked about himself. He attended the University of Pennsylvania, completing—in four years—a bachelor's and a master's degree in computer science and engineering.

Throughout his schooling he often sought roles where he could help or teach others such as camp counselor or teaching assistant. Mr. Mangione graduated college during the COVID-19 pandemic and secured remote work utilizing his computer science degree.

In summary, Mr. Mangione is a smart, kind, well-rounded, young man.

## 2.     Brief Case Background

When Mangione was arrested on December 9, 2024, the case received monumental attention from the press and the public as well as from politicians and law enforcement officials. The New York City Mayor, NYPD and the Federal Bureau of Investigation staged an internationally televised "perp walk" where a phalanx of heavily armed agents with long guns slow-walked a heavily shackled Mangione to this very courthouse for his initial appearance on a complaint charging a death-eligible offense. Between February and April 2025, the United States Attorney General rolled out the new administration's death penalty agenda by making the Mangione case the first in which her Justice Department would seek the death penalty. As a result, when Mangione's counsel asked the prosecutors for an opportunity to present mitigating factors, this request was denied. The death penalty decision had already been made, because it was being sought based on politics, not merit.

As part of an orchestrated effort to secure a death-eligible indictment against Mangione and achieve maximum publicity in the process, the Attorney General and other law enforcement officials have intentionally and serially violated his constitutional rights, including the constitutional violations listed in Section 3 below. The federal government has overcharged him with a death penalty offense. The New York County District Attorney also overcharged him with murder charges related to terrorism. On September 16, 2025, the New York Supreme Court dismissed the two terrorism-related charges as being unsupported by the evidence. Mr. Mangione

relies on this Court, as he did on the New York court, to correct the errors made by the government and prevent this case from proceeding as a death penalty prosecution.

**3.     The Six Ways Mangione's Constitutional Rights Have Been Violated**

The actions of the United States Attorney General, federal and state law enforcement, the New York City Mayor and others have violated Mr. Mangione's constitutional and statutory rights and have fatally prejudiced this death penalty case in the following six ways:

<u>First</u>, the Attorney General's extrajudicial statements in her April 1, 2025, press release, her follow-up Instagram Post and her television appearance on Fox News Sunday on April 6, 2025, concerning the S.D.N.Y. grand jury investigation, violate the secrecy mandated by Federal Rule of Criminal Procedure 6(e), are presumed prejudicial under Local Rule 23.1(d), and, in the context of an unconstitutional, staged "perp walk," violated Mangione's Fifth and Eighth Amendment rights.

<u>Second</u>, by indicting this case while a motion regarding grand jury prejudice was pending, and where the defense explicitly requested that the government screen the grand jurors for exposure to the Attorney General's illegal and prejudicial statements, the government allowed the grand jury to be prejudiced such that this Indictment should be dismissed.

<u>Third</u>, by refusing counsel's request to present mitigating information prior to a decision on whether to authorize a capital prosecution and by explicitly basing a death penalty decision on a political agenda, this decision to pursue the death penalty was arbitrary and capricious in violation of the Fifth and Eighth Amendments.

<u>Fourth</u>, returning a death-eligible indictment through unconstitutional and prejudicial conduct violates Mangione's due process rights by forcing him to be tried before a death-qualified jury.

Fifth, the death penalty is arbitrarily imposed in violation of the Fifth and Eighth Amendments.

Sixth, the Federal Death Penalty Act lacks constitutional procedures approved by Congress, and the Executive's efforts to "gap-fill" through procedures not authorized by Congress fail to satisfy the constitution.

### 4.    UnitedHealthcare

To understand why this case has garnered the attention of the public, law enforcement and politicians at the highest levels, it is necessary to understand the role of UnitedHealth Group. UnitedHealth Group is the nation's largest insurer, and the world's largest health care conglomerate. Over the last two decades, UnitedHealth has transformed from a large insurer into a vertically integrated enterprise. The company has acquired physician practices, clinics, and pharmacy benefit managers, creating an internal supply chain that enables UnitedHealth Group to pay itself to deliver care to people enrolled in its health plans. UnitedHealth earned more than $400 billion in revenue last year as the third-largest company in the Fortune 500.

In October 2024, a United States Senate committee released a report stating that UnitedHealth Group and other Medicare Advantage insurers used algorithms to increase the rate of claim denials so as to maintain specific profit targets regardless of patient medical needs.

### 5.    The Shooting of Brian Thompson

At about 6:44 a.m. on the morning of December 4, 2024, Brian Thompson, the CEO of UnitedHealthcare, was shot and killed while he was walking on a nearly deserted street, twenty minutes before sunrise in midtown Manhattan. The shooting, which was captured on video, immediately created widespread speculation that Thompson was killed due to UnitedHealthcare's public and controversial policies of placing profit over patient care. Public reaction was immediate

and intense. As relevant to this motion, this shooting generated nearly unprecedented public interest and social comment.

### 6.    The NYPD Press Leaks and the Arrest of Mangione

In the days following Thompson's death, the New York City Police Department ("NYPD") fanned the flames of public discourse about the shooter's motives as well as the public comment about UnitedHealthcare's practices by leaking information that the bullets and shell casing bore the words "delay," "deny" and "depose."  A nation-wide manhunt ensued with the public following every twist and turn and speculating on social media about the identity of the shooter.

Luigi Mangione was arrested by the Altoona Pennsylvania Police Department on Monday, December 9, 2024, at about 9:30 a.m. and held in jail in Pennsylvania. Members of the New York County District Attorney's ("DANY") staff and the NYPD traveled to Altoona to collect evidence and to try to interview him. At the time of arrest, the police recovered notes of Mangione. These were promptly leaked to news outlets based in New York City, presumably by the New York law enforcement personnel investigating the shooting.  In particular, law enforcement leaked these writings to the press as early as December 10, 2024, and falsely described them as a "manifesto,"[1] a term used only by law enforcement to cast Mangione as a terrorist and to generate even greater amounts of press attention and public interest in the case.

### 7.    Mangione Agrees to Waive Extradition to New York

On Monday December 16, 2024, Mangione's counsel informed DANY that he intended to waive extradition to New York State to appear in the Supreme Court of New York County. As of

---

[1]"Manifesto" is defined by Merriam-Webster as "a written statement declaring *publicly* the intentions, motives, or views of its issuer."  (Emphasis added). There is absolutely no evidence that Mr. Mangione ever either publicly released or intended to release the writings that law enforcement attribute to him.

the date of extradition, there was no indication that the United States Attorney was investigating or had any intention of prosecuting this case. Mangione's counsel made arrangements with DANY as well as the chambers of New York Supreme Court Justice Gregory Carro for Mangione to appear before Justice Carro on Thursday, December 19, 2024, for arraignment on New York State charges.

### 8.    District Attorney's and Police Commissioner's Press Conference

On Tuesday, December 17, 2024, the District Attorney and New York City Police Commissioner held a press conference during which the District Attorney announced that Mangione had been charged with one count of Murder in the First Degree and two counts of Murder in the Second Degree, in addition to other offenses. The District Attorney, who did not mention anything about a potential federal case, much less a potential death penalty case, specified that two of the state Murder counts were predicated on allegations that Mangione engaged in acts of terrorism.[2] The District Attorney stated that "this was a frightening, well-planned targeted murder that was intended to cause shock and attention and intimidation." He continued, "it occurred in one of the most bustling parts of our city, threatening the safety of local residents and tourists alike, commuters and business-people just starting out on their day."

The New York City Police Commissioner then addressed the press and public and stated as follows:

> [I]n the nearly two weeks since Mr. Thompson's killing, we have seen a shocking and appalling celebration of cold-blooded murder. Social media has erupted with praise for this cowardly attack. People ghoulishly plastered posters threatening other CEOs with an "X" over Mr. Thompson's picture, as though he was some sort of a sick trophy. And yesterday, the New York Post reported that some extreme activists were circulating a deck of cards with other most wanted CEOs to be targeted for assassination. These are the threats of a lawless violent mob who would trade in their own vigilantism for the rule of law that protects us all. Let me say this plainly: there is no heroism in what Mangione did. This was a senseless act of

---

[2] As noted, the terrorism charges were dismissed by Justice Carro due to insufficient evidence on September 16, 2025.

violence. It was a cold and calculated crime that stole a life and put New Yorkers at risk. We don't celebrate murders and we don't lionize the killing of anyone. And, any attempt to rationalize this is vile, reckless and offensive to our principles of justice.

Neither the District Attorney nor the Police Commissioner told the public that Mangione was presumed innocent. Rather, they each communicated that Mangione was already guilty of a well-planned, targeted murder and was a terrorist who threatened the safety of our city.

On the morning of Thursday, December 19, 2024, Mangione appeared in Court in Pennsylvania and formally waived extradition to New York. He was then flown from Pennsylvania to Long Island and then put on a helicopter that landed at Manhattan's Wall Street Heliport. The mayor, scores of law enforcement and hundreds of reporters and photographers were waiting for him.

9. **Mangione is "Perp Walked" In Shackles Surrounded by Scores of Law Enforcement Officials Including the New York City Mayor Before Hundreds of Reporters and TV Cameras**

In a show of force befitting a captured cartel chief or comic book villain, Mr. Mangione, at the time a 26-year-old who had never been in trouble with the law, was "perp walked" before scores of television cameras and press reporters, surrounded by armed law enforcement officials in tactical SWAT gear and raid jackets.[3] The perp walk appears to have been arranged by the FBI-NYPD Joint Task Force, who, along with the City's highest elected official and upwards of fifty armed agents in sunglasses, black jackets and black semi-automatic rifles, waited for the helicopter to arrive before positioning themselves around Mangione and slowly marching their orange-clad shackled trophy the full length of the pier so the press, which the agents summoned and assembled,

---

[3]The mayor, being under indictment and legally prohibited from possessing a firearm by the terms of his pretrial release conditions, was in a charcoal overcoat and light grey scarf. He plainly had no role in this charade of a law enforcement procedure.

could depict him forever as what our elected representatives and law enforcement officials wanted him to be: a guilty terrorist deserving of execution.

This perp walk was done purely to dehumanize Mangione and had no legitimate law enforcement purpose. It goes without saying that federal agents transport (presumed innocent) defendants to the Southern District Courthouse every day without humiliating them through a staged perp walk, which was ruled to be unconstitutional twenty-five years ago in *Lauro v. Charles*, 219 F.3d 202 (2d Cir. 2000).

### 10. The Mayor's and Police Commissioner's Press Conference After the Perp Walk

A few minutes after Mangione was placed into a van following the illegal perp walk to be transported to federal court, the New York City Mayor held a press conference at the heliport alongside the Police Commissioner, saying "Police Commissioner Tisch and I want to send a clear, loud message that this act of terrorism and the violence that stems from it are something that will not be tolerated in the city. We wanted personally to be here to show the symbolism of leading from the front . . . ." In the mayor's words, his presence at the perp walk was symbolic, further showing that this was not a legitimate law enforcement measure. As with every press conference concerning Mr. Mangione, there was no mention of his presumption of innocence or his right to due process.

Following the unconstitutional staged perp walk and the mayor's public remarks about sending a message and symbolism, Mr. Mangione was brought to federal court for an initial appearance on a complaint charging four counts. One count, murder through the use of a firearm during the crime of stalking, is punishable by the death penalty. Following the initial appearance, Mr. Mangione was detained and held at the Metropolitan Detention Center.

On Monday, December 23, 2024, Mangione appeared in New York Supreme Court for an arraignment on the New York County indictment charging him with First- and Second-Degree Murder and other crimes.

### 11.    The Progress of the Federal Case After the Initial Appearance

Counsel for Mr. Mangione had steady communications with the SDNY prosecutors in late December 2024 and January 2025. On Friday, January 3, 2025, counsel consented to a 30-day continuance of the preliminary hearing date of January 18, 2025. On the evening of January 7, 2025, the parties had a phone conference during which the SDNY prosecutors indicated that the Capital Case Committee (under the Biden Administration) would be free for a virtual meeting on Monday, January 13, 2025. The next day, January 8, 2025, the SDNY prosecutors emailed that the meeting would be at 11:45 a.m. on January 13th, which was the only date available. The prosecutors also stated that "you are free to submit something in writing if you like, but it's not required." Counsel understood that with the change in administration less than two weeks away, time was of the essence and that the government would not give the defense more than a few days to develop and present an argument against the death penalty. Counsel was also told that due to the time limitations, an in-person meeting was not possible.

### 12.    Counsel Is Given Five Days After Being in the Case for Three-Weeks to Make a Submission to the Prior Administration's Capital Committee

On Sunday morning, January 12, 2025, at 9:07 a.m., counsel emailed an eleven-page, single-spaced written submission to Aaron J. Stewart of the Capital Case Section and the three SDNY prosecutors detailing why the death penalty was inappropriate in this case. Defense counsel explained that because Mr. Mangione had only been arrested about a month earlier, and because counsel had only five days to prepare the letter, there was no opportunity to conduct a meaningful mitigation analysis, which typically takes several months and sometimes more than a year. With

that explicit limitation, counsel provided four reasons why the federal government should not pursue the death penalty.

First, the submission argued that because DANY's case charging Mr. Mangione with First Degree Murder, which carries a punishment of life in prison without parole, was already indicted, there was a reduced federal interest in pursuing the death penalty. We pointed out that the investigation was conducted by DANY and the NYPD, and that any involvement by federal agencies was minimal and incidental. We reminded the prosecutors of the DOJ's own Justice Manual, which provides that "prior to charging a capital offense, prosecutors must (1) carefully assess whether an accused is subject to effective prosecution in another jurisdiction (JM 9-27.240)…and (2) thoroughly review the substantial federal interest principles outlined at JM 9-27.230 and the dual and successive prosecution policies ("Petit policy") outlined at JM 9-2-031 . . . ." The Justice Manual continues that "[p]riority should be given to crimes causing the most harm to the nation, including through widespread impact to the community." The Justice Manual further states that federal authorities must consider "the strength of the other jurisdiction's interest in prosecution" as well as "the probable sentence or other consequence if the person is convicted in the other jurisdiction." *See* Justice Manual, 9-10.140 and 9-27.240. Based on these considerations in the Justice Manual, we argued that the federal authorities should not seek death.

Second, the submission argued that the aggravating factors do not outweigh the mitigating ones, as the Justice Manual requires. Counsel asserted that the only colorable statutory aggravating factor was "substantial planning and premeditation" under 18 U.S.C. § 3592(c)(9). It was also argued that the statutory aggravating factor of "grave risk of death to additional persons" should not apply because the shooting was at close range, was allegedly targeted against one person and was committed at a time, 6:45 a.m., when the streets of New York are relatively empty.

-10-

<u>Third</u>, the submission  argued that since the District Attorney is prosecuting the shooting as a First-Degree Murder case carrying a sentence of life without parole, the federal government should not spend millions of dollars in taxpayer resources trying to execute Mangione, especially when the federal interest—the stalking of a single person—is so slight in comparison to the District Attorney's terrorism charges.[4]

<u>Finally</u>, the submission argued that each of the seventeen cases over the past four decades prior to the Mangione case where the United States Attorney for the Southern District filed Notices of Intent (NOI) was significantly distinct from this one. For starters, each of the seventeen defendants was either a leader or member of a violent drug distribution enterprise or a terrorism organization such as al Qaeda or ISIS at the time of the death-eligible murder(s).  Also, all but four defendants committed multiple murders. Of the four that committed one murder, each was committed as part of a criminal enterprise, two of which involved torture and two of which involved a contract killing. In addition, three of the murders were of witnesses or informants, and one killing took place in front of the victim's family.

## 13.   The Virtual Meeting with the Capital Committee and SDNY Prosecutors

On Monday, January 13, 2025, a virtual meeting was held between Mangione's counsel, representatives of the Biden administration's Capital Committee and the SDNY prosecutors. The presentation reiterated the points made in the January 12, 2025, letter, as to which there were no questions or comments. One or more of the government lawyers had questions about Mr. Mangione's mental and physical state over the previous months and years to which counsel

---

[4]Because Justice Carro dismissed the charges of First-Degree Murder (Intentional Murder in Furtherance of Act of Terrorism) and Second-Degree Murder (Murder as a Crime of Terrorism), Mangione faces a maximum punishment in New York of twenty-five years to life in prison, instead of mandatory life without parole, in the state case.

explained that there was insufficient time to locate and assemble the relevant records and consult with potential experts before meeting with the committee. The government lawyers indicated that due to the imminent change in administration, there was not time for Mangione's counsel to present a mitigation package to the Biden administration's capital committee, and that they would make a decision with the data they had, which did not include any mitigation information.

### 14.    President Trump Orders A Change in Death Penalty Policy

On January 20, 2025, Donald Trump became the 47th President of the United States. On his very first day in office, seven days after the virtual meeting with the prior administration's Capital Committee, the President issued a memorandum order entitled "Restoring the Death Penalty And Protecting Public Safety."  Broadly, the memorandum order outlined the Executive Branch's new policy that it would seek the death penalty in a far broader and different manner than did the previous administration.[5]  Specifically, the new policy involved seeking the death penalty aggressively "for all crimes of a severity demanding its use" and, in cases involving a capital crime by an undocumented immigrant or the murder of a law enforcement officer, that the penalty would be sought without consideration of "any other factors" such as the specific facts of each case or the presence of mitigating or aggravating factors.

Four days after the President's Order, on January 24, 2025, defense counsel spoke with the line prosecutors who said that there was still no decision but that one was imminent.

### 15.    The February 4th Call

On Tuesday, February 4, 2025, defense counsel spoke with the SDNY prosecutors, who stated in substance that the Capital Case Committee under the Biden administration had not made

---

[5]On January 20, 2025, his first day in office, the President took 46 Presidential actions, including the memorandum order concerning the death penalty, signifying the importance to the administration of "restoring the death penalty."

a decision. The prosecutors further stated, both in this call and other calls, that the current administration (The Trump administration) had not yet assembled a functioning Capital Review Committee.  Indeed, the Senate confirmation vote on President Trump's appointment of Pam Bondi to serve as the Attorney General took place on this date. On this same date, Avi Moskowitz was appointed as learned counsel.

**16.    The Attorney General's February 5, 2025, First-Day Memorandum**

On her first day in office, February 5, 2025, the Attorney General issued a memorandum entitled "Reviving the Federal Death Penalty And Lifting the Moratorium on Federal Executions." In the memorandum, the Attorney General criticized prior administrations for failing to seek the death penalty as aggressively as she and the President believed appropriate. Of this, she wrote, "This shameful era ends today. Going forward, the Department of Justice will once again act as the law demands – including by seeking death sentences in appropriate cases and swiftly implementing those sentences in accordance with the law."

In her February 5, 2025, memorandum, Attorney General Bondi revoked the death penalty protocol used by the Biden administration and reverted to the protocol that was in place in the first Trump administration. Those protocols provide in relevant part as follows:

**9-10.080 - Non-Expedited Decision Submissions**

In any case in which the United States Attorney or Assistant Attorney General is contemplating requesting authorization to seek the death penalty or otherwise believes it would be useful to the decision-making process to receive a submission from defense counsel, the United States Attorney or Assistant Attorney General shall give counsel for the defendant a reasonable opportunity to present information for the consideration of the United States Attorney or Assistant Attorney General which may bear on the decision whether to seek the death penalty.

The protocol further provides that after the conclusion of a "reasonable period of time" the United States Attorney or the Assistant Attorney General "shall submit his recommendation

through the Capital Case Section whether to seek the death penalty, along with certain enumerated

materials including a "Death Penalty Analysis" which is described as follows:

> The analysis must identify applicable threshold intent factors under 18 U.S.C. § 3591, applicable statutory aggravating factors under 18 U.S.C. §§ 3592(b)-(d), and applicable mitigating factors under 18 U.S.C. § 3592(a). In addition, the United States Attorney or Assistant Attorney General should include his or her conclusion on whether all the aggravating factor(s) found to exist sufficiently outweigh all the mitigating factor(s) found to exist to justify a sentence of death, or in the absence of mitigating factors, whether the aggravating factor(s) alone are sufficient to justify a sentence of death.

Finally, the protocol, in section 9-10.140 titled Standards for Determination provides that

> In determining whether it is appropriate to seek the death penalty, the United States Attorney or Assistant Attorney General, the Capital Review Committee, the Deputy Attorney General, and the Attorney General will determine whether the applicable statutory aggravating factors and any non-statutory aggravating factors sufficiently outweigh the applicable mitigating factors to justify a sentence of death or, in the absence of any mitigating factors, whether the aggravating factors themselves are sufficient to justify a sentence of death. Reviewers are to resolve ambiguity as to the presence or strength of aggravating or mitigating factors in favor of the defendant. The analysis employed in weighing the aggravating and mitigating factors should be qualitative, not quantitative: a sufficiently strong aggravating factor may outweigh several mitigating factors, and a sufficiently strong mitigating factor may outweigh several aggravating factors. Reviewers may accord weak aggravating or mitigating factors little or no weight. Finally, there must be substantial, admissible, and reliable evidence of the aggravating factors.

