UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA

                                  **AFFIRMATION IN SUPPORT**
                                  **OF PRETRIAL MOTIONS**

      v.

                                  25 Cr. 176 (MMG)

LUIGI MANGIONE,

                Defendant.
------------------------------------------------------X

        KAREN FREIDMAN AGNIFILO, an attorney at law duly admitted to practice in the Southern District of New York, affirms the following to be true under the penalty of perjury:

        1.      I am an attorney and Of Counsel at Agnifilo Intrater LLP, a law firm located in New York City, and I am an attorney for Luigi Mangione. I make this affirmation in support of a motion dated October 10, 2025, seeking Orders (1) dismissing Counts Three and Four of the indictment for failure to state an offense under 18 U.S.C. § 924(j) and 18 U.S.C. § 924(c); (2) suppressing evidence the government recovered through a warrantless search of Mr. Mangione's backpack; and (3) suppressing Mr. Mangione's statements to law enforcement that were the result of custodial interrogation without *Miranda* warnings.

        2.      I have prepared this affirmation based on my review of the indictment and the discovery provided by the government, including body-worn camera footage.

### ALLEGED FACTS[1]

        3.      On December 4, 2024, at 6:45 a.m., UnitedHealthcare CEO Brian Thompson was shot outside the company's annual investor conference at the New York Hilton Midtown. Mr.

---

[1] Because the dual federal and state charges against Mr. Mangione relate to the exact same set of facts and have identical suppression issues relating to the warrantless search of Mr. Mangione's backpack, the factual portion of this motion will, in large part, mirror the factual portion of Mr. Mangione's state omnibus motion filed on April 30, 2025.

Thompson, who had been subject to previous threats,[2] died at a local hospital approximately 30 minutes later.

4. Following the shooting, the NYPD released video of the shooting and pictures of the masked suspect to the public. Within hours of the shooting, law enforcement also disseminated to the media and the public that two of the discharged shell casings had the words "DENY" and "DEPOSE" inscribed on them, and that the word "DELAY" was inscribed on a bullet recovered at the scene.[3] The NYPD began a nationwide manhunt to search for the masked perpetrator and also enlisted the help of the public by posting a reward for information leading to his capture.

5. The NYPD viewed thousands of hours of surveillance video to attempt to locate the shooter and where the shooter had been in the previous weeks. The NYPD Police Commissioner stated that she assigned ten detectives from the NYPD's Intelligence Division to search though social-media profiles of hundreds of young men who looked similar to the shooter and had also posted negative comments about the health insurance industry.[4]

6. As depicted on police body worn camera footage, on the morning of December 9, 2024, Patrolmen Joseph Detwiler and Tyler Frye of the Altoona Police Department in Pennsylvania responded to a McDonald's restaurant, based on a 911 call reporting a "suspicious

---

[2]*See, e.g.*, *Brian Thompson's wife said threats had been made against UnitedHealthcare CEO before shooting*, NBC NEW YORK (Dec. 4, 2024), https://www.nbcnewyork.com/manhattan/brian-thompson-united-healthcare-ceo-threats/6039242/.

[3]Law enforcement incorrectly initially reported to the media that the words inscribed on the bullets were "Deny," "Defend" and "Depose," before correcting their mistake days later. *See, e.g.*, Tom Murphy, *Words on ammo in CEO shooting echo common phrase on insurer tactics: Delay, deny, defend*, AP, (Dec. 5. 2024), https://apnews.com/article/unitedhealthcare-ceo-shooting-delay-deny-defend-depose-ee73ceb19f361835c654f04a3b88c50c.

[4]*See* Noah Shachtman, *Commish Tisch to the Rescue,* New York Magazine (March 8, 2025), https://nymag.com/intelligencer/article/nypd-commissioner-jessica-tisch-eric-adams.html.

male that looked like the shooter from New York City." (NY GJ Tr. at 99.) Arriving at the McDonald's, the patrolmen, both in full uniform and displaying badges, approached Mr. Mangione at 9:29 a.m. as he sat at a table in the back of the restaurant. As pictured below, Mr. Mangione was sitting at a corner table with a wall behind him and to his left[5]:



7. Patrolmen Detwiler and Frye positioned themselves to Mr. Mangione's right, blocking his only exit from the table (as he was already surrounded by two walls and a table). Patrolman Detwiler first asked Mr. Mangione to pull down his face mask and then asked for his name. Patrolman Detwiler told Mr. Mangione that someone had called the police because they thought he was suspicious. Both Patrolmen were fully armed and their firearms were visible for all to see.

