# AGNIFILO
# INTRATER

---

October 16, 2025

**VIA ECF**
The Honorable Margaret M. Garnett
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

      Re: *United States v. Mangione*, 25 Cr. 176 (MMG)

Dear Judge Garnett:

      We write in reply to the government's October 8, 2025, letter addressing whether certain social media statements made by Department of Justice ("DOJ") personnel violated Local Criminal Rule 23.1 and the Court's April 25, 2025, Order. For the reasons stated below, counsel submits that these statements fall well within the confines of Local Criminal Rule 23.1 and the Court's Order and were prejudicial to Mr. Mangione's right to a fair trial.

**1.    The DOJ Personnel Who Made the Statements are Covered by Local Rule 23.1**

      The Court's instruction to the government could not have been clearer. On April 25, 2025, the Court stated:

> [G]iven the nature of this case, I would like to just remind all counsel of the strictures of Local Criminal Rule 23.1 about public commentary about this matter that could impede or affect Mr. Mangione's ability to get a fair trial and the Court's ability to select a fair jury in this case. I'm specifically directing the government to convey my directive to Mr. Clayton and request that he convey the same to Attorney General Bondi *and any of her subordinates at Main Justice*.

(4/25/25 Tr. at 17–18) (emphasis added).

      On April 30, 2025, the government informed the Court that it had conveyed the Court's directive to the Attorney General:

> The Government also writes to inform the Court that United States Attorney for the Southern District of New York, Jay Clayton is recused from this matter. Pursuant to 28 USC Section 515, Criminal Division Chief Perry Carbone is acting as Attorney for the United States in this case. Per the Court's instruction, the Government has notified Mr. Carbone of the Court's admonition regarding Local Criminal Rule 23.1. Mr. Carbone has conveyed the same to the Office of the Deputy Attorney General, which confirmed that it will in turn notify the Attorney General.

The Honorable Margaret M. Garnett
October 16, 2025
Page 2 of 10

(Dkt. 30 Gov't 4/30/25 Letter at 1).

This was further confirmed in the government's October 8, 2025, letter, which noted that the government "previously communicated the Court's admonition regarding Local Rule 23.1 to the appropriate parties." (Dkt. 56: Gov't 10/8/25 Letter at 1 n.2).[1] This letter was accompanied by an October 8, 2025, Declaration from Sean Buckley, the Deputy United States Attorney of the Southern District of New York, who indicated that the government communicated the Court's April 25, 2025, admonition to the Deputy Attorney General's Office, and that he "personally communicated the Court's September 24 Order, including its admonition . . . to the Deputy Attorney General." (Dkt. 56-1: AUSA Buckley Declaration at 3 and n.1).

Despite this Court's clear directives and assurances made to this Court, the government nevertheless claims that the DOJ personnel who publicly commented on the case are "Department of Justice employees who are not associated with this matter." (Gov't 10/8/25 Letter at 2.) This position is factually inaccurate and inconsistent with the Court's instruction explicitly directed at the Attorney General and her subordinates.[2] There can be no doubt that the Attorney General of the United States herself is "associated" with Mr. Mangione's case, as the Attorney General is the only individual in the DOJ authorized to seek the death penalty in any case.

Moreover, the Attorney General has publicly stated that she herself was involved in *this* specific case as she publicly directed the Southern District of New York prosecutors to seek the death penalty against Mr. Mangione in an April 1, 2025, press release.[3] The Attorney General further explained her own reasons for doing so on April 6, 2025, stating the following on the Fox News Channel:

---

[1] In its submission, the government notes that, "on September 2, 2025, the Executive Office for the United States Attorneys ('EOUSA') also recently issued new review and approval processes for any public statements by employees of the United States Attorney's Offices at panels, conferences and public events. Further, all DOJ employees are subject to governing regulations and policies of the Department. For example, all DOJ employees are subject to 28 C.F.R 502 an internal Department regulation regarding public statements by Department employees." Counsel requests a copy of these new rules.

[2] The time to object to the Court's Order concerning the Attorney General and her subordinates was on April 25, 2025, when the Order was issued, not six months later, after it was repeatedly violated. If the government had a good faith basis to object to the Order, it would have objected. That it did not is further proof that the Order faithfully reflected the scope of Local Criminal Rule 23.1.

[3] Upon information and belief, given the cadence and the highly unusual way in which the death penalty was sought and authorized here, which was wholly outside the procedures set forth in the Department of Justice's own policy manual in a capital case, the defense believes that the Southern District of New York did not recommend seeking the death penalty in this case and that the decision to seek was solely a decision by the Attorney General herself, thereby making her in fact part of Mr. Mangione's prosecution team.