### 17.    February 6th Email

On Thursday, February 6, 2025, the day after the Attorney General's first-day

memorandum, defense counsel emailed the trial prosecutors the following: "if the Capital Crimes

Section is unable to make a decision based on our first submission, we respectfully request 3

months in order to give us time to conduct a thorough mitigation investigation in order to submit

additional information."  To be clear, this is a remarkably abbreviated timetable to assemble an

appropriate mitigation package. However, it was obvious to counsel that the government was eager

to move the Mangione case forward. Counsel requested the minimal amount of time necessary to

develop a meaningful mitigation package. The prosecutors did not agree to the request for three

months. Rather, on February 11, 2025, the trial prosecutors told counsel in a phone call that any additional mitigation submission would need to be submitted within one week. Then, on March 12, 2025, the trial prosecutors stated in a phone call that a decision as to the death penalty would be reached without waiting for the defense to submit mitigating information.

18.    **The Attorney General's April 1, 2025, Press Release**

On the morning of April 1, 2025, the Attorney General issued a press release (attached as Exhibit 1).[6] The title of the press release is "Attorney General Pamela Bondi Directs Prosecutors To Seek Death Penalty For Luigi Mangione." In the release, the Attorney General wrote, "After careful consideration, I have directed federal prosecutors to seek the death penalty in this case **as we carry out President Trump's agenda to stop violent crime and Make America Safe Again**." (Emphasis added). The Attorney General continued, "as alleged, Luigi Mangione stalked and murdered United Health Care executive Brian Thompson on December 4, 2024. The murder was an act of political violence.[7] Mangione's actions involved substantial planning and premeditation and because the murder took place in public with bystanders nearby **may** have posed a grave risk of death to additional persons."[8] (Emphasis added). The Attorney General concluded the Press Release by stating "[t]his is in line with Attorney General Bondi's Day One Memo as Attorney General entitled Reviving the Federal Death Penalty and Lifting The Moratorium On Federal

---

[6]Counsel for Mr. Mangione were first informed by a newspaper reporter that the Attorney General directed the line prosecutors to seek the death penalty. Judging by the forthright nature of the line prosecutors, had they known the Attorney General had directed them to seek the death penalty, counsel believes they would have told us. They did not tell the undersigned. Rather, counsel learned about it when the rest of the world did.

[7]The charges in the federal case do not involve political violence but instead the stalking of a single person who is not a politician or public servant or someone engaged in politics.

[8]The Attorney General misstated the statutory aggravating factor, which provides that "the defendant . . . knowingly created a grave risk of death to 1 or more persons in addition to the victim of the offense."    She added the word "may" to the phrase "have posed a grave risk" to falsely convey that the aggravating factor applied when it does not.

Executions." The Attorney General's death penalty order and her factually-misleading, prejudicial public statements were instant international news, immediately and widely reported by press outlets around the world, including the *New York Times*, *New York Post*, *Wall Street Journal*, *BBC*, *Reuters*, *Associated Press*, *Al Jazeera*, *CNN*, *Fox News*, *Law.com*, *Guardian*, *Washington Post*, *CBS News*, *USA Today*, *Bloomberg*, *Los Angeles Times*, *Chicago Tribune*, *Politico*, *ABC News* and countless others.

Rather than authorizing the S.D.N.Y. prosecutors to seek the death penalty in a non-public communication, the Attorney General took the unprecedented action of directing them to do so via press release, knowing that this death penalty investigation would be conducted by presenting evidence to grand jurors exposed to her press release before hearing any evidence. In this release, she did not once say that Mr. Mangione had not yet been indicted for any federal crime, or that these are mere "allegations." She never once discussed the presumption of innocence or that Mr. Mangione is innocent until proven guilty. She assured the country, including the grand jurors, that she (the nation's Attorney General) gave the matter "careful consideration" and that her expert opinion, as the head of the Department of Justice and nation's highest ranking law enforcement officer, was that Mangione warranted execution.

However, the Attorney General's press release was false in other respects because when the defense asked for three months to conduct an abbreviated mitigation investigation[9] and prepare a submission to the current administration's Capital Case Section, this request was denied. So, in fact the Attorney General did not carefully consider the matter because her Justice Department refused to consider any mitigating evidence. Yet, she falsely assured the country, and the grand

---

[9]The defense was told numerous times that a decision was imminent, thus we requested a reasonable three months rather than the nine months to one year that a more fulsome proper mitigation investigation can take.

jurors, that she had. In addition, she also called the incident "an act of political violence" even though Mr. Mangione was charged in a complaint with stalking a single person who was not a politician, or an activist, and who was not otherwise engaged in politics.

In addition to being legally false and factually misleading, the Attorney General's press release is prejudicial for several reasons. First, the press release violates Federal Rule of Criminal Procedure 6(e) because it discloses publicly that SDNY prosecutors and a grand jury will be conducting an investigation with a view toward charging Mangione with a death-eligible offense. She further specified publicly the crime the grand jury would investigate, stalking and murder, and the two particular statutory factors the grand jury would consider to vote a capital indictment. Publicly releasing details about a grand jury investigation, such as the specific aggravating factors the grand jury would consider, violates the rule of grand jury secrecy.

Second, the press release provided a blue print to the public and the grand jurors to indict Mangione with a death penalty offense based on two statutory aggravating factors that she expressly outlined for the public. Not surprisingly, the grand jury followed her blueprint precisely and found the exact two aggravating factors she told them to find.

Third, the Attorney General's extrajudicial statement included her personal opinion as to the merits of the case including the fact that this was an appropriate case for capital punishment, in violation of Local Criminal Rule 23.1.

### 19.    The Attorney General's Instagram Posts

Shortly after the Attorney General's press release, the Attorney General launched an Instagram account (attached as Exhibit 2). The inaugural two posts of the Attorney General's new Instagram account were a photograph of the Attorney General standing before the seal of the United States Department of Justice and the following message: "Luigi Mangione's murder of

Brian Thompson—an innocent man and father of two young children —was a premeditated, cold-blooded assassination that shocked America. After careful consideration, I have directed federal prosecutors to seek the death penalty in this case as we carry out President Trump's agenda to stop violent crime and Make America Safe Again."

Before addressing the substance of the United States Attorney General's Instagram Post, the fact that she created an Instagram account specifically to make extrajudicial statements about this grand jury investigation is further proof that her April 1st press release was to influence the public. The Attorney General's Instagram content, like her press release, expressed her personal belief that Mangione was guilty of a "premeditated, cold blooded assassination." She again lied to the public that she carefully considered the matter even though she refused to permit the defense to present mitigating factors. She also again failed to state that Mr. Mangione had not been indicted or that he was presumed to be innocent. She reemphasized that the decision was based on politics, specifically the administration's agenda to "Make America Safe Again." As a final matter, because the Attorney General was explicitly discussing a matter being considered by a federal grand jury in this district, her public Instagram post violated Rule 6(e).

**20.    The Attorney General's Televised Appearance on Sunday, April 6, 2025**

On Sunday, April 6, 2025, presumably after the grand jury investigation she ordered five days earlier had begun, the Attorney General appeared on *Fox News Sunday,* where she made her most egregious and prejudicial statements about the case. Concerning the Luigi Mangione case and her direction to prosecutors to seek the death penalty, she stated the following:

> The President's directive was very clear: we are to seek the death penalty when possible. It hadn't been done in four years. I was a capital prosecutor. I tried death penalty cases throughout my career. If there was ever a death case, this is one. This guy is charged with hunting down a CEO, a father of two, a married man. Hunting him down and executing him. I feel like these young people have lost their way. I was receiving death threats for seeking the death penalty on someone who is

charged with an execution of a CEO. We are going to continue to do the right thing. We are not going to be deterred by political motives. I've seen a protestor walking down the street here, "free Luigi," I mean this guy is charged with a violent crime and we are going to seek the death penalty whenever possible.

The Attorney General's television appearance went even further than her first two improper, prejudicial, false public statements in that she explicitly leveraged her purported personal experience as a "capital prosecutor" and told the viewers and grand jurors, "I was a capital prosecutor. I tried death penalty cases throughout my career. If there was ever a death case this is one." This statement alone is enough to prejudice the entirety of this case. The Attorney General of the United States is telling the public that based on her personal experience as a capital prosecutor who tried death penalty cases throughout her career that Mangione is guilty and should be executed.

The Attorney General told the public that Mangione hunted down and executed a CEO, a father, a married man. She then pivoted to her own experiences as the Attorney General overseeing this very case: "I was receiving death threats for seeking the death penalty for someone who is charged with an execution of a CEO."  The Attorney General plainly said this to convey that Mangione was aligned with dangerous people who would threaten the Attorney General and that the death penalty was necessary to avenge the killing of a CEO of a large wealthy corporation.

She then assured the nation that despite being threatened in connection with this case, "we are going to continue to do the right thing. We are not going to be deterred by political motives." She said this to establish her own moral rectitude in the face of threats from those supporting Mangione. She concluded this part of her remarks by telling the American people what doing "the right thing" means: "we are going to seek the death penalty whenever possible."

The Attorney General's televised statement, five days after she ordered a grand jury death penalty investigation to commence and eleven days before it returned a death indictment, is fatally

prejudicial. She emphasized publicly, for the third time, that her decision to seek the death penalty was based on the President's directive, specifically that the administration will seek the death sentence "whenever possible."  Worse, she then invoked her personal experience, saying that she was a capital prosecutor, who tried death penalty cases throughout her career, and that "[i]f there was ever a death case, this is one."  According to the Attorney General, as stated during her television appearance, she was motivated in part to seek the death penalty because of the alleged victim's status as a CEO. However, as the Attorney General should know, there is no provision in the death penalty statute or in the Department of Justice's death penalty protocol allows for consideration of the social, economic or professional status of an alleged homicide victim in determining whether to seek the death penalty. Yet, the Attorney General explicitly considered exactly that and invited the public and potential grand jurors to do the same.

The Attorney General's pattern of public statements in perhaps the most high-profile murder case currently pending in the United States shows that this capital prosecution was brought unabashedly for political reasons, that the victim's professional status as a CEO was relevant to her decision, and that she had no interest in considering mitigating information.  But perhaps most critically, the Attorney General's actions show both that she intended to improperly influence potential members of the grand jury pool and petit venire, and that she continued to do so for an extended period during the pendency of this case.

### 21.    The April 11, 2025, Emergency Motion and the April 17, 2025, Indictment

On April 11, 2025, five days after the Attorney General's television appearance, defense counsel filed a motion (Document 16) with this Court, recounting the Attorney General's pattern of damaging, patently improper, extrajudicial statements and that the government refused counsel's request for three months to make a mitigation presentation. The emergency motion

sought a Court Order: (1) precluding the government from seeking the death penalty; (2) directing that any proposed federal grand jurors be screened for exposure to the Attorney General's public statements; (3) ensuring that the Attorney General certify that she has read Local Rule 23.1; (4) restraining the Attorney General from making extrajudicial statements in violation of Local Rule 23.1 that could prejudice Mr. Mangione's right to a fair hearing by a grand jury, including the grand jury's consideration of death-eligible offenses; (5) directing the government to produce for *in camera* inspection any memoranda, documents, and notes provided to the Attorney General as part of her "careful consideration" of the evidence; and (6) directing the government to produce any emails, records, documents, memoranda and notes of any communication between a government official and anyone advocating for the death sentence, or any particular sentence, in this case by or on behalf of any business, corporate interest, lobbying interest or other party.

The matter was assigned to Judge Edgardo Ramos. Three days later, on April 14, 2025, the government filed a response (Document 18) in which it argued, among other things, that the appropriate manner to press counsel's arguments is before the District Judge assigned to the matter after indictment. To the extent that the government responded to counsel's request to screen the grand jurors for exposure to the Attorney General's extrajudicial statements, the government characterized this request as the defense intruding into the grand jury process and refused to provide any information as to whether and to what extent it screened the grand jurors.

Two days later, on April 16, 2025, the defense filed a reply (Document 20) urging the Court to take action under its supervisory authority over the grand jury, especially to the extent that Local Rule 23.1 explicitly applies to grand jury investigations potentially being prejudiced by inappropriate public statements. After the motion was fully briefed but before Judge Ramos issued a decision, the government indicted the case on April 17, 2025.

The Indictment charges four counts. Count Three charges Murder Through the Use of a Firearm During and in Relation to the Crime of Stalking, as charged in Counts One and Two. As part of the allegations of Count Three, the government charged two statutory aggravating factors: grave risk of death and that the offense was committed after substantial planning and premeditation. These two factors were the same ones the Attorney General spoke about in her press release from 16 days earlier.

On April 24, 2025, the government filed a Notice of Intent To Seek The Death Penalty asserting that in the event of a conviction on Count Three, the death sentence is justified by the two statutory aggravating factors listed in the Indictment as well as three additional non-statutory aggravating factors, specifically (i) victim impact, (ii) selection of site and victim for an act of violence, and (iii) future dangerousness.

## ARGUMENT

1. **The False, Damaging, Public Statements of the Attorney General, in Violation of Rule 6(E) And Local Rule 23.1, In Combination with the Staged Perp Walk, the NYPD Leaks, and the Public Statements of the Mayor and Police Commissioner, Violated Mangione's Right to Due Process Such That This Death Penalty Case Should Be Dismissed**

The United States Attorney General as well as law enforcement personnel and the highest New York City elected official took every opportunity to prejudice Mr. Mangione's chances of having a fair grand jury hearing and fair legal proceedings in this death penalty case. Placing their own, and their administration's, political agendas above the constitutional safeguards assured to every criminal defendant, and especially one facing a death sentence, they serially violated the constitution, the Federal Rules of Criminal Procedure, this court's local rules and traditional notions of fairness. By publicly directing the SDNY to indict Mangione for stalking and murder and further specifying the aggravating factors to present to the grand jury, the Attorney General

violated Fed. R. Crim. P 6(e). By intentionally prejudicing the case by publicly stating her opinion that based on her experience as a capital prosecutor, Mangione is guilty and should receive the death penalty, she also violated Local Criminal Rule 23.1. In addition, federal law enforcement intentionally violated Mangione's constitutional rights as established in *Lauro v. Charles*, 219 F.2d 202 (2d Cir. 2000), by staging a dehumanizing, unconstitutional "perp walk" where he was televised, videotaped and photographed clambering out of a helicopter in shackles on his way to his initial appearance.  This was done solely to prejudice him and without the slightest legitimate law enforcement objective. Because of the blatant, intentional and damaging nature of this torrent of prejudice from multiple public officials, mainly the United States Attorney General, from the inception of this case through the grand jury vote on April 17, 2025, the death penalty indictment against Mr. Mangione must be dismissed.

There is a  high bar to dismissing an indictment due to pretrial publicity. *See generally Bank of Nova Scotia v. United States*, 487 U.S. 255 (1988); *United States v. Myers*, 510 F. Supp. 323 (E.D.N.Y. 1980). However, there has never been a situation remotely like this one where prejudice has been so great against a death-eligible defendant.

First, none of the prior cases where extrajudicial statements potentially prejudiced a grand jury investigation involved a death penalty case. The Supreme Court has repeatedly emphasized the self-evident difference between the death penalty and every other punishment and the necessity of greater reliability in the legal processes in death cases. The "qualitative difference between death and other penalties calls for greater degree of reliability when the death sentence is imposed." *Locket v. Ohio*, 438 U.S. 586, 599 (1978); *see also Gregg v. Georgia*, 428 U.S. 153 (1976); *Roberts v. Louisiana*, 428 U.S. 325 91976); *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976); *Proffit v. Florida*, 428 U.S. 242 (1976).

Second, there has never been a case where the United States Attorney General leveraged her personal experience as a purported "capital prosecutor" who allegedly "tried death penalty cases throughout my career" and then made three separate public statements containing false and misleading information that a capital defendant was guilty, not entitled to the presumption of innocence, that he committed two specific aggravating factors involving the same two considerations upon which the grand jury subsequently returned special findings, and that "if there was ever a death case, this is one." Moreover, the Attorney General's statement that her decision to seek the death penalty was based on "careful consideration" was false because, having denied the defense the opportunity to conduct even a truncated mitigation investigation, she never even considered any mitigating information. Indeed, in the same breath, she declared that the death penalty was appropriate as a political matter and in furtherance of the President's priorities, not because it was justified by the specific facts of the case.

The Attorney General's public statements used incendiary language that invoked economic and class division such as "hunting down a CEO" and "execution of a CEO" and "premeditated cold blooded assassination," while publicly emphasizing that executing Mangione would further the administration's efforts to "Make America Safe Again." This language was intended to prejudice the rights of Mangione, feeding the false "crime wave" narrative that established and affluent members of society, including CEOs, were under siege from a seething and disgruntled underclass. Such language about a defendant and the existential structural risk to society he presents would be prejudicial coming from anyone. Issued repeatedly and publicly by the nation's highest law enforcement official, while a grand jury was hearing evidence, these statements are fatally prejudicial in this death penalty case. The Attorney General's press release, directing the SDNY prosecutors to present evidence to a grand jury and secure an indictment charging murder

and stalking and further to charge specific statutory aggravating factors amount to a violation of the grand jury secrecy provision of Fed. R. Crim. P. 6(e). There are sound, legal reasons why grand jury investigations are never commenced through a press release or public announcement, namely because to do so would violate the rule of grand jury secrecy.

Rule 6(e)(2)(B)(vi) states that among the persons who may not disclose a matter occurring before a grand jury is "an attorney for the government."  The Attorney General is certainly an attorney for the government. By stating publicly in her April 1, 2025, press release that she "directed federal prosecutors to seek the death penalty in this case," and publicly specifying the charges the grand jury would consider and the two statutory aggravating factors the grand jury would vote on, the Attorney General disclosed a matter before a grand jury in violation of Rule 6(e).

Rule 6(e) is intended to protect, among others, defendants being investigated for crimes by a grand jury. The rule is meant to ensure that prosecutors do not publicly announce the guilt of someone before a grand jury indictment, since, of course, the grand jury is supposed to be an independent body that might not choose to return an indictment. Here, rather than protecting Mangione's rights to have a grand jury consider evidence and deliberate in secret, the very person making the ultimate decision as to the death penalty, the Attorney General, purposely violated the very rule that was supposed to protect him from public disclosure of a matter before a grand jury. The Attorney General violated Rule 6(e), and this was not a mere case of prejudice before the grand jury but one of purposeful unlawful conduct.

In addition, the Attorney General clearly and egregiously violated Local Criminal Rule 23.1. As concerns the grand jury, Local Criminal Rule 23.1(b) provides in part as follows:

> With respect to a grand jury or other pending investigation of any criminal matter, a lawyer participating in or associated with the investigation (including government

lawyers. . . ) shall refrain from making any extrajudicial statement . . . if there is a substantial likelihood that the dissemination will interfere with a fair trial or otherwise prejudice the administration of justice.

Local Rule 23(d) defines what kinds of statements are particularly concerning. It provides that "(s)tatements concerning the following subject matters presumptively involve a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice within the meaning of this rule:  . . . (7) any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case."

Because the Attorney General, through her April 1, 2025, press release, commenced the grand jury investigation in this case, and because she is charged with the responsibility of making the final decision as to whether to pursue a death sentence in p this case, the Attorney General is a "lawyer participating in or associated with the investigation." As a result, she is within the purview of the Local Rule. Her three extrajudicial statements (the press release, the Instagram post, and the television appearance) are rife with specific assertions that violate the Local Rule. These individual assertions are of two types.

First are assertions of the Attorney General's opinion as to Mangione's guilt and the merits of this case as a death penalty case as well as being part of the administration's death penalty "agenda." Among other assertions that violate the Local Rule, she stated the following:

(1) in her Instagram post, she said "Luigi Mangione's murder of Brian Thompson – an innocent man and father of two young children – was a premeditated, cold blooded assassination that shocked America";

(2) in her Instagram post, she said, "After careful consideration, I have directed federal prosecutors to seek the death penalty in this case as we carry out President Trump's agenda to stop violent crime and Make America Safe Again";

(3) in her televised appearance, she said "I was a capital prosecutor. I tried death penalty cases throughout my career. If there was ever a death case, this is one."

These individual extrajudicial statements reflect the Attorney General's opinion that Mangione is guilty, that he should receive the death penalty and that in her experience as a capital crimes prosecutor, "if there was ever a death case, this is one." Because these are statements of the Attorney General's opinion as to the merits, the Rule presumes they have prejudiced the due administration of justice, and indeed they have.