---

[5] The still photos embedded in this motion are screen shots from the police body-worn camera footage provided to the defense by the prosecution. Counsel has blurred law enforcement faces in the still photos.

8. After Patrolman Detwiler asked to see Mr. Mangione's identification (Mr. Mangione is alleged to have provided a New Jersey license in the name of Mark Rosario), the patrolman asked Mr. Mangione if he was from New Jersey and whether he had been to New York recently. As Mr. Mangione prepared to eat his food, Patrolman Detwiler moved even closer to Mr. Mangione and asked him what he was doing in New York. Before Mr. Mangione even responded, Patrolman Detwiler asked him to stand up and put his hands on top of his head—with Detwiler grabbing and lifting Mr. Mangione's right wrist above his head. Patrolman Detwiler asked Mr. Mangione why he was nervous, as Detwiler frisked Mr. Mangione. Patrolman Detwiler ordered Mr. Mangione to sit back down at the table and directed Patrolman Frye to talk to Mr. Mangione, while Detwiler motioned for Frye to move physically closer to Mangione to reinforce Mangione's inability to leave. As the video shows, Mr. Mangione was cooperative and complied with every request.

9. As Patrolman Frye effectively had Mr. Mangione in custody while he stood watch over him and blocked any potential exit, Patrolman Detwiler went outside to call another officer and tell him that he was "100% sure" that Mr. Mangione was the individual that law enforcement was looking for connected to the December 4, 2024, shooting in New York.

10. Patrolman Detwiler returned to the back area of the McDonald's to further interrogate Mr. Mangione and asked again if he was from New Jersey, what he was doing in Altoona and whether he had been to New York recently. Even though Patrolman Detwiler had already decided that Mr. Mangione was the New York shooter, he told Mr. Mangione, as a pretext for the police interaction, that they were there because Mr. Mangione had been at the McDonald's for 40 minutes. Patrolman Frye remained in his strategic position blocking Mr. Mangione's exit as Detwiler continued interrogating Mr. Mangione:



11. At 9:41 a.m., twelve minutes after they first approached Mr. Mangione, Patrolman Detwiler moved a backpack from the floor where Patrolman Frye had been blocking Mr. Mangione's path to an area far out of Mr. Mangione's reach. In the next minute, five additional uniformed and armed officers entered the back area of the McDonald's where Mr. Mangione was penned in.

12. Detwiler ordered another officer to stand next to Patrolman Frye (forming an armed human wall trapping Mr. Mangione at the back of the restaurant) as Detwiler walked outside to talk with other officers to confirm that Mr. Mangione fit the description of the New York suspect.

13. When Detwiler reentered the McDonald's at 9:45 a.m., three patrolmen surrounded Mr. Mangione, and Mr. Mangione's backpack was approximately six feet away on a table. Notably, two of the patrolmen were positioned between Mr. Mangione and the backpack:



14. At 9:46 a.m., with eight officers now on the scene, another officer asked Patrolman Detwiler if he had read Mr. Mangione his rights as required by the Supreme Court's ruling in *Miranda v. Arizona*, 384 U.S. 436 (1966)). When Patrolman Detwiler responded that he had not, the officer told Detwiler to tell Mr. Mangione that he was under official police investigation and to read Mr. Mangione his rights. Patrolman Detwiler informed Mr. Mangione that he was under official police investigation and that he would be arrested for "false ID" if he gave the police a false name again. But Detwiler did not provide Mr. Mangione *Miranda* warnings, as the other officer had instructed.

15. Patrolman Detwiler then continued his custodial, non-*Mirandized* interrogation of Mr. Mangione by asking if his name was Mark Rosario, to which Mr. Mangione responded, "No." Patrolman Detwiler asked Mr. Mangione for his real name and his date of birth, which Mr. Mangione provided. Another officer at the scene asked Mr. Mangione twice why he lied about his name. At this time, there were nine officers surrounding Mr. Mangione and blocking his exit from

McDonald's.