The Honorable Margaret M. Garnett
October 16, 2025
Page 3 of 10

> The president's directive was very clear: we are to seek the death penalty, when possible. It hasn't been done in four years. I was a capital prosecutor; I tried death penalty cases throughout my career. If there was ever a death case, this is one...this guy is charged with hunting down a CEO, a father of two, a married man, hunting him down and executing him. I feel like these young people have lost their way. I was receiving death threats for seeking the death penalty on someone who was charged with an execution of a CEO.

*AG Pam Bondi accuses district court judges of playing 'whack-a-mole' with anti-Trump lawfare*, Fox News Sunday with Shannon Bream, Fox News, Apr. 6, 2025, available at https://www.foxnews.com/video/6371135377112.[4]

Moreover, this Court itself recognized the Attorney General's role in this case by ordering the acting United States Attorney for the Southern District of New York to advise the Attorney General to read Local Criminal Rule 23.1. Therefore, not only is the Attorney General the only person in the DOJ authorized to approve the ultimate life or death decision of whether to seek the death penalty—thus making her part of a prosecution team in cases where capital punishment is sought—she in fact personally made the decision to execute Mr. Mangione and personally caused the grand jury investigation that led to his indictment.

Because the Attorney General is "associated" with the case, and because the Court directed her and her subordinates to be informed of the local rule, it is necessarily the case that her employees are also covered by Local Criminal Rule 23.1 as they are "non-lawyer personnel employed by a lawyer's office or subject to a lawyer's supervision." As indicated in the defendant's letter motion to the Court filed September 23, 2025, one of the DOJ employees who publicly commented on this case on the X platform was the Deputy Director of the DOJ's Office of Public Affairs who works directly for the Attorney General. (*See* Dkt. 52: Defense 9/23/25 Letter at 2–3. The other DOJ employee who reposted the X post was the Chief of Staff and Associate Deputy Attorney General for the Deputy Attorney General. Because these individuals are DOJ employees working under the Attorney General, this Court should find that they fall under Local Criminal Rule 23.1.

**2.     The Social Media Posts Have Prejudiced the Defendant**

The government claims that Mr. Mangione was not prejudiced by these social media posts. (Gov't 10/8/25 Letter at 2–3). Under Local Criminal Rule 23.1(d), however, there is a class of statements that "presumptively involve a substantial likelihood that their public dissemination will

---

[4]Not only is the Attorney General prejudicing Mr. Mangione by giving her personal opinion as to his guilt and the merits of the case, but she also personally inserted herself into the calculus by justifying the decision based on alleged death threats made to her, a wholly inappropriate justification as there is no connection between Mr. Mangione and any unrelated death threats to the Attorney General.

-3-

The Honorable Margaret M. Garnett
October 16, 2025
Page 4 of 10

interfere with a fair trial or otherwise prejudice the due administration of justice . . . ." This presumption specifically applies to "[a]ny opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case." Local Criminal Rule 23.1(d)(7). Here, the social media posts made by the DOJ employees and sent to thousands of their followers discussed President Trump's and the Deputy Director of the DOJ's Office of Public Affairs' opinions as to Mr. Mangione's guilt or innocence.[5] The opinion in question—i.e., "@POTUS is absolutely right"—was referencing an embedded televised statement made by the President of the United States, and reposted by an official White House X account, that said in part as follows:

> "Think about Mangione.  He shot someone in the back as clear as you are looking at me or I am looking at you.  He looked like a pure assassin. . . . .He shot him in the middle of the back . . .  instantly dead . . . this is a sickness."

The social media post and repost are included below:



---

[5] The government's characterization of this public social media posting as merely a "reposting not necessarily an endorsement of the original tweet" (citing *Flynn v. Cable News Network, Inc.*, 621 F. Supp. 3d 432, 439 (S.D.N.Y. 2022), fails to acknowledge the posting account indeed endorsed the repost when he added his office's opinion that the president's comments about Mr. Mangione guilt were also held and endorsed by the Attorney General and the DOJ.