<u>Second</u> are statements made by the Attorney General that, while not perhaps reflective of her opinion, are so clearly prejudicial to the administration of justice that they violate the Rule. These include: (1) in her televised appearance, she said "[Mangione] is charged with hunting down a CEO, a father of two, a married man. Hunting him down and executing him;" and (2) in her televised appearance, she said, "I was receiving death threats for seeking the death penalty on someone who is charged with an execution of a CEO."

Given the fact that each of these statements were made after she directed the SDNY prosecutors to seek a capital indictment through a grand jury presentment, and that at least the three assertions of opinion are presumed to be prejudicial, the Attorney General's extrajudicial statements violated Mangione's due process rights in a death penalty case in violation of the Fifth and Eighth Amendments.

By gratuitously telling the public that she has received death threats for seeking the death penalty against Mangione, the Attorney General leveraged her own personal experience—whether true or not—to make Mangione seem dangerous to the country and menacing to the Attorney General. A more prejudicial statement by the nation's Attorney General is hard to imagine.

The Attorney General's damaging statements were especially harmful given the history of prejudice from other federal government officials, including the staged perp walk as well as public statements by the New York City Mayor. The Second Circuit held in *Lauro v. Charles*, 219 F.3d 202 (2d Cir. 2000) that staged perp walks are unconstitutional violations of the Fourth Amendment. There, the Court stated that it is "clearly established" that a "staged perp walk," that is the display of an arrested defendant to the media unrelated to legitimate law enforcement objectives, is unconstitutional. *Lauro*, 219 F.3d at 212. There was no legitimate law enforcement reason to summon hundreds of reporters and photographers as well as the New York City Mayor to slow-walk a visibly shackled Mangione the length of a pier surrounded by armed agents. Law enforcement agents are able to securely bring a defendant to the Southern District Courthouse without a demeaning public spectacle when it suits them. For instance, with Sheldon Silver, the agents drove Silver "in an unmarked car to the basement of the federal courthouse." Judge Caproni noted that they did this "rather than an improper effort to set Silver up for a prejudicial 'perp walk.'" *United States v. Silver*, 103 F. Supp. 3d 370 (S.D.N.Y. 2015) (emphasis added). This is just one of the many ways this case is vastly different from Silver, specifically that the agents here committed a brazen and intentional constitutional violation by perp walking Mangione on his way to the Southern District Courthouse rather than treating him like virtually all other defendants.

Mangione's staged perp walk was done for the political needs of federal and local officials and not for public safety. For Mayor Adams, who was under indictment himself at the time, it presented an opportunity to change his personal narrative: he could be seen internationally catching a criminal, rather than alleged to be one himself. For federal and state law enforcement officials, showing Mangione shackled and surrounded by agents provided them with a critical advantage in their respective prosecutions of him. Potential jurors—grand and petit—were imprinted with a

scene out of a Marvel movie, with dozens of agents needed to protect the public from the shackled monster Mangione. This is precisely the sort of prejudicial unconstitutional procedure the Second Circuit warned against in *Lauro*. Nonetheless, the authorities could not resist feeding into the media firestorm that surrounded the Thompson killing, the nationwide manhunt, the NYPD leaks, and the torrent of news stories and social media posts about the predatory behavior of large, wealthy insurance companies. The politicians, prosecutors, agents and detectives who staged the perp walk knew it would dominate the news cycle for days. They knew every person with a phone would watch the videos and see the photographs of men with guns and their shackled dehumanized prey. The video of Mangione was carried live on various news sources, and was viewed countless times between the date of its occurrence and the date of the grand jury vote. Photographs of Mangione in an orange jump suit flanked by the mayor and scores of armed agents were ubiquitous. It is impossible to find a New Yorker who didn't see it. And, that was the agents' objective: to recast Mangione as already guilty, already convicted, already condemned, already facing punishment, in this case a potential death sentence, in the eyes of the public.

The unprecedented combination of circumstances here, including: the Attorney General commencing a capital case grand jury investigation by way of press release; the Attorney General making repeated brazen, damaging, public statements about a capital defendant to promote her administration's death penalty agenda; and the unconstitutional perp walk of a capital defendant remove any presumption of regularity that may otherwise apply to a grand jury investigation. Simply put, the Court should not presume regularity on a series of events so patently and prejudicially irregular.

While courts often refer to this presumption of regularity as something the defense must rebut, the presumption can only apply when events are actually regular. Here, however, the

presumption should not apply for all of the reasons stated. Nonetheless, even if the presumption did apply, these facts soundly rebut it. Accordingly, for this, and other reasons, this case is drastically different than the facts before the Court in *United States v. Silver,* 103 F. Supp. 3d 370 (2015). There, Judge Caproni ruled ultimately that while the Court "does not condone the Government's brinksmanship relative to the Defendant's fair trial rights or the media blitz orchestrated by the U.S. Attorney's Office in the days following Mr. Silver's arrest," the prejudice did not rise to the level of requiring the indictment against Silver to be dismissed.

A central precept in Judge Caproni's decision was the presumption of regularity surrounding grand jury proceedings. Grand jury proceedings are "accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." *United States v. R. Enters*., Inc., 498 U.S. 292, 301 (1991) (quoting *United States v. Mechanic*, 475 U.S. 66, 75 (1986)). "In order to overcome such presumption, a defendant must demonstrate some grossly prejudicial irregularity or some other particularized need or compelling necessity." *United States v. Gibson*, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001).

In *Silver*, the Court noted that the district court indeed has authority to dismiss an indictment and that it can do so to "eliminate prejudice or deter official misconduct." *Silver,* 103 F. Supp. 3d at 376. However, this authority is "narrowly circumscribed to instances where the misconduct at issue 'amounts to a violation of one of those few clear rules which were carefully drafted by (the Supreme) Court and by Congress to ensure the integrity of the grand jury's functions.'" *Id.* at 376-77 (quoting *United States v. Williams*, 504 U.S. 36, 46 (1992); *Mechanic*, 475 U.S. at 74 (O'Connor, J. concurring).

In *Silver*, the defendant did not raise a constitutional due process objection nor claim that any of the prejudice was related to conduct that violated Rule 6(e), both of which are raised as

objections here. However, the larger distinction between the two cases is that *Silver* was not a death penalty prosecution. If, as the Supreme Court says, death is different, *see, e.g.*, *Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring), then intentionally prejudicing a death-eligible defendant by making toxic public statements is different than when law enforcement is not trying to kill the person they are talking about in an intentionally damaging way.

Also, the statements of then-U.S. Attorney Preet Bharara about Mr. Silver, which the Court found to be patently inappropriate and prejudicial,[10] were still a far cry from the outrageously damaging statements by the Attorney General here. The main, but not sole, difference is that the Attorney General here invoked her personal experience and opinion, after she herself commenced the investigation, but before the grand jury returned the indictment, when she said on national television, "I was a capital prosecutor. I tried death penalty cases throughout my career. If there was ever a death case, this one."  For the nation's highest law enforcement official to exhort a grand jury to not just indict someone, but to indict someone with a capital crime, by resorting to her own experience and opinion as a capital prosecutor is the very height of prejudice.

---

[10]At a press conference, the U.S. Attorney noted that the charges against Silver were only allegations, something that was never said in the three public statements by the Attorney General. The U.S. Attorney went on to talk about the "show me the money" culture of Albany, and said "for many years New Yorkers have asked the question, 'how could Speaker Silver, one of the most powerful men in all of New York, earn millions of dollars in outside income without deeply compromising his ability to honestly serve his constituents?' Today we provide the answer. He didn't." The U.S. Attorney also said "and as the charges also show, the greedy art of self-reward was practiced with particular cleverness and cynicism by the Speaker himself."  The U.S. Attorney also gave a speech at New York law school, where he referred to the charges as "business as usual in our public corruption unit," cautioning that he was "not talking about anything outside the four corner of the complaint . . . ."  The U.S. Attorney was also interviewed by MSNBC and stated, "you see somebody who has basically sold his office to line his pockets and comprised his integrity and ethics with respect to how to make decisions on all these issues I mentioned that affect people's lives, that's a big problem. And its a big problem for democracy."

In addition, the Attorney General's comments here come in the context of other prejudicial and unconstitutional actions that did not exist in the *Silver* case. In finding that the government did not further prejudice Silver, the Court took into consideration that the agents drove Silver "in an unmarked car to the basement of the federal courthouse." *Silver,* 103 F. Supp. 3d at 378. The Court further noted that this "showed considerable sensitivity, rather than an improper effort to set Silver up for a prejudicial 'perp walk.'"  In this death penalty case, on the other hand, the agents orchestrated the opposite of such "considerable sensitivity."  They marched a death-eligible defendant in shackles as part of a staged perp walk, a practice condemned repeatedly for more than two decades by the Second Circuit.

This Court has demonstrated its concerns for Mr. Mangione's ability to get a fair trial by reminding all counsel at Mr. Mangione's arraignment to comply with Local Rule 23.1. This Court specifically directed the government to convey this directive to the U.S. Attorney for the Southern District of New York and the Attorney General:

> The last thing before we turn to the speedy trial clock and any other issues that counsel might like to raise is that given the nature of this case, I would like to just remind all counsel of the strictures of Local Criminal Rule 23.1 about public commentary about this matter that could impede or affect Mr. Mangione's ability to get a fair trial and the Court's ability to select a fair jury in this case. I'm specifically directing the government to convey my directive to Mr. Clayton and request that he convey the same to Attorney General Bondi and any of her subordinates at Main Justice.

(4/25/25 Tr. at 17-18.)

Yet, despite this Court's directives, the administration continues to prejudice Mangione's right to a fair trial.  For example, Donald Trump appeared on Fox News on September 18, 2025, at 3:40 ET and stated the following about this case:

> Think about Mangione. He shot someone in the back, as clear as you're looking at me or I'm looking at you. He shot – he looked like a pure assassin. I was surprised actually, you know you would've thought this guy would have been at a central

-32-

casting in the movie. And maybe he was. But, he, think about what he did. He openly – its not like gee there is a question. If there is a question, you can understand it, maybe. But, there's not a question. He walked up to a man, didn't give him warning, didn't say turn around. Didn't do like the old west, where you have a gun fight, you know, you each have a gun. He shot him right in the middle of the back. Instantly dead. And now he's like, I'm watching the girls going crazy for him. This is a sickness. This is, you know, this really has to be studied and investigated. It's not possible.

Then, today, on the date of this submission, September 19, 2025, Chad Gilmartin III, of the Department of Justice Office of Public Affairs, under the Attorney General, quoted an X post by @Rapid Response47 with the Fox News clip saying, "@POTUS is absolutely right. In April, @AGpambondi took action and directed federal prosecutors to seek the death penalty in this case."

It is remarkable that both the President and the Justice Department Press Office continue to make gratuitous prejudicial comments about Mangione while they press for his execution in proceedings before this Court.

2. **By Indicting This Case While a Motion Regarding Grand Jury Prejudice Was Pending and Where the Defense Explicitly Requested the Grand Jurors to Be Screened for Exposure to the Attorney General's Illegal and Prejudicial Statements, the Government Violated Mangione's Due Process Rights Such That the Indictment Should Be Dismissed**

On April 11, 2025, the defense filed a motion (Document 16) with this Court seeking, among other things, to preclude the government from seeking the death penalty, and asking the Court to order the prosecutors to screen the grand jurors for exposure to the Attorney General's prejudicial, unlawful statements during the period of the grand jury's investigation.[11] The matter was assigned to Judge Ramos, who directed the government to respond. The government, consistent with the Court's order, responded on April 14, 2025 (Document 18), and argued that the defense should raise the death penalty issue before the District Judge assigned to the eventual

---

[11]We respectfully incorporate the arguments made in the April 11, 2025, motion here.

indictment and that it would not comment on whether grand jurors were or would be screened, as such is a confidential matter under Rule 6(e). 6(e). On April 16, 2025, two days after the government's response, the defense replied and asked this Court to use its supervisory powers to ensure that the Attorney General's statements in violation of Local Criminal Rule 23.1 did not infect the grand jury.

Because the Court specifically directed the government to answer the motion, it was apparent that the Court was considering the relief sought by the defense. But rather than allow the Court to issue a ruling or any guidance whatsoever on a monumentally important matter concerning a death penalty case, the government ignored the pending motion, asked the grand jury to indict, and filed a death penalty indictment with the Court.

By specifically directing the government to respond to the defendant's motion, the government was on clear notice that this court was engaged in the issue. However, the prosecution never gave the Court a chance to rule one way or the other.

The April 11, 2025 motion was made specifically to prevent exactly what ended up happening: Mangione was indicted by a pool of grand jurors who must have been exposed to the nation's top law enforcement officer telling them that Mangione was the target of the government's ongoing investigation, that he was guilty, and that he should be killed by the government. It is hard to imagine a more prejudicial set of circumstances for a grand jury to hear a death penalty presentation – the kind that the Constitution itself protects most explicitly.

The Fifth Amendment of the Constitution itself, in its very text, separates capital cases from all other cases in mandating an impartial pool of grand jurors. The Fifth Amendment begins, "No person shall be held to answer *for a capital*, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const., Amend. V (emphasis added). The text

itself specifically begins with capital offenses – like the one here – because they are the cases for which an impartial grand jury is most important.

The grand jury right has since been read to apply to all felonies in the federal system. *Ex Parte Wilson*, 114 U.S. 417 (1885). But even when extending the grand jury right to all felonies one hundred and forty years ago, the Supreme Court observed that the Amendment itself has "[t]he leading word 'capital' describing the crime by its punishment only," and that in the Amendment, all other crimes fall merely into the category of "the associated words 'or otherwise infamous crime.'" *Id.* at 423. Death is different, even for the Founders.

Indeed, in the first draft of the Fifth Amendment, introduced by James Madison himself in 1789 "at the first session of the House of Representatives of the United States, it stood thus: 'In all crimes punishable with loss of life or member, presentment or indictment by a grand jury shall be an essential preliminary.'" *Id.* at 424. Other crimes were not even included in the draft presented to the First Congress. But in capital cases, Madison recognized, the grand jury right must be protected, because death is different.

This history shows that capital cases were front of mind for the Founders as deserving of robust grand jury protections. And, of course, the intent of the Founders has been relied upon in constitutional interpretation from *McCulloch v. Maryland*, 17 U.S. 316, 415 (1819) (Marshall, J.) (looking to "the intention of those who gave these powers" to conduct constitutional interpretation) to *District of Columbia v. Heller*, 554 U.S. 570, 598 (2008) (delving deeply into the Founding-era understanding of the Second Amendment's wording and phrases, and predicating the holding in large part on "the history that the founding generation knew."). So should this Court here.

But the right to an untainted grand jury in a capital case, so sacred to the Founders as to explicitly set it forth in the text, means nothing if the potential grand jurors have been exposed to

prejudicial statements, videos, and images by the highest-ranking federal law enforcement officer in the United States and the mayor of the city in which the alleged crime took place.  But were the comments of the Attorney General so bad?

This is why the language of the Local Rule is so instructive.  The Local Rules of any District demarcate the lines of acceptable conduct as experienced by the people who actually try cases and see the effects of improper conduct every day: the District Court judges.  The Local Rules come into existence to combat problems that the actual practitioners in the District have encountered in actual cases.  They recognize the problems that arise in the real world, and set forth boundaries so that litigation is conducted properly and in observance of the parties' rights – they are the tried and true rules of the road, forged by hard experience.

Here, the Local Rules could not be more clear—someone involved in a case cannot make statements outside of court if there is a "substantial likelihood" that those statements "will interfere with a fair trial or otherwise prejudice the administration of justice."  Local Rule 23.1(b).  Some of the statements that are presumptively improper are those which provide "any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case."  Local Rule 23.1(d).

The Judges of this District enacted the Local Rules because they have seen the results of the kind of prejudicial statements and actions that the government—led by the Attorney General herself—has engaged in here.

The hard-won wisdom of those who actually work on criminal cases is that when law enforcement—any level of law enforcement, let alone the chief federal law enforcement officer  in the United States—provide their opinions on the guilt of a defendant before the grand jurors or

trial jurors have heard the actual evidence, it has profound, real-world Fifth Amendment implications.

Our April 11, 2025, motion warned of what ended up happening here. The Local Rules were written precisely to prevent what ended up happening here. And the very text of the Fifth Amendment provides a blazing beacon of warning that the Grand Jury right is most precious, most important, in a capital case. That is why the Constitution spells the right out explicitly. The government's actions in this case impermissibly tainted the Grand Jury pool, and this Court must dismiss the Indictment because no other remedy can restore Mangione to the status quo ante.

### 3. By Refusing to Permit the Defense to Present Mitigating Factors and Instead Seeking the Death Penalty for Explicitly Political Reasons, the Government Seeks to Apply the Death Penalty In an Unconstitutionally Arbitrary Manner

The arbitrary imposition of the death penalty violates Fifth Amendment Due Process and the Eighth Amendment prohibition against cruel and unusual punishment. *Furman v. Georgia*, 408 U.S. 238, 287 (1972) ("Death is today an unusually severe punishment, unusual in its pain, in its finality, and in its enormity. No other existing punishment is comparable to death in terms of physical and mental suffering"); *Gregg*, 428 U.S. at 153; *Jurek*, 428 U.S. at 262; *Proffit*, 428 U.S. at 242; *Godfrey v. Georgia*, 446 U.S. 420 (1980); *Zant v. Stephens*, 462 U.S. 862 (1983); *Glossip v. Gross*, 576 U.S. 863 (2015). The Fifth and Eighth Amendments ensure not only that death penalty trials proceed according to the constitution, but also that the death penalty is charged in a manner that is not arbitrary and capricious.

In *United States v. Littrell*, 478 F. Supp. 2d 1179 (C.D. Cal. 2007), the Court struck the government's Notice of Intent to seek the death penalty as being arbitrary and capricious in violation of the constitution, stating that "[t]he decision whether or not to seek death against a defendant is a prosecutor's most solemn task. It must be made only after careful consideration of

all relevant facts and circumstances, including both aggravating and mitigating factors." *Id.* at 1192.

In *United States v. Costanza-Galdomez,* No. SAG-22-409, 2025 WL 1712436 (D. Md. June 18, 2025), the court struck the government's Notice of Intent where the government reversed course and sought the death penalty after initially not seeking capital punishment. The court was very clear that seeking the death sentence under these circumstances impacted on defendant's constitutional rights, stating:

> This dispute is about due process. To be clear, the Executive is entitled to charge cases as it sees fit, and Congress has authorized the Department of Justice to seek the death penalty in qualifying cases. But, "[w]hen a defendant's life is at stake," courts are required to be "particularly sensitive to insure that every safeguard is observed."

*Id*. at *1.

In *United States v. Spurlock,* 782 F. Supp. 3d 987 (2025), the Court struck the Notice of Intent, in part, on Fifth Amendment Due Process grounds where the government sought the death penalty after indicating it would not seek it. Relying on *Costanza-Galdomez* No. SAG-22-409, 2025 WL 1712436 (D. Md. June 18, 2025) and *Spurlock,* 782 F. Supp. 3d 987 (2025), the District Court in  *United States v. Cole,* No. 2023-cr-0016, 2025 WL 2592515 at *1 (D.V.I. Sept. 7, 2025) struck the Notice of Intent after stating that "[t]he government cannot be allowed to play 'fast and loose' with decisions involving life and death."

These decisions firmly establish that the court retains the power under the constitution to set aside a Notice of Intent where, as here, the death penalty is being pursued in a manner that is arbitrary. Courts have this authority, and must have this authority in death cases, because "(w)hen a defendant's life is at stake" courts are required to be "particularly sensitive to insure that every safeguard is observed."  *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). The holdings in *Costanza-*

*Galdomez, Spurlock and Littrell* are entirely consistent with this admonition that "every safeguard" be observed.

The Founders recognized the difference between death and other punishments "by distinguishing between deprivations of life, liberty and property in the Due Process clause of the Fifth Amendment." *Costanza-Galdomez,* 2025 WL 1712436 at *1. Liberty is different than mere property and life is different than both. This distinction between life, on the one hand, and liberty and property, on the other, was emphasized time and again by the Supreme Court when it held "the penalty of death is qualitatively different from a sentence of imprisonment, however long." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *Furman*, 408 U.S. at 290 ("the calculated killing of a human being by the State involves, by its very nature, a denial of the executed person's humanity.")

There is no doubt that prosecutors have broad discretion to make charging decisions in all cases, including death penalty cases. However, in the area of capital cases, if the government wields its admittedly broad discretion in an arbitrary way to decide who lives and who dies, it violates the Fifth and Eighth Amendments. "When the State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and in particular, in accord with the Due Process Clause." *Evitts v. Lucey*, 469 U.S. 387, 401 (1985); *see City of Sacramento v. Lewis*, 523 U.S. 833, 834 (1998) ("Protection against governmental arbitrariness is the core of due process.") It is for this reason that courts have, in limited but appropriate circumstances, struck the government's Notice of Intent to Seek the Death Penalty when the government abuses its wide discretion and acts in a way that is arbitrary and capricious. *See*, *e.g.*, *Costanza-Galdomez*; *Spurlock; Littrell*.