16. At 9:48 a.m.—nearly twenty minutes after law enforcement first approached Mr. Mangione and prevented him from leaving and asked him numerous interrogation questions—Patrolman Stephen Fox finally read Mr. Mangione his *Miranda* warnings. After informing Mr. Mangione of his constitutionally protected right to remain silent, Patrolman Fox asked Mr. Mangione if he wanted to talk to law enforcement. Mr. Mangione exercised his constitutional right to remain silent and expressed that he did not want to speak to law enforcement. Patrolman Fox told Mr. Mangione that he "was not in custody at this point," despite the fact that, at that moment, there were ten officers in the back of the McDonald's where Mr. Mangione was sitting, they had already decided with 100% certainty that he was the shooter, and he was clearly in custody and not free to leave. Patrolman Fox then asked Mr. Mangione why he had a fake ID. After Mr. Mangione did not answer, Patrolman Fox ordered Mr. Mangione to stand and put his hands on the wall so Fox could pat him down, and as the video depicts, Mr. Mangione complied in all respects with these directives.

17. At 9:50 a.m., approximately 90 seconds after telling Mr. Mangione that he was not in custody even though he was surrounded by officers, and after he had already been patted down and frisked twice, Patrolman Fox handcuffed Mr. Mangione and thoroughly searched him again. Mr. Mangione remained standing, handcuffed and surrounded by officers as they waited for verification of his identification:



18. At 9:54 a.m., Patrolman Detwiler walked out of the McDonald's to discuss Mr. Mangione's identification with another officer. During this conversation and without any explanation, Patrolman Detwiler covered his body-worn camera with his hand to prevent the camera from recording twenty seconds of his conversation.

19. At 9:58 a.m., several officers started searching through Mr. Mangione's jacket and pockets and searched him again. At the same time, Patrolwoman Christy Wasser and Patrolman Fox began searching through the backpack that law enforcement had placed on a table out of Mr. Mangione's reach more than 17 minutes earlier.

20. As part of these warrantless searches, Patrolwoman Wasser opened Mr. Mangione's backpack and fully searched the backpack, its compartments and its contents, including closed bags that were within the backpack while Mr. Mangione was handcuffed and surrounded by officers who were positioned between Mr. Mangione and his backpack:



21.     As part of this warrantless search inside the McDonalds, Patrolman Fox retrieved a small item from inside the backpack that was enclosed in cardboard and wrapped in tape; Patrolman Fox took out his knife and sliced open the tape to find a computer chip inside.

22.     The officers continued their warrantless search through Mr. Mangione's backpack at McDonald's even after he was removed from the restaurant by other officers and driven to the police precinct. During this continued search of the backpack, Patrolwoman Wasser recovered a gun magazine loaded with bullets. Now realizing she had made a potentially devastating mistake by thoroughly searching the backpack of a murder suspect in a significant New York press case without a warrant, Wasser suddenly stated that she was searching through the backpack at McDonald's to make sure there "wasn't a bomb or anything in here" before putting the backpack in the car. The falsity of that comment was made clear seconds when later another officer at McDonald's stated "Now that we found that [i.e., the loaded magazine], let's just bring it back" to the precinct. Suddenly not concerned about a "bomb," Patrolwoman Wasser placed all the items back into the backpack and stopped searching. Patrolwoman Wasser repeated her comment that

she was making sure there were no bombs in the backpack, as another officer commented that "at this point we probably need a search warrant for it." Without calling for the bomb squad, evacuating the McDonald's or even searching for a bomb, Patrolwoman Wasser placed the backpack in her police car and brought it to the precinct.

23. Patrolwoman Wasser left McDonald's at 10:04 a.m. There is no body-worn camera footage from her for the next 11 minutes as she drove to the precinct with the backpack in question. At 10:16 a.m., one minute after arriving at the precinct, Patrolwoman Wasser continued her warrantless search of the backpack. Patrolwoman Wasser first re-opened the same backpack compartment that she had started searching at the McDonald's before immediately closing that compartment and opening the front compartment of the backpack as if she was specifically looking for something. Instantly, she "found" a handgun in the front compartment.

24. After finding the gun at the precinct, Patrolwoman Wasser again explained to another officer that she quickly searched the bag at McDonald's to make sure there were "no bombs or anything." Patrolwoman Wasser did not explain why she did not seek a warrant once she had arrived at the precinct.

25. Patrolwoman Wasser continued to rummage through and search the backpack in a hallway at the precinct without a warrant and recovered a silencer, a red notebook containing Mr. Mangione's personal writings, additional writings, a computer chip, an iPhone and several USB flash drives.

26. Over seven hours after the warrantless search of Mr. Mangione's backpack, the Altoona Police Department finally sought a search warrant at 5:14 p.m. This warrant application sought permission to search and seize the items from Mr. Mangione's backpack that law enforcement had already searched several times and seized earlier that morning.