The Honorable Margaret M. Garnett
October 16, 2025
Page 5 of 10

While acknowledging that the presumption of prejudice exists for such opinions regarding a defendant's guilt or innocence, the government nonetheless claims that it should not apply to this case because of the length of time between the challenged statements and the trial. (Gov't 10/8/25 Letter at 3.) In making this argument, the government relies on *Skilling v. United States* that found no presumptive prejudice where "over four years elapsed between Enron's bankruptcy and [the defendant's] trial." *Skilling v. United States*, 561 U.S. 358, 383 (2010). In *Skilling*, however, the Court noted that, "[a]lthough reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* In contrast, the media attention to this case has not diminished since the alleged shooting in December 2024, as the United States government repeatedly continues to publicly comment on the case, and there are three pending cases that the media write about consistently. Moreover, unlike in *Skilling* where the prejudice was minimized by the four-year delay between the prejudicial statement and trial, here the prejudice is more severe because the commentary appears almost daily, compounded exponentially by the reach of social media, and both this Court and the state court have expressed an interest in potentially trying the concurrent federal and state cases in 2026.

Further distinguishing this case from *Skilling*, here, since day one, Mr. Mangione has been treated unjustly as part of a coordinated ongoing campaign by the United States government to paint him as a terrorist and violent leftwing extremist, despite there being absolutely no evidence to support these assertions. In fact, just yesterday, October 15, 2025, at a press conference with the President of the United States, the Director of the FBI, (who reports directly to the Attorney General), deliberately named Mr. Mangione in response to a reporter's question about a wholly unrelated case. *See* https://x.com/RedWave_Press/status/1978558182382501991. It is also worth noting that the vast impact of social media commentary regarding Mr. Mangione in 2025 further distinguishes this case from *Skilling* which took place prior to the DOJ and White House utilizing this medium to communicate to the public.

Another distinction between the Mangione case and *Skilling*, and indeed with any case from outside the Southern and Eastern Districts of New York is the explicit rule of this Court when it comes to public statements and pretrial prejudice. In the committee notes to Rule 23.1, the committee states that "(t)his rule was the subject of substantial debate and compromise at the time of the 1997 revisions to the Local Rules." The committee further notes that the Rule has not been changed since that time. While the impact of lawyer statements to the press may be different in other jurisdictions that do not have an equivalent rule, the committee that studies cases in New York has concluded that a lawyer's assertion of opinion as to the guilt of a defendant prejudices the defendant's prospects at a fair trial here in the Southern District of New York. There is no indication of what the rules are concerning trials in Houston (where *Skilling* was tried) or anyplace else. But, the rules in the SDNY represent the committee's learning and experience with criminal trials in the SDNY, specifically that statements of the type here are prejudicial. By arguing otherwise, the government wills away the experience and "substantial debate" of a committee tasked with ensuring that trials here are fair.

The Honorable Margaret M. Garnett
October 16, 2025
Page 6 of 10

Consequently, because *Skilling* is distinguishable, the presumption of prejudice applies here because the above-referenced statements, posts and reposts express an opinion about Mr. Mangione's guilt or innocence.

**3. Statements Made by the White House About This Case Are Subject to Rule 23.1 and Prejudicing Mr. Mangione**

Unlike any of its predecessors since the Watergate era, the Department of Justice has not acted independently of the White House in this case—or in several others. This departure from the longstanding principle of prosecutorial independence has created a blurred and constitutionally troubling line between the Department of Justice and the Executive Office of the President. As a result, the government cannot credibly contend that statements made by the White House concerning this matter fall outside the scope of Rule 23.1 or this Court's prior order, for several reasons.

First, the DOJ has endorsed White House statements by reposting them. Second, at least one administration employee reports both to the Attorney General and the White House: the Chief of Staff and Associate Deputy Attorney General for the Deputy Attorney General (referenced above), who holds the simultaneous titles of "Chief of Staff & Associate Deputy Attorney General for @DAGToddBlanche under the leadership of @AGPamBondi and @POTUS [American flag emoji]"—meaning he reports directly to both the Attorney General and the White House. Similarly, the president himself has repeatedly referred to himself as the "Chief Law Enforcement Officer,"[6] while personally directing individual cases.[7]

---

[6] *See, e.g.* https://www.pbs.org/newshour/politics/fbi-searches-home-and-office-of-ex-trump-national-security-adviser-john-bolton-ap-source-says (quoting President Trump as stating: "I'm actually the chief law enforcement officer").