In *Littrell*, the Court held that the government's decision to seek the death penalty was arbitrary and capricious and it struck the Notice of Intention to seek the death penalty. Holding that the Fifth Amendment Due Process Clause requires the government to consider both aggravating and mitigating factors when charging a death-eligible case, the Court found the government failed to appropriately consider mitigating evidence. "The obligation to consider all available information before starting the process of a Government-sponsored execution is equally incumbent on the prosecutor as on the jury." *Littrell*, 478 F. Supp. 2d at 1187. "In order to make an educated, rational decision regarding whether or not to seek the death penalty against a defendant, the Government must take into account all available relevant information." *Id.* A decision that does not consider "relevant mitigating facts would be arbitrary and capricious, and an unconstitutional exercise of the prosecutor's charging authority." *Id*. at 1188.

Justices Brennan and Marshall, dissenting in the denial of a petition for writ of certiorari, stated, "(t)he selection process for the imposition of the death penalty does not begin at trial; it begins in the prosecutor's office. His decision whether or not to seek capital punishment is no less important than the jury's. Just like the jury, then, where death is the consequence, the prosecutor's discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Degarmo v. Texas*, 106 U.S. 337 (1985) (Brennan and Marshall, dissenting). "In capital cases, the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson*, 428 U.S. at 304 (1976) (citation omitted).

These cases indicate that part of the process due a defendant being considered for execution is that the government must consider mitigating factors before it charges him. The critical role

played by mitigating factors was highlighted by the Court in *Locket v. Ohio*, 438 U.S. 586, 604 (1978). In *Locket*, Ohio's death penalty statute was found unconstitutional because it limited the types of information a jury could consider. The plurality decision held that a sentencing jury may "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence." *Id*. at 604. Later Supreme Court decisions such as *Eddings v. Oklahoma*, 455 U.S. 104 (1982) emphasized and expanded *Locket*'s holding that so long as information is in the nature of mitigation, courts and legislatures must ensure that a jury considers it. *See also Penry v. Lynaugh*, 492 U.S. 302 (1989).

The government cannot constitutionally ignore Fifth Amendment Due Process and the Eighth Amendment when making the monumental determination to attempt to take someone's life. Sixty years of Supreme Court decisions point uniformly in one direction: that in every death penalty case at every critical stage, including the charging stage, mitigating information must be considered. The central constitutional significance of mitigation is codified in Title 18, United States Code, Section 3592, which provides for mitigating factors.  The statute states, "in determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor."  The statute then lists seven examples of mitigating factors – impaired capacity, duress, minor participant, equally culpable defendants, no prior criminal record, mental or emotional disturbance, and victim's consent before going on to broadly provide that mitigating factors can also be "other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence." Consistent with the decisions in, among other cases, *Locket, Eddings*, and *Penry*, Section 3592 requires consideration of any mitigating factor.

The consideration of mitigation is not, and cannot be, relegated to a time period after a capital indictment has been returned. Indeed, the primary reason that the U.S. Department of Justice created a rigorous internal protocol for charging any death penalty case is to ensure that the prosecutors seriously consider mitigation before charging a capital crime. *See United States v. Bowers*, 2020 WL1675916, *3 (W.D. Pa. 2020); *Littrell*, 478 F. Supp. 2d 1179; *see also Furman*, 408 U.S. 238; *Woodson*, 428 U.S. 280; *Gregg*, 428 U.S. 153. When considering the central constitutional importance of mitigating factors, the Court's decision in *Eddings v. Oklahoma*, 455 U.S. 104 (1982) is particularly instructive. Monty Lee Eddings was convicted of first-degree murder in the State of Oklahoma and was sentenced to death. In imposing sentence, the trial judge refused to consider the mitigating factors of the defendant's difficult family history and his "emotional disturbance."  Because the trial court refused to consider these factors, the Supreme Court reversed and directed that "(o)n remand, the state courts must consider all relevant mitigating evidence and weigh it against the evidence of the aggravating factors." *Eddings*, 455 U.S. at 117.

To be clear, we are not here arguing that the Justice Department's protocol is the source of any rights of which we seek to avail ourselves. On the contrary, we are arguing that the protocol is a reflection of what is required by the Fifth and Eighth Amendments when the federal government charges a capital case. Ignoring the policies and procedures designed to protect Mangione's constitutional rights enabled the Justice Department to deprive him of those rights.

The federal government violated the Fifth and the Eighth Amendments by refusing a reasonable adjournment of three months to permit counsel to develop and present mitigating information before it presented a capital indictment. In addition, counsel was not afforded the opportunity to meet with any capital committee representative of the Trump Administration, despite asking to do so. Counsel was told both that the Trump Administration would be willing to

hear whatever information counsel could compile in one week but would not grant more time than that, and that the administration was not interested in being presented with mitigating information and that the death penalty decision would be made without such information.  On February 6, 2025, when defense counsel emailed the SDNY prosecutors and asked for a modest three-month period to conduct a mitigation investigation and present mitigation information to the administration in advance of a death penalty decision, this request was denied. Under these particular circumstances, the government violated Mangione's Fifth and Eighth Amendment rights.

That defense counsel was given five days to make a presentation to the Biden Administration's capital committee less than a month after Mangione's arrest does not change this analysis, especially when no decision was made and there was no mitigation presented. That is especially true where counsel then explicitly and in writing asked for an opportunity to present mitigation to this administration's capital committee and was denied. As noted, a meaningful mitigation investigation typically involves dozens of interviews of family and friends to develop a defendant's social history going back generations. It also involves identifying, gathering and reviewing decades of school, medical, and other records. Such an investigation can take a year or longer in a typical case.

The Mangione case is anything but a typical case. Here, a young man who has never been in legal trouble, who is universally described as kind, gentle, intelligent and thoughtful, who had devoted his life to a close, loving family and many friends, who had the drive and ability to pursue academic excellence, becoming the valedictorian of the academically-demanding Gilman School in Baltimore and graduating the University of Pennsylvania in four years with a master's degree in engineering, finds himself a defendant in a death-eligible federal indictment filed by a government

that refused to meet with his lawyers or consider any mitigating information. For the government to reject defense counsel's request to develop and present mitigating factors in a situation like this is as inconsistent with the death penalty protocol and the constitution as it is incomprehensible.

To be clear, counsel was not asking for a year to conduct a thorough and exhaustive investigation. The written request of February 6, 2025, was for three months to assemble and comprehend everything we could on an aggressive timetable so that the government could better understand the unique circumstances of this case before moving forward with a death-eligible indictment.

However, the government had no interest in learning the circumstances because it never intended to render a death penalty decision on the merits. The decision to seek the death sentence for Mangione and to announce it publicly was purely political. As noted, the Mangione case was the very first case announced by this Administration's Justice Department to be a death penalty case. Because of the issues concerning United Health Care, the larger issues surrounding health coverage, the publicity created by the NYPD leaks, the unconstitutional perp walk, the repeated press conferences of the New York City Mayor and Police Commissioner, the Mangione case had overwhelming international recognition. As a result, the Mangione case presented an opportunity for the new Administration to demonstrate its loathing of the prior administration, and to publicly advance its new and aggressive death penalty agenda through one of the most watched criminal cases in decades.

As for the Attorney General, she had already released her first-day memorandum "Reviving the Federal Death Penalty And Lifting the Moratorium on Federal Executions" and needed a blockbuster inaugural case around which to stage a media strategy, comprised of the April 1st Press Conference, the Instagram post and the television appearance.

When Mangione's counsel emailed the line prosecutors on February 6, 2025, a day after the Attorney General's first-day memo, asked for three months to make a mitigation submission and were told the administration was not interested in mitigation, there was a reason the administration denied the request. The reason was because the Attorney General was planning to leverage the Mangione case to bring maximum public attention to her first-day memo commitment about "reviving the federal death penalty." The administration was not interested in hearing about mitigation because it had likely already made the strategic decision to seek to execute Mangione as a matter of political theater. Mitigating factors played no role in this political decision.

The Attorney General's April 1, 2025, Press Release, the launching of her Instagram Account and her nationally televised statements lobbying the American people for the execution of Mangione were all part of a cogent marketing strategy around executing Mangione to roll out the administration's death penalty agenda. Counsel cannot locate any other instance where the United States Attorney General ordered a U.S. Attorney to seek the death penalty by means of a press release and then launched an Instagram site and appeared on national television to "sell" the public on her decision to execute someone for the sake of politics. In addition to violating Mangione's due process rights by refusing to consider mitigating factors and, instead, basing the decision to seek the death penalty on political motives, the Attorney General also ignored all of the relevant protocols she implemented in her February 5, 2025, first-day memorandum. As noted, we are not arguing that the Justice Department's death penalty protocol provides defendants with substantive rights. However, the protocol does reflect the constitutional requirement that prosecutors consider mitigating information. In particular, the Attorney General did not (1) give defense counsel a reasonable opportunity to present information…which may bear on the decision whether to seek the death penalty; (2) receive from the United States Attorney or Assistant

Attorney General a "death penalty analysis" identifying applicable mitigating factors; (3) weigh whether the applicable statutory and non-statutory aggravating factors sufficiently outweigh the mitigating factors and (4) resolve any ambiguity about the strength of the competing aggravating and mitigating factors in favor of the defendant.

Rather than follow the protocol which she implemented and which is intended to ensure that the government adequately considers mitigation, the Attorney General explicitly and unapologetically based her death penalty decision on the administration's policy to "Make America Safe Again," to end the "shameful era" of the prior administration not seeking the death penalty, and because seeking the death penalty "hadn't been done in four years." Unlike other areas of Presidential policymaking, however, the state execution of human beings has constitutional implications which the Attorney General has misunderstood and ignored.

In understanding the magnitude of the constitutional and other legal violations in this case, it is useful to compare this case to *United States v. Saipov* where Judge Broderick denied a defense motion to strike the Notice of Intent based on prejudicial public comments made by President Trump before the case was indicted. *United States v. Saipov*, No. 17-CR-722 (VSB), 2019 WL 624176 (S.D.N.Y. Feb. 14, 2019). *Saipov* is instructive because the case stands for the proposition that under certain circumstances, that did not exist in *Saipov*, a district court retains the authority to prevent the government from pursuing capital punishment. Indeed, this proposition has been established in several other district court decisions as well. *See Littrell*, 478 F. Supp. 2d at 1179, *Spurlock*, 782 F. Supp. 3d at 987, *Cole,* 2025 WL 2592515 at *1; *Costanza-Galdomez*, 2025 WL 1712436 at *2.

Saipov observed that "absent a preliminary showing of arbitrary action, the Court must assume that the Attorney General's decision (to seek the death penalty) was made in good faith."

*Saipov*, 2019 WL 624176 (quoting *United States v. Kee*, 2000 WL 863119 at 4 (S.D.N.Y. June 27, 2000) (denying motion to dismiss government's notice of intent to seek death penalty)). In finding that the defendant in Saipov failed to provide "exceptionally clear proof" that Attorney General Sessions abused his discretion, the Court emphasized that the government followed the death penalty case protocol. Here, the government did not follow any aspect of the protocol, including rejecting defendant's request to submit mitigation. Because *Saipov* ultimately held that under the facts there, the district court would not set aside the government's Notice of Intent, the facts of *Saipov* must be contrasted to those here. Specifically, there are at least six distinguishing factors between this case and *Saipov*.

First, as noted, Saipov's counsel was afforded the time and opportunity to present mitigating information in writing and during an in-person mitigation meeting to the Capital Case Committee that made the recommendation to the Attorney General regarding the death penalty Central to the Court's decision in *Saipov* was that the defendant was afforded all the protections and procedural safeguards provided by the Justice Department's established protocol. On the other hand, Mangione's counsel was denied a three-month period to develop and present mitigating information to the current administration's committee, despite making this explicit request in writing.

Second, the grand jury investigation in *Saipov* followed the typical course, consistent with Rule 6e, and was not publicized by an unprecedented press blitz announcing that an investigation would commence resulting in a murder/stalking indictment based on two specific statutory aggravating factors. The presumption of regularity applied in *Saipov* because the procedures were regular. Here, however, the Attorney General's public announcement that the SDNY is directed to

seek the death penalty is not only irregular, it is unprecedented. It also amounts to a brazen breach of the death penalty protocol which is itself irregular.

Third, the defense here has made a preliminary showing that the Attorney General rushed the death penalty decision in this case so it would be the administration's first death penalty announcement and did not reach the decision in a good faith effort to administer the death penalty in a constitutional manner.

Fourth, the facts in *Saipov* were far more consistent with the prior cases where this District has sought the death penalty. Saipov was charged with killing eight people because of his allegiance to an international terrorist organization, ISIS. Like other cases prosecuted as death-eligible cases in this District, Saipov committed multiple murders and was aligned with a dangerous violent criminal organization. The Mangione case involves a single homicide allegedly committed by someone who not only is not affiliated with a violent criminal organization but has never harmed anyone in his life and has never been arrested. There has never been a prior death penalty case remotely similar to this one.

Fifth, the court in *Saipov* concluded that the President's tweets did not impact the judgment of the Attorney General in deciding to seek the death penalty. Whereas here it was the Attorney General, the person with the ultimate authority to decide whether the Justice Department seeks the death penalty, who herself made the prejudicial remarks. While the President's tweets in *Saipov* may have been inappropriate, the President is not individually tasked with making final death penalty decisions on behalf of the Justice Department. A major component to the *Saipov* holding was that there was no evidence that Attorney General Sessions was in the least bit influenced by the President's tweets.

Sixth, the *Saipov* court observed that the defense failed to show Attorney General Sessions was influenced by politics whereas here, Attorney General Bondi explicitly stated her decision to seek the death penalty was to "carry out President Trump's agents to stop violent crime and make America safe again." The precise evidence that was lacking in *Saipov* was provided by the Attorney General herself here when she repeatedly stated her opinion in public that Mangione must be executed to further of the administration's policy to "Make America Safe Again."

Decisions such as *Littrell*, *Costanza-Galdomez*, and *Spurlock* demonstrate that while the Executive Branch enjoys far greater discretion in charging a death penalty case than it does in trying one, that discretion is nevertheless limited by the Fifth and Eighth Amendments. The government cannot play fast and loose with decisions involving life and death." *Constanza-Galdomez*, 2025 WL 1712436 at *13. The limitations on the government's discretion appear to fall into three related areas: (i) the government cannot charge the death penalty in an arbitrary manner, (ii) it must consider mitigating factors, and (iii) it cannot make death penalty decisions for the sake of politics. Here, the government ran afoul of all three. For the court's proclamation that "(w)e demand the most from the government when it seeks to impose an irrevocable penalty" to have meaning, the death penalty here cannot stand. *Id*.

Indeed, the facts here are so egregious, that this Court need not identify precisely where the line is marking the limit of the government's discretion under the constitution regarding how a death-eligible offense is charged. It need only find that wherever that line is, the facts here go beyond it. These facts go beyond any semblance of reasonable discretion in securing an indictment on which a human being can be executed. This case is simply without precedent. However broad the government's discretion may be in charging death penalty cases, the government's actions here abuse that discretion. At a certain point, the Government forfeits to the rule of law and the

constitution whatever right it may have had to try to execute someone. Under these circumstances, this government may not execute Mr. Mangione consistent with the Fifth and Eighth Amendments.

###### 4. Returning a Death Eligible Indictment Through Unconstitutional and Prejudicial Conduct Permits the Government to Try Mangione with a Death-Qualified Jury in Violation of His Due Process Rights

The mere filing of a capital indictment and Notice of Intent to seek the death penalty bring serious legal prejudice to a defendant in several ways. The most pressing of these is that it requires the case to be tried before a "death qualified" jury, which creates a great disadvantage for the defendant.

Under present law, in capital cases, courts must excuse prospective jurors whose views on the death penalty would "prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths." *Wainwright v. Witt*, 469 U.S. 412, 424 n.5 (1985). *See also Morgan v. Illinois*, 504 U.S. 719, 728 (1992) (a juror who "in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause"). A jury that is selected according to such procedures is said to be "death qualified." *Buchanan v. Kentucky*, 483 U.S. 402, 407 n.6 (1987). In the nearly three decades since the United States Supreme Court last rebuffed a challenge to death qualification, the evidence regarding the problems caused by death qualification has changed and the new evidence demonstrates that death qualification leads to biased outcomes and tends to preclude members of racial minorities from exercising their constitutional right to participate as jurors. As one researcher has observed, social-science research was just emerging when the Court declined to reject death qualification in *Lockhart v. McCree*, 476 U.S. 162 (1986):

> The Supreme Court reviewed this research along with fourteen other empirical studies in order to examine the allegation of death-qualified jury bias in *Lockhart v. McCree*. The study authored by Cowan, Thompson, and Ellsworth was the only

study that the Court did not discard, but the Court was nonetheless unwilling to base its constitutional decision on a "lone study."

Emily Hughes, *The Empathic Divide in Capital Trials: Possibilities for Social Neuroscientific Research*, 2011 Mich. St. L. Rev. 541, 571 (2011) (citing Claudia L. Cowan, William C. Thompson & Phoebe C. Ellsworth, *The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation*, 8 Law and Human Behavior 53 (1984)). Hughes notes that since *Lockhart*, however, there has been a "rich body of social science evidence augmenting and complicating the intersection of bias and capital juror decision making." *Id.* at 559.

Death qualification systematically eliminates the views of racial minorities and certain religious groups and otherwise results in jurors that tend to be whiter, more conservative, more sexist and homophobic, more conviction-prone and more biased against defendants than the typical jury-eligible citizen. *See* Mona Lynch & Craig Haney, *Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the "Empathic Divide,"* 45 Law & Soc'y Rev. 69, 70 (2011) ("because the death qualification process systematically excludes persons on the basis of their strong death penalty views from the jury, the demographic makeup of the capital jury is distinctive and problematic. That is, compared to juries seated in nondeath cases, death qualified jury pools are disproportionately white, male, older, and more religiously and politically conservative").

The federal death penalty system has not avoided the pitfalls caused by death qualification. *See* Mona Lynch, *Institutionalizing Bias: The Death Penalty, Federal Drug Prosecutions, and Mechanisms of Disparate Punishment*, 41 Am. J. Crim. L. 91 (2013) (discussing the bias that results from death qualified juries). In *Fell*, the district court concluded—based on testimony from Dr. Craig Haney, a social psychologist who had studied jury selection in capital cases—"[w]ith respect to the compositional bias of the death-qualified jury, it can no longer be seriously questioned that panels who have announced their openness to a death penalty verdict and have

been selected on that basis are more likely to convict than jurors who more closely mirror the full range of values in our society." *Fell*, 224 F. Supp. 3d at 333. Dr. Haney testified that among the reasons that death qualification results in capital juries that are biased in favor of the prosecution are that it excludes minorities; selects jurors who are more likely to impose the death penalty than other jurors; and promotes death sentences because of the psychological effect of the questions asked and answers given. *Id.* at 332.

The judge found as a matter of fact that "death qualified juries have a disposition towards conviction which is significantly greater than the attitude of juries who have not passed through the filter of death qualification." *Id.* at 335. Based on all the evidence presented in that case, the *Fell* court found that the social science had "converged on a common conclusion that the process by which jurors are selected does not measure up to the standards of detached objectivity required by *Gregg*" and it "supported the position [] that jury selection since *Gregg* is not the solution to inherent jury bias, but rather part of the problem." *Id.* at 338. The court continued:

> [T]he procedures for conducting trials mandated by the *Gregg* decision have not cured systemic shortcomings in jury selection and deliberations. The death qualification process continues to weight jury panels in favor of conviction and in favor of the death penalty through the exclusion of a large portion of the community which holds views opposed to the death penalty. When surveyed, jurors who actually served in capital cases had great difficulty in following courts' instructions. It is an inadequate response to presume that juries follow our instructions when the evidence is to the contrary. The evidence introduced at the hearing demonstrates that despite efforts to create a more just death penalty regime, the FDPA—like the very similar state death penalty statutes enacted after *Furman*—remains inherently unreliable as it seeks to identify those cases in which death is the just outcome.

*Id.* at 339-40.

Whatever the validity of the Supreme Court's views on death qualification at the time of *McCray*, social science research now indicates that death qualification exacerbates rather than reduces the risk of wrongful execution. By removing citizens who oppose the death penalty, the process results in juries that are more homogenous, less empathetic, with higher unconscious levels

of racism and sexism, and who appear to receive victim-impact evidence in different, even racialized ways.