27. Mr. Mangione was formally arrested and charged in Altoona with forgery, possession of a weapon and tampering with records or identification, possession of an instrument of a crime (for possessing a silencer) and furnishing a false identification to a law enforcement officer.

28. On December 17, 2024, the New York County District Attorney's Office publicly announced that Mr. Mangione had been charged by a grand jury in an 11-count indictment alleging the following crimes: (1) Murder in the First Degree (Penal Law § 125.27(1)(a)(xiii)); (2) Murder in the Second Degree as a Crime of Terrorism (Penal Law §§ 125.25(1), 490.25);[6] (3) Murder in the Second Degree (Penal Law § 125.25(1); (4) Criminal Possession of a Weapon In the Second Degree (Penal Law § 265.03(1)(b)); (5) Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03(3)); (6) Criminal Possession of a Weapon in the Third Degree (Penal Law § 265.02(7)); (7) Criminal Possession of a Weapon in the Third Degree (Penal Law § 265.02(2)); (8) Criminal Possession of a Weapon in the Third Degree (Penal Law § 265.02(8)); (9) Criminal Possession of a Weapon in the Third Degree (Penal Law § 265.02(8)); (10) Criminal Possession of a Weapon in the Fourth Degree (Penal Law § 265.01(9)); and (11) Criminal Possession of a Forged Instrument in the Second Degree (Penal Law § 170.25). During a press conference by the Manhattan District Attorney and the NYPD Police Commissioner, announcing these charges, there was no mention whatsoever of any federal case.

29. On December 19, 2024, after waiving extradition to New York, Mr. Mangione was transported via procession in a fleet of over a dozen police cars and then was flown via plane and helicopter to New York City from Pennsylvania. Upon arrival, Mr. Mangione was paraded in a

---

[6] Mr. Mangione is no longer charged with counts one and two of the state court indictment charging Mr. Mangione with terrorism related offenses as those charges were dismissed by the Honorable New York Supreme Court Judge Gregory Carro.

choreographed highly publicized "perp-walk" by the NYPD, the FBI and the New York City mayor.

30. Later that morning, counsel was on the way to state court for the previously arranged Supreme Court arraignment at 2:00 pm. Before Mr. Mangione could be brought to state court for this planned arraignment, for which he waived extradition to New York from Pennsylvania, the FBI unexpectedly seized custody of Mr. Mangione from the local authorities and brought him to the Southern District of New York where he was charged by federal complaint, filed the night before, charging Mr. Mangione with Stalking (Counts One and Two) counts), Murder Through Use of a Firearm (Count Three) and a Firearms Offense (Count Four). These charges are based on the identical facts and evidence as the New York state court indictment.[7] Mr. Mangione was remanded to federal custody at the Metropolitan Detention Center in Brooklyn, where he is currently still detained.

31. On April 1, 2025, the United States Attorney General directed the Southern District of New York prosecutors to seek the death penalty. On April 17, 2025, the federal prosecutors formally indicted Mr. Mangione for the charges listed in the federal complaint. As discussed in the attached Memorandum of Law, both Counts Three and Four of the indictment require that Mr. Mangione use a firearm during and in relation to a "crime of violence" as that term is defined by law and will be discussed further below. In this case, the alleged crimes of violence are the stalking charges alleged in Counts One and Two of the indictment.

---

[7]Indeed, much of the discovery provided in the federal case is from discovery provided to the federal prosecutors from the New York County District Attorney's case, as the factual and evidentiary materials are nearly identical.

32. On April 24, 2025, the federal prosecutors filed their Notice of Intent to seek the death penalty.[8]

33. Based on the facts alleged in this affirmation and the attached Memorandum of Law, counsel respectfully requests that this Court issue Orders dismissing Counts Three and Four of the indictment, suppressing the evidence recovered from law enforcement's warrantless search of Mr. Mangione's backpack at the McDonald's and suppressing Mr. Mangione's statements to law enforcement at the McDonald's that were obtained through custodial interrogation without *Miranda* warnings.

Dated: October 10, 2025
New York, NY

Respectfully submitted,

_____
Karen Friedman Agnifilo
Marc Agnifilo
Jacob Kaplan
AGNIFILO INTRATER LLP
140 Broadway, Suite 2450
New York, NY 10005

---

[8] The highly unusual and unlawful manner in which the death penalty has been sought in this case is the subject of prior motions currently being litigated and pending before this Court.