[7] Below is one example:



Donald J. Trump
@realDonaldTrump

Pam: I have reviewed over 30 statements and posts saying that, essentially, "same old story as last time, all talk, no action. Nothing is being done. What about Comey, Adam "Shifty" Schiff, Leticia??? They're all guilty as hell, but nothing is going to be done." Then we almost put in a Democrat supported U.S. Attorney, in Virginia, with a really bad Republican past. A Woke RINO, who was never going to do his job. That's why two of the worst Dem Senators PUSHED him so hard. He even lied to the media and said he quit, and that we had no case. No, I fired him, and there is a GREAT CASE, and many lawyers, and legal pundits, say so. Lindsey Halligan is a really good lawyer, and likes you, a lot. We can't delay any longer, it's killing our reputation and credibility. They impeached me twice, and indicted me (5 times!), OVER NOTHING. JUSTICE MUST BE SERVED, NOW!!! President DJT

Third, the Attorney General's DOJ policy rhetoric emphasizes a political agenda rather than the independent non-partisan traditional role of the DOJ. A recent *Politico* article's review of the Attorney General's more than 100 public statements since her appointment found that she deliberately appears on significantly more right-leaning media outlets and as the article stated:

> has emerged as perhaps the most openly political and partisan Attorney General in modern American history – political in the sense that she carefully structures her appearances and rhetoric to track the priorities of the White House with no concern for notions of DOJ independence . . . she appears to conceive her role as an advocate for Trump in particular and for the American right more generally.

Ankush Khardori, *What I Learned by Watching Every Pam Bondi Speech*, POLITICO, Oct. 7, 2025, https://www.politico.com/news/magazine/2025/10/07/pam-bondi-speeches-trump-justicedepartment-column-00589860.

By issuing the prejudicial statements about Mr. Mangione described above, the Department of Justice and the White House have coordinated to cultivate and disseminate negative public rhetoric deliberately designed to taint the prospective jury pool. For example, as recently as September 25, 2025, the President of the United States issued a National Security Presidential Memorandum/NSPM-7 "Countering Domestic Terrorism and Organized Political Violence" declaring certain individuals as "anti-fascist" and designating "Antifa" as a Domestic Terrorist Organization. As part of the President's justification for this declaration, he cites three specific cases, including the "2024 assassination of a senior healthcare executive," clearly a reference to the allegations against Mr. Mangione. This declaration was made despite the fact that, only nine days prior, in New York State Supreme Court, the judge dismissed the terrorism charges against Mr. Mangione, finding that the defendant's conduct did not rise to the level of terrorism (and noted that the federal government also did not charge him with terrorism). The judge held that there "was no evidence presented of a desire to terrorize the public, inspire widespread fear, engage in a broader campaign of violence, or to conspire with organized terrorist groups." *See People v. Mangione*, Decision and Order at 9. Moreover, there is no evidence to support any of these claims, nor does Mr. Mangione hold the political or ideological beliefs that are being ascribed to him by this administration.

Unfortunately, there is little reason to believe that the DOJ and White House will stop their concerted efforts to prejudice Mr. Mangione. This is because of UnitedHealth's continued attempts to influence this administration. Following the death of its Chief Executive Officer, UnitedHealth reportedly lost approximately $63 billion in market value.[8] In May 2025, *The Wall Street Journal* reported that UnitedHealth was under criminal investigation relating to its Medicare operations.[9] Subsequently, on September 14, 2025, *The Wall Street Journal* published an article detailing

---

[8] https://finance.yahoo.com/news/unitedhealth-lost-63-billion-value-183122649.html.

[9] https://www.wsj.com/business/unitedhealth-doj-medicare-billing-investigation-8d56800d.

The Honorable Margaret M. Garnett
October 16, 2025
Page 8 of 10

UnitedHealth's extensive connections with the current Administration.[10] According to that reporting, UnitedHealth obtained meetings with senior officials of the Department of Justice, including the Attorney General's Chief of Staff. The same article stated that UnitedHealth more than doubled its expenditures on lobbying and legal services to $7.7 million in the first half of 2025, engaging individuals with direct ties to this Administration—including persons identified as among the top donors to the president's Super PAC. These lobbyists, several of whom are former Department of Justice employees, reportedly arranged meetings for UnitedHealth with senior DOJ officials. The article further recounted that a UnitedHealth Chief Executive Officer met with the White House Chief of Staff and claimed that they did not discuss the government's investigations into UnitedHealth but rather addressed "*other issue*s." (Emphasis added.)

UnitedHealth's continued financial viability depends upon maintaining the narrative that Mr. Mangione—rather than the company or its business practices—is the villain. Accordingly, the defense respectfully requests discovery regarding these meetings to determine whether the "other issues" discussed between UnitedHealth and the government precipitated coordinated efforts by the White House and the Department of Justice to malign and prejudice Mr. Mangione.