A secondary jury-related issue that affects jurors' decision-making is the concept of "information overload." "Information overload" (sometimes called "decision fatigue") is a term derived from the marketing industry and embodies a corpus of scientific study demonstrating that when too much information is provided to a decision maker, the surfeit of information can result in sub-optimal decision making. Katie Morgan & Michael J. Zydney Mannheimer, *The Impact of Information Overload on the Capital Jury's Ability to Assess Aggravating and Mitigating Factors*, 17 Wm. & Mary Bill of Rts. J. 1089, 1089 (2009). In the context of capital punishment, research shows that jurors have great difficulty comparing aggravating and mitigating factors and fail to reach reasoned conclusions as a result of information overload.[12] Because death penalty trials involve "conditions of uncertainty and complexity, jurors, like all other rationally bounded decision makers are unable to devise either a fully specified solution to the problem at hand or to assess fully the probable outcomes of their action." *Id.* at 1126. As Morgan and Mannheimer explain, capital juries make their decisions in stressful and unfamiliar settings. Layered on top of that is the sheer magnitude of the aggravating and mitigation information presented for their consideration. And further layered on top of that is the complex struggle to "understand the abstruse legal framework that the courts have constructed around the death penalty." *Id.* at 1126-27.

Ultimately, the impact of this information overload is that jurors will, "whether consciously or subconsciously, choose[] to simply pick an option to end the decision-making process instead

---

[12]Richard L. Wiener, *Death Penalty Research in Nebraska: How Do Judges and Juries Reach Penalty Decisions?,* 81 Neb. L. Rev. 757, 768-69 (2002) (reviewing several studies concerning juror comprehension of mitigating circumstances).

of choosing the best option," a phenomenon known as satisficing, *id.* at 1116, 1126, or simply opt

out or check out of the decision-making process altogether, *id.* at 1117, 1126. In so doing, jurors

"ignore or disregard other relevant information" and "select which information he or she desires

to process and become blind to all additional information." *Id.* at 1127. When capital jurors do this,

"they are ultimately sentencing defendants to death, not based upon the belief that defendants are

unworthy to live, as determined by a comparison of aggravating and mitigating evidence, but

because the capital jury is unable to adequately make this crucial decision," a process that results

in an unreliable and arbitrary death sentence. *Id.* at 1128. This problem is compounded by the pro-

death bias introduced by the death qualification process, increasing the likelihood that a frustrated

jury, suffering from information overload, will default to death simply in order to avoid further

debate and end the decision-making process.

      In addition to violating the constitutional rights of the accused by creating arbitrary and

unreliable verdicts, death qualification also violates the constitutional rights and interests of jurors

and potential jurors. The Supreme Court has explained that the harm done by racial discrimination

in the selection of jurors is not limited to its effects on the rights of the parties, because

discriminatory practices in jury selection also violate the equal protection rights of jurors and

potential jurors. *Miller-El v. Dretke*, 545 U.S. 231, 237 (2005); *cf.*, *e.g.*, *Powers v. Ohio*, 499 U.S.

400, 402 (1991). Death qualification necessarily results in a process that discriminates in favor of

the empanelment of white conservative males and against potential jurors who are not white or not

male. This is because white conservative males approve of the death penalty to a far greater extent

than do members of any other race or gender. In this way, death qualification violates the

constitutional rights of nonwhite and non-male citizens who would otherwise be qualified to serve

as jurors. The racial bias inherent to death qualification, coupled with the procedural requirement that an FDPA jury be death qualified, makes the federal death penalty unconstitutional.

A death-qualified jury would prejudice Mangione under the facts here because it would statistically result in a jury that would identify far more with Mr. Thompson and the government and less with Mr. Mangione than a typical jury. Also, the mere fact that a death-qualified jury is statistically likely to be less diverse in terms of race and gender adversely impacts the defendant, who tends to benefit from a variety of views and a robust debate in the jury room. In addition, the Attorney General's repeated comments that the death penalty is appropriate for Mangione because he killed a CEO plays into the prejudice to Mangione from a jury that is more likely to be white and male and middle-aged than a typical jury in this District. For these reasons, the Court should not permit the government to proceed with the death penalty.

### 5. The Federal Death Penalty Is Imposed in an Arbitrary and Capricious Fashion in Violation of the Fifth and Eighth Amendments

The arguments in Point Four above relate to the particular facts and circumstances here that make the death penalty arbitrary and capricious as applied to Mangione. The arguments here, in Point Five, focus on the Federal Death Penalty statute being unconstitutional in all applications and based on current standards.

As noted, the Due Process Clause of the Fifth Amendment prohibits imposing the death penalty based on "arbitrary distinctions." *Chapman v. United States*, 500 U.S. 453, 465 (1991). The Eighth Amendment imposes additional restrictions and establishes the minimum standards for what constitutes impermissible cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153 (1976).

Specifically, the United States Supreme Court has indicated that at least three types of punishment may be deemed unconstitutionally cruel. First, the Eighth Amendment categorically

prohibits the imposition of inherently barbaric punishments. *See Graham v. Florida*, 560 U.S. 48, 59 (2010); *Gregg v. Georgia*, 428 U.S. 153, 170–72 (1976) (opinion announcing judgment); *In re Kemmler*, 136 U.S. 436, 447 (1890). Second, the Eighth Amendment prohibits excessive and disproportionate punishments. *See Graham*, 560 U.S. at 59. Because life in prison without the possibility of parole by itself is so harsh and promotes the penal goals that courts and commentators have recognized as legitimate: deterrence, retribution, incapacitation, and rehabilitation, *see, e.g.*, *id.* at 71, the imposition of the death penalty is excessive and nothing more than the "gratuitous infliction of suffering." *Gregg*, 428 U.S. at 183.

Finally, the Eighth Amendment prohibits punishments that are arbitrary. In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court required "that capital punishment be imposed fairly, and with reasonable consistency, or not at all." "To pass constitutional muster, a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988). It is with these principles in mind that Mr. Mangione challenges the constitutionality of the FDPA and of the federal death penalty that statute authorizes.

This Court will not be the first to consider the constitutionality of the Federal Death Penalty Act. *See e.g.*, *United States v. Bowers*, No. CR 18-292, 2020 WL 1675916 (W.D. Pa. Apr. 6, 2020); *United States v. Sampson*, Cr. No. 01-10384-MLW, 2015 WL 6511247 *21 (D. Mass., Oct. 28, 2015). However, none of these recent cases is binding precedent, and neither the Supreme Court nor the Second Circuit has squarely addressed the issue. Thus, because the constitutionality of the death penalty must be examined in light of present conditions, this Court is not foreclosed from granting the relief sought herein. Indeed, the Supreme Court has acknowledged an ongoing

"obligation to re-examine capital-sentencing procedures against evolving standards of procedural fairness in a civilized society." *Gardner v. Florida*, 430 U.S. 349, 357 (1977)); *cf. State v. Santiago*, 318 Conn. 1, 47 (2015) ("Because the legal standard is an evolving one, it is both necessary and appropriate for us to consider the issue anew, in light of relevant recent developments, when it is raised.")

In *United States v. Fell*, 224 F. Supp. 3d 327 (D. Vt. 2016), after receiving extensive statistical and expert testimony at an evidentiary hearing, the district court found that "the FDPA—like the very similar state death penalty statutes enacted after *Furman*—remains inherently unreliable as it seeks to identify those cases in which death is the just outcome;" that "the death penalty continues to be imposed in an arbitrary manner;" and that "delay continues to be a primary feature of the FDPA [such that] the statistical evidence that executions, many years after the offense conduct, affect the murder rate has not been accepted by the National Resource Council and continues to be unprovable." *Id.* at 340, 345, 349. Nonetheless, the court declined to strike the death notice, erroneously regarding itself as precluded from doing so by Supreme Court precedent, though it urged the high court to revisit the issue. *Id.* at 358-59.

At a minimum, this Court should follow the example set in *Fell*. If this Court concludes that Supreme Court precedent precludes striking the death penalty as unconstitutional on its face, it "can hold a hearing and permit witnesses to testify." *Id.* at 329. Further, after developing a factual record, the Court can fully address the legal issues. While it may simply acknowledge that current Supreme Court precedent forecloses reconsideration of these issues, it may also decide that "the new factual record may require a fresh look at the manner in which existing principles are applied to a factual record which continues to develop," *id.*, and that contemporary examination will aid a

-57-

higher Court that considers these issues at a later date. *See United States v. Fell*, 217 F. Supp. 2d 469, 477 (2002).

> A.    **The Federal Death Penalty is Unconstitutional Because it Continues to be Imposed and Carried Out in an Arbitrary and Capricious Manner Post-*Furman* and *Gregg*[13]**

In 1972, citing the arbitrary and capricious imposition of capital punishment across the land, the Supreme Court struck down all existing death-penalty schemes (including the then-existing federal penalty) as incompatible with the guarantees of the Eighth and Fourteenth Amendments to the United States Constitution. *Furman v. Georgia*, 408 U.S. 238 (1972).[14]

Four years later, with decisions in three cases on three new statutory schemes—*Gregg v. Georgia*, 428 U.S. 153 (1976), *Proffitt v. Florida*, 428 U.S. 242 (1976), and *Jurek v. Texas*, 428 U.S. 262 (1976)—the death penalty was revived. The Court reasoned that state governments could execute people as punishment without running afoul of the Constitution by ensuring that their statutes were structured to narrow eligibility for the death penalty, and to give adequate information

---

[13]Mr. Mangione acknowledges that the Second Circuit, in *United States v. Aquart*, 912 F.3d 1 (2d Cir. 2018), rejected arguments (1) that the FDPA operates in an unconstitutionally arbitrary and capricious manner and (2) that the FDPA is unconstitutionally arbitrary because death cases cannot be distinguished from non-death cases by reference to any principled standard, but respectfully preserves those issues for appellate review by raising them herein. The *Aquart* court also rejected an argument that the evolving standards of decency render the FDPA unconstitutional, but Mr. Mangione respectfully asserts that the continued evolution of public opinion since *Aquart* was decided justifies a fresh determination of that issue.

[14]Four years after *Furman*, the issue of capital punishment returned to the Court, this time in the cases of five men who had been prosecuted and sentenced to death—all in the South—under newly-enacted post-*Furman* statutes. On July 2, 1976, the Court issued opinions in those five cases. In three of the cases, the Court concluded that the states had successfully met the constitutional concerns raised in the *Furman* opinion. *Gregg v. Georgia*, 428 U.S. 153 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976); *Proffitt v. Florida*, 428 U.S. 242 (1976). The other two state schemes were struck down because they required automatic imposition of a sentence of death for certain murders without allowing for the "particularized consideration of all relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (Opinion of Justices Stewart, Powell and Stevens); *Roberts v. Louisiana*, 428 U.S. 325 (1976).

and guidance to juries to avoid the arbitrary and capricious imposition of death sentences. The expectation, and requirement for purposes of the Constitution, was that, thereafter, the penalty would be imposed in a reasoned manner, ensuring that only the worst of the worst would be sentenced to death.

In an unsuccessful attempt to meet these newly identified constitutional requirements, the federal government modified its death penalty statutes in 1988. That year, Congress passed the Drug Kingpin Act[15] as part of the Anti-Drug Abuse Act of 1988.[16] The Drug Kingpin Act authorized the federal death penalty for certain drug-related murders.[17] Specifically, it codified the death penalty as punishment for any defendant who intentionally kills, counsels, commands, procures, induces or causes the intentional killing of an individual[18] or law enforcement officer while working as part of a criminal enterprise,.[19] The legislative history behind the 1988 bill shows that Congress aimed the death penalty provisions specifically at triggermen and drug lords from whom the triggermen received their orders.[20]

Six years later, in 1994, the federal government again revised its death penalty code. The new Federal Death Penalty Act (FDPA) greatly expanded the number of federal crimes potentially

---

[15] 21 U.S.C. § 848 (1988).

[16] Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181.

[17] *See* 21 U.S.C. § 848(e) (1988).

[18] *See id.* § 848(e)(1)(A).

[19] *See id.* § 848(e)(1)(B). A law enforcement officer is defined as "a public servant authorized by law or by a Government agency or Congress to conduct or engage in the prevention, investigation, prosecution or adjudication of an offense, and includes those engaged in corrections, probation, or parole functions." *Id.* § 848(e)(2).

[20] See Brian Serr, *Of Crime and Punishment, Kingpins, and Foot Soldiers, Life and Death: The Drug War and the Federal Death Penalty Provision--Problems of Interpretation and Constitutionality*, 25 Ariz. St. L.J. 895, 914 (1993) (explaining that there is an abundance of legislative history showing Congress intended the Drug Kingpin Act for use against triggermen and their bosses).

carrying a sentence of death, with members of Congress placing the number at sixty.[21] Prior to 1994, federal death penalty statutes could be placed in one of three categories: (1) crimes in which a person was intentionally killed; (2) crimes in which a dangerous activity resulted in death; and (3) non-homicide crimes including treason and espionage.[22]  The FDPA expanded the number of crimes for which the death penalty can be imposed in all three categories.[23] First, in the intentional killing category, the FDPA permits capital punishment for the following crimes: (1) murder during a drug related drive-by shooting; (2) murder by a federal prisoner serving a life sentence; (3) murder of a United States national; (4) murder by an escaped federal prisoner already sentenced to life imprisonment; and (5) murder of a state correctional officer.[24] Second, the FDPA added five new crimes in the category of dangerous activity resulting in death: (1) violent acts at airports; (2) rape or child molestation; (3) violence in the course of maritime navigation; (4) violence at maritime fixed platform; and (5) use of a weapon of mass destruction.[25] In this category, the FDPA also amended other crime statutes to allow for the imposition of a death sentence when the following acts result in a death: kidnapping, hostage-taking, alien smuggling, genocide, conspiracy against civil rights, and deprivation of civil rights under color of law.[26] Third, the non-homicide category was amended and the following crimes became eligible for the death penalty: (1) carjacking resulting in death; (2) murder in a federal facility; (3) first degree murder committed by

---

[21]*See, e.g.*, 140 Cong. Rec. S12421-01, S12433 (daily ed. Aug. 24, 1994) (statement of Sen. Kerry) (stating that there were "about 60" new death penalties); Charles Kenneth Eldred, *The New Federal Death Penalties*, 22 Am. J. Crim. L. 293, 293 n.2 (1994). ("It is indisputable that the quantity of crimes for which the death penalty has been made available has substantially increased.").

[22]John P. Cunningham, *Death in the Federal Courts: Expectations and Realities of the Federal Death Penalty Act of 1994*, 32 U. Rich. L. Rev. 939, 953–54 (1998).

[23]*Id.* at 954-55.

[24]*Id.*

[25]*Id.* at 955.

[26]*Id.* at 955-56.

firing a weapon into a crowd; (4) murder of a witness, victim, or informant in response to law enforcement; and (5) murder of a court officer or juror.[27]

Challenges to the constitutionality of the FDPA are usually met with the response that the Act is constitutional because it contains the safeguards articulated in *Gregg*. *See, e.g., United States v. Sampson*, 2015 WL 7962394 * 18 (D. Mass. 2015); *United States v. Jacques*, 2011 WL 1675417 * 3 (D. Vt. May 4, 2011). The problem with this response is that the statute's purported safeguards have failed to meet the standards articulated by the Supreme Court. As articulated in *Glossip v. Gross*, 576 U.S. 863, 908-946 (2015), "the Court in effect delegated significant responsibility to the States [and Congress] to develop procedures that would protect against those constitutional problems. Almost 40 years of studies, surveys, and experience strongly indicate, however, that this effort has failed." *Id.* at 909 (Breyer, J., dissenting).

Although much has changed in the half century since the death penalty was struck down in *Furman* and in the more than thirty years since it was re-enacted in the ADAA and expanded in the FDPA, those changes have generally had the effect of limiting the scope of the death penalty or imposing additional conditions on its use. Indeed, the Supreme Court has repeatedly narrowed the penalty after identifying unanticipated ways in which the federal government has failed to meet its constitutional obligations when seeking death. For example, juvenile offenders could be prosecuted and sentenced to death for capital crimes in the period immediately following *Gregg*,[28] but the court later concluded that the Constitution does not permit the government to kill minors.[29] Similarly, intellectually disabled people could be executed for almost the first 30 years of the

---

[27]*Id.* at 955.
[28]*Stanford v. Kentucky*, 492 U.S. 361 (1989).
[29]*Roper v. Simmons*, 543 U.S. 551 (2005).

modern death penalty, but then were removed from the pool of eligible subjects.[30]  As these changes demonstrate, the post-*Gregg* safeguards codified in the FDPA are not sufficient to ensure that the federal death penalty necessarily is imposed in compliance with the Constitution.

Even as the Supreme Court has continued to narrow the circumstances in which the federal government may execute defendants, so too has the penalty's popularity and public acceptance declined. At the end of 1994, when the FDPA went into effect, 34 States and the federal government held 2,890 prisoners under sentence of death.[31] As of July 1, 2025, several more states had abolished the death penalty, leaving a total of 2,044 persons on death row in 29 states, federal prisons, and U.S. military facilities. [32] And support for the death penalty is at a five-decade low[33], while a majority of Americans believe capital punishment is applied unfairly.[34]

Many of these changes have come about because, as Justice Breyer concluded, "the death penalty, in and of itself, now likely constitutes a legally prohibited 'cruel and unusual punishmen[t].'" *Glossip v. Gross*, 576 U.S. 863, 908-946 (2015) (Breyer, J., dissenting). Justice Breyer based his decision on "[a]lmost 40 years of studies, surveys, and experience" that "strongly indicate" that entrusting to the states the significant responsibility to develop procedures to protect against the constitutional problems identified in *Furman* "has failed." *Id.* He discerned that the administration of the modern, post-*Furman* death penalty involves serious unreliability,

---

[30]*Atkins v. Virginia*, 536 U.S. 304 (2002).

[31]*See* Bureau of Justice Statistics Bulletin, *Capital Punishment 1994*, available at https://bjs.ojp.gov/content/pub/pdf/cp94.pdf.

[32]*See* Robert Dunham, *Death Row USA*, LEGAL DEFENSE FUND (July 1, 2025), www.naacpldf.org/our-thinking/death-row-usa/.

[33]*See*, The Death Penalty in 2024, Death Penalty Information Center, available at https://deathpenaltyinfo.org/research/analysis/reports/year-end-reports/the-death-penalty-in-2024.

[34]Juan A. Lozano, PBS Newshour, available at https://www.pbs.org/newshour/nation/for-thefirst-time-more-americans-believe-death-penalty-is-applied-unfairly-report-finds.

arbitrariness with various underlying causes, and unconscionably long delays, which, for federal death row inmates, result in decades-long solitary confinement. *See, generally*, *id.* at 908-09.

The random and capricious imposition of the death penalty is perhaps best captured by Justice Stewart's analogy, in *Furman*, between being sentenced to death and being struck by lightning:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders, … many just as reprehensible as these, the petitioners are among a capriciously selected handful upon whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race … I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

*Furman*, 408 U.S. at 309-10 (Opinion of Stewart, J., concurring; citations and footnotes omitted).

In *Zant v. Stephens*, 462 U.S. 862 (1983), the Court summarized its holding in *Furman* as follows:

> A fair statement of the consensus expressed by the Court in *Furman* is that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."

Members of the *Furman* Court had also found that the death penalty was fraught with invidious and irrational selectivity, "feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority…." *Furman*, 408 U.S. at 255 (Douglas, J., concurring). Justice White, who concurred in the result, highlighted the infrequent utilization of the death penalty:

> That conclusion, as I have said, is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not.

408 U.S. at 313 (White, J., concurring). In fact, the infrequency with which defendants were targeted for capital punishment was noted by each of the five concurring Justices in the *Furman* majority. *See Furman*, 408 U.S. at 248 n.11 (Douglas, J., concurring); *id.* at 291-95 (Brennan, J., concurring); *id.* at 309-10 (Stewart, J., concurring); *id.* at 312 (White, J., concurring); and, *id.* at 354 n. 124 and 362-63 (Marshall, J., concurring).