The significance of these prejudicial statements is that they have life or death consequences for Mr. Mangione. The statements have caused irreparable harm because the government's sustained public commentary, designed to further a political agenda, will have a prejudicial impact on a future jury. Since the government is seeking to execute Mr. Mangione, he will already be subject to a more politically conservative jury pool, as any prospective juror, in order to be "death-qualified" has to affirmatively be willing to execute him as punishment. Literature and studies support that there is a correlation between death-qualified jurors and a conservative outlook. For example, in *Lockhart v. McCree*, 476 U.S. 651 (1986), the American Psychological Association's amicus brief summarized a social-science record that death-qualified jurors are "more conviction-prone" and prosecution-leaning than jurors excluded for opposition to capital punishment. Available at https://www.apa.org/about/offices/ogc/amicus/lockhart.pdf at pp. 6–16. Additionally, in a statewide study by Fitzgerald and Ellsworth, it was found that death-qualification disproportionately removes "twice as many Democrats as Republicans" and skews the panel toward a more conservative and pro-prosecution bent. Fitzgerald, R., and Ellsworth, P. C. (1984). Due Process vs. Crime Control: Death Qualification and Jury Attitudes. Law and Human Behavior, 8 (1-2), at 46, available at https://capitalpunishmentincontext.org/files/resources/deathqual/Due Process.pdf.

The administration's consistent and baseless attempts to paint Mr. Mangione as a left-wing extremist, especially during a time of unprecedented political polarization, will have a significant prejudicial effect on a conservative leaning death-qualified jury who will, as a result, associate him with these viewpoints. Therefore, it is not a stretch to conclude that the administration's attempt to unfairly and inaccurately paint Mr. Mangione as a left-wing violent extremist will have a significant prejudicial effect on this case and his life.

---

[10] https://www.wsj.com/business/unitedhealth-is-spending-big-on-trump-allies-to-fix-its-washington-problems-8ca64351.

5. **Remedy Sought**

As the Court is aware, in Points One and Two of Mr. Mangione's September 19, 2025, motion, we ask the Court to dismiss the indictment in light of the prejudicial and unlawful statements of the Attorney General and others and due to the government indicting the case while the grand jury prejudice motion was pending before the Court. In Point Three, we ask the Court to dismiss the Notice of Intent to Seek the Death Penalty. The statements made by DOJ officials since the original motion was filed provide further support for both Points One and Three. The heart of the defense's concern is that the government has engaged in purposeful, repeated, unlawful actions specifically designed to hurt Mr. Mangione's chances at fair legal proceedings and a fair trial and as part of a wider government effort to further a political agenda. That these same officials—whether acting directly or through their subordinates—have continued on this course even after this Court has explicitly directed them not to has caused this case to be unlike any prior death penalty case. Counsel cannot find another death penalty case where the trial judge issued a clear, unambiguous order that specified government officials should abide by a critical local rule ensuring that trials in this District are not adversely impacted by prejudicial public statements, only to see that order repeatedly violated and have that violation defended by the government.

If the sanctity of a death penalty prosecution means anything it means that government personnel seeking to execute someone cannot purposely, repeatedly and brazenly violate Court Rules and a Judge's Order to gain an unfair advantage so it can have a better chance at killing the defendant. Also, the administration's steady and persistent use of the Mangione case to press a political viewpoint is further proof that the Mangione case was political fodder for the government from the beginning.

As an alternative to dismissal of the indictment, counsel asks the Court to order the government to provide internal documents, communications and emails that will answer the question the Court posed in its September 24, 2025, Order: "how these violations occurred." The government did not answer the Court's question.

The Honorable Margaret M. Garnett
October 16, 2025
Page 10 of 10

## 6. Conclusion

Mr. Mangione is one young man, alleged to have acted alone, fighting for his life in three separate cases, against the full force and might of the entirety of the United States Government that is actively and persistently using his him as a pawn to further its political agenda. This is the very definition of prejudicial where the consequence is death.

For these reasons, as well as the reasons articulated in Mr. Mangione's September 19, 2025, motion, this Court should dismiss the indictment or, in the alternative, dismiss the Notice of Intent seeking the death penalty.

Respectfully submitted,

_____
Karen Friedman Agnifilo
Marc Agnifilo
Jacob Kaplan
AGNIFILO INTRATER LLP
140 Broadway, Suite 2450
New York, NY 10005

_____/s/_____
Avi Moskowitz
Eylan Schulman
Christopher Neff
MOSKOWITZ COLSON
GINSBERG & SCHULMAN
80 Broad Street, Suite 1900
New York, NY 10004

cc:  Gov't Counsel (via ECF)