In 1972, writing in a nation of 200 million people that carried out 50 executions per year, Justice Brennan explained that "when government inflicts a severe punishment no more than 50 times a year, the inference is strong that the punishment is not being regularly and fairly applied." 408 U.S. at 294. "When the punishment of death is inflicted in a trivial number of the cases in which it is legally available, the conclusion is virtually inescapable that it is being inflicted arbitrarily. Indeed, it smacks of little more than a lottery system." *Id.*

The modern death penalty presents a lottery no less arbitrary and unfair than the penalty struck down in *Furman*. Indeed, the inference Justice Brennan drew is even stronger. Although the United States has grown to more than 328 million people—exclusive of the 3.3 million people living in Puerto Rico—executions are carried out more arbitrarily and at lower rates than ever before. In the fifteen years after the federal death penalty was reestablished in 1988, the United States carried out only three executions—this notwithstanding that thousands of prosecutions in which the penalty was theoretically available were brought during that period. In the eighteen years that followed, between March 17, 2003, and July 14, 2020, the federal government carried out no executions at all, though thousands of people were prosecuted for crimes theoretically eligible for the death penalty during that period. The Department of Justice, under President Trump, then proceeded to kill thirteen convicted persons in the course of just six months beginning in July 2020. In 2021, the Department of Justice, under President Biden, issued a moratorium on

executions, and President Biden commuted the death penalty sentences of 37 out of 40 inmates on the federal death row before leaving office. Upon assuming office for the second time, President Trump announced that his Department of Justice would seek the death penalty in "all appropriate cases," and would prioritize the killing of illegal immigrants and those convicted of murdering law enforcement officers, apparently without consideration of the specific facts of each case or reference to any aggravating or mitigating factors.[35]

To reiterate Justice Brennan's observation, "the conclusion is virtually inescapable that [the death penalty] is being inflicted arbitrarily. Indeed, it smacks of little more than a lottery system." 408 U.S. at 294; *see also*, *Walton v. Arizona*, 497 U.S. 639, 658 (1990) (Scalia, J., concurring), *overruled on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002) (observing that the key opinions in *Furman* "focused on the infrequent and seeming randomness with which, under the discretionary state systems, the death penalty was imposed").

Courts are increasingly cognizant of the wisdom of Justice Brennan's insight that extreme rarity necessarily indicates arbitrariness where the death penalty is concerned. For example, recognizing that the rarity with which the Connecticut capital punishment scheme was used indicated that the death penalty in that state was arbitrary, the Connecticut Supreme Court held the statute unconstitutional in 2015. *State v. Santiago*, 122 A.3d 1, 38-39 (Conn. 2015). That same year, Justices Breyer and Ginsburg filed a dissenting opinion in *Glossip v. Gross*, 135 S. Ct. 2726, 2755-2780 (2015) (Breyer & Ginsburg, JJ., dissenting) ("*Glossip* dissent"),[36] calling into question

---

[35]Presidential Action, "Restoring the Death Penalty and Protecting Public Safety," January 20, 2021, *available at* https://www.whitehouse.gov/presidential-actions/2025/01/restoring-the-death-penalty-and-protecting-public-safety/
[36]Although there was a second dissent in *Glossip* on the merits of the issue presented in that case—the constitutionality of the drugs utilized in lethal injections—this brief will utilize the shorthand "*Glossip* dissent" to refer to the opinion of Justices Breyer and Ginsburg.

the continued constitutionality of capital punishment, citing, among other reasons, the increasing

rarity of the punishment, its disproportionate racial impact, its regional application, and the

arbitrary manner in which it is sought.

This argument—that the federal death penalty should be struck down because it is so

infrequently and arbitrarily sought or imposed—should not be misunderstood as a call for more

frequent use of the federal death penalty. As Justice Brennan stated in *Furman*:

> The States claim, however, that this rarity is evidence not of arbitrariness, but of
> informed selectivity. Informed selectivity, of course, is a value not to be denigrated.
> Yet, presumably the States could make precisely the same claim if there were 10
> executions per year, or five, or even if there were but one. That there may be as
> many as 50 per year does not strengthen the claim. When the rate of infliction is at
> that low level, it is highly implausible that only the worst criminals who commit
> the worst crimes are selected for this punishment. No one has yet suggested a
> rational basis that could differentiate in these terms the few who die from the many
> who go to prison. Crimes and criminals simply do not admit of a distinction that
> can be drawn so finely as to explain, on that ground, the execution of such a tiny
> sample of those eligible. Certainly the laws that provide for this punishment do not
> attempt to draw that distinction; all cases to which the laws apply are necessarily
> "extreme."

408 U.S. at 293-94 (Brennan, J., concurring).

After 30 years of experience with a post-*Gregg* federal death penalty, it is a simple truth

that the federal death penalty is sought and imposed even more rarely and more arbitrarily than

was the case when *Furman* was decided. Being sentenced to death in the federal system is truly

akin to being struck by lightning. Indeed, as argued *infra*, no meaningful basis may be discerned

for distinguishing the cases of those sentenced to death from those spared the sentence, even among

the most extreme.

In 2011, the Death Penalty Information Center published a report on this issue, entitled,

"Struck by Lightning: The Continuing Arbitrariness of the Death Penalty Thirty-Five Years After

Its Re-instatement in 1976" (Death Penalty Information Center Washington, DC 2011).[37]   The

report catalogues the arguments and collects the data for declaring the scheme of capital

punishment that is practiced in our courts unconstitutional. *See also*, G. Ben Cohen. & Robert J.

Smith, *The Racial Geography of the Federal Death Penalty*, 85 Wash. L. Rev. 425, 431 (2010)

("The infrequency of the federal death penalty—with 67 federal death sentences in the face of over

150,000 murders—makes death by lightning-strike look positively routine. Indeed, a federal death

sentence is akin to winning (or in this instance losing) the lottery.") (noting that there were 424

deaths by lightning in the years 1999-2008).

The Supreme Court's efforts to impose guardrails on the use of capital punishment since it

was reimposed after *Furman*—and the government and the states' failed efforts to comply with

those guardrails—illustrate the inherently contradictory nature of two lines of Supreme Court

cases. *See* Mary Sigler, *Contradiction, Coherence and Guided Discretion in the Supreme Court's

Capital Sentencing Jurisprudence*, 40 Amer. Crim. L. Rev. 1151 (2003). In *Gregg*, the Court

posited the concept of "guided discretion" as a check on the untrammeled discretion given juries

in the pre-*Furman* era, requiring that a sentencing body's discretion "must be suitably directed and

limited so as to minimize the risk of wholly arbitrary and capricious action."  *Gregg*, 428 U.S. at

189. However, in cases such as *Lockett v. Ohio*, 438 U.S. 586 (1978) and *Eddings v. Oklahoma*,

455 U.S. 104 (1982), the Court held that while a jury's discretion to impose a sentence of death

must be guided and channeled, a jury's discretion to impose a *life* sentence could not be limited.

This battle had long been fought in the Supreme Court principally by the late Justices Scalia

and Blackmun. *See, e.g.,* Justice Scalia's concurrence in *Callins v. Collins*, 510 U.S. 1141, 1141-

42 (1994), and his dissent in the since- overruled *Walton v. Arizona*, 497 U.S. 639, 657-73 (1990).

---

[37]Available at https://deathpenaltyinfo.org/documents/StruckByLightning.pdf.

It was Justice Scalia's basic view that cases such as *Lockett* and *Eddings* are incompatible with the idea of guided discretion and that those cases should be overruled. Other critics, however, point out that if the lines of cases are in fact irreconcilable, it is the death penalty that must be overruled. *See*, Steven G. Gey, *Justice Scalia's Death Penalty*, 20 Fla. St. U. L. Rev. 67 (1992).

Since the Supreme Court delegated significant responsibility to the States and Congress to develop procedures that would satisfy the heightened reliability required when death is on the line, "[a]lmost 40 years of studies, surveys, and experience strongly indicate, however that this effort has failed." *Glossip*, 135 S. Ct. at 2755 (Breyer and Ginsburg, JJ., dissenting). As *Santiago* held:

> [I]t has become apparent that the dual federal constitutional requirements applicable to all capital sentencing schemes—namely, that the jury be provided with objective standards to guide its sentence, on the one hand, and that it be accorded unfettered discretion to impose a sentence of less than death, on the other—are fundamentally in conflict and inevitably open the door to impermissible racial and ethnic biases.

122 A.3d at 13.

> The question is whether this individualized sentencing requirement inevitably allows in through the back door the same sorts of caprice and freakishness that the court sought to exclude in *Furman*, or, worse, whether individualized sentencing necessarily opens the door to racial and ethnic discrimination in capital sentencing. In other words, is it ever possible to eliminate arbitrary and discriminatory application of capital punishment through a more precise and restrictive definition of capital crimes if prosecutors always remain free not to seek the death penalty for a particular defendant, and juries not to impose it, for any reason whatsoever? We do not believe that it is.

*Id.* at 67-68.

In support of its conclusion, the *Santiago* court aptly noted that "the United States Supreme Court itself has expressed serious doubts as to whether its own commandments can be reconciled." 122 A.3d at 68. In *Tuilaepa*, the Court recognized that "[t]he objectives of these two inquiries can be in some tension…." 512 U.S. at 973. Then, 14 years later in *Kennedy*, the Court acknowledged that "[t]he tension between general rules and case-specific circumstances has produced results not

altogether satisfactory." 554 U.S. at 436. "Our response to this case law," the Court conceded, "is still in search of a unifying principle…." *Id.* at 437. *See also Turner v. Murray*, 476 U.S. 28, 35 (1986) (plurality opinion) ("[b]ecause of the range of discretion entrusted to a jury in a capital sentencing scheme, there is a unique opportunity for racial prejudice to operate").

In *Godfrey v. Georgia*, 446 U.S. 420, 442 (1980) Justice Marshall elaborated on this "fundamental defect" in the Court's Eighth Amendment jurisprudence:

> [T]he task of selecting in some objective way those persons who should be condemned to die is one that remains beyond the capacities of the criminal justice system. For this reason, I remain hopeful that even if the Court is unwilling to accept the view that the death penalty is so barbaric that it is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments, it may eventually conclude that the effort to eliminate arbitrariness in the infliction of that ultimate sanction is so plainly doomed to failure that it—and the death penalty—must be abandoned altogether.

*Id.* at 439-42 (Marshall, J., concurring in the judgment). Even Justice Antonin Scalia, not known to have harbored any hostility towards the death penalty, was persuaded that the Supreme Court's *Furman* and *Woodson/Lockett* lines of jurisprudence are fundamentally incompatible:

> Our cases proudly announce that the Constitution effectively prohibits the States from excluding from the sentencing decision *any* aspect of a defendant's character or record, or *any* circumstance surrounding the crime[]…. To acknowledge that there perhaps is an inherent tension between this line of cases and the line stemming from *Furman* … is rather like saying that there was perhaps an inherent tension between the Allies and the Axis Powers in World War II. And to refer to the two lines as pursuing twin objectives … is rather like referring to the twin objectives of good and evil. They cannot be reconciled.

*Walton v. Arizona*, 497 U.S. 639, 663, 664-65 (1990) (internal citations and quotations omitted) (Scalia, J., concurring in part and concurring in the judgment), overruled in part on other grounds by *Ring v. Arizona*, 536 U.S. 584 (2002). Whatever rationality and predictability the *Furman* line of cases sought to achieve, the Court's prohibition on channeling the sentencer's consideration of relevant mitigation "quite obviously destroys" it. *Id.* at 664-65.

"Four decades ago, the Court believed it possible to interpret the Eighth Amendment in ways that would significantly limit the arbitrary application of the death sentence. But that no longer seems likely." *Glossip*, 135 S. Ct. at 2762 (Breyer and Ginsburg, JJ., dissenting) (citing *Gregg*, 428 U.S. at 195 (joint opinion of Stewart, Powell and Stevens, JJ.) ("[T]he concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met")). It is now clear— based upon current data and the analysis in *Santiago* and the *Glossip* dissent—that the death penalty suffers from too many flaws to remain constitutional.

Under the rubric the Supreme Court used in *Furman,* the federal death penalty is sought and imposed in an arbitrary, capricious and "unusual" manner. *Cf. Roper v. Simmons*, 543 U.S. 551, 567 (2005) (execution of juveniles violates the Eighth Amendment, in part because of "the infrequency of its use even where it remains on the books"); *Atkins v. Virginia*, 536 U.S. 304, 316 (2002) (execution of mentally retarded offenders violates the Eighth Amendment, in part because "even in those states that allow the execution of mentally retarded offenders, the practice is uncommon"); *see also Thompson v. Oklahoma*, 487 U.S. 815, 822 n.7 (1988) (plurality) ("[C]ontemporary standards, as reflected by the actions of legislatures and juries, provide an important measure of whether the death penalty is 'cruel and unusual' [in part because] whether an action is 'unusual' depends, in common usage, upon the frequency of its occurrence or the magnitude of its acceptance."). Because the federal death penalty is so infrequently sought, imposed, or carried out, it operates in an unconstitutionally arbitrary and capricious manner. Whether the most accurate analogy is being struck by lightning or participating in, and losing, a deadly lottery, the federal death penalty does not operate in a rational manner. On this basis, the court should strike it down.

### B.    No principled rubric separates death penalty cases from non-death cases, rendering the federal death penalty unconstitutionally arbitrary

An arbitrarily imposed death penalty is anathema to the Constitution, which requires "that capital punishment be imposed fairly, and with reasonable consistency, or not at all." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982). "When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint." *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008). For that reason, "capital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them 'the most deserving of execution." *Id.* (citations omitted). In practice, the federal death penalty has failed to meet this constitutional standard and operates in an arbitrary and irrational manner. This point was made both in the *Glossip* dissent and in the Connecticut Supreme Court's *Santiago* opinion.

There is no consistency or predictability in the manner in which federal juries (and in three cases, federal judges) have imposed or declined to impose the federal death penalty or, indeed, which cases are allowed to plead out to life terms or less and which proceed to trial. The Federal Death Penalty Resource Project maintains a compendium of penalty-phase verdict sheets returned in virtually every federal capital case that has proceeded to trial since 1988.[38] Those hundreds of federal verdict sheets offer clear insight into the hopelessly irremediable problem of arbitrariness and caprice that marks the administration of the federal death penalty system. There is no rhyme, reason, or predictability concerning who is sentenced to death and who is spared or who simply never has to face a jury on a life-or-death decision. The Project website also maintains a summary

---

[38]The following is a link to those verdict sheets, current through May 2024: https://fdprc.capdefnet.org/verdict-forms

of the factual circumstances and outcome in hundreds of capital cases, whether tried or not, and much other useful information regarding the federal death penalty.

This argument is not refuted by simply pointing out that there are always difficulties inherent in comparing cases. A review of previous cases in which the death penalty was authorized should put that reflexive and simplistic argument to rest, because there is simply no principled way to distinguish, on the law or on the facts, between cases in which a death sentence was imposed and those in which the death penalty was rejected. As the following brief summaries demonstrate, whether a death sentence is imposed cannot be predicted by reference to the offense conduct charged or by reference to any other objective or rational metric:

- *United States v. Joseph Sablan and William Guerrero*, 08-CR-00259-PMP (C.D. Ca. 2008): Two inmates murdered a federal corrections officer at USP/Atwater in 2008. Both had prior murder convictions and were serving life sentences. One defendant had murdered a prison guard previously while serving a sentence in Guam. In 2015 both death notices were withdrawn and both defendants entered guilty pleas to life sentences.

- *United States v. Jessie Con-Ui*, 3:13-cr-00123 (M.D. Pa. 2013): Federal inmate, with prior murder conviction and life sentence, murders federal correctional officer at USP/Canaan; murder captured on videotape, more than 200 stab wounds inflicted. Defendant convicted and sentenced to life.

- *United States v. Anthony Battle*, 95-CR-528-ODE (N.D. Ga. 1995): In 1994, a federal inmate serving a life sentence for the murder of his wife on an army base killed a federal corrections officer at USP/Atlanta with a hammer. Tried, convicted, sentenced to death. Sentence commuted to life after almost three decades on death row.

- *United States v. Roy C. Green*, No. 98-337-CBM (C.D. Ca. 1998): In 1997 defendant stabbed one federal corrections officer to death and seriously wounded a second. Three other officers were also seriously injured. Mr. Green has been declared incompetent and has never stood trial for this crime.

- *United States v. Larry Lujan*, 05-CR-00924-RB (D.N.M. 2005): Lujan was convicted of what the Tenth Circuit described as "a gruesome [crime] in which Lujan (and his cohorts) severely beat [the victim] over a significant period of time, sexually assaulted [him], and engaged in other acts to terrify and isolate [the victim]." *United States v. Lujan*, 603 F.3d 850, 852 (10th Cir. 2010). In addition, at the penalty phase, the government convinced the jury beyond a reasonable doubt that Lujan had committed two additional murders which the Tenth Circuit described as "equally gruesome." *Id.* at 853. These additional murders included the facts that after Lujan slit the throats of the two victims, he "poured gasoline

over the victims' bodies, including the apparently still-breathing Alfredo, and set them on fire…. The victims' eleven-year-old daughter discovered the bodies the next afternoon." *Id*. Based on these murders and other evidence the jury specifically found that Lujan would be a danger in the future. On October 5, 2011, after the jury was unable to reach a unanimous verdict, Larry Lujan received a life sentence.

- *United States v. Dzohkhar Tsarnaev*, 13-CR-10200-GAO (D. Mass. 2013): Bombing of Boston Marathon, murder of a police officer, total of 4 killed, dozens injured. Tried, convicted, sentenced to death. Tsarnaev was one of only three individuals on death row whose sentence Biden declined to commute to life, and he remains on death row.

- *United States v. Timothy McVeigh*, 96-CR-00068-RPM (D. Co. 1996): The Oklahoma City bombing case. 168 dead. Hundreds injured. Tried, convicted, sentenced to death, executed.

- *United States v. Terry Nichols*, 96-CR-00068-RPM (D. Co. 1996) (D. Co): McVeigh's co-defendant. Tried, convicted, sentenced to life.

- *United States v. Khalfan Mohamed and Daoud Rashed al`-Owhali* (S.D.N.Y. 1998): Two defendants associated with Usama bin Laden and al Qaeda convicted in simultaneous terrorist truck-bombings in 1998 of two American embassies in East Africa. 224 killed, including 12 Americans; thousands injured. Tried, convicted, sentenced to life.

- *United States v. Eric Rudolph*, 00-CR-00422-CLS-TMP (N.D. Al. 2000): The Olympic and abortion-clinic bomber. Victims included a police officer. Arrested after five-year manhunt. Described by Attorney General Ashcroft as "America's most notorious fugitive." Negotiated guilty plea for life sentence.

- *United States v. Zacharias Moussaoui*, 01-CR-00455-LMB (E.D. Va. 2001): Defendant convicted of causing thousands of deaths in the September 11, 2001, attacks on the United States. Sentenced to life by jury.

- *United States v. Theodore Kaczynski*, 96-CR-00259-GEB-GGH (E.D. Ca. 1996): The Unabomber. Three murders by mail-bombs. Plea agreement. Sentenced to life.

- *United States v. Jared Loughner*, 11 Cr. 0187 (TUC LAB) (D. Az. 2011): Mass shooting at public event resulting in six deaths including a child and the Chief Judge of the United States District Court for Arizona; 13 others shot and wounded including Congresswoman Gabriel Gifford. Plea agreement. Sentenced to life.

- *United States v. Vincent Basciano*, 05-CR-00060-NGG (E.D.N.Y. 2005): Mafia crime boss serving life sentence for RICO murder accused of another Mafia hit murder. On June 1, 2011, after deliberating for less than 2 hours, a unanimous jury rejected the death penalty and sentenced Basciano to life imprisonment.

- *United States v. Anh Duong*, 01-CR-20154-JF (N.D. Ca. 2001): Mr. Duong was previously sentenced to death in California state court for 4 murders that occurred in a nightclub in

1999. Federal prosecutors in the Northern District of California indicted Mr. Duong in a 29-count, multi-defendant racketeering indictment, alleging 3 capital homicides (arising out of a string of robberies), and an additional 5 RICO murders. On December 15, 2010, a federal jury sentenced Mr. Duong to life in prison.

- *United States v. Edgar Diaz and Emile Fort*, 05-CR-00167-WHA (N.D. Ca. 2005): Attorney General approved plea agreements providing for 40-year sentences for both defendants, in a case involving seven gang-related murders, including (in Mr. Fort's case) the murder of an innocent child.

- *United States v. Joseph Minerd*, 99-CR-00215-MBC (W.D. Pa. 1999): Arson/pipe bomb murder of pregnant girlfriend, her fetus and three-year old daughter. Tried, convicted, sentenced to life.

- *United States v. Christopher Dean*, 98-CR-00063-WKS (D. Vt. 1998): Defendant sends pipe bomb through the mails killing victim and disfiguring victim's mother. Plea agreement. Sentenced to life.

- *United States v. Billy Cooper*, 01-CR-00008-CWR-FKB (S.D. Miss. 2001): Car-jacking double homicide. Tried, convicted, sentenced to life.

- *United States v. Christopher Vialva and Brandon Bernard*, 99-CR-00070-ADA (W.D. Tex.1999): Car-jacking double homicide. Tried, convicted, sentenced to death. Vialva and Bernard were among the individuals executed by President Trump in the final months of his first term, after spending approximately 20 years on death row.

- *United States v. Gary Sampson*, 01-CR-10384-LTS (D. Mass. 2001): Two murders during separate car-jackings. Plead guilty, sentenced to death by jury. Later set aside. Again sentenced to death on re-trial. Died of natural causes while on death row in 2021.

- *United States v. David Paul Hammer*, 96-CR-00239-JHS (M.D. Pa.1996): Prison inmate guilty of strangling to death cellmate at USP/Allenwood. Sentenced to death. Sentence later vacated. Sentenced to life on re-trial.

- *United States v. Michael O'Driscoll*, 01-CR-00277-MM (M.D. Pa. 2001): Prison inmate guilty of stabbing to death fellow inmate at USP/Allenwood. Same judge, same courtroom, same defense attorneys as *Hammer*. Sentenced to life.

- *United States v. Gregory Storey*, 96-CR-40018-DES-ALL (D. KS. 1996): Prison inmate with Aryan Brotherhood ties kills fellow prisoner at USP/Leavenworth. Plea agreement. Sentenced to less than life sentence.

- *United States v. Douglas Black and Steven Riddle*, 98-CR-00196-DBS (D. Co. 1998): Inmates at USP/Florence attack two suspected "snitches," one killed one injured. Plea agreements. Substantially less than life sentences.

- *United States v. William Sablan and Rudy Sablan*, 00-CR-00531-WYD (D. Co. 2000): Two cousins housed at USP/Florence kill their cellmate, eviscerate his body, hang his entrails around the cell, and, on videotape, display the victim's heart and liver to responding officers. Defendants tried separately. Life verdicts in each case.

- *United States v. Barry Mills, et al.*, 02-CR-00938-RGK (C.D. Ca. 2002): A RICO mega-indictment targeting 40 members of the Aryan Brotherhood prison gang and charging 17 murders. Initially 27 defendants were death- eligible and 14 defendants were actually authorized for capital prosecutions. After two lengthy trials, juries spared the first four defendants facing the death penalty—the alleged leaders of the gang—and the government withdrew its efforts to seek death as to the remaining authorized capital defendants.

- *United States v. Fu Xin Chen, Jai Wu Chen and You Zhong Peng*, 95-CR-00870-ERK-ALL (E.D.N.Y. 1995): Chinese gang members who kidnapped, raped and murdered victims held for ransom. Fu Xin Chen and Jai Wu Chen entered plea agreements. Attorney General withdrew death authorization shortly before Peng trial. Peng convicted after trial. All three sentenced to life.

- *United States v. Louis Jones*, 95-CR-00047-C-1 (N.D. Tex. 1995): Decorated Gulf War veteran with no prior record abducts, rapes and kills young woman soldier. Tried, convicted, sentenced to death, executed.

- *United States v. Chevie Kehoe and Daniel Lee*, 97-CR-00243-KGB (E.D. Ark. 1997): Triple murder of two adults and small child in connection with activities of white supremacist organization. Tried and convicted together. Kehoe—considered more culpable – sentenced to life. Lee was sentenced to death by the same jury and became the first person executed by the federal government in more than eighteen years when executed by the Trump administration in July 2020.

- *United States v. Michael Jacques*, 08-CR-00117-WKS (D. Vt. 2008): Defendant with prior convictions for sexual assaults kidnaps, rapes and murders 12-year-old niece. Case authorized for federal capital punishment. Allowed to plead guilty to life sentence.

- *United States v. Gurmeet Singh Dhinsa*, 97-CR-00672-ERK (E.D.N.Y. 1997): Millionaire Sikh businessman hires killers of two employees cooperating with authorities in criminal investigation of defendant. Tried, convicted, sentenced to life.

- *United States v. Trinity Ingle and Jeffrey Paul*, 96-CR-60023-JLH (W.D. Ark. 1996): Murder of elderly retired National Parks employee. Victim shot while bound and gagged. At separate trials, Ingle was convicted and sentenced to life; Paul was convicted and sentenced to death. Paul's death sentence was vacated, and a new penalty phase trial ordered, in 2022, after he won a statutory innocence habeas corpus proceeding. Resentenced to life imprisonment in October 2023, after the Department of Justice voluntarily dismissed its appeal of his habeas grant.

- *United States v. Kristen Gilbert*, 98-CR-30044-MAP (D. Mass. 1998): VA nurse murders four patients and attempts to murder three more. Tried, convicted, sentenced to life.

- *United States v. LaFawn Bobbitt and Rashi Jones*, 97-CR-00169-JAG (E.D. VA. 1997): Fatal shooting of bank teller during robbery. Security guard also shot and blinded. Tried, convicted, sentenced to life.

- *United States v. Billie Allen and Norris Holder*, 97-CR-00141-ERW-TCM (E.D. Mo. 1997): Fatal shooting of bank teller during robbery. Tried, convicted, and both defendants sentenced to death. Sentences commuted to life imprisonment by President Biden on December 23, 2024.

Irrational and arbitrary disparities between cases in which life and death are imposed are

particularly apparent in the context of prosecutions for murder in furtherance of drug-dealing:

- *United States v. Azibo Aquart*, 06 CR 160 (PCD) (D. Conn. 2006): Three drug-related murders. Tried, convicted, sentenced to death. Death sentence vacated on appeal; resentenced to life after the government chose to forego a penalty-phase retrial.

- *United States v. Azikiwe Aquart*, 06 CR 160 (PCD) (D. Conn. 2006): Same three drug-related murders committed with his brother Azibo. Pled guilty to all three murders with no cooperation agreement, sentenced to life.

- *United States v. Corey Johnson, James Roane, and Richard Tipton*, 92-CR-00068-JRS (E.D. VA. 1992): Eleven drug-related murders. Tried, convicted, sentenced to death. Johnson was executed in the final week of President Trump's first term. The death sentences imposed on Roane and Tipton were commuted to life imprisonment by President Biden.

- *United States v. Dean Anthony Beckford*, 96-CR-00066-REP-EWH (E.D. VA. 1996): Six drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Clarence Heatley and John Cuff*, 96-CR-00515-MBM-ALL (S.D.N.Y. 1996): Fourteen drug-related murders. Plea agreement. Sentenced to life.

- *United States v. Alan Quinones and Diego Rodriguez*, 00-CR-00761-JSR (S.D.N.Y. 2000): Torture murder of suspected informant. Tried, convicted, sentenced to life.

- *United States v. Elijah Williams and Michael Williams*, 00-CR-01008-NRB (S.D.N.Y. 2000): Execution-style triple murder by father and son. Tried, convicted, sentenced to life.

- *United States v. Thomas Pitera*, 90-CR-00424-RJD (E.D.N.Y.): Nine drug-related murders in organized crime and large-scale drug trafficking context. Victims tortured and bodies dismembered. Tried, convicted, sentenced to life.

- *United States v. German Sinisterra and Arboleda Ortiz*, 98-CR-00311-GAF (W.D. Mo. 1998): One drug-related murder and one attempted murder. Tried, convicted, sentenced to death. Sinisterra died of natural causes while on death row; Ortiz, who was intellectually disabled, had his sentence commuted to life without parole by President Obama.

-76-

- *United States v. John Bass,* 97-CR-80235-AJT-ALL (E.D. Mich. 1997): Four drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Kevin Grey and Rodney Moore*, 00-CR-00157-RCL (D.D.C. 2000): Thirty-one drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Darryl Johnson*, 96-CR-00379 (N.D. Ill. 1996): Convicted of ordering two drug-related murders. Tried, convicted, sentenced to death. A co-defendant was sentenced to life imprisonment for carrying out the murders ordered by Johnson. Johnson's death penalty sentence was vacated after thirteen years on death row. Resentenced to life after the government chose to forego a new penalty-phase trial. At sentencing, the district judge remarked that Johnson had become a changed man in the sixteen years since his conviction.

- *United States v. Peter Rollack*, 97 CR 1293 (S.D.N.Y. 1997): Eight drug-related murders, including one ordered by defendant while incarcerated. Plea agreement on eve of trial. Sentenced to life.

- *United States v. Tommy Edelin*, 98-CR-00264-RCL (D.D.C. 1998): Fourteen drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Reynaldo Villarreal and Baldemar Villarreal*, 91-CR-00004-JH (E.D. Tex. 1991): Drug-related murder of law enforcement officer. Tried, convicted, sentenced to life.

- *United States v. Shahem Johnson and Raheem Johnson*, 97-CR-00314-GBL (E.D. VA. 1997): Brothers tried for five drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Juan Raul Garza*, 93-CR-00009 (S.D. Tex. 1993). Three drug-related murders. Tried, convicted, sentenced to death, executed.

- *United States v. Claude Dennis*, 96-CR-00066-REP-EWH (E.D. VA. 1996): Six drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Emile Dixon*, 01-CR-00389-RJC-ALL (E.D.N.Y. 2001): Two drug-related murders, including machinegunning death of suspected informant. Tried, convicted, sentenced to life.

- *United States v. Anthony Jones*, 96-CR-00458-GLR (D. Md. 1996): Six drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Walter Diaz and Tyrone Walker,* 94-CR-00328-TJM (N.D.N.Y. 1994): Two defendants kill a drug dealer and flee to New York City where, in a failed effort to steal a car, they shoot and kill a woman in lower Manhattan. Later in same day the defendants fired at, but missed, a retired schoolteacher in Coney Island in a failed armed robbery. Defendant Walker was also found by the jury to have beaten to death an elderly man during a burglary when Walker was 19 years- old. Both defendants tried, convicted, sentenced to life.

More recently, in August 2025, the Department of Justice announced that it had decided not to seek the death penalty against Rafael Caro Quintero (a founder of the Sinaloa cartel), Vicente Carrillo Fuentes (a former Juárez cartel leader), or Ismael "El Mayo" Zambada García (a former Sinaloa cartel head), notwithstanding the Trump administration's oft-stated intent to punish those involved with drug cartels as severely as possible. Those three defendants are allegedly responsible for the distribution of massive quantities of drugs---activities that doubtless posed a greater risk of death to others than did the early-morning shooting of which Mr. Mangione is accused. They are also allegedly responsible for hundreds, if not thousands, of gruesomely violent murders in furtherance of cartel activity, but the Department of Justice is not seeking their execution.

These are just selected cases from the larger pool of potential and authorized federal capital cases. As a review of the summaries of authorized cases compiled by the Federal Death Penalty Resource Counsel Project and the verdict sheets available on-line will demonstrate, these exemplars are typical of federal capital cases nationwide. Since all capital cases, including these, were authorized by the Attorney General of the United States for capital prosecution, each of these cases and defendants was (or should have been) among the "worst of the worst" the federal system has to offer. Indeed, it is likely there is not a crime on the list as to which a prosecutor could not argue in summation, "If this case doesn't call for the death penalty, what case does?" And yet, in case after case—indeed, in the overwhelming *majority* of trial cases—juries returned life verdicts. In even more cases, plea agreements that took death off the table were offered and accepted. Even those cases in which a death sentence was initially imposed rarely ended in an execution—and, in many of those cases, whether a defendant was executed depended on who happened to hold the office of President at the time.

All of these cases involved terrible facts and horrific conduct by the defendants. All involved the infliction of agony on victims and survivors. Yet only a few of these defendants were sentenced to death, while an overwhelming majority were not—and a vanishingly small percentage of capitally-charged defendants were executed or remain on death row. No discernable logical basis exists for distinguishing between those defendants who were sentenced to death and those who were not. Instead, imposition of the death penalty turns on race, region, gender, the executive's political bent, and plain bad luck. *None of these arbitrary factors is a permissible criterion for selecting defendants for capital punishment.*

In *Walker v. Georgia*, 129 S. Ct. 453 (2008), Justice Stevens, dissenting from the denial of *certiorari*, noted that Georgia had sharply curtailed the scope of its statutory proportionality review of death sentences, and noted, "[T]he likely result of such truncated review … is the arbitrary or discriminatory imposition of death sentences in contravention of the Eighth Amendment." *Id.* at 457 (Stevens, J., dissenting). *See* B. Sarma, *Furman's Resurrection: Proportionality Review and the Supreme Court's Second Chance to Fulfill Furman's Promise*, 2009 Cardozo L. Rev. de novo 238 (2009). As argued in the Cardozo article:

> Almost forty years have passed since *Furman*, and nobody seriously argues that the Court's decision to regulate procedure has solved the constitutional problem of arbitrariness. In fact, evidence indicates that the application of the death penalty is just as arbitrary today as it was when the Court decided *Furman*. If *Furman* inspired positive changes in its immediate wake, those changes have been all but eviscerated in the past two decades.

*Id.* at 242.

Because it is imposed arbitrarily, the death penalty is unconstitutional and must be struck down.

C.    **THE FDPA bifurcated trial procedures violate due process because jurors cannot reach a reasoned choice between life and death sentences**[39]

The FDPA's procedures do not ensure a reliable process, do not suitably direct and limit jurors' discretion in determining whether to take or spare a life, and cannot protect against arbitrary imposition of the death penalty. The statute is therefore unconstitutional.

Because death is qualitatively different from other forms of punishment, the greater need for the reliability of the process by which a death sentence is arrived at has been long recognized. *E.g.*, *Woodson v. North Carolina*, 428 U.S. at 303-305. The Eighth and Fourteenth Amendments therefore require that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  *Gregg v. Georgia*, 428 U.S. at 189 (opinion of Stewart, Powell, and Stevens, JJ.).

A death penalty sentencing scheme that creates an unreasonable risk that jurors will misunderstand their role and their assignments violates the Eighth Amendment and the Due Process Clause. *See Simmons v. South Carolina*, 512 U.S. 154 (1994). In order for a jury's decision to impose a death sentence to withstand Eighth Amendment scrutiny, the jury's discretion must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Godfrey v. Georgia*, 446 U.S. at 427.

A federal death penalty trial under the FDPA is unlike any other trial process, and the FDPA's bifurcated trial procedures are so convoluted and confusing that they violate due process.

---

[39]Mr. Mangione acknowledges that Judge Broderick rejected this argument in *United States v. Saipov*, 17-CR-722 (VSB), 2023 WL 371531 (Jan. 24, 2023), which decision is not binding on this Court.

In a death penalty trial, jurors must reject moral judgments in favor of legal analysis at the liability stage and are then required to engage in moral judgment at the penalty phase. In some cases, jurors are required to consider evidence of a defendant's remorse immediately after rejecting that same defendant's protestations of innocence—and they are asked to do so without recommending an enhanced penalty as a sanction for the defendant's insistence on his right to trial and his refusal to admit guilt during the liability phase. During the penalty phase, unanimity is required, and lay jurors are often familiar with that concept based on exposure to trial proceedings in true crime podcasts, in books, and on television. But in the penalty phase, they are expected to understand that unanimity is no longer of any consequence and that a non-unanimous determination is permissible despite having had the importance of unanimity drummed into them through a lifetime of experience, and despite having been instructed on unanimity at trial. Jurors schooled in the burden of proof in the guilt phase, *beyond a reasonable doubt*, will be expected in the penalty phase to apply that standard of proof to aggravating factors and to apply a lesser standard, *preponderance of the evidence*, to mitigating factors---and they will be expected to remember which party bears which burden of proof as to each of the myriad factors presented for their consideration. They will be required to determine at the outset whether threshold mental state factors have been proven and then will be expected to disregard any evidence of those factors at the next stage of their deliberations because those factors are not "aggravating factors" to be considered when determining whether or not to recommend death. And they will be left largely without guidance as to what quantum of evidence is required in mitigation or aggravation, because the FDPA requires jurors to determine whether aggravating factors outweigh mitigating factors "sufficiently" to justify a sentence of death based on each juror's own arbitrary and subjective "common-sense" understanding of the concept of "sufficiency." Because it does not provide jurors

with meaningful guidance on these and other issues, the FDPA permits death arbitrarily to be imposed (or not imposed) on the basis of un-guided discretion.

Expert practitioners find the FDPA process confusing. It is unreasonable to expect even the most conscientious and reasonably intelligent jurors to parse this complex mélange of concepts and come out with an understanding of the process or a principled verdict. The FDPA therefore violates due process and is unconstitutional.

Social science demonstrates that the likelihood of arbitrary determinations under the FDPA is anything but hypothetical. Study after study shows that jurors, no matter how sincere and well-intentioned, misunderstand what they are supposed to do during the penalty-phase of a death penalty trial. One such study was detailed in C. Haney, L. Sontag and S. Constanzo, *Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death*, 50 Journal of Social Issues 149 (1994). The authors interviewed 57 capital jurors from 19 death penalty trials conducted under a California system that was very similar to the FDPA construct. Among the study's findings were the following:

- One third of the California jurors sampled focused in the penalty phase discussion solely on the nature of the crime itself in a way that essentially created a presumption of death;
- For many of the jurors, the absence of mitigation was the only reason given for the imposition of a death sentence, shifting the burden to the accused;
- The sampled jurors used their instructions to limit their consideration of some of the evidence admitted during the penalty phase, and to insulate themselves from the impact of their decision;
- Many of the sampled jurors dismissed mitigation evidence outright because they believed that mitigation evidence failed to "fit into" the rubric contained in the instructions, indicating a failure to understand what constituted mitigating evidence;
- 80% of the sampled jurors rejected mitigation evidence from their consideration because it did not directly reduce the defendant's responsibility for the crime;
- 60% of the sampled jurors rejected mitigation evidence because it did not completely account for the defendant's actions;
- Less than one third of the interviewed jurors demonstrated a workable understanding of what constituted mitigation evidence; and
- 80% of the juries returning a death verdict did so believing that life imprisonment without the possibility of parole did not really mean life without parole.

Other studies have demonstrated a similarly alarming and comprehensive misunderstanding of the sentencing mission in general, and mitigation in particular, among jurors deciding death penalty cases. *See, e.g.*, Peter Meijes Tiersma, *Dictionaries and Death: Do Capital Jurors Understand Mitigation?*, Utah L. Rev. 1 (1995). Juries in actual death penalty cases often believe, completely erroneously, that once an aggravating factor has been found, death is mandatory. *See, e.g.,* U. Bentele and W.J. Bowers, *How Jurors Decide on Death: Guilt is Overwhelming; Aggravation Requires Death; and Mitigation is No Excuse*, 66 Brooklyn L. Rev. 1011, 1031-41 (2001). Indeed, statistically valid surveys of capital-case jurors who served on actual capital cases overwhelmingly, and with no peer-reviewed research to the contrary, establish the disturbing extent of confusion on the part of jurors making life and death decisions. The article draws on the findings of the Capital Jury Project, an ongoing study funded by the National Science Foundation, of decision-making by actual capital jurors. By 2003, the ongoing CJP had completed interviews of 1,155 capital jurors from 340 trials in 14 states. 66 Brooklyn L. Rev. at 1017. For a full description of the Project, and its methodology, *see* W.J. Bowers, *The Capital Jury Project: Rationale, Design & Preview of Early Findings*, 70 Ind. L.J. 1043, 1079 (1995). Professor William J. Bowers, who holds a Ph.D. in Sociology, is Principal Research Scientist, College of Criminal Justice, Northeastern University, and serves as the Principal Investigator for the Capital Jury Project. 66 Brooklyn L. Rev. at 1011. Indeed, the studies demonstrate that a substantial number of jurors who actually serve on capital cases *automatically* vote for death if the defendant is found guilty of murder. *See, e.g.,* W. S. Geimer & J. Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Trials*" 15 Am. J. Crim. L. 1, 41 (1989), ("A significant number of jurors in death penalty cases believed that the death penalty was mandatory or presumed for first degree murder . . . . In the cases in which the jury recommended death, over

half of the jurors believed that death was to be the punishment for first degree murder, or at least that death was to be presumed appropriate unless defendant could persuade the jury otherwise"); S.P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*, 98 Columbia L. Rev. 1538 (1998) ("Many jurors wrongly think they must return a death sentence if they find the defendant's crime was especially heinous, or the defendant is especially likely to present a risk of future danger"); T. Eisenberg, S. P. Garvey & M. T. Wells, *Jury Responsibility in Capital Sentencing: An Empirical Study*, 44 Buff. L. Rev. 339, 360 (1996) ("Nearly one-third of the jurors were under the mistaken impression that the law required a death sentence if they found heinousness or dangerousness, a result replicated in the multi-state study of the interview data"); W. S. Bowers, *The Capital Jury Project: Rationale, Design and Preview of Early Findings*, 70 Ind. L.J. 1043, 1091, n.32 (1995) ("Many jurors believe that the death penalty is mandatory if the crime is heinous or vicious"); W. J. Bowers, M. Sandys & B. Steiner, *Foreclosing Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making,*" 83 Cornell L. Rev. 1476 (1998) ("There appears to be a presumption that clear unequivocal proof of guilt justifies the death penalty); T. Eisenberg and M. T. Wells, *Deadly Confusion: Juror Instructions in Capital Cases*, 79 Cornell L. Rev. 1, 12, 38 n.12 (1992) ("There is a 'presumption of death'").

Jurors in death penalty cases often misunderstand what evidence they are permitted to consider or required to reject at the different procedural stages and jury instructions rarely cure those profound misunderstandings. Rory Little, a former Associate Deputy Attorney General who served on the capital case review committee, commented on this problem in *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Fordham Urb. L.J. 347, 450-90 (1999). As Professor Little explained, given the "generality of these statutory aggravating factors and their commonality in many murders are considered together with the added

authority to invoke non-statutory aggravating factors, it is the rare federal defendant that could not, in theory, be sentenced to death simply upon conviction of any killing offense." *Id*. at 402.

The Capital Jury Project ("CJP"), supported by the National Science Foundation, conducted a comprehensive study of decision-making among capital jurors, interviewing 1201 members of 354 different juries sitting in death penalty cases in 14 states. *See* W. Bowers and W. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 Crim. Law Bulletin 51 (2003). The CJP found that juries decide issues relevant to punishment before the penalty phase begins more than half the time, meaning that mitigation factors are never considered in half of death penalty trials. The CJP also found a comprehensive lack of understanding among jurors concerning what constitutes mitigation and why mitigation matters; that jurors often fail to understand the instructions given by the judge; and that the jury decision-making process in death penalty cases is so flawed that it violates constitutional principles.

The CJP's comprehensive research demonstrates that even in jurisdictions in which the jurors are specifically instructed that mitigating factors do not need to be found unanimously, and that mitigating factors are not restricted to a statutory list, a terrifying percentage of the jurors never grasped these critical features of the law. 39 Crim. Law Bulletin at 68-69. The CJP's findings provide a window into a process which has been designed with as much care as this politically sensitive issue permits, but which in practice is grossly arbitrary, unfocused and very often influenced by racial factors. The CJP underscores what seems obvious— that this process is insufficiently narrowed and focused to be constitutional. A jury's decision on whether or not a defendant should be put to death appears to have little to do with the instructions given by the court or the care with which the process has been constructed or managed. This makes the FDPA unconstitutional.

The Supreme Court's decisions upholding the death penalty in the past have been based on assumptions shown that the CJP's research proves to be erroneous. For example, in *Boyde v. California*, 494 U.S. 370 (1990), the Court's decision was based on inaccurate assumptions about how the jurors assessed categories of information presented during trial. Likewise, the court's decision in *Tuilaepa v. California*, 512 U.S. 967 (1994) included the conclusion that instructions given to the penalty phase jurors to guide their handling of aggravating factors, mitigating factors and the various burdens of proof were "phrased in conventional and understandable terms." *Id*. at 976. Conventional as the instructions may be, the CJP research clearly demonstrates that they are not understandable to jurors.

In *Tuilaepa*, the Court said that whether a penalty phase instruction is constitutional depends on whether it has a "common sense core of meaning . . . that criminal juries should be capable of understanding." *Id*. at 975. One shocking lesson taught by the CJP's rigorous social science is that capital juries often fail to understand and apply the trial court's instructions. Because instructions concerning the FDPA's purported guardrails and the penalty phase considerations are unlikely to be understood and applied, the FDPA is unconstitutional under the reasoning of *Tuilaepa*.

This Court should declare the FDPA unconstitutional and permit this case to proceed as a non-death penalty case. In the alternative, Mr. Mangione requests an evidentiary hearing to permit the presentation of expert testimony and empirical evidence in support of the argument that the FDPA is so incomprehensible to jurors as to prevent, or substantially impair, their performance in the task of deciding between a death sentence and a life sentence.

6.    **The FDPA Lacks Constitutional Procedures Approved by the legislature and the Government's Efforts to "Gap-Fill" Through Procedures Not Authorized by Congress Cannot Pass Constitutional Muster[40]**

"It is the legislature, not the court, which is to define a crime and ordain its punishment."

*United States v. Wiltberger*, 18 U.S. 76, 93 (1820) (Marshall, C.J.).

A.    **Introduction and Summary of the Argument**

When Congress enacted the FDPA in 1994, it endowed prosecutors with exclusive authority to allege aggravating factors for consideration during the sentencing phase, which the statute requires the prosecutor to do by means of filing and serving notice a reasonable time before trial. 18 U.S.C. § 3593(a). The FDPA does not authorize the presentation of evidence concerning aggravating factors to a grand jury, and it does not authorize a grand jury to consider and determine whether any such aggravating factors exist. Thus, the FDPA does not authorize any procedure by which evidence of aggravating factors may be presented to and considered by the grand jury when that body is determining whether to issue a capital indictment. In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court held that aggravating factors are akin to elements of the offense that must be found by a jury. *Ring*, 536 U.S. at 569 (explaining that "enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense'....") (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000). Accordingly, like any other element of an offense for which the government seeks to obtain an indictment, evidence of aggravating factors must be presented to a grand jury, and a capital offense may only be presented at trial if the grand jury has found the relevant aggravators when issuing the indictment. *See Jones v. United States*, 526 U.S.

---

[40]Mr. Mangione acknowledges that Judge Broderick rejected this argument in *United States v. Saipov*, 17-CR-722 (VSB), 2023 WL 371531 (S.D.N.Y. Jan. 24, 2023), which decision is not binding on this Court.

227, 251-52 (1999) (holding that all elements of a federal offense "must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt"); *see also Harris v. United States*, 53 6 U.S. 545 (2002) ("those facts setting the outer limits of a sentence and of the judicial power to impose it are elements of the crime for constitutional analysis").

Post-*Ring*, the FDPA's exclusive procedural mechanism for presentment of aggravating factors at trial is no longer operative—and the statute lacks any other congressionally-approved method of alleging aggravating factors for consideration by either a grand or petit jury. Without any statutory grant of authority by Congress, the government has unilaterally attempted a *de facto* "amendment" of the FDPA's procedures, and to work around *Ring*, by obtaining an indictment containing "special findings" akin to the aggravating factors it intends to present at trial. But neither the DOJ nor any other executive agency can make or amend law. It is up to Congress to amend the FDPA if it wishes to authorize a death penalty process compliant with *Ring* and the Constitution, and Congress has chosen not to do so.

The federal death penalty statute, as enacted, is unconstitutional. This Court should resist and reject the government's unilateral effort effectively to amend the statute through the use of "special findings" by precluding the government from seeking to execute Mr. Mangione.

**B.    The FDPA's Aggravating Factors are "Elements" of a Capital Offense Under *Ring* and Must Be Presented to and Found by a Grand Jury**

*Ring* concerned the constitutionality of Arizona's statutory procedures for seeking the death penalty. It did not directly address the constitutionality of the FDPA. But because the Arizona statute and the FDPA are indistinguishable in all material regards, *Ring*'s holding that facts that must be found before a death sentence may be imposed are the functional equivalent of offense

elements that must be found by a jury is equally applicable to "aggravating factors" under the FDPA.

The FDPA and Arizona capital schemes are similar in that each requires that additional fact-finding be conducted after a guilty verdict before a death sentence may be imposed. Under both statutes, death can only be imposed if a fact-finder determines, after a guilty verdict is reached, that existing "aggravating factors" support the imposition of a death sentence. Under the Arizona statutory procedures invalidated in *Ring*, the death-qualifying factors could be found by a judge—not a jury—after a jury convicted the defendant or following a guilty plea. The FDPA differs in that it requires that aggravating factors be found by a jury, in a separate penalty phase following a guilty verdict—but that distinction does not make a difference with regard to the critical question whether "aggravating factors" should be considered elements of a capital offense. *Ring* answered that critical question in the affirmative. As the Court explained, "aggravating factors" without which death cannot be imposed are, as a matter of logic, elements that must be proven to a jury and found beyond a reasonable doubt. "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602 (citing *Apprendi*, 530 U.S. at 482-83). Thus, because aggravating factors "expose[] a defendant to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone," aggravating factors are the functional equivalent of elements of a capital offense for constitutional purposes. *Id.* (emphasis in original). *See also Apprendi*, 530 U.S. at 494, n.19 (("[W]hen the term 'sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict.")

Because they are the functional equivalent of elements of a capital offense, the Constitution requires that aggravating factors be presented and proved in the same manner as any other offense elements. Only by treating them in that manner can a defendant's Constitutional rights be preserved. As the *Ring* court explained,

> The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death.

*Ring*, 536 U.S. at 609.

The same is true of a defendant's Fifth Amendment right to have the charges against him presented to a grand jury and to be held to answer to those charges only if the grand jury returns an indictment. The right to a grand jury indictment would be senselessly diminished if a prosecutor seeking a capital indictment were not required to present aggravating factors to the grand jury, and to obtain an indictment charging those factors.[41]  Indeed, the Supreme Court has repeatedly held that all elements of a federal offense—to include all facts increasing the maximum penalty for such an offense—"must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 251-52 (1999); s*ee also United States v. Cotton,* 535 U.S. 625 (2002) (in federal prosecutions, any fact increasing the maximum punishment "must also be charged in the indictment").

But the FDPA does not permit its statutory and non-statutory aggravating factors to be presented to a grand jury or require that they be included in an indictment as required by the Fifth Amendment. Instead, the sole Congressionally authorized means by which statutory and non-statutory aggravating factors may be alleged in a capital case brought pursuant to the FDPA is by

---

[41]Because *Ring* concerned a state proceeding that did not implicate the Fifth Amendment, the *Ring* Court did not have occasion to consider explicitly whether aggravating factors necessarily had to be presented to a grand jury as well as proven to a petit jury.

notice served and filed by the prosecutor. Specifically, the FDPA provides that a death sentence can be pursued only if "the attorney for the government"—not a grand jury— believes that the circumstances of the offense are such that a sentence of death is justified…." 18 U.S.C. § 3593(a). If the "attorney for the government" believes death is warranted, the next step in the congressionally enacted process is for that attorney to serve and file a notice, signed by the attorney for the government, stating, *inter alia*, that "the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified . . . and that the government will seek a sentence of death" and "setting for the aggravating factor or factors that the government ... proposes to prove as justifying a sentence of death." 18 U.S.C. § 3593(a)(1).

The Constitution requires that a grand jury—not a government attorney—be permitted to determine whether a person "shall be held to answer for a capital, or otherwise infamous crime." U.S. Const., Amend. V. The FDPA allocates responsibility for that determination to a government attorney, not a grand jury, and is therefore unconstitutional. The Notice of Intent—which was not presented to a grand jury and included in the Indictment—must be stricken.

### C.    The Indictment's "Special Findings" Cannot Cure the FDPA's Constitutional Shortcomings[42]

Faced with statutory procedures that are unconstitutionally defective under *Ring*, the government has attempted to cure the FDPA by rewriting the statute to permit a grand jury to return "special findings," akin to the FDPA's aggravating factors, and in that manner charge a capital

---

[42]Some other courts have rejected the arguments set forth herein, but no precedent binding on this Court exists on the issue. Moreover, none of the decisions to the contrary has merit. None of those decisions has distinguished *United States v. Jackson*, 390 U.S. 570 (1968), which is on all fours and constitutes compelling Supreme Court precedent. Nor have those courts otherwise acknowledged or addressed the separation of powers concerns raised by the "special findings" procedure invented by the government. *See, e.g.*, *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006); *United States v. Allen*, 406 F.3d 940, 949 (8th Cir. 2005).

offense. This Court must not allow the government to avoid the FDPA's unconstitutionality by rewriting the statute to its own liking. Indeed, the Supreme Court rejected a closely analogous effort by federal prosecutors to work around unconstitutional provisions of a capital punishment statute by inventing procedures not authorized by Congress almost sixty years ago, in *United States v. Jackson*, 390 U.S. 570 (1968).

*Jackson* concerned the government's efforts to elide unconstitutional provisions of the Federal Kidnaping Act by creating procedures not authorized by the statute itself. The Federal Kidnaping Act provided that a death sentence "shall" be imposed whenever a jury recommends capital punishment in certain kinds of kidnaping cases but provided no parallel provision permitting a judge to impose death without a jury recommendation. *Id.* at 571, 574. That capital punishment provision was unconstitutional because it infringed on defendants' right to a trial by jury: if a defendant pleaded guilty (or pursued a bench trial), no jury would be empaneled and death could not be imposed, but if a defendant sought trial, he risked a jury finding that would mandate death. *Id.* at 572-73. In an effort to avoid the conclusion that the statute's death penalty provision was unconstitutional, the government argued that the statute "authorize[d] ... by implication" a procedure, not expressly provided for by statute, by which a judge accepting a guilty plea could empanel a limited-purpose jury to determine whether a death sentence was warranted. *Id.* at 576-77. The Supreme Court rejected the government's attempt to cure the statute's constitutional defects by adopting procedures not expressly authorized by Congress as "untenable" and found it "unnecessary to decide whether ... the statutory scheme the Government envisions" would be constitutional, "for it is not the scheme that Congress enacted." 390 U.S. at 573, 576-77. As in *Jackson*, it is not necessary in this case to determine whether the submission of "special findings" to a grand jury would be sufficient, under the Constitution, to protect a capital

defendant's rights under the Fifth and Sixth Amendments, because the procedural scheme purportedly used by the government herein "is not the scheme that Congress enacted." *Id.* at 573. The scheme Congress enacted in the FDPA requires a prosecutor to allege aggravating factors in the form of a notice served and filed before trial. Congress has provided for no means by which those factors can be presented to and found by a grand jury as the Fifth Amendment requires. It is unnecessary to consider whether the procedural scheme the government purports to have used passes Constitutional muster, because it is not the scheme that Congress enacted.

The fundamental separation of powers set forth in Articles I through III of the Constitution forbids prosecutors—who represent an arm of the executive—from creating procedures by which to present aggravating factors to a grand jury, as the government purports to have done in this case. Since at least as early as 18 U.S.C. § 3593(a), it has been clear that the Constitution affords Congress the sole power to define and create all offenses against the United States, and the punishment therefor. *See also*, *United States v. Worrall*, 2 U.S. (2 Dall.) 384, 393-94 (1798); *United States v. Wiltberger*, 18 U.S. 76, 93 (1820), ("[i]t is the legislature, not the court, which is to define a crime and ordain its punishment"); *Hudson*, 11 U.S. at 34 ("[t]he legislative authority of the Union must first make an act a crime, fix a punishment to it, and declare the Court that shall have jurisdiction of the offense" and "[t]he power of punishment is vested in the legislative, not in the judicial department")*; see also Bousley v. United States*, 523 U.S. 614, 620-21 (1998) ("under our federal system it is only Congress, and not the courts, which can make conduct criminal"); *Staples v. United States*, 511 U.S. 600, 604 (1994) ("[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes which are solely creatures of statute") (citation omitted).

As a result, "[o]ne may be subjected to punishment for crime in the federal courts only for the commission or omission of an act defined by statute, or by regulation having legislative authority, and then only if punishment is authorized by Congress." *Viereck v. United States*, 318 U.S. 236, 241 (1943) (citations omitted). *See also United States v. Lanier*, 520 U.S. 259, 267-68 n. 6 (1997) ("[f]ederal crimes are defined by Congress, not the courts")*; Logan v. United States*, 144 U.S. 263, 283 (1982) ("[a]lthough the constitution contains no grant, general or specific, to congress of the power to provide for the punishment of crimes, [with certain exceptions] … no one doubts the power of congress to provide for the punishment of all crimes and offenses against the United States"). Applying these principles in *Bouie v. City of Columbia*, 387 U.S. 347 (1964), in which the state courts of South Carolina, in an obvious effort to prosecute civil rights protesters, had construed an existing statute in a manner that created a new crime, the Supreme Court intervened and set aside the statute, as interpreted, as contrary to *Wiltberger*. *See also Crandon v. United States*, 494 U.S. 152, 158 (1990) ("legislatures, not courts, define criminal liability").

Nor can the government argue that Congress, in allocating to prosecutors the exclusive power to identify and assert aggravating factors, has *sub silentio* delegated to the government the legislative authority to create procedures by which to present those aggravators to a grand jury. Such an argument would violate the non-delegation doctrine, which serves to preserve the separation of powers envisioned by the founders and enshrined in the Constitution. This is because "[t]he non-delegation doctrine originated in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989); U.S. Const., Art.1, § 1. As Justice Scalia stated in his dissent in *Mistretta*:

> It is difficult to imagine a principle more essential to democratic Government than that upon which the doctrine of unconstitutional delegation is founded: Except in a few areas constitutionally committed to the Executive Branch, the basic policy decisions governing society are to be made by the Legislature.

* * *

> That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of Government ordained by the Constitution.

488 U.S. at 415 (Scalia, J., *dissenting*). The majority in *Mistretta* ultimately found that the non-delegation doctrine had not been violated by creation of the United States Sentencing Commission and the guidelines it promulgated, because, in constituting the Commission, Congress had "[laid] down by legislative act an intelligible principle to which the [Sentencing Commission] is directed to conform," 488 U.S. at 372, quoting *N.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928); *Mistretta*, 488 U.S. at 374. Nevertheless, the Court reaffirmed the principle that "'the integrity and maintenance of the system of Government ordained by the Constitution's mandate that Congress generally cannot delegate its legislative power to another Branch." 488 U.S. at 371-72, *quoting Field v. Clark*, 143 U.S. 649, 692 (1892).

Thus, *Mistretta* involved the delegation only of authority to determine sentencing factors within the limits of a legislatively determined "intelligible principle." It did not include the authority to determine the very elements of an offense, as would be the case under a hypothetical post-*Ring* FDPA. Plainly, Congress must have the opportunity to determine, in light of *Ring*, the precise elements of federal capital offenses and how *Ring* has affected the legislative balancing which produced the FDPA in the first place.

In *Touhy v. United States*, 500 U.S. 160, 164 (1991), the Court upheld Congress' delegation to the Attorney General of the authority to *temporarily* classify a drug as a controlled substance in order to bring its use and/or distribution within reach of criminal prosecution. This delegation of authority was based on the advent of "designer drugs" which were only marginally different in chemical composition from drugs that were already controlled. The Court held that the intelligible

Congressional principle at issue not only meaningfully constrained the Attorney General's discretion to define criminal conduct but that, in addition, "Congress ha[d] placed multiple specific restrictions on the Attorney General's discretion to define criminal conduct." *Id.* at 167.

Since Congress could not delegate to the Executive Branch the power to rewrite the FDPA to its post-*Ring* liking, *a fortiori* the Executive Branch cannot simply assume that power by attempting to substitute new procedures and elements for those originally provided by Congress, but rendered constitutionally infirm by the *Ring, Jones, Apprendi* trilogy.

Finally, in determining whether the government's invention of a procedure by which to obtain "special findings" akin to the aggravating factors required by the FDPA passes muster, it must be noted that federal grand juries lack any authority to issue "special findings" even if the government were authorized to seek them. The Federal Rules of Criminal Procedure provide that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P 7(c)(1). In 1979, Rule 7 was amended specifically to allow notice of criminal forfeitures to be alleged by indictment.

Obviously, nothing in the text of the Rule, and nothing in the Indictment Clause of the Fifth Amendment, contemplates or permits a grand jury to make "Special Findings" that serve the function of the triggering requirements of the FDPA---triggering requirements that are unconstitutional as enacted. Consequently, the prosecutor's attempt to rescue the FDPA via the grand jury's "Special Findings" is of no consequence. The FDPA's procedures concerning presentment of aggravating factors is unconstitutional, and the death penalty therefore remains unavailable in any federal prosecution until and unless Congress takes action to codify procedures that conform with the Constitution.

## <u>CONCLUSION</u>

For the reasons stated in Points One and Two, the Indictment should be dismissed. For the

reasons stated in Points Three through Six, the government should be precluded from prosecuting

this matter as a death penalty case.

Respectfully submitted,

_____
Karen Friedman Agnifilo
Marc Agnifilo
Jacob Kaplan
AGNIFILO INTRATER LLP
445 Park Ave., 7th Fl.
New York, NY 10022

            /s/
_____
Avi Moskowitz
Eylan Schulman
Christopher Neff
MOSKOWITZ COLSON
GINSBERG & SCHULMAN
80 Broad Street, Suite 1900
New York, NY 10004

## <u>CERTIFICATION</u>

The undersigned hereby certifies that the Memorandum of Law in Support of Luigi Mangione's Motion Challenging the Constitutionality of the Death Penalty complies with this Court's September 18, 2025, Order authorizing counsel to file an oversized brief in this matter. The word count, exclusive of the caption, tables, and signature blocks, is 32,610 words according to the word-processing system used to prepare the document.

Dated: September 19, 2025

_____
Karen Friedman Agnifilo
AGNIFILO INTRATER LLP
445 Park Ave., 7th Fl.
New York, NY 10022