UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :

UNITED STATES OF AMERICA          :

                               :

     - v. -                   :

                               :

LUIGI NICHOLAS MANGIONE,     :      25 Cr. 176 (MMG)

                 Defendant.     :

                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S OMNIBUS OPPOSITION TO THE DEFENDANT'S MOTIONS DATED SEPTEMBER 20, 2025 AND OCTOBER 11, 2025

 

SEAN S. BUCKLEY
Attorney for the United States Acting Under
Authority Conferred By 28 U.S.C. § 515

 

Dominic A. Gentile
Jun Xiang
Alexandra S. Messiter
Thomas John Wright
Assistant United States Attorneys
    - Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 2

RELEVANT BACKGROUND ............................................................................................... 3

  I.   THE FEDERAL DEATH PENALTY ACT .............................................................. 3
  II.  THE INDICTMENT AND NOTICE OF INTENT ........................................... 4

PART 1

CONSTITUTIONALITY MOTION

ARGUMENT ........................................................................................................................ 5

  I.   DEFENDANT'S DUE PROCESS CHALLENGE BASED ON PUBLIC STATEMENTS AND PRETRIAL PUBLICITY FAILS AS A MATTER OF LAW ..................................... 6
  II.  THERE WAS NO DUE PROCESS VIOLATION ARISING FROM THE TIMING OR CONDUCT OF THE GRAND JURY ............................................................... 13
  III. THERE IS NO BASIS TO INTERFERE WITH THE GOVERNMENT'S PROSECUTORIAL DISCRETION IN THIS CASE ................................................ 17
    A.  The Department of Justice's Capital Case Protocol ...................................... 19
    B.  The Capital Case Protocol Was Followed in This Case ................................ 21
    C.  The Capital Case Protocol Is Not Subject to Judicial Review ...................... 24
    D.  The Attorney General's Decision to Seek the Death Penalty Is Presumptively Unreviewable ................................................................................................ 26
  IV. DEATH QUALIFYING PROSPECTIVE JURORS DOES NOT RENDER A RESULTING DEATH SENTENCE UNRELIABLE ................................................ 29
  V.  THE FEDERAL DEATH PENALTY DOES NOT VIOLATE THE FIFTH OR EIGHTH AMENDMENTS ............................................................................................... 32
    A.  Applicable Law ............................................................................................ 32
      1.  *The Death Penalty Is Constitutional* ................................................. *32*
      2.  *The Defendant's Burden In Facially Challenging The FDPA Is Extremely High* ..... *34*
    B.  The FDPA Does Not Allow for Arbitrary and Capricious Sentences .......................... 35
    C.  The Defendant's "No Principled Rubric" Challenge to the FDPA's Constitutionality Also Fails ..................................................................................................... 38
    D.  Mangione's Challenge to the FDPA's Bifurcated Trial Procedures and Its Impact on the Jury's Ability to Follow Instructions is Meritless.......................................... 41
  VI. THE SUPREME COURT'S *RING* DECISION DID NOT RENDER THE FDPA UNCONSTITUTIONAL ............................................................................ 46
    A.  The FDPA Does Not Bar the Government from Alleging the Statutory and Non-Statutory Aggravating Factors in an Indictment........................................... 47
    B.  The Presentment of "Special Findings" to the Grand Jury Does Not Constitute a "Rewriting" of the FDPA........................................................................... 51
    C.  The Presentation of the Indictment's "Special Findings" to the Grand Jury Does Not Violate the Non-Delegation Clause ......................................................... 56

PART 2

**CRIME OF VIOLENCE MOTION**

**ARGUMENT** .......................................................................................................... **58**

I.    APPLICABLE LAW ................................................................................... 59

  A.    The Categorical and Modified Categorical Approach .................................. 59

  B.    18 U.S.C. §§ 2261A and 2261(b) ............................................................. 63

II.   DISCUSSION .......................................................................................... 65

  A.    18 U.S.C. § 2261A Is Divisible into At Least Four Distinct Crimes........................... 65

  B.    The Defendant is Charged Under 18 U.S.C. § 2261A(1)(A) (Count One) and
      § 2261A(2)(A) (Count Two), Each of Which Require Conduct that Places the Victim in
      Reasonable Fear of Death or Serious Bodily Injury ...................................... 73

  C.    18 U.S.C § 2261A(1)(A) and § 2261A(2)(A) Each Require Proof of the Threatened,
      Attempted, or Actual Use of Force ....................................................... 74

  D.    *Borden* Does Not Apply Because 18 U.S.C. § 2261A(1)(A) and § 2261(A)(2)(A) Do
      Not Reach Reckless or Negligent Conduct................................................ 79

  E.    18 U.S.C. § 2261A(1)(A)(i) and § 2261(A)(2)(A)(i) Do Not Reach Threatened Self-
      Harm ................................................................................... 82

PART 3

**SUPPRESSION MOTION**

**ARGUMENT** .......................................................................................................... **89**

I.    RELEVANT FACTS.................................................................................... 90

II.   THE CONTENTS OF THE DEFENDANT'S BACKPACK ARE ADMISSIBLE............ 93

  A.    Applicable Law ...................................................................... 93

  B.    The Contents of the Backpack Are Admissible......................................... 96

III.  THE DEFENDANT'S STATEMENTS PROVIDING A FALSE NAME TO THE
     ALTOONA POLICE DEPARTMENT ARE ADMISSIBLE......................................... 102

  A.    Applicable Law ...................................................................... 102

  B.    The Defendant's Statements Falsely Identifying Himself Are Admissible................ 105

**CONCLUSION** ...................................................................................................... **108**

# TABLE OF AUTHORITIES

Page(s)

Cases

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ................................................................................................... 16

*Apprendi v. New Jersey*,
   530 U.S. 466 (2000) ................................................................................... 34, 46, 47

*Arizona v. Gant*,
   556 U.S. 332 (2009) ................................................................................................... 92, 95

*Bank of Nova Scotia v. United States*,
   487 U.S. 250 (1988) ....................................................................................... 6, 7, 13, 17

*Baze v. Rees*,
   553 U.S. 35 (2008) ..................................................................................................... 31

*Borden v. United States*,
   593 U.S. 420 (2021) ....................................................................... 75, 77, 78, 79, 80

*Bordenkircher v. Hayes*,
   434 U.S. 357 (1978) ................................................................................................... 26

*Bosse v. Oklahoma*,
   137 S. Ct. 1 (2016) ..................................................................................................... 32

*Buchanan v. Kentucky*,
   483 U.S. 402 (1987) ................................................................................................... 29

*Bucklew v. Precythe*
   587 U.S. 119 (2019) ................................................................................................... 31

*Callins v. Collins*,
   510 U.S. 1141 (1994) ................................................................................................. 37

*Carter v. United States*,
   530 U.S. 255 (2000) ................................................................................................... 85

*Collier v. United States*,
   989 F.3d 212 (2d Cir. 2021) ..................................................................................... 77

*Colorado v. Bertine*,
   479 U.S. 367 (1987) ................................................................................................... 93

*Colotti v. United States*,
   71 F.4th 102 (2d Cir. 2023) ................................................................................. 61, 81

*Copeland v. Vance*,
   893 F.3d 101 (2d Cir. 2018) ..................................................................................... 33

*Deaver v. Seymour*,
   822 F.2d 66 (D.C. Cir. 1987) ................................................................................... 14

*Descamps v. United States*,
   570 U.S. 254 (2013) ................................................................................... 60, 61, 70, 72

*Dobbert v. Florida*,
   432 U.S. 282 (1977) ................................................................................................... 12

*Duncan v. United States*,
   Nos. 17 Civ. 91 (EJL), 07 Cr. 23 (EJL), 2019 WL 1320039 (D. Idaho Mar. 22, 2019) ........... 33

*In re Terrorist Bombings of U.S. Embassies in E. Afr.*,
  552 F.3d 93 (2d Cir. 2008) ................................................................. 47

*Eddings v. Oklahoma*,
  455 U.S. 104 (1982) ......................................................................... 39

*Elonis v. United States*,
  575 U.S. 723 (2015) ................................................................... 79, 80

*Florida v. Wells*,
  495 U.S. 1 (1990) ............................................................................. 93

*Fulks v. United States*,
  875 F. Supp. 2d 535 (D.S.C. 2010) ................................................. 77

*Furman v. Georgia*,
  408 U.S. 238 (1972) ..................................................... 17, 35, 36, 37

*Gentile v. State Bar of Nevada*,
  501 U.S. 1030 (1991) ......................................................................... 8

*Giron-Molina v. Garland*,
  86 F.4th 515 (2d Cir. 2023) ............................................................. 82

*Glossip v. Gross*,
  576 U.S. 863 (2015) ......................................................................... 31

*Gregg v. Georgia*,
  428 U.S. 153 (1976) .......................................... 5, 31, 35, 36, 37, 42

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995) ......................................................................... 83

*United States v. Higgs*,
  353 F.3d 281 (4th Cir. 2003) ........................................................... 55

*Illinois v. Lafayette*,
  462 U.S. 640 (1983) ......................................................................... 93

*In re Grand Jury Subpoena Dated Feb. 2, 2012*,
  908 F. Supp. 2d 348 (E.D.N.Y. 2012) ............................................. 15

*In re Sealed Case*,
  131 F.3d 208 (D.C. Cir. 1997) ......................................................... 26

*In re Sealed Case*,
  829 F.2d 50 (D.C. Cir. 1987) ........................................................... 14

*INS v. Chadha*,
  462 U.S. 919 (1983) ......................................................................... 33

*INS v. St. Cyr*,
  533 U.S. 289 (2001) ......................................................................... 34

*Johnson v. Texas*,
  509 U.S. 350 (1993) ......................................................................... 35

*Jones v. United States*,
  526 U.S. 227 (1999) ........................................................... 34, 47, 51

*Jones v. United States*,
  527 U.S. 373 (1999) ....................................................................... 3, 6

*Kansas v. Marsh*,
  548 U.S. 163 (2006) ......................................................................... 36

*Lauro v. Charles*,
  219 F.3d 202 (2d Cir. 2000) ........................................................... 8, 9

*Leocal v. Ashcroft,*
    543 U.S. 1 (2004) ................................................................................. 78
*Liparota v. United States,*
    471 U.S. 419 (1985) ............................................................................. 85
*Lockhart v. McCree*
    476 U.S. 162 (1986) ........................................................................ 29, 30
*Lujan v. G & G Fire Sprinklers, Inc.,*
    532 U.S. 189 (2001) ............................................................................. 33
*Mathis v. United States,*
    579 U.S. 500 (2016) ...................................................................... passim
*Matthews v. United States,*
    622 F.3d 99 (2d Cir. 2010) .................................................................. 47
*McCleskey v. Kemp,*
    481 U.S. 279 (1987) ............................................................ 26, 32, 38, 39, 40
*Miranda v. Arizona,*
    384 U.S. 436 (1966) ...................................................................... passim
*Mistretta v. United States,*
    488 U.S. 361 (1989) .................................................................. 52, 55, 56
*Mu'Min v. Virginia,*
    500 U.S. 415 (1991) ............................................................................. 10
*Murphy v. Florida,*
    421 U.S. 794 (1975) ............................................................................. 10
*Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.,*
    522 U.S. 479 (1998) ............................................................................. 85
*Nichols v. Reno,*
    931 F. Supp. 748 (D. Colo. May 29, 1996) ..................................... 11, 19
*Nichols v. Reno,*
    124 F.3d 1376 (10th Cir. 1997) ......................................................... 19
*Nix v. Williams,*
    467 U.S. 431 (1984) ............................................................................. 93
*Oouch v. U.S. Dep't of Homeland Sec.,*
    633 F.3d 119 (2d Cir. 2011) .............................................................. 82
*Patton v. Yount,*
    467 U.S. 1025 (1984) ........................................................................... 10
*Portee v. United States,*
    941 F.3d 263 (7th Cir. 2019) .............................................................. 81
*Richardson v. Marsh,*
    481 U.S. 200 (1987) ............................................................................. 42
*Rideau v. Louisiana,*
    373 U.S. 723 (1963) ............................................................................. 12
*Ring v. Arizona,*
    536 U.S. 584 (2002) ...................................................................... passim
*Rosa v. McCray,*
    396 F.3d 210 (2d Cir. 2005) ............................................................ 102
*Schriro v. Summerlin,*
    542 U.S. 348 (2004) ............................................................................. 51

*Sheppard v. Maxwell,*
  384 U.S. 333 (1966) ........................................................................................ 12
*Shipley v. California,*
  395 U.S. 818 (1969) ........................................................................................ 95
*Skilling v. United States,*
  561 U.S. 358 (2010) ......................................................................... 7, 9, 10, 12
*Smith v. Ohio,*
  494 U.S. 541 (1990) ........................................................................................ 92
*Stolt-Nielsen S.A. v. United States,*
  442 F.3d 177 (3d Cir. 2006) ........................................................................... 14
*Touby v. United States,*
  500 U.S. 160 (1991) ........................................................................................ 55
*Tuilaepa v. California,*
  512 U.S. 967 (1994) .......................................................................................... 5
*United States v. Abarca,*
  No. 22 Cr. 20505, 2024 WL 1643174, 2024 WL 1637343 .................... 65, 66, 71, 73
*United States v. Adegbite,*
  846 F.2d 834 (2d Cir. 1988) ......................................................................... 102
*United States v. Ali ("Ali I"),*
  No. 24 Cr. 20341 (S.D. Fla.) ................................ 64, 65, 66, 69, 70, 71, 73, 77, 81
*United States v. Ali,*
  No. 24 Cr. 20341 (S.D. Fla.) .................................................................... 65, 81
*United States v. Allen,*
  406 F.3d 940 (8th Cir. 2005) ..................................................................... 50, 55
*United States v. Aquart,*
  912 F.3d 1 (2d Cir. 2018) ........................................ 6, 17, 32, 36, 37, 39, 40
*United States v. Armstrong,*
  517 U.S. 456 (1996) ........................................................................... 25, 26, 28
*United States v. Arnold,*
  412 F. Supp. 3d 732 (E.D. Mich. 2019) ........................................................ 32
*United States v. Austin,*
  729 F. Supp. 3d 396 (S.D.N.Y. 2024) ................................................... 104, 105
*United States v. Bacon,*
  No. 18 Cr. 75 (LPS), 2021 WL 5051364 (D. Del. Nov. 1, 2021) ............... 65, 73, 74
*United States v. Baker,*
  2025 WL 1681324 (2d Cir. 2025) ................................................................. 15
*United States v. Baker,*
  665 F.3d 51 (2d Cir. 2012) ....................................................................... 61, 82
*United States v. Barnes,*
  532 F. Supp. 2d 625 (S.D.N.Y. 2008) ...................................... 32, 40, 51, 54
*United States v. Barraza,*
  576 F.3d 798 (8th Cir. 2009) ......................................................................... 77
*United States v. Barrett,*
  102 F.4th 60 (2d Cir. 2024) ..................................................................... 86. 87
*United States v. Beardsley,*
  691 F.3d 252 (2d Cir. 2012) ......................................................................... 82

*United States v. Bernard*,
  No. 24 Cr. 20287 (KMM) (EFD) (S.D. Fla. Feb. 22, 2025) .................................................... 82

*United States v. Bignon*,
  813 F. App'x 34 (2d Cir. 2020) ................................................................................................ 99

*United States v. Bourgeois*,
  423 F.3d 501 (5th Cir. 2005) .................................................................................................... 49

*United States v. Bowers*,
  No. 18 Cr. 292, (W.D. Pa. 2020) ............................................................................................. 44

*United States v. Brito*,
  771 F. Supp. 3d 157 (E.D.N.Y. 2025) ............................................................................... 94, 98

*United States v. Bronx Reptiles, Inc.*,
  217 F.3d 82 (2d Cir. 2000) ....................................................................................................... 79

*United States v. Brown*,
  441 F.3d 1330 (11th Cir. 2006) ........................................................................... 34, 49, 50, 55

*United States v. Calandra*,
  414 U.S. 338 (1974) .................................................................................................................. 14

*United States v. Candelario-Santana*,
  368 F. Supp. 3d 316 (D.P.R. 2019) .................................................................................... 32, 43

*United States v. Catino*,
  735 F.2d 718 (2d Cir. 1984) ..................................................................................................... 25

*United States v. Chadwick*,
  433 U.S. 1 (1977) ......................................................................................................... 92, 96, 98

*United States v. Christensen*,
  No. 17 Cr. 20037 (JES) (JEH), 2019 WL 651501 .................................................................. 32

*United States v. Cisneros, No.*,
  01 Cr. 1709 (MCA), 2002 WL 35649521 (D.N.M. Dec. 10, 2002) ....................................... 25

*United States v. Con-Ui*,
  No. 13 Cr. 123, 2016 WL 9331115 (M.D. Pa. Jan. 28, 2016) ........................................... 33, 43

*United States v. Coonce*,
  932 F.3d 623 (8th Cir. 2019) .................................................................................................... 32

*United States v. Coonce*,
  No. 10 Cr. 3029 (GAF), 2014 WL 1018081 n.10 (W.D. Mo. Mar. 14, 2014) .................. 34, 43

*United States v. Cooya*,
  2011 WL 3608611 (M.D. Pa. Aug. 16, 2011) ......................................................................... 28

*United States v. Corbin*,
  620 F. Supp. 2d 400 (E.D.N.Y. 2009) ..................................................................................... 10

*United States v. Council*,
  No. 17 Cr. 866 (RBH) .............................................................................................................. 32

*United States v. Cramer*,
  No. 16 Cr. 26 (MAC) ............................................................................................................... 43

*United States v. Crusius*,
  20 Cr. 389 (DCG), 2020 WL 4340550 (W.D. Tex. July 28, 2020) ......................................... 24

*United States v. Cushnie*,
  No. 14 Cr. 119 (PGG), 2014 WL 7447149 .............................................................................. 95

*United States v. Daugerdas*,
  892 F.3d 545 (2d Cir. 2018) ..................................................................................................... 85

*United States v. Davis,*
 No. 588 U.S. 445 (2019) ........................................................................... 59
*United States v. Diaz,*
 854 F.3d 197 (2d Cir. 2017) ................................................................. 92, 95
*United States v. Durand,*
 767 F. App'x 83 (2d Cir. 2019) ............................................................... 102
*United States v. Elias,*
 No. 23 Cr. 6626, 2025 WL 2857883 (2d Cir. Oct. 8, 2025) ............................ 86, 87
*United States v. Elkins,*
 725 F. Supp. 3d 570 (N.D. Tex. 2024) .............................................. 65, 71, 76
*United States v. Faux,*
 828 F.3d 130 (2d Cir. 2016) ......................................................... 101, 104, 105
*United States v. Fell,*
 224 F. Supp. 3d 327 (D. Vt. 2016) ................................................. 30, 31, 34
*United States v. Fell,*
 360 F.3d 135 (2d Cir. 2004) ........................................... 3, 4, 16, 32, 57
*United States v. Fell,*
 531 F.3d 197 (2d Cir. 2008) .................................................. 47, 48, 49, 55
*United States v. Fernandez,*
 231 F.3d 1240 (9th Cir. 2000) ........................................................ 18, 24
*United States v. Figueroa,*
 165 F.3d 111 (2d Cir. 1998) ............................................................... 79
*United States v. FNU LNU,*
 653 F.3d 144 (2d Cir. 2011) ............................................................. 104
*United States v. Frank,*
 8 F. Supp. 2d 253 (S.D.N.Y. 1998) ..................................................... 28
*United States v. George,*
 No. 17 Cr. 201, 2019 WL 537186 (E.D. La. Feb. 11, 2019) .......................... 33
*United States v. Gibson,*
 175 F. Supp. 2d 532 (S.D.N.Y. 2001) .................................................... 8
*United States v. Griffin,*
 No. 94 Cr.  (AGS), 1996 WL 140073 (S.D.N.Y. Mar. 27, 1996) .................... 10
*United States v. Griffin,*
 No. 17 Cr. 20639, 2022 WL 2071054 ........................... 65, 70, 71, 74, 76
*United States v. Hardrick,*
 No. 10 Cr. 202, 2011 WL 2516340  (E.D. La. June 22, 2011) ................... 22, 23, 25
*United States v. Hatter,*
 532 U.S. 557 (2001) .................................................................. 5, 32
*United States v. Hayes,*
 589 F.2d 811 (5th Cir. 1979) ......................................................... 76, 77
*United States v. Heath,*
 455 F.3d 52 (2d Cir. 2006) ........................................................... 93, 94
*United States v. Hendricks,*
 921 F.3d 320 (2d Cir. 2019) ............................................................. 77
*United States v. Hilts,*
 757 F. App'x 56 (2d Cir. 2018) ......................................................... 15

*United States v. Jackson*,
   390 U.S. 570 (1968) ........................................................................... 52, 53, 54
*United States v. Jackson*,
   No. 04 Cr. 801 (PKC), 2006 WL 59559 (S.D.N.Y. Jan. 9, 2006) ................................. 22, 23, 25
*United States v. Jacques*,
   No. 08 Cr. 117, 2011 WL 1675417 (D. Vt. May 4, 2011)......................................... 54
*United States v. Johnson*,
   No. 24 Cr. 20110, 2025 WL 1520055, 2025 WL 1517219................................. passim
*United States v. Jones*,
   132 F.3d 232 (5th Cir. 1998)................................................................. 32, 56
*United States v. Kadem*,
   317 F. Supp. 2d 239 (W.D.N.Y. 2004) ...................................................... 103, 106
*United States v. Kee*,
   2000 WL 863119 (S.D.N.Y. June 27, 2000)................................................... 42, 45
*United States v. Lavin*,
   No. 92 CR. 326 (JFK), 1992 WL 373486 ...................................................... 102
*United States v. Le*,
   902 F.3d 104 (2d Cir. 2018)................................................................. 33, 45
*United States v. LeCroy*,
   441 F.3d 914 (11th Cir. 2006)................................................................ 53
*United States v. Lee*,
   274 F.3d 485 (8th Cir. 2001)................................................................ 18, 24
*United States v. Littrell*,
   478 F. Supp. 2d 1179 (C.D. Cal. 2007)..................................................... 26, 27, 28
*United States v. Llera Plaza*,
   179 F. Supp. 2d 444 (E.D. Pa. 2001) ...................................................... 42, 44
*United States v. Lopez*,
   63 F. Supp. 2d 411 (S.D.N.Y. 1999) ......................................................... 102
*United States v. Lopez*,
   547 F.3d 364 (2d Cir. 2008)................................................................. 93, 99
*United States v. Lopez-Matias*,
   522 F.3d 150 (1st Cir. 2008) ................................................................ 24
*United States v. Madison*,
   337 F. Supp. 3d 1186 (M.D. Fla. 2018) ...................................................... 33
*United States v. Martinez*,
   991 F.3d 347 (2d Cir. 2021)................................................................. 61, 72
*United States v. Matthews*,
   532 F. App'x 211 (3d Cir. 2013)............................................................. 97
*United States v. McCullah*,
   76 F.3d 1087 (10th Cir. 1996)................................................................ 57
*United States v. McDuffy*,
   890 F.3d 796 (9th Cir. 2018)................................................................ 77
*United States v. Mechanik*,
   475 U.S. 66 (1986) ...................................................................... 7, 13,17
*United States v. Mejia*,
   No. 24-CR-212-1 (VSB), 2025 WL 934343 (S.D.N.Y. Mar. 27, 2025).................................. 92

*United States v. Mendez*,
   315 F.3d 132 (2d Cir. 2002) ...................................................................... passim
*United States v. Messina*,
   806 F.3d 55 (2d Cir. 2015) ................................................................................ 84
*United States v. Mikos*,
   2003 WL 22110948 (N.D. Ill. Sept. 11, 2003) ......................................... 42, 43
*United States v. Mills*,
   393 F. Supp. 3d 650 (E.D. Mich. 2019) ........................................................... 32
*United States v. Minerd*,
   176 F. Supp. 2d 424 (W.D. Pa. 2001) ............................................................. 57
*United States v. Minners*,
   No. 05 Cr. 152, 2020 WL 4275040 (N.D. Okla. July 24, 2020) ...... 65, 69, 70, 71, 74
*United States v. Mitchell*,
   502 F.3d 931 (9th Cir. 2007) ........................................................................... 40
*United States v. Montgomery*,
   No. 11 Cr. 20044, 2014 WL 1453527 ......................................................... 27, 34
*United States v. Montgomery*,
   635 F.3d 1074 (8th Cir. 2011) ......................................................................... 77
*United States v. Moore*,
   916 F.3d 231 (2d Cir. 2019) ............................................................................ 60
*United States v. Morillo*,
   No. 08 CR 676 (NGG), 2009 WL 3254431 .................................. 92, 93, 96, 97, 98
*United States v. Morris*,
   61 F.4th 311 (2d Cir. 2023) ............................................................... 60, 61, 72
*United States v. Natson*,
   444 F. Supp. 2d 1296 (M.D. Ga. 2006) ........................................................... 34
*United States v. Newton*,
   369 F.3d 659 (2d Cir. 2004) ..................................................... 101, 104, 105
*United States v. Ng*,
   699 F.2d 63 (2d Cir.1983) ............................................................................... 25
*United States v. Nixon*,
   418 U.S. 683 (1974) ........................................................................................ 26
*United States v. Ofomata*,
   No. 17 Cr. 201, 2019 WL 527696 (E.D. La. Feb. 11, 2019) ....................... 32, 33
*United States v. Paul*,
   217 F.3d 989 (8th Cir. 2000) ...................................................................... 56, 57
*United States v. Perea*,
   986 F.2d 633 (2d Cir. 1993) ....................................................................... 92, 94
*United States v. Piche*,
   981 F.2d 706 (4th Cir. 1992) ........................................................................... 77
*United States v. Plunkett*,
   No. 04 Cr. 70083, 2024 WL 4173806 ..................................................... passim
*United States v. Quinones*,
   313 F.3d 49 (2d Cir. 2002) ................................................... 47, 48, 49, 55
*United States v. Quinones*,
   No. 00 Cr. 761 (JSR), 2004 WL 1234044 (June 3, 2004 S.D.N.Y.) ........................ 57

*United States v. Robinson*,
  367 F.3d 278 (5th Cir. 2004) .................................................................. 34, 51
*United States v. Robinson*,
  414 U.S. 218 (1973) .................................................................................. 92
*United States v. Roof*,
  225 F. Supp. 3d 413 (D.S.C. 2016) ..................................................... 29, 33
*United States v. Sablan*,
  No. 00 Cr. 00531, 2007 WL 4116117 (D. Colo. Nov. 16, 2007) ............. 28
*United States v. Sablan*,
  No. 00 Cr. 531 (WYD), 2006 WL 1028780 (D. Col. Apr. 18, 2006) ...................... 43
*United States v. Sablan*,
  No. 08 Cr. 259, 2014 WL 172543 (E.D. Cal. Jan. 15, 2014) ..................... 34
*United States v. Saipov*,
  No. 17 Cr. 722 (VSB), 2019 WL 624176 (S.D.N.Y. Feb. 14, 2019) ................... passim
*United States v. Saipov*,
  No. 17 Cr. 722 (VSB), 2023 WL 371531 (S.D.N.Y. Jan. 24, 2023) .............. 32, 41, 48, 54
*United States v. Salerno*,
  481 U.S. 739 (1987) ....................................................................... 33, 34 55
*United States v. Sampson*,
  486 F.3d 13 (1st Cir. 2007) ............................................................... passim
*United States v. Sampson*,
  No. 01 Cr. 10384, 2015 WL 7962394 ................................................. 43, 44, 49
*United States v. Sanders*,
  211 F.3d 711 (2d Cir. 2000) .................................................................... 26
*United States v. Santillan*,
  902 F.3d 49 (2d Cir. 2018) .................................................................... 101
*United States v. Schaffer*,
  851 F.3d 166 (2d Cir. 2017) ............................................................ 102, 104
*United States v. Scott*,
  990 F.3d 94 (2d Cir. 2021) ..................................................................... 60
*United States v. Shakir*,
  616 F.3d 315 (3d Cir. 2010) .................................................................... 95
*United States v. Siegel*,
  717 F.2d 9 (2d Cir. 1983) ....................................................................... 44
*United States v. Silver*,
  103 F. Supp. 3d 370 (S.D.N.Y. Apr. 10, 2015) ................................... 12, 13
*United States v. Slone*,
  969 F. Supp. 2d 830 (E.D. Ky. 2013) ...................................................... 25
*United States v. Smith*,
  No. 16 Cr. 86 (SLG) ......................................................................... 32, 43
*United States v. Solomon*,
  No. 05 Cr. 385, 2007 WL 1468794 (W.D. Pa. May 14, 2007) .................. 33
*United States v. Spurlock*,
  No. 23 Cr. 22 (MMD) (CLB),2024 WL 3850395 ................................... 83
*United States v. Stokes*,
  733 F.3d 438 (2d Cir. 2013) ............................................................. 93, 94

*United States v. Tavares,*
  No. 01 CR. 1115 (JFK), 2002 WL 31571662 ............................................ 102, 106
*United States v. Taylor,*
  596 U.S. 845 (2022) ....................................................................................... 60
*United States v. Taylor,*
  635 F. Supp. 2d 1243 (D.N.M. 2009) ........................................................... 34
*United States v. Taylor,*
  648 F. Supp. 2d 1237 (D.N.M. 2008) ........................................................... 27
*United States v. Thompson,*
  29 F.3d 62 (2d Cir. 1994) .............................................................................. 93
*United States v. Thompson,*
  251 U.S. 407 (1920) ....................................................................................... 14
*United States v. Tipton,*
  90 F.3d 861 (4th Cir. 1996) ........................................................................... 57
*United States v. Tsarnaev,*
  No. 13 Cr 10200, 2013 WL 5701582 ...................................................... 22, 25
*United States v. Wasylyshyn,*
  979 F.3d 165 (2d Cir. 2020) .......................................................................... 79
*United States v. Whitehorn,*
  829 F.2d 1225 (2d Cir. 1987) ...................................................................... 100
*United States v. Williams,*
  181 F. Supp. 2d 267 (S.D.N.Y. 2001) ............................................... 18, 19, 24
*United States v. Williams,*
  504 U.S. 36 (1992) .................................................................................. passim
*United States v. Williams,*
  930 F.3d 44 (2d Cir. 2019) ............................................................................ 93
*United States v. Williams,*
  No. 00 Cr. 1008 (NRB), 2004 WL 2980027 (S.D.N.Y. Dec. 22, 2004) ....... 40, 51, 54
*United States v. Williams,*
  No. 24 Cr. 2696, 2025 WL 2784100 (2d Cir. Sept. 30, 2025) .................. 61, 82
*Watkins v. Sowders,*
  449 U.S. 341 (1981) ....................................................................................... 42
*Witherspoon v. Illinois,*
  391 U.S. 510 (1968) ....................................................................................... 29
*Yates v. United States,*
  574 U.S. 528 (2015) ................................................................................. 83, 84
*Zafiro v. United States,*
  506 U.S. 534 (1993) ....................................................................................... 42
*Zant v. Stephens,*
  462 U.S. 862 (1983) ................................................................................... 5, 57

Statutes

18 U.S.C. § 16 .................................................................................................... 78
18 U.S.C. § 875(c) ............................................................................................. 80
18 U.S.C. § 924(c) ....................................................................................... 58, 59
18 U.S.C. § 924(c)(1)(A) ................................................................................... 59

18 U.S.C. § 924(c)(3)................................................................................... passim
18 U.S.C. § 924(c)(3)(A)................................................................................ 58
18 U.S.C. § 924(e).......................................................................................... 61
18 U.S.C. § 924(j)................................................................................. 4, 58, 59
18 U.S.C. § 1519............................................................................................ 83
18 U.S.C. § 1951............................................................................................ 87
18 U.S.C. § 1951(b)(1)................................................................................... 87
18 U.S.C. § 2113............................................................................................ 77
18 U.S.C. § 2261............................................................................................ 68
18 U.S.C. § 2261(b)....................................................................................... 64
18 U.S.C. § 2261(b)(1).............................................................. 64, 73, 76, 78
18 U.S.C. § 2261(b)(5)................................................................................... 64
18 U.S.C. § 2261A................................................................................... passim
18 U.S.C. § 2261A(1)(A)(i)............................................................. 72, 81, 83
18 U.S.C. § 2261A(2)(A)(i)........................................................................... 72
18 U.S.C. § 3591(a)(2)..................................................................................... 6
18 U.S.C. § 3592(c).................................................................................... 6, 55
18 U.S.C. § 3593(a).................................................................................. passim
18 U.S.C. § 3593(c).................................................................................. 56, 57
18 U.S.C. § 3593(d)........................................................................................ 57
18 U.S.C. § 3593(e)................................................................. 6, 23, 55, 56
18 U.S.C. § 3593(f)........................................................................................... 4
18 U.S.C. §§ 115............................................................................................ 87
18 U.S.C. §§ 2261A(1)(A)....................................................................... passim
18 U.S.C. §§ 2261A(1)(A)(ii)........................................................................ 81
18 U.S.C. §§ 2261A(1)(B)........................................................................ 66, 86
18 U.S.C. §§ 2261A(2)(A)........................................................................ 58, 79
18 U.S.C. §§ 3592(a)...................................................................................... 23
Pub. L. 115-334............................................................................................. 69
18 U.S.C. § 924........................................................................................ 60, 73
18 U.S.C. § 924(c) or § 924(j)........................................................................ 60
18 U.S.C. § 2261A(1)................................................................................ 71, 72

Rules

Fed. R. Crim. P. 6(e)(2)(B)............................................................................... 8
Fed. R. Crim. P. 6(f)....................................................................................... 48
Fed. R. Crim. P. 7(a)....................................................................................... 48
Fed. R. Crim. P. 7(a)(1)(A)............................................................................ 48

## PRELIMINARY STATEMENT

The Government respectfully submits this omnibus memorandum of law in opposition to defendant Luigi Nicholas Mangione's motions challenging the constitutionality of the death penalty, seeking dismissal of the Indictment and the Government's Notice of Intent to Seek the Death Penalty, and seeking suppression of certain evidence.  (Dkt. Nos. 51, 59).

The defendant's first motion, dated September 20, 2025, raises five principal challenges: (1) that public statements and pretrial publicity in this case were so prejudicial as to render his prosecution unconstitutional; (2) the timing of the Government's grand jury presentation violated due process; (3) the Government's decision to seek the death penalty was arbitrary and capricious; (4) empaneling a death qualified jury and conducting a bifurcated proceeding violates the defendant's due process rights; and (5) the Federal Death Penalty Act ("FDPA") and capital punishment itself violates the Fifth and Eighth Amendments.  (Dkt. No. 51) (the "Constitutionality Motion").

The defendant's second motion, filed on October 11, 2025, seeks to: (1) dismiss Counts Three and Four of the Indictment challenging the predicate crime of violence on which those counts are based (Dkt. No. 59) (the "Crime of Violence Motion"); and (2) suppress certain evidence seized from the defendant's possession at the time of his arrest and certain statements the defendant made to law enforcement.  (Dkt. No. 59) (the "Suppression Motion").

The Government's opposition proceeds in three parts.  In Part 1, the Government responds to the defendant's Constitutionality Motion ("Const. Mot."), in Part 2, the Government responds to the defendant's Crime of Violence Motion ("COV Mot."), and in Part 3, the Government responds to the defendant's Suppression Motion ("Suppress. Mot.").

For the reasons that follow, the defendant's motions should be denied in their entirety.

## RELEVANT BACKGROUND

### I.    THE FEDERAL DEATH PENALTY ACT

The FDPA details strict procedures that must be followed before a defendant may be sentenced to death. Initially, the Government must serve a defendant with pretrial notice of its intent to seek the death penalty. 18 U.S.C. § 3593(a).  The notice must set forth the specific aggravating factor or factors that the Government intends to prove.  *Id.*

The FDPA provides for separate guilt and penalty phases in a death penalty prosecution. If the jury convicts the defendant at the guilt phase of the trial, a penalty phase is held before the same jury.  During the penalty phase, the Government must first establish beyond a reasonable doubt that the defendant had at least one of four enumerated mental states establishing the defendant's intent to kill.  *Id.* § 3591(a)(2).  If the jury finds that the defendant acted with at least one of the requisite mental states, then the jury considers the Government's proof of the noticed aggravating factors.  These factors may include statutory factors set forth in the FDPA and non-statutory factors.  *Id.* § 3592(c).  The defendant may put before the jury proof of any mitigating factors he believes weigh against a death sentence.  *Id.* § 3592(a).

To return a death sentence, the jury must find the existence of at least one statutory aggravating factor.  *Id.* § 3593(e).  The jury then may consider all of the aggravating factors and all of the mitigating factors that have been proven.  *Id.*  The Government has the burden of establishing the existence of any aggravating factor beyond a reasonable doubt, and the jury must find aggravating factors unanimously.  The defendant's burden of establishing the existence of any mitigating factor is by a preponderance of the evidence.  *Id.* § 3593(c).  Any juror who is individually persuaded that a mitigating factor exists may consider it in reaching a sentencing decision; unanimity is not required as to mitigating factors.  *Id.* § 3593(c), (d); *see also Jones v. United States*, 527 U.S. 373, 376-79 (1999) (describing FDPA procedures); *United States v. Fell*,

360 F.3d 135, 140-41 (2d Cir. 2004) ("*Fell I*").  The entire sentencing procedure must be free of any invidious factors, and a nondiscrimination attestation must be signed by each juror.  18 U.S.C. § 3593(f).

Finally, the FDPA includes special procedures for appellate review.  *Id.* § 3595.  Section 3595(b) requires that the review be based on the "entire record."  The court of appeals is to "address all substantive and procedural issues raised" on the appeal of a sentence of death and shall consider whether the sentence of death was imposed under the "influence of passion, prejudice, or any other arbitrary factor."  *Id.* § 3595(c).

## II.    THE INDICTMENT AND NOTICE OF INTENT

On April 17, 2025, a grand jury in this district returned 25 Cr. 176 (MMG) charging the defendant in four counts.  (Dkt. No. 22).  As relevant here, the offense charged in Count Three (murder through use of a firearm, in violation of 18 U.S.C. § 924(j)), is a death-eligible crime under the FDPA. On April 24, 2025, the Government filed the Death Penalty Notice, officially notifying the defendant that it intended to seek the death penalty for the crime and identifying the relevant aggravating factors.  (Dkt. No. 25).

The Notice of Intent to Seek the Death Penalty (the "Notice") fully complied with the FDPA. First, the Government alleged that the defendant possessed all four of the threshold intent factors with respect to Count Three.  The Government further provided notice that with respect to the death-eligible count, it intended to prove two statutory aggravating factors: "grave risk of death to additional persons," 18 U.S.C.  § 3592(c)(5); and "substantial planning and premeditation," *id.* § 3592(c)(9).  In addition, the Notice listed several non-statutory aggravating factors: (i) "victim impact"; (ii) selection of site and victim for an act of violence"; and (iii)  "future dangerousness."

4

## PART 1

## CONSTITUTIONALITY MOTION

## ARGUMENT

Each of the defendant's constitutional arguments has been raised and rejected in federal capital cases, based on an unbroken line of Supreme Court and appellate precedent upholding the FDPA.

The defendant's arguments are foreclosed by binding Supreme Court precedent. Moreover, even if precedent did not foreclose the defendant's arguments, his motion fails on its merits. He identifies no cognizable grand jury prejudice sufficient to meet the demanding standard that the purported violation substantially influenced the grand jury's decision; no justiciable defect in the Department of Justice's internal capital authorization process; no Eighth Amendment infirmity not already foreclosed by a slew of Supreme court authority; and no procedural flaw in either the FDPA's bifurcated, death qualified trial framework or the Government's well established practice of alleging statutory aggravating factors as special findings and proving them to a jury beyond a reasonable doubt. At bottom, what the defendant recasts as a constitutional crisis is merely a repackaging of arguments that controlling precedent has repeatedly rejected, and none warrants dismissal of the indictment or categorical preclusion of a congressionally authorized punishment.

Reduced to their core, the defendant's arguments invite this Court to discard what the Supreme Court has spent five decades refining: a capital framework that narrows who may be sentenced to death and channels the jury's ultimate moral judgment through guided discretion. *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 189–95 (1976) (plurality); *Zant v. Stephens*, 462 U.S. 862, 878–90 (1983); *Tuilaepa v. California*, 512 U.S. 967, 971–80 (1994). Congress followed that blueprint in the FDPA, which requires unanimous beyond a reasonable doubt gateway findings

(the factors listed in 18 U.S.C. § 3591(a)(2), and at least one 18 U.S.C. § 3592(c) factor), broad consideration of mitigation, and a structured selection determination under 18 U.S.C. § 3593(e). *See Jones*, 527 U.S. at 376–79; *United States v. Aquart*, 912 F.3d 1, 48–49 (2d Cir. 2018).  The defendant's motions—equal parts policy lament and doctrinal misread—cannot overcome controlling law.

## I.    DEFENDANT'S DUE PROCESS CHALLENGE BASED ON PUBLIC STATEMENTS AND PRETRIAL PUBLICITY FAILS AS A MATTER OF LAW

The defendant's lead claim is that a constellation of public communications—some attributed to Government officials and some not—warrant dismissal of a facially valid federal indictment and, alternatively, categorical preclusion of capital sentencing in this case.  (Const. Mot. at 22-33).  The law does not support either remedy.  The Supreme Court and the Second Circuit have long made clear that (i) pretrial publicity, even when intense, is not itself a constitutional defect; (ii) dismissal of an indictment for publicity is an extraordinary, disfavored remedy that requires concrete proof that misconduct "substantially influenced" the grand jury; and (iii) the Constitution's principal safeguard against the risk of prejudice from publicity is searching *voir dire* and careful trial management, not pretrial dismissal.

As an initial matter, the grand jury "belongs to no branch of the institutional Government," and courts accord a strong presumption of regularity to its proceedings.  *United States v. Williams*, 504 U.S. 36, 47 (1992).  That presumption is overcome, and dismissal becomes even theoretically available, only upon a showing of both legal error and actual prejudice, *i.e.*, that the challenged conduct "substantially influenced the grand jury's decision to indict" or leaves "grave doubt" that the decision to indict was free from such influence.  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988).  Speculation about what grand jurors might have read or heard in the press, without concrete record proof tying any publicity to the grand jury's deliberations, does not satisfy

that standard. *See United States v. Mechanik*, 475 U.S. 66, 75 (1986) (emphasizing harmless error principles in the grand jury context); *accord United States v. Saipov*, No. 17 Cr. 722 (VSB), 2019 WL 624176, at *4 (S.D.N.Y. Feb. 14, 2019) ("*Saipov I*") (denying motion to dismiss capital indictment based on the President's public statements because defendant's "assertion [wa]s pure speculation made without a scintilla of direct factual support."). The defendant's motion, which catalogues public statements and coverage but does not identify any grand juror exposure, much less a nexus between such exposure and the return of the indictment, falls well short of the standard set forth in *Bank of Nova Scotia*.

Nor do the defendant's assertions trigger a presumption of prejudice under *Skilling v. United States*, 561 U.S. 358 (2010). In *Skilling*, the Supreme Court, confronting saturating coverage of Enron's collapse held that even intense, unfavorable publicity does not, by itself, violate due process or compel a venue change absent proof that the proceedings occurred in an "atmosphere that [was] utterly corrupted by press coverage" or where "bedlam reigned at the courthouse." *Id.* at 380. The Court rejected presumed prejudice and found no evidence that any seated juror was actually biased. (*Id.*) ("Prominence does not necessarily produce prejudice, and juror *impartiality,* we have reiterated, does not require *ignorance.*") (emphasis in original). So too here, generalized allegations of negative media and public commentary without concrete proof of a corrupted trial environment or juror partiality fall well short of *Skilling*'s exacting standard.

The defendant's reliance on Rule 6(e) points the same way. (Const. Mot. at 25-27). Grand jury secrecy protects "matters occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(B). Courts in this district routinely recognize that public announcements of arrests and indictments do not disclose Rule 6(e) material. *See, e.g., United States v. Gibson*, 175 F. Supp. 2d 532, 537–38 (S.D.N.Y. 2001) (rejecting motion for grand jury minutes where a book about defendant's

organized crime ties was discussed in grand jury proceeding because defendant failed to demonstrate a particularized need as required by Rule 6(e)).  Mangione offers no competent evidence that any speaker disclosed grand jury testimony, exhibits, voting, or deliberations.  Nor could he plausibly attribute statements that were made *prior* to the grand jury hearing as evidence for Rule 6(e) violations.   There is no evidence or even indication that any commentary by a Government officials violated grand jury secrecy.   Accordingly, the defendant's claim necessarily fails.

Equally misplaced is defendant's invocation of Local Criminal Rule 23.1, which regulates extrajudicial statements by "lawyers" and certain law-enforcement and non-law enforcement personnel when such statements present a "substantial likelihood" of prejudicing a criminal proceeding.  (Const. Mot. at 22-33).  But Rule 23.1 is not a mechanism for the extraordinary relief requested by the defendant—dismissal of the indictment.  *See Lauro v. Charles*, 219 F.3d 202, 209–10 (2d Cir. 2000) (recognizing that even improper law enforcement publicity does not automatically require suppression or dismissal and addressing remedies tailored to the wrong).  Rule 23.1 does not create a freestanding constitutional veto over an otherwise valid prosecution, and nothing in the defendant's submission justifies remedying an alleged violation of a local procedural rule with the extraordinary remedy of dismissal.  *See also Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075–76 (1991) (approving attorney speech restrictions keyed to likelihood of material prejudice while recognizing competing First Amendment values).  As more fully discussed in the Government's letter, dated October 8, 2025, the social media reposts cited by the defense were made by individuals not associated with this prosecution team and were

promptly removed.[1]  Local Rule 23.1 regulates participants "associated with" the investigation or litigation, not strangers to the case, and, in all events, the calibrated remedies the rule contemplates, admonitions and curatives, are the appropriate tools, not dismissal.  (*Id.* at 1072-73) (making the "distinction between participants in the litigation and strangers to it.").

For many of the same reasons, statements by White House officials or political actors do not fall within the scope of Rule 23.1.  White House officials are not lawyers or personnel associated with this litigation, and are not subject to any of the lawyers' supervision in this case.  Local Rule 23.1(a).  Thus, their public commentary does not implicate the Local Rule.  Even if statements by political officials touch on pending criminal matters, courts have consistently declined to treat such commentary as grounds for judicial intervention or dismissal.  (*See infra* p.10).  The proper inquiry with respect to these officials is not under Rule 23.1, but whether the statements create a "presumption of juror prejudice"—a showing the defense has not and cannot make.  As the holding in *Skilling* counsels, "extensive screening questionnaire[s] and follow-up *voir dire* [are] well suited" to the task of identifying and inspecting the possible effects of any pretrial publicity.  561 U.S. at 384.

The defendant's reliance on the imagery of a "perp walk" and the holding in *Lauro*—a civil damages action—is likewise unavailing and fails to meet the burden *Skilling* imposes.  In *Lauro*, the Second Circuit condemned a "staged" perp walk as a Fourth Amendment violation in discussing civil liability—it did not contemplate, let alone hold, that such conduct warrants dismissal of criminal charges.  219 F.3d at 212–13.  The proper remedy for a "stage[d] perp walk"

---

[1] As detailed in the Government's letter, dated October 8, 2025, the Department promptly directed that the posts be removed. (Dkt. No. 56). The Department further communicated the Court's admonitions to the Deputy Attorney General's Office and the individuals involved, and reinforced internal review procedures governing public statements by Department employees. (*See* Dkt. No. 56; Decl. of Sean S. Buckley ¶¶ 4-6, Dkt. No. 56-1).

during arrest or transport are case specific curatives aimed at the petit jury. *United Staes v. Corbin*, 620 F. Supp. 2d 400, 407 (E.D.N.Y. 2009) (finding "the use of screening questionnaires, a thorough and searching *voir dire*, and perhaps affording additional peremptory challenges to the defendant" sufficient to overcome effects of a "perp walk.") *United States v. Griffin*, No. 94 Cr. 631 (AGS), 1996 WL 140073, at *1 (S.D.N.Y. Mar. 27, 1996) ("[A] thorough voir dire of potential jurors can detect and eliminate any prospective jurors influenced by pretrial publicity."). A staged photo-op, assuming one occurred here, is not a talisman that invalidates an indictment, particularly in the absence of any showing of actual prejudice.

Publicity—even intense—is not novel in this district. Courts routinely try high visibility cases here, with robust prophylaxis against spillover prejudice, including written juror questionnaires probing media exposure, individualized and sequestered *voir dire*, instructions forbidding media consumption, sequestration of witnesses, and targeted admonitions. *See Skilling*, 561 U.S. at 377–85 (rejecting presumed prejudice claim despite "pervasive, adverse publicity," emphasizing effectiveness of *voir dire* and trial safeguards); *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (recognizing breadth of trial court discretion in conducting *voir dire* about publicity); *Murphy v. Florida*, 421 U.S. 794, 799–803 (1975) (distinguishing pervasive community prejudice from mere familiarity with case); *Patton v. Yount*, 467 U.S. 1025, 1031–36 (1984) (time lapse and *voir dire* safeguards cured publicity concerns). The defendant's motion, by contrast, seeks the most dramatic of remedies at the earliest stage, in the absence of any *voir dire* record. The Supreme Court's consistent direction is that trial, not pretrial dismissal, is where potential prejudice is assessed and remedied.

That is precisely how at least one court in this district resolved similar claims. In *Saipov I*, the defendant attacked the Government's decision to seek the death penalty in part by invoking

governmental commentary. 2019 WL 624176, at *5. In rejecting this argument, Judge Broderick found that the President's public commentary on a social media platform nearly a year earlier was insufficient to rebut the presumption of regularity that attaches to the Government's charging decisions. (*Id.*) (noting the defendant's failure to provide "'exceptionally clear proof' that the Attorney General abused his discretion in directing the Government to seek the death penalty.") (quoting *McCleskey v. Kemp*, 481 U.S. 279. 297 (1987)).

In reaching that result, Judge Broderick relied on *Nichols v. Reno*, which squarely addressed whether high profile public statements by the then Attorney General and President could, by themselves, taint a federal criminal prosecution. 931 F. Supp. 748, 753 (D. Colo. May 29, 1996). *Nichols* held that the Attorney General's exercise of charging discretion is "presumptively unreviewable." *Id.* at 751. In the absence of clear evidence to the contrary, courts will presume that prosecutors have discharged their duties properly. *Saipov I*, 2019 WL 624176, at *4 (citing failure to offer any "evidence that the President's remarks impacted the Attorney General's decision-making process in any way."). Applying *Nichols*, Judge Broderick concluded that tweets and similar public remarks were legally irrelevant without a non-speculative showing of causation, and therefore provided no basis to dismiss, to bar capital sentencing, or to pierce prosecutorial deliberations. *Id.* The same is true here.

Both *Saipov I* and *Nichols* teach that public rhetoric by the Attorney General or the President is not a proxy for proof of prejudicial effect. That presumption is buttressed here, as it was in *Nichols* and *Saipov I* by application of the Capital Case Protocol. *See Saipov I*, 2019 WL 624176, at *3-*4; *Nichols*, 931 F. Supp. at 752-53. The law presumes regularity in charging decisions and that presumption is rebutted only by particularized evidence tying the statements to the challenged government action.

11

Nor does the defendant's catalogue of statements remotely approach the narrow line of cases where courts have presumed prejudice because the entire proceeding was saturated with inherently prejudicial, state-sponsored publicity that could not be cured by *voir dire*. For example, in *Rideau v. Louisiana*, 373 U.S. 723 (1963), the Supreme Court reversed a conviction where the defendant's filmed confession was broadcast repeatedly to the small community from which the jury was drawn; in *Sheppard v. Maxwell*, 384 U.S. 333 (1966), the trial court ceded control of the courtroom to the press and failed to insulate the jury from "disruptive influences in the courtroom." *Id.* at 363. Those extreme facts are not present here. New York City is not a small parish where three televised broadcasts of a defendant's confession reach virtually every potential juror. And the defendant points to no judicial abdication of control over the courtroom or the jury, nor can he, as a trial date has not been set yet much less a venire been empaneled. The Supreme Court has repeatedly instructed lower courts not to presume prejudice absent such extraordinary circumstances. *See Skilling*, 561 U.S. at 381 ("Presumed prejudice . . . attends only the extreme case."); *Dobbert v. Florida*, 432 U.S. 282, 303 (1977) (no presumed prejudice where pretrial publicity was extensive but not "utterly corrupted by press coverage"). The Court should decline the defendant's invitation to do so here.

In short, the governing standards are stringent and the record here demonstrates that the defendant does not meet them. Mangione offers no "particularized proof of irregularities" in the grand jury process, only conjecture about atmospherics. *United States v. Silver*, 103 F. Supp. 3d 370, 376 (S.D.N.Y. Apr. 10, 2015)[2] (quoting *Mechanik*, 475 U.S. at 75). Under *Williams*, *Bank*

---

[2] The defendant's attempt to use *Silver* as a yardstick likewise fails. The facts and context of *Silver* bear no resemblance to this case. (Const. Mot. at 30). In *Silver*, the court's analysis centered on statements made by the then U.S. Attorney, an individual plainly "associated with" the prosecution and thus directly linked to the pending litigation. Here, by contrast, the individuals responsible for the online comments are not members of the prosecution team, staff supervised by the prosecution

*of Nova Scotia*, *Mechanik*, and their progeny, the proper course is to deny dismissal and address any issues of publicity if they arise, through the ordinary calibrated tools of *voir dire* and instruction— not by erasing a valid indictment.

## II. THERE WAS NO DUE PROCESS VIOLATION ARISING FROM THE TIMING OR CONDUCT OF THE GRAND JURY

The defendant next argues that the Government violated his due process rights by seeking an indictment while his motion to address alleged grand jury prejudice remained pending before the Court. That motion, filed on April 11, 2025, sought to preclude the Government from pursuing the death penalty and requested that the Court order screening of grand jurors for exposure to statements made by the Attorney General, other Department of Justice officials, and members of the White House staff, which the defense characterized as unlawful and prejudicial under Local Criminal Rule 23.1. (Dkt. No. 52; Const. Mot. at 34). The defendant's arguments collide with principles of ripeness and grand jury autonomy.

The defendant's core grievance—that the Government "ignored" a pending motion by proceeding to the grand jury while a screening request was being briefed—fails at the threshold. (*Id.*). A defense motion does not freeze charging authority, and the relief the defense sought was not ripe because a grand jury had not yet returned an indictment. *See, e.g., Deaver v. Seymour*, 822 F.2d 66, 68-71 (D.C. Cir. 1987) (affirming denial of injunctive relief seeking to enjoin prosecutor from seeking an indictment because the Federal Rules of Criminal Procedure provided adequate opportunities to challenge prosecutorial authority); *Stolt-Nielsen S.A. v. United States*, 442 F.3d 177, 184–87 (3d Cir. 2006) (holding that a pre-indictment injunction barring an

---

team, or otherwise employed by the U.S. Attorney's Office for the Southern District of New York. Nor are they law enforcement agents working on this prosecution. They are not "associated with" this litigation within the meaning of Rule 23.1. Any holding in *Silver* therefore rests on an evaluation of facts and circumstances not present in this case.

indictment is unavailable and that defenses must be litigated after indictment in the criminal case); *In re Sealed Case*, 829 F.2d 50, 53 (D.C. Cir. (affirming district court's denial of request to enjoin prosecutor from seeking an indictment because defendant "can raise his objections by appropriate motions, *if* and *when* an indictment is entered.") (emphasis in original).

Moreover, the Government had not yet filed its Notice of Intent to Seek the Death Penalty. Nothing in the Constitution, the Federal Rules of Criminal Procedure, or this district's Local Rules precludes the Executive Branch from presenting a case to the grand jury while a defendant's collateral motion remains unresolved.  The decision to seek an indictment rests exclusively with the Executive.  Courts have long recognized that judicial intervention at the pre-indictment stage is unripe and inappropriate.  *See United States v. Calandra*, 414 U.S. 338, 350 (1974) ("Any holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws."); *Williams*, 504 U.S. at 53 ("The authority of the prosecutor to seek an indictment has long been understood to be 'coterminous with the authority of the grand jury to entertain [the prosecutor's] charges.'") (quoting *United States v. Thompson*, 251 U.S. 407, 414 (1920).

The defendant's broader request that the Court regulate the timing of the Government's presentation of evidence to the grand jury, or prevent the Government from pursuing a capital indictment, fares no better.  The Supreme Court has long held that a district court's supervisory authority over grand jury proceedings is limited and does not extend to dictating or overseeing the Government's presentation of its case.  In *Williams*, the Supreme Court squarely rejected the notion that a district court may dismiss an indictment based on a prosecutor's alleged failure to present exculpatory evidence, emphasizing that the grand jury "belongs to no branch of the

institutional Government" and that "[i]t would run counter to the whole history of the grand jury institution to permit an indictment to be challenged on the ground that there was inadequate or incompetent evidence before the grand jury." 504 U.S. at 54. (internal quotations and citations omitted).  The Court made clear that a federal court may not invoke its supervisory power to prescribe "standards of prosecutorial conduct before the grand jury." *Id.* at 68.

That principle has been reaffirmed repeatedly.  *See, e.g., United States v. Baker*, 23-6318, 2025 WL 1681324, at *4 (2d Cir. 2025) (summary order) ("An indictment is not subject to challenge 'on the ground that there was inadequate or incompetent evidence before the grand jury.'"); *United States v. Hilts*, 757 F. App'x 56, 59 (2d Cir. 2018) (summary order) (explaining that courts may not "entertain challenges attacking the sufficiency of evidence before a grand jury, and presenting such a challenge as prosecutorial misconduct does not bring it within the court's authority"); *In re Grand Jury Subpoena Dated Feb. 2, 2012*, 908 F. Supp. 2d 348, 351 (E.D.N.Y. 2012) ("Although courts must ensure that the grand jury process is not being abused by the government, it is not the role of the courts to micromanage the government's presentation of evidence to the grand jury.").

Equally misplaced is the defendant's suggestion that the Court should have prevented the Government from seeking the death penalty before indictment.  (Const. Mot. at 33–37).  The defendant identifies no authority for the proposition that he may, by motion, control the Government's charging process or preemptively litigate issues that may never arise.  A defendant who wishes to challenge the legal propriety of capital prosecution may do so at the appropriate time, and in the appropriate manner—*i.e.,* after indictment and before the District Judge assigned to the case.  Because this matter had not yet been indicted and the Government had not yet filed its Notice of Intent, any such challenge was premature and unripe.  *See Abbott Labs. v. Gardner*,

387 U.S. 136, 148–49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) (ripeness doctrine protects against "judicial interference until a[ ] . . . decision has been formalized and its effects felt in a concrete way by the challenging parties"); *Fell I*, 360 F.3d 135, 139–40 ("Ripeness is a constitutional prerequisite to exercise of jurisdiction by federal courts. At the core of the ripeness doctrine is the necessity of ensur[ing] that a dispute has generated injury significant enough to satisfy the case or controversy requirement of Article III of the U.S. Constitution by prevent[ing] a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur.") (internal citations and quotation marks omitted)).

The Government is unaware of any case—nor has the defendant cited to any—in which a federal court has entertained a challenge to a potential death penalty prosecution, or to the presentation of evidence, *before* an indictment has even been returned. Mangione's motion cites no statute, rule, or controlling authority for this proposition, instead, he relies solely on Local Criminal Rule 23.1 and several inapposite cases. (Const. Mot. at 35–36). The fundamental precept of federal jurisdiction is that a dispute must be ripe before it may be adjudicated. *See Abbott Labs.*, 387 U.S. at 148–49. Here, because no indictment had yet been returned and no Notice of Intent had yet been filed, there was no concrete controversy for the Court to resolve.

As discussed above, however, even assuming that the Court found a technical violation of Local Rule 23.1, dismissal of the Indictment would be wholly inconsistent with established precedent. The Supreme Court has made clear that dismissal is a drastic remedy reserved only for cases of actual prejudice affecting the grand jury's decision to indict. *Bank of Nova Scotia*, 487 U.S. at 254 ("[A] district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants."); *Mechanik*, 475 U.S. at 73 ("[T]he petit jury's

verdict render[s] harmless any conceivable error in the charging decision that might have flowed from the violation.").  Likewise, in *Williams*, the Court admonished that the supervisory power cannot be used "as a means of prescribing … rules of grand jury procedure."  504 U.S. at 46–47. Even if a public statement by a government official were deemed inconsistent with this Court's Local Rules, such a violation standing alone would not establish that the grand jury was improperly influenced or that probable cause was lacking. Dismissal on that ground would therefore run counter to the well-established case law recognizing both the grand jury's independence and the narrow circumstances under which an indictment may be set aside.

Another of the defendant's speculative arguments is the claim that he was indicted by a pool of grand jurors "who must have been exposed to" the Attorney General's public comments, and therefore should have been "screened" about any such exposure.[3]  (Const. Mot. at 33–34). This argument, like others, rests on conjecture rather than evidence.  The defendant identifies no factual basis for concluding that any grand juror actually heard or was influenced by the statements attributed to the Attorney General, nor any authority suggesting that public commentary renders a grand jury incapable of fulfilling its constitutional role.

In sum, the defendant's motion invites the Court to intrude upon the Executive's charging authority, to disregard the well-settled limits of judicial oversight of the grand jury, and to entertain speculative claims that are neither ripe nor supported by evidence.   It should therefore be denied.

## III.    THERE IS NO BASIS TO INTERFERE WITH THE GOVERNMENT'S PROSECUTORIAL DISCRETION IN THIS CASE

Mangione next complains that the Attorney General's decision to seek the death penalty violated his Fifth and Eighth Amendment rights because it was made in an arbitrary and capricious

---

[3] The Government will submit, *ex parte*, a letter addressing the defendant's "screening" argument more directly.

manner without adequate consideration of mitigating evidence. (Const. Mot. at 37–50). The defendant makes the false claim that the Government "was not interested in being presented with mitigating information," (*id.* at 43), and that the subsequent opportunity to make a presentation to the Department's Capital Review Committee did not cure the purported constitutional deficiency, (*id.*). He thus asserts that the Government failed to afford a meaningful opportunity to present mitigation evidence which rendered its charging decision arbitrary, unconstitutional, and in violation of his Fifth and Eighth Amendment rights. (*Id.*). The defendant's arguments find no footing in either the law or the facts and should be rejected outright.

As a threshold matter, the defendant's position on the Department of Justice's death penalty protocol is internally inconsistent. On the one hand, he expressly disclaims reliance on the protocol as a source of any enforceable rights, (Const. Mot. at 42), acknowledging—as every court to consider the issue has held—that the protocol is an internal policy guide that "does not create any substantive or procedural rights." *United States v. Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000); *United States v. Lee*, 274 F.3d 485, 493 (8th Cir. 2001); *Nichols*, 124 F.3d at 1376; *Saipov I*, 2019 WL 624176, n. 8; *United States v. Williams*, 181 F. Supp. 2d 267, 299 (S.D.N.Y. 2001). Yet on the other hand, he insists that the protocol "reflects what is required by the Fifth and Eighth Amendments" and that disregarding it "enabled the Justice Department to deprive him of those rights." (Const. Mot. at 42). In other words, Mangione concedes that the protocol itself does not confer rights, but then claims that failure to follow it deprived him of constitutional protections effectively treating the protocol as the very source of those rights.

That logical contradiction underscores the flaw in his claim. The Constitution, not an internal DOJ manual, defines the scope of due process and Eighth Amendment protections. The Department's capital review procedures are policy instruments, not constitutional mandates.

18

Courts have consistently rejected attempts to convert the DOJ death penalty protocol into a set of judicially enforceable constitutional requirements.  *Saipov I*, 2019 WL 624176, n. 8; *Williams*, 181 F. Supp. 2d at 299; *Nichols*, 931 F. Supp. at 752-53.  Mangione cannot avoid that precedent simply by rebranding the protocol as a "reflection" of constitutional duties.  (*Id.*).  Thus, his argument collapses under the weight of its own logic.  If the protocol creates no rights, then a failure to adhere to it cannot constitute a constitutional violation.

Moreover, the defendant's claim that the Attorney General's decision to seek the death penalty violated his Fifth and Eighth Amendment rights because it was made in an "arbitrary and capricious" manner rests on a fundamental misapprehension of that standard in the capital context. (Const. Mot. at  37–50).  As the Supreme Court made clear in *Furman v. Georgia*, 408 U.S. 238 (1972), the "arbitrary and capricious" inquiry addresses whether a statutory capital sentencing scheme operates in a manner that risks the random or discriminatory imposition of the ultimate punishment.  It does not regulate, nor has any court applied it to regulate, the internal administrative decision of the Department of Justice to authorize a capital prosecution.  Consistent with *Furman*, the Second Circuit has likewise treated arbitrariness as a constraint on sentencing procedures, not prosecutorial charging authority.  *See Aquart*, 912 F.3d at 54–57.  The defendant therefore errs in attempting to transpose a constitutional standard designed to evaluate capital sentencing frameworks onto the Attorney General's discretionary authorization decision, one that the Justice Manual explicitly characterizes as an internal executive-branch process that creates no substantive rights.

## A.    The Department of Justice's Capital Case Protocol

The Department of Justice's procedures governing capital case determinations are set forth in the Justice Manual §§ 9-10.010 to 9-10.190 (the "Capital Case Protocol"). These internal

guidelines are designed to assist the Attorney General, and those acting under her authority, in exercising prosecutorial discretion fairly, consistently, and even-handedly across the country.  *Id.* § 9-10.030.  The Capital Case Protocol underscores that in every case, the decision whether to seek the death penalty "must be based upon the facts and law applicable to the case and be set within a framework of consistent and even-handed national application of Federal capital sentencing laws." *Id.*  It further makes clear that "[a]rbitrary or impermissible factors—such as a defendant's race, ethnicity, or religion—will not inform any stage of the decision-making process." *Id.*  The Attorney General retains final authority over whether the Government will seek the death penalty. *Id.* § 9-10.050.

Under the Capital Case Protocol, whenever death is a potential penalty, the United States Attorney must make a formal recommendation to the Department's Capital Review Committee, an internal body composed of senior DOJ officials.  *Id.* §§ 9-10.080, 9-10.130.  Before submitting that recommendation, the U.S. Attorney should provide defense counsel a reasonable opportunity to present information bearing on whether a capital prosecution is appropriate.  *Id.* § 9-10.080. The Capital Case Protocol also affords defense counsel a reasonable opportunity to meet directly with the Capital Review Committee to discuss the case.  *Id.* § 9-10.130.

After considering the parties' submissions and any presentations, the Capital Review Committee makes its recommendation to the Attorney General, who then renders the final decision on whether the Government will seek the death penalty.  *Id.* § 9-10.130.  In making its recommendation, the Capital Review Committee, the U.S. Attorney, and the Attorney General may weigh "any legitimate law enforcement or prosecutorial reason that bears for or against seeking the death penalty."  *Id.* § 9-10.140.  Relevant considerations may include whether the available and admissible evidence is legally sufficient to obtain and sustain a capital conviction

and death sentence; whether the aggravating factors outweigh the mitigating factors to a degree that justifies a death sentence; or, where no mitigating factors exist, whether the aggravating factors alone warrant that outcome. *Id.*

The Justice Manual provides that "the Attorney General will make the final decision whether the Government should file a notice of intent to seek the death penalty." *Id.* § 9-10.130. The Justice Manual specifically also provides that the Manual itself does not "create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal." *Id.* § 1-1.200.

### B. The Capital Case Protocol Was Followed in This Case

The Government fully complied with the Capital Case Protocol in making its determination to seek the death penalty in this case. On January 8, 2025, several weeks after the defendant was arrested and after counsel was assigned, the U.S. Attorney's Office extended an invitation to defense counsel to meet with the Capital Review Committee on January 13, 2025, and to provide a written mitigation submission pursuant to the Capital Case Protocol in advance of the meeting. *See* JM §§ 9-10.080, 9-10.130. On January 12, 2025, defense counsel distributed its written mitigation submission to the Department's Capital Case Section and the U.S. Attorney's Office.

On January 13, 2025, defense counsel presented evidence in support of mitigation to the Capital Review Committee.[4] At the end of the meeting, a member of the defense team asked if there would be an additional opportunity for the defense to submit mitigation materials. The defense team was informed that additional submissions would have to be made through the U.S.

---

[4] Due to the anticipated change in the composition of the Capital Review Committee, the meeting was held by video conference in order to expedite this phase of the review process.

Attorney's Office but that no deadline could be provided.[5]  The defense did not submit additional materials.  The Capital Review Committee then made its recommendation to the Attorney General whether to seek the death penalty.  After considering all of the relevant materials and recommendations, including those of the U.S. Attorney's Office, the Capital Review Committee, and defense counsel, on April 1, 2025, the Attorney General directed the Government to seek the death penalty.

Thus, contrary to the defendant's assertion that the Attorney General "ignored" the protocol, (Const. Mot. at 45–46), the Government in fact fully complied with every procedural safeguard the Capital Case Protocol prescribes.  Defense counsel was invited on January 8, 2025, to submit mitigation materials and meet with the Department's Capital Review Committee.  JM § 9-10.080.  On January 12, 2025, counsel submitted a written mitigation presentation, and on January 13, 2025, the defense personally appeared, via video conference, before the Committee to present mitigation arguments, after which time the Committee made a recommendation to the Attorney General.  JM § 9-10.130.  On April 1, 2025, the Attorney General directed the Government to seek the death penalty.  *Id.*  These steps reflect precisely the process contemplated by §§ 9-10.080 and 9-10.130 of the Justice Manual and belie any suggestion of procedural irregularity or political interference. They likewise demonstrate the careful, case-specific deliberation that a decision of this gravity requires and that the Attorney General in fact undertook.

The defendant's claim that he had no meaningful opportunity to conduct a mitigation analysis, "which typically takes several months and sometimes more than a year" misunderstands both the purpose of the Justice Manual's Capital Case Protocol and the nature of the mitigation

---

[5] On February 11, 2025, during a phone call between defense counsel and the prosecution team, the Government informed counsel that any additional mitigation materials should be submitted as soon as possible, preferably within a week.

contemplated at that stage.  (Const. Mot. at 9).  The Capital Case Protocol governs the internal Executive Branch charging process, not the statutory penalty phase presentation, and it requires only a reasonable opportunity—not months or years—to provide information the Attorney General may consider.  JM § 9-10.080; *United States v. Tsarnaev*, No. 13 Cr 10200, 2013 WL 5701582, at *1 (D. Mass. Oct. 18, 2013) ("The opportunity extended by the protocol to the defendant to submit information and materials for consideration in the Department's internal deliberations does not create a legal right that can be overseen and enforced by the Court."); *United States v. Jackson*, No. 04 Cr. 801 (PKC), 2006 WL 59559, at *2 (S.D.N.Y. Jan. 9, 2006) ("The Attorney General's capital case review procedure … is not part of the judicial function."); *United States v. Hardrick*, No. 10 Cr. 202, 2011 WL 2516340, at *2  (E.D. La. June 22, 2011) ("The presentation of mitigation evidence to the Capital Case Review Committee is a matter of DOJ internal procedure and does not involve the Court.").

The defendant's assertion that he lacked a reasonable opportunity to submit mitigation materials to the Capital Case Review Committee also disregards the more than two-month period between the January 13, 2025 meeting with the Committee and the Attorney General's April 1, 2025 decision to seek the death penalty—during which defense counsel had ample opportunity to submit additional evidence of mitigation but chose not to, and which they now claim were unable to provide.

By contrast, mitigation under the FDPA concerns the evidence that may be presented to— and must be considered by—the sentencing jury at a capital penalty phase.  *See* 18 U.S.C. §§ 3592(a), 3593(c). The statutory and constitutional mitigation standards thus govern the jury's selection decision, while the Capital Case Protocol governs only the Attorney General's internal charging deliberations.

The court's decision in *Jackson* is instructive on this point. In *Jackson*, the court expressly recognized that it had no judicial role in supervising or evaluating mitigation submissions under the Justice Manual. Although Judge Castel initially granted the defendant's request to set dates for the submission of mitigation material to the Government, he later corrected course, explaining that this was a "mistake[] on my part." *Jackson*, 2006 WL 59559, at *2. After reconsidering the issue, he concluded that "[t]he Attorney General's capital case review procedure … is not part of the judicial function" and that the Justice Manual "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural." *Id.* Judge Castel went on to explain his reasoning:

> It is not hard to imagine how diligent defense counsel could subjectively believe-no matter how objectively thorough his or her own investigation-that there was yet a stone to be unturned in uncovering a complete and accurate profile of a defendant. At this stage, it was and is up to the Attorney General and his designees to assess whether they have sufficient information to determine whether to file a notice of intention to seek the death penalty under 18 U.S.C. § 3593(a). *Id.*

Judge Castel understood that because a mitigation investigation can always expand, courts cannot entangle themselves in an internal Executive Branch deliberative process that Congress left entirely to the Department of Justice. *Id.* at *2–3. Under *Jackson*, any request that the Court revisit, evaluate, or judge the sufficiency of the defendant's pre-authorization mitigation process is necessarily outside the Court's authority.

## C.    The Capital Case Protocol Is Not Subject to Judicial Review

Even if the Government had not followed every procedural step of the Capital Case Protocol—which it did—the protocol confers no substantive or enforceable rights. The Justice Manual makes this point clear. JM § 1-1.200 ("[The Justice Manual] is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations placed [by the Justice Manual]

on otherwise lawful litigative prerogatives of DOJ.").  Against this background, every court to

have considered the matter has held that the internal prosecutorial policies and procedures in the

Justice Manual do not limit the Government's prosecutorial discretion, do not create substantive

or procedural rights, and may not be enforced against the Government.  *See, e.g.*, *United States v.*

*Lopez-Matias*, 522 F.3d 150, 155 (1st Cir. 2008) (reversing district court order striking notice of

intent to seek the death penalty based on alleged violation of Capital Case Protocol); *Lee*, 274 F.3d

at 493 ("We agree with those courts which have concluded that the Capital Case Protocol is

unenforceable by individuals."); *United States v. Fernandez,* 231 F.3d 1240, 1246 (9th

Cir.2000) ("[I]t is clear that the USAM does not create any substantive or procedural rights.");

*Saipov*, 2019 WL 624176, n. 8 ("even if the Government did not follow every dictate of the Capital

Case Protocol to the letter, numerous courts have concluded that the Capital Case Protocol 'does

not create any [ ] legally enforceable rights, and that, therefore, [death-eligible defendants] lack

the power to order the Government to abide by it.'") (quoting *Williams*, 181 F. Supp. 2d at 299);

*United States v. Crusius*, 20 Cr. 389 (DCG), 2020 WL 4340550, at *4 (W.D. Tex. July 28,

2020) (concluding that the court lacked "the authority to grant Defendant the relief he seeks

because the pre-authorization mitigation presentation is not a judicial proceeding presided over by

a judge, but part of an administrative, discretionary decision-making process of whether to seek

the death penalty"); *United States v. Slone*, 969 F. Supp. 2d 830, 833 (E.D. Ky. 2013) (denying

motion to set schedule for presentation of mitigating evidence to federal prosecutors because "[t]he

Court does not have the authority to manage the DOJ's internal processes"); *Tsarnaev*, 2013 WL

5701582, at *1 (same); *Hardrick*, 2011 WL 2516340, at *2 (same); *Jackson*, 2006 WL 59559, at

*2 (same); *United States v. Cisneros*, No. 01 Cr. 1709 (MCA), 2002 WL 35649521, at *1 (D.N.M.

Dec. 10, 2002) (declining to intervene in deadlines set by Government with respect to death

penalty review because "the death-eligible Defendants lack any judicially enforceable substantive or procedural rights with respect [to] the Government's exercise of prosecutorial discretion under the Justice Department's internal death-penalty protocol"); *see also United States v. Catino*, 735 F.2d 718 (2d Cir. 1984) (finding that Department's Petite policy "affords defendants no substantive rights. It is merely an internal guideline for exercise of prosecutorial discretion, not subject to judicial review."); *United States v. Ng,* 699 F.2d 63, 71 (2d Cir.1983) (same).

Consistent with extensive and uniform authority, the Court should reject the defendant's arguments here.

### D. The Attorney General's Decision to Seek the Death Penalty Is Presumptively Unreviewable

The Attorney General's decision whether to seek the death penalty is a quintessential act of prosecutorial discretion—indeed, a "core executive constitutional function." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). The principles governing prosecutorial discretion are well established: the Attorney General is vested with broad authority to determine when and how to prosecute, and her decisions are entitled to a strong presumption of regularity. *Id.* at 464.

Prosecutorial discretion is not ordinarily subject to judicial review. As the Supreme Court has long recognized, decisions by the executive branch "whether or not to prosecute, or what charge to file or bring . . . generally rest[] entirely in [the prosecutor's] discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *Armstrong*, 517 U.S. at 464; *United States v. Nixon*, 418 U.S. 683, 693 (1974). This principle has been repeatedly reaffirmed by the courts of appeals. *See, e.g., United States v. Sanders*, 211 F.3d 711, 720 (2d Cir. 2000) ("[I]t is the prosecutor, not the court, who is vested with authority to decide whether to prosecute or to forgo prosecution."); *In re Sealed Case*, 131 F.3d 208, 214 (D.C. Cir. 1997) ("[T]he exercise of prosecutorial discretion, at the very core of the executive function, has long been held presumptively unreviewable.").

Because prosecutorial discretion occupies such a central place in the separation of powers, the Supreme Court has made clear that courts will not lightly second guess its exercise. Indeed, the Court has required "exceptionally clear proof before [it] would infer that the discretion has been abused." *McCleskey*, 481 U.S. at 297.

Mangione seeks to intrude upon that space by claiming that the Government's decision to seek the death penalty is arbitrary and capricious because the Government failed to take into account mitigating circumstances relevant to his case. In support of that claim, the defendant relies on several inapposite cases, which have no bearing on the facts and the law present here. The defendant relies primarily on *United States v. Littrell*, 478 F. Supp. 2d 1179 (C.D. Cal. 2007) in asking the Court to intervene in the Government's capital case decision making process. The defendant's reliance on *Littrell* is misplaced.

In *Littrell*, the district court took the extraordinary step of granting the defendant's motion to strike the Government's notice of intent to seek the death penalty against Littrell, finding that the Government's decision to seek the death penalty was arbitrary and capricious. *See Littrell*, 478 F. Supp. 2d at 1192. The trial court was primarily concerned with the Government's failure to consider a number of mitigating factors, particularly co-defendants who would not be sentenced to death. *See id*. at 1190–92. Littrell was one of more than 40 members of the Aryan Brotherhood charged in a sweeping RICO conspiracy case. *Id*. at 1182. Seventeen of the defendants were charged with capital offenses relating to one or more of thirteen murders. *Id*. Littrell faced capital punishment for a murder he committed while incarcerated. Prior to his trial, however, a jury was unable to unanimously reach a sentencing decision in the capital trial of two co-defendants who held leadership roles in the gang. After this result, the prosecution chose not to seek the death penalty against three other gang members who allegedly ordered Littrell to carry out the murder

27

for which he was indicted. The prosecution also chose not to seek the death penalty against other members of the gang who were arguably similarly situated to Littrell. *See id*. at 1190–92. Given these circumstances, the district court held that "when all relevant facts and circumstances are considered, it is clear that no rational decision-maker would continue to seek to execute Gary Joe Littrell." *Id*. at 1192.

Subsequent courts, however, have expressly rejected or declined to follow *Littrell*, recognizing that the decision intruded upon the core of prosecutorial discretion and conflicted with the well-settled principle that the Attorney General's charging determinations, including whether to seek the death penalty, are presumptively unreviewable. *See United States v. Montgomery*, No. 11 Cr. 20044, 2014 WL 1453527, at *14–16 (W.D. Tenn. Apr. 14, 2014) ("The Court declines to follow *Littrell* for several reasons. First, 'a prosecutor has the discretion to decide charging issues in the absence of an improper motive (such as charging based on race, religion or another arbitrary classification), and such discretion is not normally subject to review.'"); *United States v. Taylor*, 648 F. Supp. 2d 1237, 1243–45 (D.N.M. 2008) (declining to follow *Littrell* and rejecting a claim that the prosecutor arbitrarily elected to pursue the death penalty); *United States v. Sablan*, No. 00 Cr. 00531, 2007 WL 4116117, at *6–*7 (D. Colo. Nov. 16, 2007) (same); *United States v. Cooya*, 2011 WL 3608611, *3 (M.D. Pa. Aug. 16, 2011) ("The decision in *Littrell* . . . appears to be in direct contrast to every other decision, including United States Supreme Court decisions, that have considered the issue.").

Even if *Littrell* were correctly decided, the defendant's reliance would be misplaced as his case is easily distinguishable from the circumstances in *Littrell*. There, the district court considered the reasonableness of seeking the death penalty against the defendant only in comparison to the penalties sought and imposed against other co-defendants in the same case. That

is not an issue here.  And, although the defendant claims that the Government ignored his attempts at providing mitigation evidence—as set forth above—that claim is unsupported by the facts. (*See supra* Part 1 C.2).  To the contrary, prior to the filing of the Notice of Intent in this case, defense counsel provided a written mitigation submission to the Government, participated in a conference with the Capital Review Committee in which defense counsel presented mitigation arguments, and was afforded an opportunity to provide additional mitigation materials, which he chose not to do.

The Government compared the potential mitigation against the aggravating circumstances and acted well-within its discretion to elect to seek the death penalty.  Mangione has submitted no evidence, and, in fact, he does not even allege, that the Attorney General based her decision to seek the death penalty on a constitutionally suspect factor "such as race, religion, or other arbitrary classification."  *Armstrong*, 517 U.S. at 464.  Thus, "[i]n the absence of any evidence to the contrary, the Court must presume that the prosecution was undertaken in good faith," *United States v. Frank*, 8 F. Supp. 2d 253, 283 (S.D.N.Y. 1998), and deny the defendant's motion.

## IV.    DEATH QUALIFYING PROSPECTIVE JURORS DOES NOT RENDER A RESULTING DEATH SENTENCE UNRELIABLE

The defendant contends that the FDPA is inherently unreliable, asserting that death qualified jurors are more likely to convict and that the process of death qualification impermissibly excludes prospective jurors from protected classes particularly racial minorities. (Const. Mot. at 27).  The defendant believes that this results in an arbitrary application of the punishment.  These claims must also fail.

The defendant's arguments are foreclosed by binding Supreme Court precedent.   In *Lockhart v. McCree*, the Supreme Court considered a challenge to death qualification under the Sixth Amendment and held that it did not violate a defendant's right to an impartial jury.  476 U.S. 162, 173-80 (1986) ("[W]e will assume for the purposes of this opinion that the studies are . . .

adequate to establish that 'death qualification' in fact produces juries somewhat more conviction-prone than non-death-qualified juries. We hold nonetheless, that the Constitution does not prohibit the states from death qualifying juries in capital cases."); *see also Buchanan v. Kentucky*, 483 U.S. 402, 414–20 (1987); *Witherspoon v. Illinois*, 391 U.S. 510, 517–18 (1968) (rejecting claim that social science studies indicated that death qualified jurors were guilt prone).  In so holding, the Supreme Court reasoned that death qualification serves a government's "legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case" and excludes "only those who cannot and will not conscientiously obey the law . . . ." *McCree*, 476 U.S. at 175–76.  Unless and until the Supreme Court revisits its decision in *McCree*, this Court is bound by it.  *See United States v. Roof*, 225 F. Supp. 3d 413, 416 (D.S.C. 2016) (holding death qualification is required by Supreme Court's "binding precedent").

The defendant's claim regarding the exclusion of protected classes from jury service fares no better. (Const. Mot. at 51).  In *McCree*, the Supreme Court expressly found that death qualification also does not violate a defendant's right to have a jury selected from a fair cross-section of the community.  476 U.S. at 174–75. The Court explained:

> The essence of a "fair-cross-section" claim is the systematic exclusion of "a 'distinctive' group in the community." In our view, groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors, such as the "*Witherspoon*-excludables" at issue here, are not "distinctive groups" for fair-cross-section purposes.

*Id.* at 174.

The death qualification process does not exclude racial minorities *because* of their ethnicity.  Rather, death qualification is designed to exclude from jury service in capital cases those persons who cannot follow the law.  This group obviously differs significantly from "distinctive" groups of persons who may not be excluded from jury service because they are members of such

groups, such as women or racial minorities. Even if, in disqualifying those who cannot follow the law, death qualification results in a higher rate of exclusion of certain groups from jury service in capital cases (a point the Government does not concede as true), it follows from *McCree* that their exclusion from jury service because they are unable to follow the law does not deprive the defendant of a jury selected from a fair cross-section of the community, and in turn, does not make the death penalty any less reliable.

The defendant frequently references the district court's factual findings in *United States v. Fell*, 224 F. Supp. 3d 327 (D. Vt. 2016) ("*Fell III*") for the proposition that death qualified juries are more disposed to convict than non-death qualified juries. (Const. Mot. at 51-58). In *Fell III*, the district court adopted wholesale the evidence and arguments propounded by the defense, in spite of contrary evidence offered by the Government, and without regard for the dramatic distinctions in statistics between certain state court cases and FDPA cases. Regardless, the *Fell III* court's findings have no bearing on this case. *Fell III* represents a single district court, among hundreds who have presided over cases charged under the FDPA, taking the extraordinary step of holding evidentiary hearings in the face of binding legal precedent from the Supreme Court.

Nonetheless, in the end, even the *Fell III* court recognized that it was constrained by the decisions of the Supreme Court indicating that a capital sentencing scheme such as the FDPA is constitutional. 224 F. Supp. 3d at 358–59. In essence, the entire discussion regarding the fact hearing in *Fell III* constitutes unnecessary *dicta*. It is not necessary for this Court to opine at all (either favorably or unfavorably) upon the factual findings made by the *Fell III* court. Rather, this Court must recognize, as did the *Fell III* court and the numerous others cited above, that the defendant's claims are contrary to law and must fail .

## V.    THE FEDERAL DEATH PENALTY DOES NOT VIOLATE THE FIFTH OR EIGHTH AMENDMENTS

### A.    Applicable Law

#### 1.  The Death Penalty Is Constitutional

The Supreme Court has spoken with unmistakable clarity: "[I]t is settled that capital punishment is constitutional." *Glossip v. Gross*, 576 U.S. 863, 869 (2015) (citing *Baze v. Rees*, 553 U.S. 35, 47 (2008)); *see also Gregg*, 428 U.S. at 181–87.  The Court has recently reaffirmed the same premise in *Bucklew v. Precythe*, declaring that "[t]he Constitution allows capital punishment." 587 U.S. 119, 129 (2019).  As *Bucklew* explains, death was "the standard penalty for all serious crimes at the time of the founding," and the subsequent adoption of the Eighth Amendment did not outlaw the practice.  *Id.*  Rather, ratified alongside it, the Fifth Amendment "expressly contemplates that a defendant may be tried for a 'capital' crime and 'deprived of life' as a penalty, so long as proper procedures are followed." *Id.*  The First Congress, which proposed both Amendments, in fact made numerous offenses punishable by death.  *Id.*

Within our constitutional structure, it is the Supreme Court, not lower courts, that may revisit those holdings*. See United States v. Hatter*, 532 U.S. at 567 ("[I]t is [the Supreme] Court's prerogative alone to overrule one of its precedents.").  Accordingly, the Supreme Court's "decisions remain binding precedent until [the Supreme Court] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Bosse v. Oklahoma*, 137 S. Ct. 1, 3 (2016).  District courts therefore lack authority to chart a contrary course.  S*ee United States v. Barnes*, 532 F. Supp. 2d 625, 641 (S.D.N.Y. 2008) ("If the Supreme Court's decisions upholding the death penalty are to be reevaluated in light of evolving 'standards of decency' under the Eighth Amendment, as defendants urge, they must be reevaluated by the Supreme Court, not us.").  The Second Circuit has said the same in no uncertain terms, holding

that lower courts are bound to reject per se Eighth Amendment attacks on capital punishment. *Aquart*, 912 F.3d at 48–49.

Consistent with that framework, courts have repeatedly, and recently, turned aside the very challenges the defendant presses here. *See McCleskey*, 481 U.S. at 296–97; *United States v. Coonce*, 932 F.3d 623, 641 (8th Cir. 2019); *United States v. Sampson*, 486 F.3d 13, 19–29 (1st Cir. 2007) ("*Sampson II*"); *Fell I*, 360 F.3d at 140–47; *United States v. Jones*, 132 F.3d 232, 239–42 (5th Cir. 1998); *United States v. Saipov*, No. 17 Cr. 722 (VSB), 2023 WL 371531 (S.D.N.Y. Jan. 24, 2023) ("*Saipov II*"); *United States v. Candelario-Santana*, 368 F. Supp. 3d 316, 319–20 (D.P.R. 2019); *United States v. Mills*, 393 F. Supp. 3d 650, 657–58 (E.D. Mich. 2019); *United States v. Arnold*, 412 F. Supp. 3d 732 (E.D. Mich. 2019); *United States v. Council*, No. 17 Cr. 866 (RBH), Dkt. No. 414 (D.S.C. May 7, 2019); *United States v. Smith*, No. 16 Cr. 86 (SLG), Dkt. No. 419 (D. Alaska Apr. 22, 2019); *United States v. Christensen*, No. 17 Cr. 20037 (JES) (JEH), 2019 WL 651501, at *2–*3 (C.D. Ill. Feb. 15, 2019); *United States v. Ofomata*, No. 17 Cr. 201, 2019 WL 527696, at *2 (E.D. La. Feb. 11, 2019); *United States v. George*, No. 17 Cr. 201, 2019 WL 537186, at *7–*8 (E.D. La. Feb. 11, 2019); *United States v. Madison*, 337 F. Supp. 3d 1186, 1198–1200 (M.D. Fla. 2018); *United States v. Con-Ui*, No. 13 Cr. 123, 2016 WL 9331115, at *4–*7 (M.D. Pa. Jan. 28, 2016); *Roof*, 225 F. Supp. 3d at 414–15; *United States v. Solomon*, No. 05 Cr. 385, 2007 WL 1468794, at *1–*7 (W.D. Pa. May 14, 2007); *see also Duncan v. United States*, Nos. 17 Civ. 91 (EJL), 07 Cr. 23 (EJL), 2019 WL 1320039, at *27–*28 (D. Idaho Mar. 22, 2019) (rejecting, on Section 2255, the claim that shifts in the "legal and factual landscape" undermine earlier denials of pretrial FDPA constitutional challenges).

2. *The Defendant's Burden In Facially Challenging The FDPA Is Extremely High*

Acts of Congress—including the FDPA—arrive in court cloaked with a presumption of constitutionality. *Sampson II*, 486 F.3d at 20 (citing *INS v. Chadha*, 462 U.S. 919, 944 (1983)). The consequence is straightforward: the burden to show the FDPA is unconstitutional sits squarely on the defendant's shoulders. *Id.* (citing *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 198 (2001)). And that burden is a heavy one. A facial attack is "the most difficult challenge to mount," because the challenger must demonstrate that "no set of circumstances exists in which the statute could be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *accord United States v. Le*, 902 F.3d 104, 117 (2d Cir. 2018). Facial challenges are therefore "disfavored because they often rest on speculation, flout the fundamental principle of judicial restraint that courts should avoid unnecessary constitutional adjudication and threaten to short circuit the democratic process." *Copeland v. Vance*, 893 F.3d 101, 111 (2d Cir. 2018) (internal citations and quotations omitted)).

Layered atop every duly enacted statute's presumption of constitutionality is the canon of constitutional avoidance: if a statute fairly admits of a constitutional reading, courts must adopt that reading. *INS v. St. Cyr*, 533 U.S. 289, 299–300 (2001). Where competing constructions would render a statute either constitutional or suspect, the judiciary is obliged to choose the interpretation that averts "grave and doubtful constitutional questions." *Jones v. United States*, 526 U.S. 227, 239 (1999), abrogated on other grounds *by Apprendi v. New Jersey*, 530 U.S. 466, 489–92 (2000).

Consistent with these principles, for two decades, federal courts have applied the holding in *Salerno* setting forth the standard for facial attacks to FDPA challenges—and have rejected those attacks time and again. *See, e.g.*, *United States v. Brown*, 441 F.3d 1330, 1367 (11th Cir. 2006); *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004); *United States v. Sablan*, No. 08 Cr. 259, 2014 WL 172543, at *4 (E.D. Cal. Jan. 15, 2014); *United States v. Montgomery*, No.

11 Cr. 20044, 2014 WL 1453527, at *4–*5 (W.D. Tenn. Apr. 14, 2014); *United States v. Coonce*, No. 10 Cr. 3029 (GAF), 2014 WL 1018081, at *22 n.10 (W.D. Mo. Mar. 14, 2014); *United States v. Taylor*, 635 F. Supp. 2d 1243, 1246 (D.N.M. 2009); *United States v. Natson*, 444 F. Supp. 2d 1296, 1302 (M.D. Ga. 2006).

In spite of this heavy burden, the defendant claims that the FDPA and death penalty are unconstitutional for the following reasons: (i) the FDPA allows for arbitrary distinctions in imposing the death penalty in violation of the Fifth Amendment (Const. Mot. at 55); (ii) the death penalty is excessive and disproportionate in violation of the Eighth Amendment (*id.* at 56); and (iii) the FDPA imposes capital punishment in an arbitrary manner in violation of the Eighth Amendment (*id.*). As set forth below, each of these claims is without merit and foreclosed by binding precedent.

## B. The FDPA Does Not Allow for Arbitrary and Capricious Sentences

Mangione first argues that the death penalty cannot be reliably applied because the "extreme rarity" of its application "necessarily indicates arbitrariness where the death penalty is concerned." (Const. Mot. at 65). He relies heavily on *Furman*, which invalidated Georgia's capital punishment system. In that case, the Court recognized that only 15 to 20 percent of convicted murders received capital sentences in jurisdictions that authorized the death penalty, 408 U.S. 238 at 386 n.11 (Burger, C.J., dissenting), and Justice Stewart's concurring opinion asserted that death sentences imposed under these schemes are "cruel and unusual in the same way that being struck by lightning is cruel and unusual," *id.* at 309; *see also id.* at 313 (White, J., concurring) (observing that "the death penalty is exacted with great infrequency"). The defendant points to statistical studies purporting to establish that, between 1988—when the death penalty was reestablished—and July 14, 2020, only three death penalty executions were carried out in the United States.

(Const. Mot. at 64). He further claims that between July 2020 and January 2021, thirteen people were executed. From this, he asserts that the FDPA, like the scheme at issue in *Furman*, is unconstitutional. (*Id.*).

Decisions subsequent to *Furman* make clear, however, that the *Furman* decision was not based on the infrequency with which the death penalty was imposed, but rather on the fact that (unlike under the FDPA), under the capital sentencing scheme at issue, juries exercised unguided, and potentially arbitrary discretion in deciding whether or not to sentence defendants to death. *See, e.g.*, *Johnson v. Texas*, 509 U.S. 350, 359 (1993) ("The guiding principle that emerged from *Furman* was that States were required to channel the discretion of sentencing juries in order to avoid a system in which the death penalty would be imposed in a "wanto[n]" and "freakis[h]" manner.") (quoting *Furman*, 408 U.S. at 310)). In *Gregg v. Georgia*, the Supreme Court, upholding the revised Georgia capital sentencing statute struck down in *Furman*, found that "the relative infrequency of jury verdicts imposing the death sentence does not indicate rejection of capital punishment Per se. Rather, the reluctance of juries in many cases to impose the sentence may well reflect the humane feeling that this most irrevocable of sanctions should be reserved for a small number of extreme cases."). *Gregg*, 428 U.S. at 182 (citing *Furman*, 408 U.S. at 388).

Thus, *Furman* and *Gregg* together instruct that for a capital sentencing regime to withstand constitutional scrutiny, it must "(1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Aquart*, 912 F.3d at 54–55 (quoting *Kansas v. Marsh*, 548 U.S. 163, 173–74 (2006)).

Set against the framework established in *Furman* and *Gregg*, the Second Circuit's holding in *Aquart* definitively forecloses the defendant's argument.[6]  In *Aquart*, the Second Circuit made clear that *Furman*—a decision without a majority—did not strike down the capital punishment system at issue because it rarely resulted in the imposition of the death penalty, but rather, because it resulted in arbitrariness with which the death penalty was imposed in that system.  912 F.3d at 54–55 ("Where such safeguards are provided, no constitutional concern arises from the resulting infrequency with which federal juries vote a death sentence for crimes of intentional murder.").  The defect lay not in the death penalty's scarcity, but in its arbitrariness.  As the Court explained, "the Supreme Court's post-*Furman* capital jurisprudence makes clear" that *Furman* condemned a system whose "sentencing procedures were inadequate to ensure that death sentences were not being arbitrarily and capriciously imposed in individual cases." *Id.* at 54 (citing *Gregg*, 428 U.S. at 189); *see also Sampson II*, 486 F.3d at 23 ("In the thirty-four years since *Furman* was decided, the Court has made clear that its decision was not based on the frequency with which the death penalty was sought or imposed.  Rather, the primary emphasis of the Court's death penalty jurisprudence has been the requirement that the discretion exercised by juries be guided so as to limit the potential for arbitrariness.").

Measured against these principles, the FDPA passes constitutional muster with ease.  It does so through a carefully calibrated framework that channels the jury's discretion while preserving the moral judgment at the heart of capital sentencing.  The Act: (i) confines the death penalty to a narrow class of enumerated crimes; (ii) mandates a bifurcated proceeding separating the determination of guilt from the question of punishment; (iii) permits a death sentence only if

---

[6] The *Aquart* court overturned the defendant's death sentence for reasons that are not relevant to the defendant's motion. 912 F.3d at 41–44.

the jury unanimously finds, beyond a reasonable doubt, that the defendant acted with a specific culpable intent and that at least one statutory aggravating factor applies; (iv) requires the jury to consider any non-statutory aggravating factors proved beyond a reasonable doubt and any mitigating factors established by a preponderance of the evidence, even if credited by a single juror; (v) authorizes a death verdict only if the jury unanimously concludes that the aggravating factors outweigh the mitigating factors to such an extent as to justify death; (vi) forbids any consideration of race, color, religion, national origin, or sex; and (vii) guarantees full appellate review of any death sentence imposed. *See Aquart*, 912 F.3d at 52.

This deliberate architecture reflects the very safeguards *Furman* demanded and *Gregg* approved. As the Second Circuit aptly concluded, "no constitutional concern arises from the resulting infrequency with which federal juries vote a death sentence for crimes of intentional murder." *Id.* at 55. Indeed, that infrequency is not a flaw but a feature—an expression of the "mercy" the Supreme Court has held must remain "unlimited" in a capital jury's hands. *Id.* (citing *Callins v. Collins*, 510 U.S. 1141, 1141–42 (1994) (Scalia, J., concurring in denial of certiorari) (collecting cases)).

In short, the rarity of federal death verdicts is evidence not of constitutional infirmity, but of constitutional fidelity. The FDPA embodies the procedural rigor and moral discretion the Eighth Amendment requires. The defendant's argument, therefore, collapses under the weight of the very precedents he invokes.

### C.  The Defendant's "No Principled Rubric" Challenge to the FDPA's Constitutionality Also Fails

The defendant next advances the sweeping claim that the FDPA is arbitrary and capricious because, in his view, there exists no "principled way" to distinguish between cases in which a federal jury has imposed a death sentence and those in which it has not. (Const. Mot. at 71–72).

To support this assertion, he assembles six pages of case summaries and attaches a link to verdict sheets from federal capital trials dating back to 1991. (*Id.* at 71–77 n.38) (citing data compiled by the Federal Death Penalty Resource Project). From this collage of verdicts, he extrapolates the claim that because the administration of the death penalty lacks "consistency or predictability," it therefore offends the Constitution. (*Id.* at 71). But anecdote is not analysis, and the patchwork of case outcomes to which the defendant points proves only what the Supreme Court has long recognized—that the decision to impose death turns on the facts specific to each defendant, each crime, and each jury's moral judgment, not on any supposed formulaic uniformity.

As with the defendant's other constitutional arguments, this one is also foreclosed by Supreme Court and Second Circuit precedent. For example, in *McCleskey*, the Supreme Court recognized that "[t]he Constitution is not offended by inconsistency in results based on the objective circumstances of the crime. Numerous legitimate factors may influence . . . a defendant's ultimate sentence." 481 U.S. at 307 n.28. In addition, because the Court has mandated that a sentencing jury "be permitted to consider any relevant mitigating factor" in an individual case, any effort to distill a predictable measure of results across capital proceedings is a flawed exercise; "a consistency produced by ignoring individual differences is a false consistency." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982).

The Second Circuit's decision in *Aquart* leaves no doubt on this point as well, it directly confronted and unequivocally rejected the very argument the defendant now advances. 912 F.3d at 53–57. Like Mangione, Aquart sought to prove constitutional infirmity by compiling summaries and verdict sheets from an assortment of federal capital trials, asserting that there was "no meaningful basis" for distinguishing those defendants sentenced to death from those spared. *See* Brief on Behalf of Appellant Aquart, *United States v. Aquart*, No. 12-5086, Dkt. No. 119 at 209–

15 (2d Cir. filed Jan. 14, 2015) (citing data from the Federal Death Penalty Resource Project). The Second Circuit found this claim unpersuasive and, dispatched it with clarity and force. *Aquart*, 912 F.3d at 51 ("What the [FDPA] does not require is judicial proportionality review of the challenged death sentence as compared to sentences in other capital cases."). In rejecting the defendant's proportionality arguments, the *Aquart* court relied, in part, on the Supreme Court's decision in *McCleskey*. *Id.* at 52.

In *McCleskey*, the Supreme Court acknowledged an unavoidable truth: variations in capital sentencing are not signs of constitutional failure, but reflections of human judgment. As the Court explained:

> The capital sentencing decision requires the individual jurors to focus their collective judgment on the unique characteristics of a particular criminal defendant. It is not surprising that such collective judgments often are difficult to explain. But the inherent lack of predictability of jury decisions does not justify their condemnation.

481 U.S. at 311.

Relying on the framework provided by *McCleskey*, the Second Circuit in *Aquart* observed that "discrepancies in capital sentencing are inevitable given that the responsibility for 'express[ing] the conscience of the community on the ultimate question of life or death' is committed to the discretion of jurors who bring diverse aspects of 'human nature and varieties of human experience' to the task." *Aquart*, 912 F.3d at 56 (quoting *McCleskey*, 481 U.S. at 310–11). The Court reasoned that "the proper constitutional focus" is not on ensuring consistent outcomes in capital cases, but rather "on providing the jury with adequate information and guidance to safeguard against arbitrary or capricious capital sentences." *Id.* at 57. "Because the FDPA satisfactorily provide[s] those constitutionally mandated safeguards [], the fact that federal juries have only infrequently exercised their discretion to vote capital punishment for crimes involving intentional murder does not support a conclusion that a death sentence . . . violates due process."

*Id.* The Second Circuit found that this reasoning applied with equal force to "Aquart's assertion that his capital case cannot be distinguished from 32 others in which juries did not vote death sentences and precludes identifying infrequency as the 'constitutional measure' of a due process violation." *Id.* at 56 (quoting *Sampson II*, 486 F.3d at 25).

*Aquart* thus stands within a robust line of authority rejecting the claim that the death penalty is unconstitutional merely because one cannot divine a "principled" or "predictable" pattern in its imposition. *See, e.g.*, *United States v. Mitchell*, 502 F.3d 931, 983 (9th Cir. 2007); *Sampson II*, 486 F.3d at 25; *Barnes*, 532 F. Supp. 2d at 633–34; *United States v. Williams*, No. 00 Cr. 1008 (NRB), 2004 WL 2980027, at *6–*7 (S.D.N.Y. Dec. 22, 2004). Indeed, *Aquart* itself approvingly cited *Sampson II* for the proposition that "comparative capital case summaries and verdict sheets [are] 'wholly inadequate' to prove arbitrariness." *Aquart*, 912 F.3d at 56 (quoting *Sampson II*, 486 F.3d at 25).

In short, *Aquart* leaves no room for doubt: the Constitution demands fairness in process, not uniformity in outcome. Because the FDPA ensures precisely those procedural safeguards, the defendant's claim—that the death penalty is unconstitutional for lack of a "principled" basis distinguishing its application—fails as a matter of law.

### D.  Mangione's Challenge to the FDPA's Bifurcated Trial Procedures and Its Impact on the Jury's Ability to Follow Instructions is Meritless

The defendant next argues that the application of the death penalty is unreliable because—he alleges—the FDPA's bifurcated trial procedures are so convoluted and confusing that they violate due process. (Const. Mot. at 80). From this, he claims, the FDPA's sentencing scheme creates an unreasonable risk that jurors will misunderstand their role in the penalty hearing regardless of instructions given to them by the Court thereby violating the Eight and Fourteenth Amendments and requests an evidentiary hearing. (*Id.* at 80–86).

41

As an initial matter, the defendant concedes that a court in this district "rejected this argument," nevertheless, he seeks to minimize that ruling by noting that it is not binding on this Court.  (Const. Mot. at 80) (citing *Saipov II*, 2023 WL 371531).  While not binding, Judge Broderick's decision in *Saipov II* represents a recent and thorough examination of this precise claim under the FDPA, and it aligns squarely with the unanimous consensus among federal courts: that the statute is readily comprehensible, constitutionally sound, and capable of fair application through appropriate jury instructions.  2023 WL 371531, at *7–*8.  In short, both *Saipov II* and the long line of FDPA decisions that preceded it confirm that the statute's sentencing framework, far from being inscrutable or defective, can be, and consistently has been, applied with clarity, precision, and full constitutional fidelity.

The above notwithstanding, the defendant's suggestion that he is entitled to relief based on a hypothetical risk that jurors might misunderstand instructions that have yet to be drafted, let alone issued to any jury, has no basis in the law, and ignores the fundamental premise underlying the system of trial by jury: that juries will follow the instructions given them by the trial judge. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (finding that "juries are presumed to follow their instructions"); *Zafiro v. United States*, 506 U.S. 534, 540–41 (1993) ("[E]ven if there were some risk of prejudice, here it is of the type that can be cured with proper instructions, and juries are presumed to follow their instructions."); *United States v. Siegel*, 717 F.2d 9, 19 (2d Cir. 1983) ("There is a presumption that juries will follow instructions.") (quoting *Watkins v. Sowders*, 449 U.S. 341, 347 (1981)).

Notably, in *Gregg*, the Supreme Court upheld a Georgia statute with a weighing sentencing scheme much like that of the FDPA, stating:

> Juries are invariably given careful instructions on the law and how to apply it before they are authorized to decide the merits of a lawsuit. It would be virtually

42

unthinkable to follow any other course in a legal system that has traditionally operated by following prior precedents and fixed rules of law.

428 U.S. at 193.

In light of this clear precedent, courts presiding over FDPA prosecutions have uniformly rejected arguments like those advanced by the defendant. *See, e.g., United States v. Kee*, 2000 WL 863119, at *3 (S.D.N.Y. June 27, 2000) ("The Court remains confident that the jury can be instructed in such a way that it will understand and correctly apply the provisions of the FDPA. Of course, the parties will have the opportunity to propose and make objections to specific instructions during trial."); *United States v. Llera Plaza*, 179 F. Supp. 2d 444, 449–50 (E.D. Pa. 2001) ("[T]here is nothing in the FDPA that can be said to raise an insuperable barrier to informed sentencing. To the extent that aggravating and mitigating factors are abstract concepts, they are capable of being rendered precise and concrete in the course of crafting instructions to the sentencing jury."); *United States v. Mikos*, 2003 WL 22110948, at *19 (N.D. Ill. Sept. 11, 2003) ("Even if [the defendant] is correct in his assertion that the average American juror does not instantaneously understand the act of balancing mitigating and aggravating factors set forth within the FDPA, these abstract concepts have the benefit of being explained in concrete and precise terms through the use of careful jury instructions.").

In support of his position, Mangione relies, for the most part, on a collection of studies, including studies that rely on the Capital Jury Project ("CJP") (the "CJP Studies").[7] Federal courts, however, have uniformly rejected claims that rely on the CJP and similar studies with some calling into question their reliability. *See, e.g.*, *Candelario-Santana*, 368 F. Supp. 3d at 321–22 (rejecting

---

[7] Another study the defendant cites to heavily is one conducted by Craig Haney, Lorelei Sontag, and Sally Constanzo that was published in the Journal of Social Issues (the "Haney Study"). (Const. Mot. at 82).

statistical studies purporting to indicate race-based discrepancies in capital sentencing); *United States v. Smith*, No. 16 Cr. 86 (SLG), Dkt. No. 419, at 5-6 (D. Alaska Apr. 22, 2019) (rejecting the defendant's reliance on many of the CJP Studies and the Haney Study); *United States v. Cramer*, No. 16 Cr. 26 (MAC), Dkt. No. 315, at 5–7 (E.D. Tex. Jan. 12, 2018) (calling into question the accuracy of the CJP Studies and the Haney Study); *United States v. Sampson*, No. 01 Cr. 10384, 2015 WL 7962394, at *23–24 (D. Mass. Dec. 2, 2015) ("*Sampson I*"), ("[E]ven if the CJP results can be generalized to federal cases, there are flaws in the CJP studies that render their results unpersuasive."); *Con-Ui*, 2016 WL 9331115, at *12 (finding the CJP Studies "speculative at best" in a case where the jury had "not been impaneled and not instructed."); *Coonce*, 2014 WL 1018081, at *22; *United States v. Sablan*, No. 00 Cr. 531 (WYD), 2006 WL 1028780, at *7–*8 (D. Col. Apr. 18, 2006) (rejecting the CJP Studies and the Haney Study as "data gathered from interviews with capital-case jurors in California, North Carolina, Oregon and other states" and that "[n]one of the studies dealt specifically with the FDPA.").

The *Sampson I* court specifically criticized the defendant's reliance on the CJP data, highlighting that: (1) the studies concentrated on state death penalty schemes, rather than the FDPA; (2) the CJP interviews took place years after the jurors participated in trials, rendering their recollections less reliable; and (3) at the time of the CJP interviews, the interviewed jurors did not have access to written jury instructions, other jurors, or the trial judge, all of which would be available to a federal juror during trial to help the juror understand his/her instructions. [8] 2015 WL 7962394, at *24.

---

[8] Testimony given in an evidentiary hearing in *Fell III* confirmed the *Sampson I* court's concerns. Sections of the transcript from that hearing were included as defense exhibits in *United States v. Bowers*, No. 18 Cr. 292, (W.D. Pa. 2020). The testimony in that case is instructive, for example, the CJP conducted interviews of jurors who served in 353 state, not federal, capital trials (*see Bowers*, Dkt. No. 166–13 at 5-6; *id.* Dkt. No. 166–15 at 12); the interviews occurred, on average,

A district court in the Eastern District of Pennsylvania also rejected an argument based on similar studies, concluding that:

> the studies do not establish that the concepts of aggravating and mitigating factors as used in the FDPA bear such a degree of intrinsic "incomprehensibility" as to render them incapable of clarification through adequate jury instructions such as those to be crafted in the instant case, if a sentencing hearing is required. The studies are thus insufficient to support the defendants' argument.

*Llera Plaza*, 179 F. Supp. 2d at 450, n.5.

For the same reasons, the Court should reject the defendant's request for an evidentiary hearing to "permit the presentation of expert testimony and empirical evidence in support of the premise that the FDPA is so incomprehensible to jurors as to prevent, or substantially impair, their performance in the task of deciding between a death sentence and a life sentence." (Const. Mot. at 86). As described above, the studies and data cited by the defendant do not establish what he claims they do. But even assuming that the studies establish that some juror confusion existed in certain prior cases—and that an evidentiary hearing in this case would adduce further evidence of the same—the defendant cannot meet the high burden of showing that the FDPA's sentencing scheme is so confusing on its face that there exists no set of facts under which application of the FDPA would be valid. *See Le*, 902 F.3d at 117 n.12 ("Facial challenges are generally disfavored, and the most difficult to mount successfully because they require the challenger to establish that

---

over two years after the conclusion of the trial, and there was a "significant portion" that occurred four or more years after trial (*id.* Dkt. No. 166–15 at 31–32); the CJP evidently did not include any capital case prosecutors on the team that formulated the 700 questions to be posed in the interviews (*id.* at 29–30); and the CJP question focusing on juror responsibility for the penalty phase was legally incorrect and factually misleading (*id.* Dkt. No. 166–16 at 15–17). The studies relied upon by the defense witness which involved "mock" trials were conducted primarily with college students (*id.* Dkt. No. 166-15 at 19); and the mock trials lacked similarity to an actual capital trial—for example, there were no closing arguments from counsel to help elucidate the deliberation process for capital sentence determination (*id.* at 20). As a result, the *Bowers* court gave little effect to the CJP studies.

no set of circumstances exists under which the Act would be valid."); *see also Kee*, 2000 WL 863119, at \*3 ("The studies cited by Kee are not sufficient to call into question this body of modern death penalty jurisprudence. Nor are they sufficient to rebut the strong and well-established presumption that jurors understand and follow the instructions they are given."). Accordingly, this Court should deny the defendant's motion without a hearing.

### VI. THE SUPREME COURT'S *RING* DECISION DID NOT RENDER THE FDPA UNCONSTITUTIONAL

The defendant next mounts a facial challenge to the FDPA, asserting that it is unconstitutional because it purportedly requires prosecutors to identify statutory aggravating factors only in a notice of intent to seek the death penalty, rather than allege them in the indictment, as he claims is required under *Ring v. Arizona*, 536 U.S. 584 (2002), and its progeny. (Const. Mot. at 87-96). From this, he claims that the Government's practice of submitting statutory aggravating factors to a grand jury, in response to *Ring*, constitutes an impermissible "rewriting" of the FDPA – one that, in his view, violates the separation of powers and contravenes Supreme Court precedent. (*Id.*). Stripped to its core, the defendant's argument is that, because the FDPA is silent on the role of the grand jury, it must be read to *prohibit* the presentation of statutory or non-statutory aggravating factors to a grand jury or their inclusion in an indictment—no matter what procedure the Government employs to satisfy *Ring*. (*Id.* at 90) ("[T]he FDPA does not permit its statutory and non-statutory aggravating factors to be presented to a grand jury or require that they be included in an indictment as required by the Fifth Amendment.").

These arguments are unavailing. Nothing in the FDPA prohibits the Government from alleging statutory aggravating factors in an indictment in addition to setting them forth in the Notice of Intent. Federal courts have uniformly upheld this practice, recognizing that it comports with *Ring*, does not intrude upon legislative authority, and ensures that capital defendants receive

the procedural protections to which they are entitled.  The defendant's arguments have been uniformly rejected by federal courts and, as discussed below, should be rejected here.

### A.  The FDPA Does Not Bar the Government from Alleging the Statutory and Non-Statutory Aggravating Factors in an Indictment

As set forth above, the defendant bears an exceptionally heavy burden in advancing a facial challenge to the FDPA.  To prevail, he must show that there exists no set of circumstances under which the statute would be valid.  Congressional enactments, moreover, carry a strong presumption of constitutionality, and courts are obliged, wherever reasonably possible, to construe statutes in a manner that preserves their validity.  (*See supra*  Part 1 V. 2).

The defendant's claim that the FDPA is facially unconstitutional because it does not permit the presentation of aggravating factors to the grand jury is both legally and doctrinally incorrect. Mangione's argument  rests heavily on his interpretation of the Supreme Court's decision in *Ring*. In *Ring*, the Court extended its holding in *Apprendi* to the capital sentencing context, deciding that the facts necessary to render a defendant eligible for a death sentence—*i.e.*, the intent factors set forth in Section 3591(a)(2) and at least one statutory aggravating factor under Section 3592(c) — "operate[] as 'the functional equivalent of an element of a greater offense.'"  *Ring*, 536 U.S. at 609 (quoting *Apprendi*, 530 U.S. at 494 n.19).  Consequently, the Government must prove those facts, which establish a defendant's eligibility for the death penalty, to a jury beyond a reasonable doubt. *Id.* at 602 ("If a state makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt.").

Although *Ring* addressed only the requirement that a jury, rather than a judge, determine the statutory aggravating factors that render a defendant eligible for the death penalty, the Second Circuit has, on multiple occasions, interpreted *Ring* to require that those statutory aggravating

factors also be alleged in the indictment.  *See In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 109 (2d Cir. 2008) ("*Ring* establishes that, when the government seeks a sentence of death, the gateway mental factors and statutory aggravating factors rendering the defendant death-eligible must 'be alleged in the indictment and found by a jury.'" (quoting *United States v. Quinones*, 313 F.3d 49, 53 n.1 (2d Cir. 2002) ("*Quinones II*")); *see also Jones*, 526 U.S. at 243 n.6 (recognizing that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and found beyond a reasonable doubt").

Consistent with this understanding, the Second Circuit has held that "the logic of [*Apprendi* and *Ring*] requires that statutory aggravating factors be alleged in the indictment in capital cases," and that the Government must also "file[] a notice specifying the aggravating factors justifying the death penalty" to meet the statutory prerequisites.  *Matthews v. United States*, 622 F.3d 99, 102 (2d Cir. 2010); *see also United States v. Fell*, 531 F.3d 197, 236–37 (2d Cir. 2008) ("*Fell II*") (rejecting the argument that *Ring* rendered the FDPA unconstitutional and holding that "statutory aggravating factors ... must now be alleged in the indictment and found by a jury in capital case"); *Quinones II*, 313 F.3d at 53 n.1 (explaining that *Ring* requires aggravating factors "be alleged in the indictment and found by a jury"); *Saipov II*, 2023 WL 371531, at *5 (holding that "no provision of the FDPA prohibits the Government from presenting aggravating factors to a grand jury or including them in an indictment").[9]

---

[9] The defendant again acknowledges that "[s]ome other courts have rejected the arguments" he attempts to advance here, but claims that none of those courts have addressed the separation of powers concerns he raises. (Const. Mot. at 91 n. 42). As discussed *infra*, that is simply not true. (*See infra* Part F.3).

The defendant himself acknowledges that the FDPA's aggravating factors "are the functional equivalent of elements" of the offense that "must be charged in the indictment," and therefore must be "presented to the grand jury" under *Ring*. (Const. Mot. at 90). The Federal Rules of Criminal Procedure require that a grand jury "return the indictment," Fed. R. Crim. P. 6(f); that death penalty cases be "prosecuted by an indictment," Fed. R. Crim. P. 7(a)(1)(A); and that such an indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(a), (c). Indeed, the defendant even cites Rule 7 in support of his argument about the importance of the grand jury's role in charging a capital offense. (Const. Mot. at 96). Because the aggravating factors are, by the defendant's own admission, essential facts constituting the offense charged, there is no merit to his contention that the FDPA's silence on grand jury participation somehow precludes the Government from presenting those factors to a grand jury—particularly when the Rules expressly authorize the grand jury's involvement in precisely this way.

Moreover, while not specifically deciding this issue because it was not raised on appeal, in *Fell II*, the Second Circuit noted that the district court's rejection of the precise argument raised by the defendant here was consistent with the ruling of every court of appeals to have considered the issue. 531 F.3d at 236 n.27 ("[T]he precise issue the district court addressed . . . was whether the FDPA precluded the government from including aggravating factors in a grand jury indictment and was thus facially unconstitutional. The district court held that the statute suffered from no such constitutional infirmity. All courts of appeals to have considered that argument have likewise rejected it."). The Court's reasoning in *Fell II* is instructive:

> Although *Ring* said nothing regarding the Indictment Clause of the Fifth Amendment, some courts of appeals have interpreted the decision as applying with equal force at the indictment stage as at the penalty stage of a trial. Accordingly,

49

> several circuits, including our own, require the government to charge statutory aggravating factors under the FDPA in the indictment.

531 F.3d at 237 (citing *Quinones II*, 313 F.3d at 53 n.1) (noting that, pursuant to *Ring*, "statutory aggravating factors . . . must now be alleged in the indictment and found by a jury in capital cases.").

And, as the *Fell II* court noted, federal courts across the country have agreed that this dual practice—charging statutory aggravating factors in the indictment and listing them in the notice of intent—comports fully with both constitutional and statutory requirements. *See, e.g., Brown*, 441 F.3d at 1367 ("Although [the defendant] is correct to point out that nothing in the FDPA requires prosecutors to charge aggravating factors in an indictment, he fails to note that there is nothing in that law inhibiting such a charge. The Government can easily comply with both its constitutional obligations (by first going to the grand jury) and its statutory obligations (by later filing a § 3593(a) notice of intention to seek the death penalty). As a result, the statute is not facially unconstitutional."); *United States v. Bourgeois*, 423 F.3d 501, 507–08 (5th Cir. 2005) (holding that the Government "must charge the aggravating factors in the indictment" and "file a notice of intent to seek the death penalty, informing the defendant of the factors on which the government intends to rely in seeking that penalty"); *Sampson I*, 486 F.3d at 31 ("No provision of the FDPA prohibits a grand jury from considering those factors necessary for imposition of a death sentence. The statute simply is silent with respect to the function of the grand jury. It thus is not rendered facially unconstitutional by *Ring*.").

Mangione's argument disregards the substantial and uniform body of authority that has squarely rejected the claim that *Ring* rendered the FDPA unconstitutional. This Court should similarly find that the FDPA was not rendered facially unconstitutional by the Supreme Court's decision in *Ring*, as long as the Government satisfies its constitutional and statutory obligations by

charging aggravating factors in the indictment and listing them in the Notice of Intent, as it has done here.

### B. The Presentment of "Special Findings" to the Grand Jury Does Not Constitute a "Rewriting" of the FDPA

The defendant next claims that, confronted with an allegedly unconstitutional statute post-*Ring*, the Government has "rewritten" the FDPA by having grand juries return special findings, supposedly transforming the statute to authorize capital charges that Congress did not intend. In his view, this practice represents an impermissible executive encroachment on the legislative function and an attempt to "cure" the statute's defects by rewriting it. (Const. Mot. 87–96).

The defendant's argument fails for several reasons. First, and as referenced above, it rests on the flawed premise that the FDPA precludes the Government from submitting the statutory aggravating factors to a grand jury*, in addition to stating those factors in a notice of intent. Courts across the country have uniformly rejected Mangione's argument. *See, e.g.*, *United States v. Allen*, 406 F.3d 940, 949 (8th Cir. 2005) ("[N]othing in the [FDPA] precludes the government from also submitting [those factors] to the grand jury for inclusion in the indictment."); *Sampson*, 486 F.3d at 21 ("The FDPA does not . . . grant to prosecutors exclusive authority for determining the likely existence of aggravating factors. No provision of the FDPA prohibits a grand jury from considering those factors necessary for imposition of a death sentence."); *Brown*, 441 F.3d at 1367 ("The FDPA is not facially unconstitutional. Nothing prohibits the government from presenting aggravating factors to a grand jury and then, if appropriate, charging those aggravating factors in the indictment."); *Robinson*, 367 F.3d at 290 ("Although . . . nothing in the FDPA requires prosecutors to charge aggravating factors in an indictment, . . . there is nothing in that law inhibiting such a charge."); *Williams*, 2004 WL 2980027, at *11 ("There is simply no language in the FDPA that even mentions grand jury findings, let alone prohibits them with respect to facts constituting

aggravating circumstances."); *see also Barnes*, 532 F. Supp. 2d at 639 (adopting the Court's reasoning in *Williams*).

Second, the defendant's interpretation of *Ring* is flawed. *Ring* did not render the FDPA "constitutionally infirm" as the defendant suggests. (Const. Mot. at 96). At most, *Ring* and its progeny have announced procedural rules—that statutory aggravating factors must be submitted to a jury and alleged in an indictment—in order to aid in the application of the FDPA, not invalidate it. *See Schriro v. Summerlin*, 542 U.S. 348, 353 (2004) ("*Ring*'s holding is properly classified as procedural."); *id.* at 354 ("This Court's holding that, because Arizona has made a certain fact essential to the death penalty, that fact must be found by a jury, is not the same as this Court's making a certain fact essential to the death penalty. The former was a procedural holding; the latter would be substantive.").

In *Jones v. United States*, the Supreme Court made clear that it was not encroaching on a legislative function when it addressed the procedure of what facts must be submitted to a jury and what facts may be left for judicial fact-finding at sentencing. 526 U.S. at 243 n.6 ("The constitutional safeguards that figure in our analysis concern not the identity of the elements defining criminal liability but only the required procedures for finding the facts that determine the maximum permissible punishment; these are the safeguards going to the formality of notice, the identity of the factfinder, and the burden of proof."). The same reasoning applies here. Just as the *Jones* Court was not exercising a legislative function by defining the procedure for deciding which facts must be submitted to a jury, the Government is not exercising a legislative function by presenting aggravating factors to the grand jury (and courts have not exercised a legislative function by requiring that practice). Thus, the defendant's argument fails because "[a]dhering to

a court-crafted rule of criminal procedure when applying the FDPA does not constitute impermissible statutory redrafting." *Sampson*, 486 F.3d at 22.[10]

The FDPA provides that a capital sentence may be pursued only if "the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified." 18 U.S.C. § 3593(a). While this language confers upon the Executive Branch discretion to decide whether to seek the death penalty, that discretion cannot be read to displace the grand jury's constitutional role in determining the facts that render a defendant death eligible. The statute's reference to "the attorney for the government" concerns the exercise of prosecutorial discretion—whether to pursue the death penalty as a matter of policy and resource allocation—not the constitutional process of establishing the elements that authorize its imposition.

The defendant invokes *United States v. Jackson*, 390 U.S. 570 (1968), as an example of the Supreme Court striking down a statute where the Government's proposed procedural "fix" was so sweeping that it effectively rewrote the law without any indication of congressional intent to do so. (Const. Mot. at 91–92). That comparison is misplaced. Nothing of the sort has occurred here.

In *Jackson*, the Supreme Court determined that the Federal Kidnapping Act's procedure for imposition of the death penalty upon only a recommendation by "the jury," meant that the death penalty could not be imposed following a guilty plea (for which there is no jury) and, thus, constituted an impermissible burden on the defendant's Sixth Amendment right to a jury trial and

---

[10] The analysis by the Supreme Court in *Jones* likewise defeats Mangione's related argument that submission of statutory aggravating factors to the grand jury violates the non-delegation doctrine, which "mandate[s] that Congress generally cannot delegate its legislative power to another Branch." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). Because the Government (and the courts) are not exercising a legislative function, the non-delegation doctrine does not apply, but to the extent the Court finds that it does, the Government's authority to propose non-statutory aggravating factors is governed by an intelligible principle and therefore does not offend the non-delegation doctrine. (*See infra* Part F.3.)

Fifth Amendment right to plead not guilty.  390 U.S. at 582.  Accordingly, the Court severed the capital punishment clause and upheld the remainder of the statute.  *Id.* at 586.  In so doing, the Court rejected the Government's argument that the capital punishment clause could be saved by federal judges empaneling special juries to consider imposition of the death penalty where a defendant pleaded guilty.  *Id.* at 577.  The Supreme Court held that such a "complex and completely novel procedure" could not be read into a statute where Congress had been silent.  *Id.* at 580.

Unlike in *Jackson*, the Government's application of the FDPA adheres fully to the statute's text and purpose, and therefore *Jackson* is inapposite.  Here, the Government is not asking the Court to impose any "complex and completely novel procedure" that is fashioned "from whole cloth."  *Id.*  There is nothing complex or novel about having a grand jury consider facts that make up the elements of an offense (and their "functional equivalents" as described by *Ring*).  Nor is there anything novel about submitting those elements to a grand jury where a statute does not expressly provide for such a procedure.  In fact, "a statute will seldom expressly provide for submitting elements of an offense to the grand jury.  It is well-established law—the background against which statutes are enacted—which indicates that elements of a crime should be submitted to the grand jury."  *United States v. LeCroy*, 441 F.3d 914, 921 (11th Cir. 2006); *see also Sampson II*, 486 F.3d at 22 (rejecting the *Jackson* argument advanced by the defendant here and noting that "the role of the grand jury in charging the elements of an offense has long been established").

Because the FDPA does not present issues analogous to the Federal Kidnapping Act and the Government is not proposing to impose a complex and novel procedure that would effectively overhaul the FDPA, *Jackson* is plainly inapplicable.  *See Barnes*, 532 F. Supp. 2d at 640–41 ("Despite Defendant's assertion, the Supreme Court's opinion in *United States v. Jackson* . . . does

not provide a perfect analogy to the circumstances in this case."); *Williams*, 2004 WL 2980027, at *12 n.25 (finding *Jackson* inapplicable and holding that "[t]he FDPA simply does not need to be rewritten as the Federal Kidnaping Act did"); *United States v. Jacques*, No. 08 Cr. 117, 2011 WL 1675417, at *8 (D. Vt. May 4, 2011) ("This Court agrees that the novelty of the procedure the Government proposed to add to the kidnapping statute in *Jackson* distinguishes that case from the instant one, where the Government seeks to utilize the well-established process of grand jury indictment in its implementation of the FDPA.").

As with many of the defendant's claims, Judge Broderick's decision in *Saipov II* provides particularly persuasive guidance. In *Saipov II*, the court addressed the very same *Jackson*-based argument the defendant advances here and rejected it outright, observing: "As other courts have held in rejecting the *Jackson*-based part of Saipov's argument, '[t]his case ... does not require' the fashioning of some complex and novel procedure, as 'the role of the grand jury in charging the elements of an offense has long been established.'" 2023 WL 371531, at *6 (quoting *Sampson II*, 486 F.3d at 22). Of particular relevance to Mangione's "gap-filling" argument, Judge Broderick noted that "it is Saipov who asks that I fill in the FDPA's silence to find that it prohibits the Government from presenting the aggravating factors to a grand jury." *Id.* The court further concluded that "there is no violation of the separation of powers principles and *Ring* does not render the FDPA's congressionally authorized method for charging the death penalty unconstitutional." *Id.*

Finally, even on defendant's own terms, his claim cannot support the draconian remedy he seeks. A facial attack on the FDPA must show that "no set of circumstances exists under which the [statute] would be valid." *Salerno*, 481 U.S. at 745. Mangione cannot carry that burden where courts across the country—including courts within this Circuit—have repeatedly tried FDPA cases

post-*Ring* using the very practice of which he complains. *See Fell II*, 531 F.3d at 236 n.27;

*Quinones II*, 313 F.3d at 53 n.1; *Higgs*, 353 F.3d at 298–301; *Brown*, 441 F.3d at 1367–69; *Allen*,

406 F.3d at 942–45.

### C. The Presentation of the Indictment's "Special Findings" to the Grand Jury Does Not Violate the Non-Delegation Clause

The defendant also claims that the Government's authority to identify and assert

aggravating factors results from an unconstitutional delegation of legislative power.[11]  (Const.

Mot. at 94–96) ("The FDPA's presentment of aggravating factors is unconstitutional.").  As an

initial matter, this argument has been rejected by every court to which it has been made, including

the Fourth, Fifth, Eighth, and Tenth Circuit Courts of Appeals.

The nondelegation doctrine arises from the constitutional principle of separation of powers,

specifically Article 1, Section 1, which provides that "all legislative Powers herein granted shall

be vested in a Congress of the United States."  *See Touby v. United States*, 500 U.S. 160, 165

(1991); *Mistretta*, 488 U.S. at 371.  Under the non-delegation doctrine, Congress may not

constitutionally delegate its legislative power to another branch of government. *See Mistretta*, 488

U.S. at 372.  Congress may, however, seek aid from coordinate branches of government.  For

example, delegation of congressional power, in the sentencing realm, is permissible "[s]o long as

Congress shall lay down by legislative act an intelligible principle to which the person or body

---

[11] The defendant does not specify whether his non-delegation claim concerns statutory or non-statutory aggravating factors.  For purposes of this argument, the Government assumes he refers to the latter since Congress itself defined and enumerated the statutory aggravating factors in 18 U.S.C. § 3592(c).  The fact that Congress specifically identified those factors confirms that it properly exercised its legislative authority.  Non-statutory factors, by contrast, are those "the attorney for the government proposes to prove as justifying a sentence of death. *Id.* § 3593(a). And, as every court to have addressed this question has recognized, the non-delegation analysis pertains solely to those non-statutory factors.

authorized to [exercise the delegated authority] is directed to conform." *Jones*, 132 F.3d at 239 (citing *Mistretta*, 488 U.S. at 372) (internal citations omitted).

In *Jones*, the Court explained that "the authority to define non-statutory aggravating factors falls squarely within the executive's broad prosecutorial discretion, much like the power to decide whether to prosecute an individual for a particular crime." 132 F.3d at 239. The Court observed that Congress, acting alone, could not reasonably have anticipated the myriad factual circumstances presented by each capital case. *Id.* Recognizing this practical limitation, the Court held that the delegation of authority to the Executive is constitutionally permissible because it is constrained by four factors that together supply an "intelligible principle" adequately limiting prosecutorial discretion. *Id.*

First, the prosecution must provide advance notice to the defendant of all aggravating factors. *Id.* at 240; *see also* 18 U.S.C. § 3593(a). Second, "the death penalty jurisprudence devised by the Supreme Court guides the prosecution in formulating non-statutory aggravating factors." *Id.* Third, the district court serves as the "gatekeeper," excluding evidence it deems irrelevant or unduly prejudicial. *Id.; see also* 18 U.S.C. § 3593(c). Fourth, the jury may consider non-statutory aggravating factors only after it has found, beyond a reasonable doubt, both the requisite mental state and at least one statutory aggravating factor. *Id.; see also* 18 U.S.C. § 3593(d).

Thus, the Government's authority to propose non-statutory aggravating factors is governed by an intelligible principle—*i.e.*, the prosecution must operate within the boundaries established by Congress and enforced by the courts. *See United States v. Paul*, 217 F.3d 989, 1003 (8th Cir. 2000) (finding no separation of powers violation because "the prosecution was adequately limited in its power" by the factors identified in *Jones*); *United States v. Tipton*, 90 F.3d 861, 895 (4th Cir. 1996) ("Assuming, without deciding, that by specifically authorizing consideration of non-

statutory aggravating factors noticed by prosecutors, Congress actually delegated a legislative function to the executive branch, as opposed to merely recognizing a traditionally shared function with that branch … any delegation involved was sufficiently circumscribed by 'intelligible principles' to avoid violating separation of power principles."); *United States v. McCullah*, 76 F.3d 1087, 1106–07 (10th Cir. 1996) (holding that the notice requirement, the court's authority to exclude certain information, and the requirement that the jury first find mens rea and a statutory aggravating factor sufficiently guided the prosecution's selection of non-statutory aggravators); *see also Fell I*, 360 F.3d at 135 (citing *Jones* with approval, though without specifically discussing and noting "the government's authority to define non-statutory aggravating factors is not an unconstitutional delegation"); *United States v. Quinones*, No. 00 Cr. 761 (JSR), 2004 WL 1234044, at *2 (June 3, 2004 S.D.N.Y.) ("*Quinones I*") ("allowing the prosecution to present non-statutory factors does not offend the non-delegation doctrine since 'the sentencing function long has been a peculiarly shared responsibility among the Branches of Government and has never been thought of as the exclusive constitutional province of any one Branch.'") (quoting *Zant*, 462 U.S. at 878); *United States v. Minerd*, 176 F. Supp. 2d 424 (W.D. Pa. 2001) ("We agree with the Fifth Circuit's reasoning in *Jones,* which considered this precise issue and found that "[t]he authority to define non-statutory aggravating factors falls squarely within the executive's broad prosecutorial discretion. . . .").

## PART 2

## CRIME OF VIOLENCE MOTION

## ARGUMENT

The defendant argues that Count One, which charges him with cyberstalking resulting in death, in violation of 18 U.S.C. §§ 2261A(1)(A) and 2261(b)(1), and Count Two, which charges him with stalking through the use of an interstate facility resulting in death, in violation of 18

58

U.S.C. §§ 2261A(2)(A) and 2261(b)(1), are not "crimes of violence" within the meaning of 18 U.S.C. § 924(c)(3) and therefore cannot serve as predicates for the 18 U.S.C. § 924(j) offense charged in Count Three or the 18 U.S.C. § 924(c) offense charged in Count Four. On that basis, he moves to have Counts Three and Four dismissed. (COV Mot., Dkt. No. 59–2).

The defendant is wrong. The offenses charged Counts Three and Four each require the Government to prove that the defendant engaged in "conduct," or a "course of conduct," that placed the victim in "reasonable fear of death . . . or serious bodily injury" and that, in fact, resulted in the death of the victim. 18 U.S.C. §§ 2261A(1)(A), (2)(A), 2261(b)(1). Volitional conduct by the defendant that simultaneously places the victim in reasonable fear of death or bodily injury and that proximately causes the victim's death necessarily involves the "use, attempted use, or threatened use of physical force against the person or property of another," 18 U.S.C. § 924(c)(3)(A), thereby making the offenses charged in Counts Three and Four crimes of violence.

## I.   APPLICABLE LAW

### A.  The Categorical and Modified Categorical Approach

Count Four of the Indictment charges the defendant with using and possessing a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). Section 924(c) provides, in relevant part, that "any person who, during and in relation to any crime of violence. . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence . . . [be punished as follows]." 18 U.S.C. § 924(c)(1)(A). Count Three of the Indictment charges the defendant with murder through the use of a firearm, in violation of 18 U.S.C. § 924(j). Section 924(j) provides that "[a] person who, in the course of a violation of [18 U.S.C. § 924(c)], causes the death of a person through the use of a firearm, shall if the killing is a murder (as defined in section 1111), be punished [as follows]." 18 U.S.C. § 924(j). The

offenses charged in Counts Three and Four thus each require that the defendant have committed an underlying predicate "crime of violence."

The term "crime of violence" is defined, in 18 U.S.C. § 924(c)(3), to mean any felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another" (the "Elements Clause") or that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (the "Residual Clause"). In *United States v. Davis*, the Supreme Court held that the Residual Clause is unconstitutionally vague. 588 U.S. 445, 448 (2019). Thus, only offenses that fall under the Elements Clause qualify as crimes of violence.

Assessing whether a statutory offense falls under the Elements Clause requires the Court to apply an analytical framework known as the categorical approach. Under the categorical approach, the Court must ignore the alleged facts of the case. For example, in this case, even though the Government has alleged and expects to prove that the defendant intentionally shot and killed Brian Thompson at close range—after having researched, planned, and traveled from another state to carry out the premeditated killing—the Court is barred from considering those facts.[12] Instead, under the categorical approach, the Court may only look to the statute and ask "whether the federal felony at issue always requires the government to prove—beyond a

---

[12] The defendant's motion has significant ramifications beyond this case. Whatever else it reaches, 18 U.S.C. § 2261A plainly reaches—and was specifically enacted to reach—cases in which defendants stalked former intimate partners in order to kill, shoot, or inflict other forms of violence on them. House Report on the Interstate Stalking Punishment and Prevention Act of 1996, H.R. REP. 104–557 ("In the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), Congress established a new federal offense aimed at stalkers of current or former spouses or intimate partners."). If the defendant's motion succeeds, it will mean that § 2261A can never be used as a predicate to support § 924(c) or § 924(j) charges in such cases, thus depriving prosecutors of a critical tool to vindicate and protect victims of intimate-partner violence. Such a result would also call into question existing convictions in intimate-partner violence cases.

reasonable doubt, as an element of its case—the use, attempted use, or threatened use of force." *United States v. Taylor*, 596 U.S. 845, 850 (2022); *United States v. Morris*, 61 F.4th 311, 317 (2d Cir. 2023). As the Supreme Court has held, "answering that question does not require—in fact, it precludes—an inquiry into how any particular defendant may commit the crime." *Taylor*, 596 U.S. at 850; *United States v. Scott*, 990 F.3d 94, 104 (2d Cir. 2021) (en banc) ("This process triggers a categorical inquiry to determine the minimum criminal conduct necessary to satisfy the elements of a crime, without regard to whether the defendant himself engaged in more egregious conduct.").[13]

The application of the categorical approach is modified if the statute in question is "divisible." A statute is divisible if it "criminalizes multiple acts in the alternative, thereby defining multiple crimes." *United States v. Moore*, 916 F.3d 231, 238 (2d Cir. 2019); *see also Descamps v. United States*, 570 U.S. 254, 257 (2013). Under the modified categorical approach, the Court may consider "a limited class of documents, such as indictments and jury instructions, to determine which alternative formed the basis of the [the charged offense]." *Descamps*, 570 U.S.

---

[13] Several sitting Justices of the Supreme Court, numerous members of the Second Circuit Court of Appeals, and federal appellate judges in nearly every other Court of Appeals have strongly condemned the categorical approach. *See, e.g.*, *Taylor*, 596 U.S. at 861 (Thomas, J., dissenting) ("This holding exemplifies just how this Court's 'categorical approach' has led the Federal Judiciary on a 'journey Through the Looking Glass' . . . . Rather than continue this 30-year excursion into the absurd, I would hold Taylor accountable for what he actually did and uphold his conviction."); *Mathis v. United States*, 579 U.S. 500, 538 (2016) (Alito, J., dissenting) ("The Court's approach calls for sentencing judges to delve into pointless abstract questions."); *Morris*, 61 F.4th at 318 ("A growing number of federal judges do not wish to continue on this journey."); *Scott*, 990 F.3d at 126 (Park, J., writing for Park, Cabranes, Sullivan, Nardini, JJ., and Livingston, C.J.) ("As a growing number of judges across the country have explained, the categorical approach perverts the will of Congress, leads to inconsistent results, wastes judicial resources, and undermines confidence in the administration of justice.") (collecting cases from the First, Third, Fourth, Fifth, Sixth, Ninth, and Eleventh Circuits).

at 257.[14]  The Court then engages in the categorical approach with respect to the "the elements of the [charged offense] (including the alternative element used in the case)."  *Id.*; *United States v. Martinez*, 991 F.3d 347, 354 (2d Cir. 2021) ("Under the modified categorical approach, a court looks to the charging instrument or other authoritative documents to determine whether a defendant *necessarily* was charged with or convicted of a crime involving the use of force under the subsection."); *Morris*, 61 F.4th at 318;  *Mathis v. United States*, 579 U.S. 500, 505–06 (2016).

As relevant here, a statute's use of the disjunctive term "or" or separation into enumerated subsections often suggests that the statute is divisible.  *Colotti v. United States*, 71 F.4th 102, 113 (2d Cir. 2023) ("The alternatives listed in §§ 155.05(2)(e) and 155.40 are set apart by the disjunctive phrase 'or,' in separate sections and subsections.  Though such a structure is not necessarily dispositive in finding divisibility, it is at least indicative."); *United States v. Williams*, No. 24 Cr. 2696, 2025 WL 2784100, at *3 (2d Cir. Sept. 30, 2025) ("The simple assault statute lists three distinct forms of simple assault with alternative sets of elements and does so disjunctively by separating each subsection with the term 'or.'"); *United States v. Baker*, 665 F.3d 51, 55 (2d Cir. 2012) (noting that divisible statutes often describe crimes "in distinct subsections or elements of a disjunctive list" (citation omitted)).

Not all statutes that use the disjunctive are divisible.  Sometimes, a statute may use the disjunctive to list "various factual means of committing a single element," rather than different elements.  *Mathis*, 579 U.S. at 506.  The Supreme Court has explained the difference between "elements" and "factual means" as follows:

---

[14] The issue in *Descamps* was whether a prior conviction counted as a "violent felony" for purposes of the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e).  Other cases have made clear that *Descamps*'s discussion of the modified categorical approach extends also to the pretrial context. *Morris*, 61 F.4th at 317.

> Elements are the constituent parts of a crime's legal definition—the things the prosecution must prove to sustain a conviction. At a trial, they are what the jury must find beyond a reasonable doubt to convict the defendant; and at a plea hearing, they are what the defendant necessarily admits when he pleads guilty. Facts, by contrast, are mere real-world things—extraneous to the crime's legal requirements. We have sometimes called them "brute facts" when distinguishing them from elements. They are circumstances or events having no legal effect or consequence. In particular, they need neither be found by a jury nor admitted by a defendant.

*Id.* at 504 (citations, quotation marks, and brackets omitted). In other words, elements form part of the legal definition of the crime, whereas factual means do not. For that reason, if "statutory alternatives carry different punishments, then . . . they must be elements." *Id.* at 517.

To illustrate the difference between an element and a factual means, the Supreme Court in *Mathis* offered the example of a statute that "required use of a 'deadly weapon' as an element of a crime and further provide[d] that the use of a 'knife, gun, bat, or similar weapon' would all qualify." *Id.* at 506. With respect to such a statute, use of a deadly weapon would be an element that the jury would need to find (and that the defendant would need to allocute to in a plea). However, the factual basis for the element—whether the weapon the defendant used was a gun, a knife, a bat, or some other weapon—would not be an element and "a jury need not make any specific findings (or a defendant admissions) on that score." *Id.* The defendant would be guilty of the offense even if, for example, the jury disagreed on which type of deadly weapon he used (the fact), so long as all jurors agreed that he used some type of deadly weapon (the element).

### B.  18 U.S.C. §§ 2261A and 2261(b)

Counts One and Two charge the defendant with committing offenses in violation of 18 U.S.C. § 2261A, which provides, in relevant part, as follows:

> Whoever—

> (1) <u>travels</u> in interstate or foreign commerce . . . , <u>with the intent</u> to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, and <u>in the course of, or as a result of</u>, such travel or presence <u>engages in conduct</u> that—

(A) <u>places that person in reasonable fear of the death of, or serious bodily injury</u> to

      (i) <u>that person;</u>

      (ii) an immediate family member . . . of that person;

      (iii) a spouse or intimate partner of that person; or

      (iv) the pet, service animal, emotional support animal, or horse of that person; or

(B) <u>causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress</u> to a person described in clause (i), (ii), or (iii) of subparagraph (A); or

(2) <u>with the intent</u> to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, <u>uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce</u> to <u>engage in a course of conduct</u> that—

      (A) <u>places that person in reasonable fear of the death of or serious bodily injury</u> to a person, a pet, a service animal, an emotional support animal, or a horse described in clause (i), (ii), (iii), or (iv) of paragraph (1)(A); or

      (B) <u>causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress</u> to a person described in clause (i), (ii), or (iii) of paragraph (1)(A),

shall be punished as provided in section 2261(b) or section 2261B, as the case may be.

18 U.S.C. § 2261A (underlining added to show elements).  Under 18 U.S.C. § 2261(b), the maximum term of imprisonment for a § 2261A offense depends on whether other statutory aggravators are present.  If no aggravators are present, the maximum term of imprisonment is five years.  18 U.S.C. § 2261(b)(5).  If, as relevant here, "the death of the victim results," the maximum term of imprisonment is life.  18 U.S.C. § 2261(b)(1).

Since its enactment, 18 U.S.C. § 2261A has been amended numerous times, including on October 28, 2000, 114 Stat. 1498; on January 5, 2006, 119 Stat. 2987; on March 7, 2013, 127 Stat. 77; on December 20, 2018, 132 Stat. 4982; and on December 22, 2020, 134 Stat. 1126.  Earlier

versions of the statute did not contain the "conduct" element that is now part of the statute. *United States v. Johnson*, No. 24 Cr. 20110, 2025 WL 1520055, at *6 (S.D. Fla. May 7, 2025), *report and recommendation adopted*, No. 24 Cr. 20110, 2025 WL 1517219 (S.D. Fla. May 28, 2025) (citing Pub. L. 113-4, Title I, § 107(b), Mar. 7, 2013, 127 Stat. 77). The 2013 amendments also separated, into independent subsections stated in the alternative, the portions of the statute relating to conduct that places the victim "in reasonable fear of the death . . . or serious bodily injury" (the "Reasonable Fear Subsection") and the portions relating to conduct that "causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress" (the "Emotional Distress Subsection"). *Id.*

## II.    DISCUSSION

### A.  18 U.S.C. § 2261A Is Divisible into At Least Four Distinct Crimes

The plain text of 18 U.S.C. § 2261A makes clear that the statute is divisible. As every federal court to have considered the divisibility of the statute has concluded, § 2261A's four subsections—§§ 2261A(1)(A), 2261A(1)(B), 2261A(2)(A), and 2261A(2)(B)—each defines a separate crime that requires proof of a distinct set of elements.[15] *See United States v. Ali* (*"Ali I"*), No. 24 Cr. 20341, 2025 WL 2938420, at *2 (S.D. Fla. Oct. 16, 2025)[16] ("[S]o § 2261A is in fact

---

[15]  As discussed further, *infra*, these subsections—§§ 2261A(1)(A), 2261A(1)(B), 2261A(2)(A), and 2261A(2)(B)—are themselves further divisible, depending on whom the defendant has threatened with death or serious bodily injury. For example, § 2261A(1)(A)(i) (conduct leading to reasonable fear of death or bodily harm to the stalking victim) is a different crime from § 2261A(1)(A)(ii) (conduct leading to reasonable fear of death or bodily harm to the stalking victim's family member).

[16]  The Government has been advised by the United States Attorney's Office for the Southern District of Florida that, at a November 5, 2025 conference, the District Judge in *United States v. Ali*, No. 24 Cr. 20341 (S.D. Fla.), orally held that 18 U.S.C. § 2261A can be interpreted to apply to cases of threatened self-harm by the defendant and, on that basis, reversed his prior ruling in *Ali I* that § 2261A is a crime of violence. (*See Ali*, Dkt. No. 383 (minute entry reflecting oral ruling).) The District Judge stated that he expected to issue a written decision (*"Ali II"*) adopting

divisible into four separate crimes."); *Johnson*, 2025 WL 1520055, at *6; *United States v. Abarca*, No. 22 Cr. 20505, 2024 WL 1643174, at *6 (S.D. Fla. Mar. 26, 2024), *report and recommendation adopted*, No. 22 Cr. 20505, 2024 WL 1637343 (S.D. Fla. Apr. 16, 2024); *United States v. Bacon*, No. 18 Cr. 75 (LPS), 2021 WL 5051364, at *12 (D. Del. Nov. 1, 2021).[17]

There is no serious question that § 2261A(1) and § 2261A(2) define different crimes that contain different elements: the former requires that the defendant have traveled "in interstate or foreign commerce," whereas the latter requires that the defendant have used "the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce." Interstate travel and the use of an interstate facility are alternative elements that define different crimes: they are set out in the disjunctive, broken up into separate subsections, and describe different conduct. *Ali I*, 2025 WL 2938420, at *2 ("Since § 2261A(1)'s elements are different from § 2261A(2)'s, the interstate-stalking statute is (at a minimum) divisible into two crimes"); *Abarca*, 2024 WL 1643174, at *6. In this case, the defendant has been charged in separate counts (Counts One and Two) with committing these two offenses and, at trial, the jury will be required to separately return

_____

the reasoning of *United States v. Plunkett*, No. 04 Cr. 70083, 2024 WL 4173806, at *7 (W.D. Va. Sept. 12, 2024). *Ali II* has not been filed on ECF. Assuming it follows *Plunkett*, *Ali II* is wrong for the same reasons as *Plunkett*, which are discussed below. To the Government's understanding, *Ali II* will not affect *Ali I*'s reasoning as to § 2261A's divisibility.

[17] The courts in *United States v. Griffin*, No. 17 Cr. 20639, 2022 WL 2071054, at *3 (E.D. Mich. June 8, 2022), and *United States v. Elkins*, 725 F. Supp. 3d 570, 576 (N.D. Tex. 2024), concluded that § 2261A defines a "crime of violence" when charged in conjunction with § 2261(b)(1), but did not address the divisibility of § 2261A itself. As explained further, *infra*, the court in *United States v. Minners*, No. 05 Cr. 152, 2020 WL 4275040, at *5 (N.D. Okla. July 24, 2020), held that the version of § 2261A which existed in 2000—which was substantially different than the current version—was indivisible. As discussed below, every post-*Minners* decision has distinguished *Minners* because the statutory language it analyzed is no longer in effect.

verdicts on each offense.  The defendant appears to concede that § 2261A is divisible as between § 2261A(1) and § 2261A(2).  (COV Mot. at 10–11).

For substantially the same reasons, subsections (A) and (B) within § 2261A(1) and § 2261A(2) also define separate crimes that require proof of different elements.  Subsection (A)—the Reasonable Fear Subsection—requires that the defendant engaged "conduct" or a "course of conduct" that placed the person whom the defendant stalked "in reasonable fear of the death of, or serious bodily injury to (i) that person; (ii) an immediate family member . . . of that person; (iii) a spouse or intimate partner of that person; or (iv) the pet, service animal, emotional support animal, or horse of that person."  18 U.S.C. §§ 2261A(1)(A), 2261A(2)(A).  By contrast, subsection (B)—the Emotional Distress Subsection—requires that the defendant engaged in "conduct" or a "course of conduct" that "cause[d], attempt[ed] to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of subparagraph (A)."  18 U.S.C. §§ 2261A(1)(B), 2261A(2)(B).  The Reasonable Fear and the Emotional Distress Subsections bear the hallmarks of different legal elements, not just different factual means to prove a common element: they are separated by the disjunctive term "or," appear in separately enumerated subsections, and require proof of different conduct.  *Johnson*, 2025 WL 1520055, at *6 ("These are alternative  elements, rather than means, because they require different actions."); *Ali I*, 2025 WL 2938420, at *2 (same); *Abarca*, 2024 WL 1643174, at *6 (same).

Importantly, conduct that causes reasonable fear of death or bodily injury need not be conduct that causes substantial emotional distress; and neither is a subset of the other.  Nor are the two types of conduct subsumed under some unitary broader element (in the way that guns and knives are subsumed under the element "deadly weapon," *see Mathis*, 579 U.S. at 506).  The defendant argues otherwise, contending that substantial emotional distress is the legal element,

whereas reasonable fear of death or bodily injury is merely a factual means of proving that element; in other words, that substantial emotional distress is analogous to "deadly weapon" and reasonable fear of death or bodily injury is analogous to "gun."  (COV Mot. at 12) (citing *Mathis*, 579 U.S. at 506).  But that analogy fails for several reasons.

First, 18 U.S.C. § 2261A is structured differently from the statute described in *Mathis*.  The statute described in *Mathis* defined the offense using the term "deadly weapon" and then defined "deadly weapon" to mean a "knife, gun, bat, or similar weapon."  579 U.S. at 506.  That structure— as well as the phrase "or similar weapon"—made clear that knives, guns, and bats were examples of "deadly weapon" rather than elements in their own right.  In § 2261A, however, the Reasonable Fear and Emotional Distress Subsections appear in *parallel*, separately enumerated subsections, and the statute does not suggest that either is an illustrative example of the other.  Also lacking is any phrase analogous to "or similar weapon."  Put another way, *Mathis* stands for the proposition that when a statute defines a crime in terms of element "X," but then provides that "X" includes "A, B, and C, or other forms of X," the statutory terms A, B, and C should not be interpreted as distinct elements, but as factual means through which element X can be proven.[18]  Quite clearly, 18 U.S.C. § 2261A does not have that structure: it does not suggest that reasonable fear of death or bodily injury is an illustrative example of substantial emotional distress (or vice versa), nor does it suggest that reasonable fear of death or bodily injury and substantial emotional distress are

---

[18] A much more apt analogy to *Mathis* would be the disjunctive list in § 2261A(2) that describes the interstate facility element to include "the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce."  The structure and residual phrase "or any other facility" make clear that the mails, computer services, and so forth are simply *examples* of interstate facilities.  Interstate facility is the element (as to which there must be jury unanimity), but there need not be unanimity as to whether that element is proved through the mails, an interactive computer service, or otherwise.

illustrative examples of some broader unarticulated element (in the way that guns and knives are both "deadly weapons").

Second, the factual means of proving an element will *always* satisfy that legal element. For example, in *Mathis*, every gun (and every knife, bat, and so forth) is a "deadly weapon"; that is why guns, knives, and bats should be understood as factual means to prove the deadly weapon element. 579 U.S. at 506. By contrast, not all conduct that places the victim in reasonable fear of death or bodily injury will cause substantial emotional distress. Consider, for example, a defendant who credibly threatens to kill or inflict bodily injury on a family member of the victim whom the victim does not know or whom the victim dislikes. On those facts, the victim might reasonably fear—that is, anticipate with apprehension[19]—that the defendant will carry through with the threat, but may feel little to no emotional distress.

Third, the Reasonable Fear and the Emotional Distress Subsections differently define the potential victims. The Reasonable Fear Subsection reaches conduct that would create a reasonable fear of death or bodily injury for "(i) that person [who is stalked]; (ii) an immediate family member . . . of that person; (iii) a spouse or intimate partner of that person; or (iv) the pet, service animal, emotional support animal, or horse of that person." 18 U.S.C. §§ 2261A(1)(A), 2261A(2)(A). By contrast, the Emotional Distress Subsection reaches only conduct that causes substantial emotional distress in categories (i), (ii), and (iii), *but not category (iv)*. Moreover, as courts have recognized,

---

[19] Of course, fear is an emotion, and sometimes a strong one. But the verb "to fear" is also commonly used to describe the expectation of something adverse without an attendant emotion. *See* Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/fear (defining the transitive verb "to fear" to mean "to be afraid of" or to "expect with alarm"). An attorney might advise a client: "I fear our conference will be delayed." A law partner might tell an associate: "I fear you will need to rewrite this brief." A parent might tell a child: "I fear we will not have time to visit the zoo." In none of these examples does the use of the term "fear" suggest emotional distress, much less substantial emotional distress, on the part of the speaker. Instead, the word "fear" shows only that the speaker views the "feared" circumstances to be regrettable.

this was by legislative design: when Congress amended the Reasonable Fear Subsection to add category (iv), it declined to add that same category to the Emotional Distress Subsection. *Johnson*, 2025 WL 1520055, at *6 ("In 2018, Congress further distinguished the Fear of Death and Serious Injury Prong (Subsection (2)(A)) from the Emotional Distress Prong (Subsection (2)(B)) when it expanded the list of protected groups of victims under Section 2261A's Subsections (1)(A) and (2)(A), but specifically refused to do so for Subsection (2)(B)."); *Ali I*, 2025 WL 2938420, at *2 (same); *see* Pub. L. 115-334, Title XII, § 12502(a)(1), Dec. 20, 2018, 132 Stat. 4982.   The difference between the victim categories supports the conclusion that the two subsections define different elements.

Against the plain text of the statute and the uniform body of case law holding that § 2261A is divisible, the defendant offers a single case, *United States v. Minners*, No. 05 Cr. 152, 2020 WL 4275040, (N.D. Okla. July 24, 2020), and on the basis of *Minners*, suggests that there is a "split" on the issue of § 2261A's divisibility.  (COV Mot. at 13).  That is very misleading.  *Minners*, by its own admission, analyzed a long-abrogated version of the statute (the "Abrogated Statute") that existed *in 2000*, many rounds of amendments ago.  *Minners*, 2020 WL 4275040, at *4 ("This statute has since been amended and is now broader.  However, the Court examines the statute at the time of defendant's conviction.").  The version of § 2261A examined in *Minners* read as follows:

> Whoever (1) travels in interstate or foreign commerce or within the special maritime and territorial jurisdiction of the United States, or enters or leaves Indian country, with the intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel places that person in reasonable fear of the death of, or serious bodily injury to, that person, a member of the immediate family (as defined in section 115) of that person, or the spouse or intimate partner of that person . . . [shall be punished]

18 U.S.C. § 2261A (October 28, 2000 to January 4, 2006).

The Abrogated Statute differed from the current version in several material ways. *First*, it contained no Emotional Distress Subsection at all. *Second*, it contained no "conduct" element; instead, it asked whether the defendant's *travel* resulted in reasonable fear of death or serious bodily injury. *Third*, because it contained no Emotional Distress Subsection, it did not differentially define the potential victims of the reasonable fear and emotional distress. In short, the Abrogated Statute did not bear any of the features that make clear that the current version of § 2261A is divisible. That the Abrogated Statute lacked these features means that *Minners'* analysis should be of no persuasive value to this Court—it analyzed a wholly different statute. For that reason, post-*Minners* decisions have uniformly declined to adopt the analysis in *Minners*. *Ali I*, 2025 WL 2938420, at *2 ("*Minners* was analyzing a version of § 2261A from *twenty-five years* ago, and the court was careful to note that the 'statute has since been amended and is now broader.'"); *Johnson*, 2025 WL 1520055, at *7 ("But *Minners* is an unpublished district court opinion that analyzed a prior version of the stalking statute. Moreover, other district courts analyzing more-recent versions of the statute have rejected *Minners*' reasoning."); *Griffin*, 2022 WL 2071054, at *5 ("But the *Minners* and *Al-Zubaidy* decisions are both distinguishable from the present case for the same reason: both analyzed a prior version of § 2261A."). Put simply, there is no "split" of authority on whether the *current* version of § 2261A is divisible.

Given the absence of case law supporting the proposition that § 2261A is indivisible, the defendant attempts to rely on the Modern Federal Jury Instructions. (COV Mot. at 12 & n.6 (citing 3 Modern Federal Jury Instructions-Criminal Instr. 63-18 and 63-23 (2025)). That effort fails as well. As an initial matter, the Modern Federal Jury Instructions are not relevant authority on the issue of § 2261A's divisibility. Jury instructions may properly be consulted to determine *which crime* within a divisible statute was the basis of a conviction. *Descamps*, 570 U.S. at 257. But the

antecedent question of *whether the statute is divisible* is a pure question of law on which jury instructions shed no light. The Modern Federal Jury Instructions may often be a helpful summary of law, but are not an independent source of law. Here, the relevant pattern instructions in the Modern Federal Jury Instructions do not cite to or discuss *Ali I*, *Johnson*, *Abarca*, *Griffin*, or *Elkins* (or *Minners*, for that matter). Indeed, they do not cite a single case that post-dates 2013, and the issue of § 2261A's divisibility is nowhere discussed. Even if considered as a summary of case law, the Modern Federal Jury Instructions are, at best, a dated and limited summary.

In any event, the Modern Federal Jury Instructions do not support the defendant's position. For example, Instruction 63-18 (Third Element-Victim Placed in Reasonable Fear), which offers pattern instructions for a § 2261A(1) offense, reads as follows:

> The third element which the government must prove beyond a reasonable doubt is that in the course of or as a result of such travel, (for conduct after Oct. 1, 2013: defendant engaged in conduct as a result of which) [name of victim] was placed in reasonable fear of the death of or serious injury to herself (or an immediate family member or a spouse or intimate partner or the pet, service animal, emotional support animal or horse of that person) *(or caused or attempted to cause or would be reasonably expected to cause) substantial emotional distress to herself (or an immediate family member or a spouse or intimate partner)).*

> To establish this element, the government must prove that as a result of the defendant's conduct during or after the travel in interstate commerce, an ordinary and reasonable person in [name of victim]'s position would have been in fear of death or serious bodily injury to herself (or an immediate family member or a spouse or intimate partner or the pet, service animal, emotional support animal or horse of that person) *(or that [name of victim] (or an immediate family member or spouse or intimate partner of [name of victim]) suffered substantial emotional distress as a result of defendant's conduct).*

3 Modern Federal Jury Instructions-Criminal Instr. 63-18 (italics added). The instructions that correspond to the Emotional Distress Subsection appear in parentheticals that are set off from the rest of the instruction, suggesting that the parenthetical is optional. But if the defendant's view—that Reasonable Fear and Emotional Distress are subparts of a *single* legal element—were correct, the parenthetical language could never be optional, since the jury would *always* need to be

instructed that this hypothetical single element could be proven through either reasonable fear or emotional distress.

**B. The Defendant is Charged Under 18 U.S.C. § 2261A(1)(A) (Count One) and § 2261A(2)(A) (Count Two), Each of Which Require Conduct that Places the Victim in Reasonable Fear of Death or Serious Bodily Injury**

Because 18 U.S.C. § 2261A(1) is divisible into at least four different crimes, each defined in a separate subsection, the Court must apply the modified categorical approach and review the Indictment to determine which of the crimes the defendant has been charged with. *Martinez*, 991 F.3d at 354 ("Under the modified categorical approach, a court looks to the charging instrument or other authoritative documents to determine whether a defendant *necessarily* was charged with or convicted of a crime involving the use of force under the subsection."); *Descamps*, 570 U.S. at 257; *Morris*, 61 F.4th at 318.

Here, the answer is clear: Count One charges the defendant with interstate stalking under the Reasonable Fear Subsection, in violation of 18 U.S.C. § 2261A(1)(A), and Count Two charges the defendant with stalking through the use of an interstate facility under the Reasonable Fear Subsection, in violation of 18 U.S.C. § 2261A(2)(A). Both Counts charge the defendant with engaging in conduct that placed the victim (rather than the victim's family member, or intimate partner, or service animal) in reasonable fear of death or bodily injury. (*See* Ind. ¶ 1 (citing § 2261A(1)(A) and alleging that the defendant's conduct "placed [the victim] in reasonable fear of the death of, and serious bodily injury to, that person," but not citing § 2261A(1)(B) or alleging conduct that caused substantial emotional distress), ¶ 2 (same as to § 2261A(2)(A)).

Thus, the Court must consider whether these crimes are "crimes of violence" under the categorical approach.[20]

### C.  18 U.S.C § 2261A(1)(A) and § 2261A(2)(A) Each Require Proof of the Threatened, Attempted, or Actual Use of Force

As discussed above, § 2261A(1)(A) and § 2261A(2)(A) have different elements, but share a common element: the defendant must have engaged in conduct—or, in the case of § 2261A(2)(A), a course of conduct—that placed the victim "in reasonable fear of the death of, or serious bodily injury to" the victim or certain other enumerated parties.  Critically, the statute contains the requirement that the victim's fear be objectively *reasonable*.  The defendant's assertion—that this element "merely provides that *as a result* of the defendant's conduct, the victim *happens* to fear injury" (COV Mot. at 21)—is incorrect as a matter of law.

Courts have consistently held that conduct that *reasonably* places the defendant in fear of death or bodily injury *necessarily* involves the threatened, attempted, or actual use of force, as required by 18 U.S.C. § 924(c)(3).  *Johnson*, 2025 WL 1520055, at *9 ("It is impossible to conceptualize an instance where an individual engages in a 'course of conduct' that puts someone in 'reasonable fear of the death of or serious bodily injury' without engaging in conduct that, at minimum, threatens the use of physical force to a person. . . . A course of conduct causing a victim to reasonably fear death or serious bodily injury is, in common parlance, a threat."); *Ali I*, 2025 WL 2938420, at *4 (same); *Abarca*, 2024 WL 1643174, at *8 ("[W]e are unpersuaded that Defendant's hypotheticals successfully demonstrate that a conviction under Section 2261A(2)(A)

---

[20] Counts One and Two each charge the defendant with causing the death of the victim, in violation of 18 U.S.C. § 2261(b)(1).  Even if the Government had not charged the death-resulting element, § 2261A(1)(A) and § 2261A(2)(A) would qualify as crimes of violence.  The inclusion of the § 2261(b)(1)—which underscores that the charged offenses can only occur through the threatened, attempted or actual use of force—is discussed in greater detail below.

could be charged without proving the use of physical force, the attempted use of physical force, or the threatened use of physical force."); *Bacon*, 2021 WL 5051364, at *13 ("Section 2261A(2)(A) requires the victim to have 'reasonable fear' of death or serious bodily injury, and Oliver has not articulated any plausible scenario in which a victim could reasonably have such a fear without at least the threat of physical force.").

The defendant tries to offer, as counterexamples,[21] hypothetical fact patterns from *Minners*. (COV Mot. at 22).

- "[T]he defendant may have had a prior relationship with the victim, so by merely telling the victim that the defendant will be in his or her area could cause the victim a reasonable fear of death or serious bodily injury." *Minners*, 2020 WL 4275040, at *6.

- "Or the defendant could merely have stalked the victim in a way that harassed the victim and caused the victim to reasonably fear for his or her life." *Id.*

- "As another example, the defendant could have, prior to the interstate stalking, used physical force against the victim, causing the victim to reasonably believe that physical force could be used against him or her again." *Id.*

But each of the above hypotheticals must involve, at a minimum, the threatened use of force. In each case, the victim's fear of being killed or suffering serious bodily injury would be reasonable only if there were additional facts that *justified* that fear. *Bacon*, 2021 WL 5051364, at *14 ("In this Court's view, the hypothesized scenario does involve at least the threatened use of physical force, when considering all the circumstances."); *Griffin*, 2022 WL 2071054, at *6 ("Third, the Court agrees with the *Bacon* court that the hypothetical scenarios proposed by the *Minners* court do indeed involve at the very least, an implicit threat of force.").

---

[21] The defendant offers a few hypotheticals showing how substantial emotional distress might be inflicted without involving the threatened, attempted, or actual use of force. (COV Mot. at 16). Those hypotheticals are irrelevant because, as discussed, § 2261A is divisible, and the Government has not charged the defendant under the Emotional Distress Subsection.

The defendant appears to assume that a threat of force must be direct and explicit, but there is no such requirement in 18 U.S.C. § 924(c)(3).  Take, for example, the first *Minners* hypothetical, in which the defendant tells the victim that the defendant is present.  It would be reasonable for the victim to fear death or bodily injury from such a statement only if, prior to the communication, there was some other fact that warranted such a fear—for example, if the defendant (prior to the stalking) stated something like: "The next time I'm outside your house, I'm going to kill you."  But if that contextualizing fact is present, then the statement "I'm outside your house" is necessarily an implicit threat of the use of force.  In other words, it is not reasonable for a victim to fear death or serious bodily injury from conduct that is innocuous on its face, unless there are contextualizing facts that transform the conduct into, at least, an implied threat of force.

The same is true for the other example that the defendant offers: "the defendant followed around an ex-romantic partner whom he previously assaulted, with the intent to harass her—not to threaten force or use force against her—yet, the victim reasonably believes that the defendant is about to physically harm her (due to prior physical violence)."  (COV Mot. at 21).  On those facts, the defendant's conduct satisfies the Elements Clause because he at least knows his conduct will be reasonably perceived by the victim as a threat of violence. As discussed in greater detail below, the defendant's subjective intent to *convey a threat* or *carry out the threat* is not required.  *Borden v. United States*, 593 U.S. 420, 432 (2021) (holding that knowing conduct is sufficient to satisfy Elements Clause).

As to both Counts One and Two, the Government has alleged that the defendant's conduct resulted in the death of the victim, in violation of 18 U.S.C. § 2261(b)(1).  Because this statutory aggravator increases the potential sentence, it is an element of the offense that must be considered under the categorical approach.  *Mathis*, 579 U.S. at 517 ("[If] statutory alternatives carry different

punishments, then . . . they must be elements."). The charged offenses therefore require the Government to prove not only that that defendant engaged in conduct that placed the victim in reasonable fear of death or serious bodily injury, but also that the defendant's conduct *caused the victim's* death. It is not possible to fathom conduct that would place the defendant in reasonable fear of death or serious bodily injury—and also *kill him*—that would not involve the threatened, attempted, or actual use of force. *Elkins*, 725 F. Supp. 3d at 576 ("The Court has a difficult time imagining a case where an actor commits a violation under §§ 2261A(2) and 2261(b)(1)–(3), with the requisite level of intention and harm, and does not also intentionally attempt or threaten to use force."); *Griffin*, 2022 WL 2071054, at *6 ("[T]he Court fails to see how an offender acting with the intent to kill, injure, or harass, can "engage in conduct that places a person in reasonable fear of death or serious injury," and from which conduct death does indeed result, without the use or threatened use of physical violence."). Tellingly, the defendant does not even attempt to offer an example of conduct that places the victim in reasonable fear of death or serious bodily injury *and* that causes the victim's death *and* that does not involve the threatened, attempted, or actual use of force. Each of the defendant's examples involves death-resulting conduct that places the victim in emotional distress, rather than reasonable fear of death or serious bodily injury. (COV Mot. at 18–19).

The defendant argues that the death resulting element in 18 U.S.C. § 2261(b)(1)—standing alone—would not necessarily satisfy the Elements Clause because that element "applies even in cases involving unintentional or accidental deaths." (COV Mot. at 17). But § 2261(b)(1) does not stand alone. It is coupled with the element, in § 2261A(1)(A) and § 2261A(2)(A), that the same conduct by the defendant that causes the victim's death must also place the victim in reasonable fear of death or serious bodily injury. The defendant's reliance on cases holding that a standalone

death-resulting element does not satisfy the Elements Clause, (COV Mot. at 17–18), therefore

misses the point.  None of the statutes discussed in those cases has a comparable requirement that

the death-resulting conduct *also* place the victim in reasonable fear of being killed.  *See United

States v. Hayes*, 589 F.2d 811, 820 (5th Cir. 1979) (interpreting 18 U.S.C. § 242, which has a

death-resulting element that does *not* require that the defendant's conduct placed the victim in

reasonable fear of being killed); *United States v. Piche*, 981 F.2d 706, 711 (4th Cir. 1992) (same

as to 18 U.S.C. § 241); *United States v. Montgomery*, 635 F.3d 1074, 1086 (8th Cir. 2011) (same

as to 18 U.S.C. § 1201(a)); *United States v. Barraza*, 576 F.3d 798, 806 (8th Cir. 2009) (same);

*Fulks v. United States*, 875 F. Supp. 2d 535, 588 (D.S.C. 2010) (same).[22]  This additional

requirement in § 2261A(1)(A) and § 2261A(2)(A) makes all the difference.  *Ali I*, 2025 WL

2938420, at *4 ("Unlike the federal kidnapping statute, § 2261A(1)(A) requires the government to

show that the defendant's intended act 'place[d] [a] person in reasonable fear' of death or serious

bodily injury.").

    In summary, the requirement in 18 U.S.C. § 2261A(1)(A) and § 2261A(2)(A) that the

defendant's conduct placed the defendant in reasonable fear of death or serious bodily injury

satisfies the Element Clause.  That is especially so when, as here, the Government has alleged that

the same fear-causing conduct in fact caused the victim's death, in violation of 18 U.S.C.

§ 2261(b)(1).  The "minimal criminal conduct necessary to satisfy the elements" of 18 U.S.C.

---

[22] The defendant also cites *United States v. McDuffy*, 890 F.3d 796, 798 (9th Cir. 2018), which held that the death-resulting element in the federal bank robbery statute, 18 U.S.C. § 2113, contains no separate mens rea requirement.  It is unclear how *McDuffy* helps the defendant, since the Second Circuit has already held that 18 U.S.C. § 2113 *is* a crime of violence under the Elements Clause, based on the requirement that the defendant committed the robbery "by force and violence, or by intimidation."  *United States v. Hendricks*, 921 F.3d 320, 328 (2d Cir. 2019); *Collier v. United States*, 989 F.3d 212, 220 (2d Cir. 2021).  As with § 2261A(1)(A) and 2261A(1)(B), it is that other element that makes the offense a crime of violence.

§§ 2261A(1)(A), 2261A(2)(A), and 2261(b)(1) is conduct that involves the threatened, attempted or actual use of force.

### D. *Borden* Does Not Apply Because 18 U.S.C. § 2261A(1)(A) and § 2261(A)(2)(A) Do Not Reach Reckless or Negligent Conduct

Citing *Borden v. United States*, 593 U.S. 420 (2021), the defendant argues that 18 U.S.C. § 2261A(1)(A) and § 2261A(2)(A) are not crimes of violence because "a defendant who has no subjective intent to harm or threaten to harm the victim, the victim's family members, or the victim's animal still satisfies [those subsections]." (COV Mot. at 21–22). The defendant misreads *Borden*.

*Borden* held that a scienter of recklessness cannot satisfy the Elements Clause. 593 U.S. at 423. The Supreme Court reasoned that the Elements Clause reaches only threatened, attempted, or actual force directed "against the person or property of another" and concluded that the "phrase 'against another,' when modifying the 'use of force,' demands that the perpetrator direct his action at, or target, another individual." *Id.* at 429. Reckless (or negligent)[23] conduct does not meet that requirement because, by definition, reckless or negligent conduct can be directed at no one at all. *Id.* at 243 ("[T]he reckless driver has not directed force at another . . . . To the contrary, his fault is to pay insufficient attention to the potential application of force. Because that is so—because his conduct is not opposed to or directed at another—he does not come within the elements clause."). By contrast, conduct that is undertaken intentionally or knowingly "against" a particular victim is targeted and thus can fall under the Elements Clause. *Id.* at 426.

---

[23] Prior to *Borden*, the Supreme Court had held, in *Leocal v. Ashcroft*, 543 U.S. 1, 13 (2004), that negligent conduct does not fall under the elements clause of 18 U.S.C. § 16, which is substantially identical to 18 U.S.C. § 924(c)(3).

*Borden* has no application to 18 U.S.C. § 2261A(1)(A) or § 2261A(2)(A) because neither subsection punishes reckless (or negligent) conduct. Instead, all subsections of § 2261A require that the defendant have traveled "with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person"—in other words, that the defendant *intentionally targeted* the victim. Unlike, for example, reckless driving, stalking requires a "purposeful or knowing mental state—a deliberate choice of wreaking harm on another, rather than mere indifference to risk." *Borden*, 593 U.S. at 438.

The language of 18 U.S.C. § 2261A(1)(A) and § 2261A(2)(A) does not separately specify the scienter for the verb "engages" in the statutory phrase "engages in conduct," but that does not mean there is no scienter requirement. *Elonis v. United States*, 575 U.S. 723, 734 (2015) ("The fact that the statute does not specify any required mental state, however, does not mean that none exists."); *United States v. Wasylyshyn*, 979 F.3d 165, 174 (2d Cir. 2020) ("Nonetheless, the 'legal principle that criminal statutes are presumed to contain a mens rea requirement' compels us to interpret the text of the Noise Regulation to include at least a minimal mens rea expectation." (quoting *United States v. Bronx Reptiles, Inc.*, 217 F.3d 82, 87 (2d Cir. 2000))); *United States v. Figueroa*, 165 F.3d 111, 115 (2d Cir. 1998) ("Equally strong in this area is the presumption that for knowledge to suffice for criminal culpability, it should, at minimum, be extensive enough to attribute to the knower a 'guilty mind,' or knowledge that he or she is performing a wrongful act."). Given that the "travel" element of § 2261A(1)(A) and § 2261A(2)(A) requires the specific intent of the defendant to target the victim, the Court should find that the "engages in conduct" element requires a scienter of at least knowledge. *Elonis*, 575 U.S. at 736 ("When interpreting federal criminal statutes that are silent on the required mental state, we read into the statute only that mens

rea which is necessary to separate wrongful conduct from otherwise innocent conduct." (citations omitted)).

The defendant cites *Borden* for the proposition that, in order to fall within the Elements Clause, the defendant must subjectively intend to inflict or threaten violence. (COV Mot. at 21). That is wrong. *Borden* took pains to explain that the Elements Clause can be satisfied by intentional *or knowing* conduct. 593 U.S. at 432 ("[T]he clause covers purposeful and knowing acts."). A defendant acts intentionally "when he consciously desires a particular result." *Id.* at 426 (citation omitted). By contrast, a defendant who acts knowingly does *not* necessarily desire the consequence of his action, but is aware that it will be the consequence: "Say a getaway driver sees a pedestrian in his path but plows ahead anyway, knowing the car will run him over. That driver, too, fits within the statute: Although he would prefer a clear road, he too drives his car straight at a known victim." *Id.* at 432.

Thus, a defendant who engages in conduct that he knows will cause reasonable fear of death or serious bodily injury has satisfied the Elements Clause because he has *knowingly* threatened violence—regardless of whether he purposefully threatened violence. Neither the Elements Clause nor *Borden* contains the requirement that the defendant's purpose was to issue a threat. To return to an earlier example, a defendant who tells a victim "I'm outside your house" has threatened violence if he knows that the victim will (under the circumstances) reasonably fear death or bodily injury from that statement, even if the defendant's subjective purpose in making the statement was not to convey a threat. *Accord Elonis*, 575 U.S. at 740 ("There is no dispute that the mental state requirement in [18 U.S.C. § 875(c)] is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat.").

In summary, *Borden*'s holding that reckless or negligent conduct does not fall under the Elements Clause has no application here. 18 U.S.C. § 2261A(1)(A) and § 2261A(2)(A) do not reach reckless or negligent conduct.

### E. 18 U.S.C. § 2261A(1)(A)(i) and § 2261(A)(2)(A)(i) Do Not Reach Threatened Self-Harm

Finally, the defendant argues, based on *United States v. Plunkett*, No. 04 Cr. 70083, 2024 WL 4173806, at \*7 (W.D. Va. Sept. 12, 2024), that 18 U.S.C. § 2261A cannot be a crime of violence because it criminalizes threatened self-harm. The argument fails because the subsections of 18 U.S.C. § 2261A that the defendant is charged under—18 U.S.C. §§ 2261A(1)(A)(i) and 2261A(2)(A)(i)—do not and cannot reach conduct that involves actual or threatened self-harm.

The defendant's argument—which is lifted from *Plunkett*[24]—proceeds as follows: *first*, the Elements Clause requires the "the use, attempted use, or threatened use of physical force against the person or property <u>of another</u>" (underlining added); *second*, § 2261A(1)(A) and § 2261A(2)(A) proscribe conduct that places the victim (a person other than the defendant) in reasonable fear of death or serious bodily injury to "an immediate family member" or "a spouse or intimate partner of [the victim]," 18 U.S.C. §§ 2261A(1)(A)(ii)–(iii), 2261A(2)(A)(ii)–(iii); *third*, it is possible for *the defendant* to be an immediate family member or intimate partner of the victim, as defined in subclauses (ii) and (iii); and *therefore*, a defendant who stalks an immediate family (or intimate partner) in order to threaten to self-harm has violated subclauses (ii) or (iii) of § 2261A(1)(A) and § 2261A(2)(A). (COV Mot. at 23); *see also Plunkett*, 2024 WL 4173806, at \*7; *cf. Portee v.*

---

[24] As discussed *supra*, the District Judge in *Ali I* has stated that he expects to issue a written opinion, *Ali II*, adopting the reasoning of *Plunkett* as to self-harm. (*United States v. Ali*, 24 Cr. 20341 (RKA) (S.D. Fla. 2025), Dkt. No. 283). *Ali II* has not been filed on ECF at the time of this submission. If *Ali II* entirely echoes *Plunkett*, it is wrong for the reasons that *Plunkett* is wrong. If *Ali II* offers any different or additional arguments, the Government may file a supplemental letter addressing those arguments.

*United States*, 941 F.3d 263, 271 (7th Cir. 2019) (applying similar logic as to an Indiana state statute).

This argument fails for the following reasons.

*First*, § 2261A(1)(A) and § 2261A(2)(A) are themselves further divisible depending on *whom* the defendant has threatened with death or serious bodily injury. Each of the subclauses (i), (ii), (iii), and (iv) requires different conduct (threatening to kill the stalking victim is different than threatening to kill the stalking victim's dog), is set out in the disjunctive, and is separately enumerated (*i.e.* (i), (ii), and (iii)). Each is therefore an alternative legal element that defines a distinct crime. *Colotti*, 71 F.4th at 113 (holding that disjunctive lists of subsections are "at least indicative" of divisibility); *Williams*, 2025 WL 2784100 (same), at *3; *Baker*, 665 F.3d at 55 (same); *see also Oouch v. U.S. Dep't of Homeland Sec.*, 633 F.3d 119, 122 (2d Cir. 2011) ("N.Y.P.L. § 263.05 is drafted as discrete offenses in a disjunctive list. It is settled in this Circuit that such structure establishes divisibility, if one or more offenses in the list (but not all) are grounds for removal."); *Giron-Molina v. Garland*, 86 F.4th 515, 520 (2d Cir. 2023) ("The disjunctive 'or' between § 5-60-101(a)(1) and § 5-60-101(a)(2) renders the statute divisible."); *United States v. Beardsley*, 691 F.3d 252, 275 (2d Cir. 2012) ("[W]e hold that the modified categorical approach is available to sentencing courts only if the statute of the underlying conviction is easily divisible into predicate and non-predicate offenses—*i.e.*, divided into disjunctive subsections, or separately listed within a single provision."). The Government has not found any case in which the Second Circuit has found to be *in*divisible a statute that contains disjunctive, separately enumerated subsections. The defendant cites no such case. At least two courts have cited to individual subclauses in § 2261A(1)(A) when describing the relevant statutory offense. *See United States v. Spurlock*, No. 23 Cr. 22 (MMD) (CLB), 2024 WL 3850395, at *1

(D. Nev. Aug. 16, 2024) (noting that defendant was charged with "stalking resulting in the death pursuant to 18 U.S.C. §§ 2261A(1)(A)(i) and 2261(b)(1)"); *cf. United States v. Bernard*, No. 24 Cr. 20287 (KMM) (EFD) (S.D. Fla. Feb. 22, 2025) (listing § 2261A(1)(A)(i) specifically as a subject offense in a search warrant).

If subclause (i) is divisible from subclauses (ii) and (iii), then the *Plunkett* self-harm argument fails. Subclause (i) requires that the defendant's conduct place the stalking victim—who must be "another person"—in reasonable fear of death or serious bodily injury to "that person," *i.e.* the stalking victim. Subclause (i) thus can never reach cases of threatened self-harm. Here, the Indictment alleges that the defendant stalked Brian Thompson and "placed that person [*i.e.* Brian Thompson] in reasonable fear of the death of, and serious bodily injury to, that person." No allegation in the Indictment corresponds to subclauses (ii) or (iii). (Ind. ¶¶ 1–2). Thus, the Court should find that the defendant is charged only with the divisible offenses under 18 U.S.C. § 2261A(1)(A)(i) and § 2261A(2)(A)(i). Those offenses can never reach threatened self-harm.

*Second*, even if § 2261A(1)(A) and § 2261A(2)(A) were not further divisible, interpreting § 2261A to proscribe threatened self-harm would violate established canons of statutory interpretation.

Under the canon that "a word is known by the company it keeps," courts generally "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015) (citations omitted). In *Yates*, the Supreme Court interpreted the meaning of "tangible object" in 18 U.S.C. § 1519, which prohibits taking certain actions with respect to "any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the

United States." *Id.* at 531 (underlining added).  In holding that "tangible object" should not be interpreted to mean literally any tangible object, the Supreme Court reasoned:

> "Tangible object" is the last in a list of terms that begins "any record [or] document."  The term is therefore appropriately read to refer, not to any tangible object, but specifically to the subset of tangible objects involving records and documents, *i.e.*, objects used to record or preserve information.

*Id.* at 544; *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (relying on same canon to conclude that the term "communication" in the phrase "communication, written or by radio or television" should not be interpreted to include private written communications).

By that same logic, "an immediate family member of that person" (subclause (ii)) and "a spouse or intimate partner of that person"  (subclause (iii)) should be understood in relation to the other subparts of the statute, rather than by their literal terms.  The gravamen of a § 2261A offense is that the defendant stalk "another person" with the intent to "kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate" *that other person* while taking some conduct that threatens either *that other person* (subclause (i)) or people or animals that the *other person* might hold dear (subclauses (ii) through (iv)).  Read naturally and in context, subclauses (ii) and (iii) encompass *third parties* bearing some close relation to the stalking victim, rather than the defendant himself.

Statutes must also generally be read to avoid absurd results.  *United States v. Messina*, 806 F.3d 55, 70 (2d Cir. 2015) ("As the Supreme Court has cautioned, interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." (citation and quotation marks omitted)).  Interpreting § 2261A to reach threatened self-harm would lead to highly unusual prosecutions.  That may not be obvious from the defendant's hypothetical: "a defendant travels interstate to harass his estranged wife in hopes that she will return to him (or contacts her electronically using a facility of interstate

communications), and in the process threatens to kill himself while placing a gun to his head if she does not agree to get back together with him." (COV Mot. at 23). But that is because the presence of the loaded gun makes that hypothetical appear plausibly prosecutable; after all, brandishing a loaded gun is almost always a crime. Consider, however, what happens when the gun is removed, but other features of the hypothetical remain:

- The same defendant is suffering from Stage IV cancer and tells his wife, "If you don't get back together with me, I'll stop chemotherapy because there's nothing left to live for."

- Or the same defendant, having once recovered from a life-threatening alcohol addiction, tells his wife, "If you don't get back together with me, I'll lose myself in alcohol again."

- Or a rebellious teenager who tells an intolerant parent, "If you can't accept my life choices, I'm going to keep cutting myself."

By the defendant's logic, each of the above examples would be prosecutable as a felony under § 2261A because, in each, the defendant threatens to seriously harm his own health. But all of the above examples involve conduct that is innocent on its face: in each, the defendant's threat relates solely to the exercise of the defendant's bodily autonomy in a way that is not inherently unlawful. *Cf. Liparota v. United States*, 471 U.S. 419, 426 (1985) (declining to interpret statute in a way that would "criminalize a broad range of apparently innocent conduct"); *Carter v. United States*, 530 U.S. 255, 269 (2000) (holding that scienter requirement, which did not appear in text of statute, should be implied to avoid "the risk of punishing seemingly innocent conduct"). Prosecuting the conduct in these hypotheticals feels absurd because self-harm is fundamentally different than harming someone else. Within some outer limits, one can innocently take actions—excessively drinking, smoking, neglecting one's diet or sleep—that might lead to self-harm, including risk of serious bodily injury or death. By contrast, one can almost never lawfully inflict serious bodily harm (much less death) on someone else. Threatening the former is rarely criminal; threatening

the latter almost always is. The defendant's interpretation of § 2261A erases that distinction, leading to absurdity. The Court there should reject that interpretation.

Another bedrock canon teaches that "language used in one portion of a statute should be deemed to have the same meaning as the same language used elsewhere in the statute." *United States v. Daugerdas*, 892 F.3d 545, 556 (2d Cir. 2018) (citation, ellipses, and quotation marks omitted); *Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 501 (1998) (discussing "the established canon of construction that similar language contained within the same section of a statute must be accorded a consistent meaning"). Subclauses (ii) and (iii) appear in both the Reasonable Fear Subsection and the Emotional Distress Subsection. *See* 18 U.S.C. § 2261A(1)(B) and § 2261A(2)(B). Therefore, to the extent that these subclauses can be interpreted to apply to the defendant himself, that would also be true as to the Emotional Distress Subsection. But interpreting § 2261A to reach cases in which the defendant threatens to cause *himself* substantial emotional distress is nonsensical. A defendant who crosses state lines (or uses the Internet) to tell a former partner "Because you've broken up with me, I have been crying myself to sleep every night while listening to breakup songs" has not committed a federal felony. Once again, treating self-harm as equivalent to harming others leads to absurdity.

*Third*, a substantially similar self-harm argument has been advanced at least twice before the Second Circuit, and both times the Second Circuit declined to adopt it. *United States v. Elias*, No. 23 Cr. 6626, 2025 WL 2857883, at *1 (2d Cir. Oct. 8, 2025) (reaffirming that Hobbs Act robbery is a crime of violence notwithstanding defendant's argument that "a person who threatens *self*-harm at gunpoint to extort a friend or relative would violate the Hobbs Act without threatening force against 'another.'"); *United States v. Barrett*, 102 F.4th 60, 81 (2d Cir. 2024) (declining to reconsider precedent that Hobbs Act robbery is a crime of violence, notwithstanding defendant's

argument that a person can be "convicted of Hobbs Act robbery for taking or obtaining property by threatening harm to himself" (citation, quotation marks, and brackets omitted)).

The Hobbs Act statute, 18 U.S.C. § 1951, is directly comparable to § 2261A: it defines "robbery" to mean "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining." 18 U.S.C. § 1951(b)(1) (underlining added). The appellants in *Elias* and *Barrett* argued that because a hypothetical defendant might be a relative or family member of the victim, Hobbs Act robbery is not, under the categorical approach, a crime of violence under 18 U.S.C. § 924(c)(3). The argument failed. The Second Circuit reiterated its adherence to precedent finding that Hobbs Act robbery is a crime of violence. *Elias*, 2025 WL 2857883, at *1; *Barrett*, 102 F.4th at 81. There is no logical reason to treat 18 U.S.C. § 2261A differently from Hobbs Act robbery.

Moreover, the Hobbs Act statute is not the only other statute that prohibits violence, or threats of violence, against family members of protected individuals. *See, e.g.*, 18 U.S.C. §§ 115 (prohibiting, among other things, "threat[s] to assault, kidnap or murder a member of the immediate family of a United States official, a United States judge, a Federal law enforcement officer, or an official whose killing would be a crime under section 1114 of this title"); 879 (prohibiting "threat[s] to kill, kidnap, or inflict bodily harm" on, among others, immediate family members of former, current, and future officeholders of the Presidency and Vice-Presidency); 1389 (prohibiting assault or battery of "a United States serviceman or an immediate family member of a United States serviceman"). On the logic of *Plunkett*, none of the above statutes

would qualify as crimes of violence.  The Court need not, and should not, adopt a line of reasoning that leads to such a ridiculous conclusion.

## PART 3

## SUPPRESSION MOTION

## ARGUMENT

The defendant moves to suppress items recovered from his backpack by the Altoona Police Department on December 9, 2024, as well as statements that he made to Altoona Police Department officers on the same date, alleging violations of his Fourth and Fifth Amendment rights.  In particular, the defendant argues that (i) the contents of his backpack should be suppressed because the backpack was impermissibly searched without a warrant; and (ii) his statements to the Altoona officers should be suppressed because his interactions with law enforcement at an Altoona McDonald's amounted to custodial interrogation without *Miranda* warnings.  (Suppress. Mot. at 35–46).

Neither argument is persuasive.  First, the contents of the defendant's backpack are admissible for multiple independent reasons: (i) the search of the defendant's backpack was conducted incident to his lawful arrest; (ii) in the circumstances of this case, the officers were justified in seeking to ensure that the backpack did not contain dangerous items before transporting it; and (iii) in any event, the contents of the backpack would inevitably have been discovered, including during an inventory search pursuant to the Altoona Police Department's procedures.  Second, the defendant's statements identifying himself by the false name "Mark Rosario"—which the Government seeks to introduce at trial—were plainly made to law enforcement while he was

not in custody for purposes of *Miranda* and, regardless, were made in response to pedigree questions for which *Miranda* warnings are not required.[25]

## I. RELEVANT FACTS

On or about the morning of December 9, 2024, two members of the Altoona Police Department in Altoona, Pennsylvania—Patrolman Joseph Detwiler and Patrolman Tyler Frye—reported to a McDonald's in the vicinity of 407 East Plank Road in Altoona, in response to a 911 call indicating that a male in that location resembled the CEO shooter from New York.[26]  Upon arriving at McDonald's and locating the defendant seated at a table wearing a black jacket, brown hat, and blue surgical-style face mask, Patrolmen Detwiler and Frye approached the defendant.[27] Patrolman Detwiler—after addressing the defendant as "sir" and asking "how are you doing?"—requested that the defendant "pull your mask down real quick for me," responding once the defendant agreed to do so by saying, "appreciate it" and "thank you."  (Patrolman Frye Bodyworn Camera Footage ("GX 1") at 9:29).  Patrolman Detwiler next asked the defendant, "What's your name," to which the defendant responded, "Mark"; when Patrolman Detwiler asked "Mark what?" the defendant further responded, "Mark Rosario."  (GX 1 at 9:29).  After explaining that "someone

---

[25] The Government does not seek to admit any of the defendant's statements at McDonald's beyond the defendant's initial statements providing the false names "Mark" and "Mark Rosario," as explained below, *infra* Part 3.B.

[26]  Although responding Altoona Police Department officers were armed and in uniform, at no point did any officer draw a weapon.

[27] The facts described herein, including the interactions between the defendant and members of the Altoona Police Department, are captured on officers' bodyworn camera footage.  All statements herein are described in sum and substance based on the Government's review of that footage. Bodyworn camera footage from Patrolman Frye and Patrolwoman Christy Wasser is affixed to this motion as Government Exhibits ("GX") 1 through 3.  Consistent with the still images included in the Affirmation in Support of Pretrial Motions filed by the defendant (Dkt. No. 59-1), the faces of individuals other than the defendant have been blurred in these exhibits.

called" and "thought you were suspicious," Patrolman Detwiler asked the defendant, "do you have your ID on you?"  (GX 1 at 9:29).  The defendant then handed Patrolman Detwiler a purported New Jersey license bearing the name "Mark Rosario."  (GX 1 at 9:29).[28]  At the time of the defendant's false statement, only Patrolmen Detwiler and Frye were present at the scene.

While Patrolman Detwiler remained near the defendant, Patrolman Frye moved toward another area of the McDonald's to verify the information on the purported license with police dispatch; when he returned, the defendant was unwrapping his food.  (GX 1 at 9:30).  Patrolmen Detwiler then asked the defendant to "do me a favor, just stand up real quick here."  (GX 1 at 9:30).  Once the defendant was standing, Patrolman Detwiler asked the defendant to place his hands on top of his head and proceeded to perform a brief frisk of the defendant for less than approximately one minute.  (GX 1 at 9:30).  Patrolman Detwiler then informed the defendant that he could sit back down.  (GX 1 at 9:30).  Approximately five minutes after the beginning of the interaction, the defendant began eating his meal.  (GX 1 at 9:34).  Additional police officers began to arrive approximately six minutes later (GX 1 at 9:40), one of whom asked the defendant whether he had any weapons on him (GX 1 at 9:42) and then, after confirming "this [is] all your property here," moved those items—including the defendant's backpack—to the next table (GX 1 at 9:43).

Shortly thereafter, Patrolman Detwiler informed the defendant that he was "under official police investigation" and that, if he provided a false name again, he would be arrested.  (GX 1 at 9:47).  The defendant then provided his real name—Luigi Mangione—and his date of birth.  (GX 1 at 9:47).  Approximately one minute later, the defendant was read his *Miranda* rights and responded "yes, sir" when asked whether he understood them.  (GX 1 at 9:49).  The defendant was

---

[28] As shown in GX 1, Patrolmen Detwiler and Frye continued to speak with the defendant in a calm and conversational tone throughout the entirety of the interaction.

then frisked again—during which frisk he informed police officers that he had a pocketknife in his pocket, which officers retrieved—before he was placed in handcuffs.  (GX 1 at 9:50).

With regard to the backpack, the defendant was asked by Patrolman Stephen Fox whether there was "anything in that bag we need to know about."  (GX 1 at 9:58).  Patrolwoman Christy Wasser and Patrolman Fox began conducting a search of the defendant's backpack, which had by then, as previously described, been moved from the floor immediately next to the defendant's table and placed on top of the next table.  (Patrolwoman Wasser Bodyworn Camera Footage ("GX 2") at 9:58).  In the course of that search, Patrolwoman Wasser located a firearm magazine wrapped in a pair of underwear (GX 2 at 10:01).  She explained to other officers that she was "just making sure there's not a bomb or anything in here before we put it in the car."  (GX 2 at 10:01).  She explained again, approximately several minutes later, after the brief search of the backpack at McDonald's was concluded, that "we just made sure there's no bombs."  (GX 2 at 10:03).

At approximately the same time that Patrolwoman Wasser and Patrolman Fox began their search of the backpack, several feet away, other officers began searching the clothing on the defendant's person—including his black jacket and the green jacket he was wearing underneath—and removing items therein prior to leading him out of McDonald's for transport.  (GX 1 at 9:58).  The defendant was subsequently escorted outside and transported to the police station.  (GX 1 at 10:00).

The entire encounter between Altoona Police Department officers and the defendant at McDonald's lasted approximately 31 minutes, from the time that officers arrived on scene until the time that the defendant was arrested and led outside.  During that time, the Altoona Police Department officers did not draw any weapons, maintained calm tones of voice and courteous

language, and used no physical restraints until the defendant was ultimately handcuffed.[29]

After securing the backpack in her patrol car, Patrolwoman Wasser transported the backpack back to the station. At the station, Patrolwoman Wasser, with her bodyworn camera recording, searched the contents of the backpack (GX 3 at 10:16–10:28), locating, among other things, a firearm (GX 3 at 10:16) and a silencer (GX 3 at 10:19).  She again explained, in discussion with another Altoona Police Department member, that she had already "checked the bag quick, I said, I ain't putting this bag in [without] making sure there's no bombs or anything" and that she had located a magazine in a pair of underwear.  (GX 3 at 10:16).

## II.  THE CONTENTS OF THE DEFENDANT'S BACKPACK ARE ADMISSIBLE

### A.  Applicable Law

There are well-established exceptions to the requirement that law enforcement officers obtain a search warrant based on probable cause before conducting a search.

First, "[i]t is well-settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment."  *United States v. Robinson*, 414 U.S. 218, 224 (1973).  "The justification for that exception is the need to ensure that the person arrested not have access to a weapon or to destructible evidence."  *United States v. Perea*, 986 F.2d 633, 643 (2d Cir. 1993); *see United States v. Diaz*, 854 F.3d 197, 205 (2d Cir. 2017) (recognizing that the search-incident-to-arrest exception "serves two interests: 'protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy'" (quoting *Arizona v. Gant*, 556 U.S. 332, 339 (2009))).  A search incident to arrest "permits the police to search a lawfully arrested person and areas within his immediate control."  *United States*

---

[29] Other civilians remained present in McDonald's and, at times, walked by the defendant and law enforcement officers in order to use the restroom (*see, e.g.,* GX 1 at 9:46).

*v. Mejia*, No. 24-CR-212-1 (VSB), 2025 WL 934343, at *5 (S.D.N.Y. Mar. 27, 2025) (quoting *Smith v. Ohio*, 494 U.S. 541, 543 (1990)).

The Supreme Court has also recognized that, even where a search cannot be justified as incident to arrest, "there may be other justifications for a warrantless search of [property] taken from a suspect at the time of his arrest." *United States v. Chadwick*, 433 U.S. 1, 15 n.9 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991). The Supreme Court has recognized, "for example," that "if officers have reason to believe that luggage contains some immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon." *Id.*; *see United States v. Morillo*, No. 08 CR 676(NGG), 2009 WL 3254431, at *7–8 (E.D.N.Y. Oct. 9, 2009) (ruling that, where there was "reason to believe" that a defendant was "hiding a dangerous instrumentality in his backpack," law enforcement officers need not "carry a potentially dangerous backpack in their police car, without either affirming or dispelling their suspicion" and may instead conduct a warrantless search "by opening [the defendant's] backpack before transporting it in their police car").

In addition, an "inventory search constitutes a well-defined exception to the warrant requirement." *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983); *see United States v. Lopez*, 547 F.3d 364, 369 (2d Cir. 2008) (explaining that "[t]he policies behind the warrant requirement are not implicated in an inventory search, nor is the related concept of probable cause" (quoting *Colorado v. Bertine*, 479 U.S. 367, 371 (1987))). Inventory searches are "constitutional under the Fourth Amendment because they 'serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.'" *United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002) (quoting *Bertine*, 479 U.S.

at 372).  Pursuant to the inventory search exception, "law enforcement officials may open closed containers as part of an inventory search so long as they act in good faith pursuant to 'standardized criteria . . . or established routine.'"  *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994) (quoting *Florida v. Wells,* 495 U.S. 1, 4 (1990)).  Nonetheless, the Second Circuit has made clear that "*every detail* of search procedure" need not be "governed by a standardized policy," *United States v. Williams*, 930 F.3d 44, 55 (2d Cir. 2019) (emphasis in original) (quoting *Lopez*, 547 F.3d at 371), and that even an unwritten inventory search policy can suffice, *see Mendez*, 315 F.3d at 138.

Moreover, under the "inevitable discovery doctrine," evidence obtained unlawfully "should not be excluded 'if the government can prove that the evidence would have been obtained inevitably' without the constitutional violation." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006) (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)); *see United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) (where the court "can find, with a high level of confidence, that the evidence would have been obtained irrespective of the error, the evidence should not be suppressed").

"The inventory search and inevitable discovery exceptions, although distinct, have been applied together on the theory that challenged evidence would inevitably have been discovered pursuant to a subsequent valid inventory search." *United States v. Brito*, 771 F. Supp. 3d 157, 176 (E.D.N.Y. 2025); *see Mendez*, 315 F.3d at 137–38 ("recognizing that "[i]n some cases, the government successfully invokes the inevitable discovery exception on the basis of inventory search procedures"); *Perea*, 986 F.2d at 644 ("if there has been a lawful arrest and an immediately ensuing search is not justifiable as incident to the arrest, a motion to suppress the proceeds of the immediate search may nonetheless be denied if the contents would inevitably have been discovered

in a permissible inventory search").  In such cases, the Second Circuit has held that the Government

must establish what defense counsel refers to the as the *Mendez* factors:

> (1) that the police had legitimate custody of the . . . property being searched, so that
> an inventory search would have been justified; (2) that when the police in the police
> agency in question conducted inventory searches, they did so pursuant to
> established or standardized procedures; and (3) that those inventory procedures
> would have inevitably led to the discovery of the challenged evidence

*Mendez*, 315 F.3d at 138; *see id.* (recognizing that evidence is admissible where "even if the invalid

search had not been conducted, the evidence would nonetheless have been discovered in the course

of a valid inventory search conducted pursuant to standardized, established procedures").

### B.  The Contents of the Backpack Are Admissible

The contents of the defendant's backpack are admissible (i) as the fruits of a search incident

to a lawful arrest, (ii) because the circumstances justified the Altoona officers' steps to ensure that

the backpack did not contain dangerous items before transporting it; and (iii) in any event, pursuant

to the inventory search and inevitable discovery exceptions.

First, the search of the defendant's backpack at McDonald's was permissible as a search

incident to a lawful arrest.  Members of the Altoona Police Department began conducting the

search of the backpack—which had been in the defendant's possession at the time he was

approached by law enforcement and was still lying on the next table, mere feet away, at the time

of the search—near-contemporaneously with the defendant's arrest, at the same time that the

defendant's person was also being searched incident to arrest.  *See Diaz*, 854 F.3d at 205

(recognizing that search incident to arrest must be "substantially contemporaneous with the arrest

and is confined to the immediate vicinity of the arrest" (quoting *Shipley v. California*, 395 U.S.

818, 819 (1969)).  And although the defendant points to his restraint in handcuffs and the presence

of multiple police officers to suggest that "the backpack was not within his immediate control"

(Suppress. Mot. at 40), courts have recognized that "handcuffs are not fail-safe" and neither the use of handcuffs nor the presence of law enforcement officers eliminate the possibility of a defendant gaining access to items in his vicinity.  *See United States v. Cushnie*, No. 14 CR 119 (PGG), 2014 WL 7447149, at *10–11 (S.D.N.Y. Dec. 31, 2014) (in finding valid search incident to arrest, rejecting the argument that "there was no possibility" that defendant—who was "handcuffed, had been placed on the ground, and was surrounded by multiple law enforcement officers"—could gain access to items "located two or three feet away"); *see also United States v. Shakir*, 616 F.3d 315, 320–21 (3d Cir. 2010) (recognizing in upholding search incident to arrest that "handcuffs are not fail-safe" and that "it is by no means impossible for a handcuffed person to obtain and use a weapon concealed . . . within lunge reach" (internal quotation marks and citation omitted)).  Unlike the defendant in *Gant*, for instance, *see Gant*, 556 U.S. at 335 (no valid search incident to arrest where defendant was handcuffed *and* "locked in the back of a patrol car" before search of a vehicle initiated), here the defendant remained within lunge reach of the backpack, from which he could have caused harm to law enforcement officers or sought to access items to destroy evidence.

Second, even if the search of the backpack at McDonald's were not justified as a search incident to arrest, it would nonetheless be permissible as falling within circumstances in which there would be "other justifications for a warrantless search" because the Altoona Police Department officers could have reasonably believed that the backpack may have contained "some immediately dangerous instrumentality."  *Chadwick*, 433 U.S. at 15 n.9.  The arrest of the defendant at McDonald's followed a multi-day manhunt for the individual, who—as was widely reported in national media outlets—was alleged to have fatally shot and killed a complete stranger in midtown Manhattan using a nine-millimeter handgun equipped with a silencer before fleeing

the scene of the crime.  In the early days following this brutal murder of a stranger in a public location, limited information was known regarding the shooter's motivations or whether the killing was part of a larger violent plot.  And, when approached by Altoona law enforcement officers after fleeing New York state, the defendant provided a false name and presented false identification. Given these circumstances, it was eminently reasonable for law enforcement officers to believe that the defendant's backpack may have contained "some immediately dangerous instrumentality, such as explosives," and eminently prudent to have sought to have dispel that suspicion before transporting the backpack in a law enforcement vehicle from the McDonald's.  *Id.* (recognizing that "if officers have reason to believe that luggage contains some immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon"); *Morillo*, 2009 WL 3254431, at *7–8 (where defendant's "furtive and evasive behavior gave the officers reason to believe he was hiding something potentially dangerous in his backpack at the time of his arrest," officers were "justified [in taking] steps to affirm their suspicions by opening [the] backpack before transporting it in their police car").[30]

Indeed, Patrolwoman Wasser—who searched the backpack at McDonald's prior to transporting it in her vehicle—explicitly and contemporaneously noted such concerns as she

---

[30] On the basis of similar reasoning, the Third Circuit has ruled that a warrantless search of a defendant's backpack prior to transport was reasonable under the Fourth Amendment due to the "interest in ensuring officer safety while transporting an arrested person's luggage." *United States v. Matthews*, 532 F. App'x 211, 223, 225–26 (3d Cir. 2013) (holding that "when a valid arrest has been made in a public place, which requires that the arrested person be transported from the scene, police may search any luggage that the person has in his possession at the time of the arrest, and which must accompany him to the police station, prior to transporting it" because "[s]uch a search is 'reasonable' in a twenty-first century where threats to the safety of police officers include backpacks that conceal bombs, capable of extreme devastation, which can be triggered remotely"). This Court need not adopt such a categorical holding, however, to recognize the reasonableness of the backpack search conducted in the particular circumstances of this case.

conducted the search and shortly thereafter, stating that she was "just making sure there's not a bomb or anything in here before we put [the backpack] in the car." (GX 2 at 10:01; GX 2 at 10:03 ("we just made sure there's no bombs"); GX 3 at 10:16 ("we just checked the bag quick, I said, I ain't putting this bag in [without] making sure there's no bombs or anything"); *see Morillo*, 2009 WL 3254431, at *7 (citing, in denying suppression motion regarding warrantless search, officer's testimony that he "need[ed] to know . . . what's in that backpack and also what's going in my car as I transport it to the stationhouse" for "the safety" of the officers, the prisoner, and other people around). Patrolwoman Wasser similarly explained those safety concerns in her documentation of the McDonald's search. (*See* Excerpt from Christy Wasser, Altoona Police Department Incident Report ("GX 4") (stating that, "on scene," she "did a brief search of [the defendant's] backpack for safety due to the severity of the arrest" and that she "did a quick search and was certain there was no explosives" before she " gathered his back pack, secured it in my vehicle, and took all his belongings to [the station]").

Finally, and in any event, the contents of the backpack are admissible because they would have inevitably been discovered pursuant to an inventory search in light of the defendant's arrest. Indeed, the very cases on which the defendant's suppression motion heavily relies squarely support the conclusion that the contents of the backpack are admissible under the inventory search and inevitable discovery exceptions. *See Brito*, 771 F. Supp. 3d at 178 (ruling contents of backpack admissible where the search of the backpack "was inevitable pursuant to the . . . applicable inventory search policy"); *Morillo*, 2009 WL 3254431, at *8 (ruling that "[w]hile the gun [found in the defendant's backpack] is admissible under the special exigency identified in *Chadwick*"— *i.e.,* that officers need not "carry a potentially dangerous backpack in their police car, without either affirming or dispelling their suspicion"— "the gun is also admissible because the arresting

officers would have inevitably found it during a later inventory search of [defendant's] backpack at the stationhouse"). And, in this case, such an inventory search was, in fact, conducted by Patrolwoman Wasser at the station. (*See* GX 4) (describing how, once at the police station, Patrolwoman Wasser searched the backpack and "[a]ll evidence was the taken into the evidence room and separated for a photo" while the defendant's other "belongings were secured" with another officer).

Seeking nonetheless to avoid this result, the defendant argues that, in this case, "[e]ven assuming the government could establish the first and third of the *Mendez* requirements, the government cannot establish the second requirement, *i.e.*, that the inventory search was conducted pursuant to established or standardized procedures." (Suppress. Mot. at 42 (citing *Mendez*, 315 F.3d at 138)). The defendant claims that the Government has not established that the Altoona Police Department has any standardized procedure for the inventory search of an arrestee's property. (Suppress. Mot at 42). But the argument fails because, in fact, the Altoona Police Department does have established procedures pursuant to which the property of arrestees is routinely searched and inventoried. (*See* Altoona Police Department Custodial Arrest Procedures ("GX 5") (providing that, for "in custody arrests," "All prisoners will be searched and their property inventoried with all information entered on a Altoona Police Department Prisoner log."); Altoona Police Department General Order 3.1.10 ("GX 6") (setting forth procedures for inventorying detainee property).[31]

---

[31] The law is clear, moreover, that even an "unwritten" inventory search policy can suffice, *Mendez*, 315 F.3d at 138, and that there is no requirement that "every detail of search procedure must be governed by a standardized policy," *Lopez*, 547 F.3d at 371 (rejecting argument that lack of standardization as to inventory list produced after searches undercut the sufficiency of a standardized inventory search procedure). Rather, where officers "are expected to search the personal belongings of each and every arrestee who comes through the station's doors," an established procedure sufficiently "constrain[s] the type of police discretion that most concerned

The defendant's next argument that Patrolwoman Wasser's search of the backpack violated Altoona Police Department procedure (Suppress. Mot at 42–43) fares no better. As an initial matter, the defendant bases these alleged violations on an Altoona Police Department policy applicable to vehicle searches (*id.* at 43 (citing Suppress. Mot., Ex. 1 (Altoona Police Department General Order 1.2.3(C)(5)(c)) (setting forth procedures for the inventory search of an impounded and/or towed vehicle))), which, by its terms, does not apply to the search of a backpack not located in any vehicle. And, as noted above, Patrolwoman Wasser has indicated that—after the initial search at McDonald's—she thoroughly searched the backpack, secured the defendant's property and placed evidence items into evidence. *See* GX 4 (describing how, once at the police station, Patrolwoman Wasser searched the backpack and "[a]ll evidence was the taken into the evidence room and separated for a photo" while the defendant's other "belongings were secured" with another officer); *see also* Excerpt from Eric J. Heuston, Affidavit of Probable Cause in Support of Search Warrant ("GX 7") (stating that at the Altoona Police Department "the backpack was inventoried for all items at station in accordance with APD policy" and providing a "list of the inventory of Mangione's person and property" including items recovered from the backpack).

But, in any event, in the context of inevitable discovery, the key question is not whether any challenged search was, in fact, a valid inventory search, but whether the items recovered in the search would have inevitably been discovered by an inventory search carried out pursuant to the police agency's procedures. *See Mendez*, 315 F.3d at 138–39 (stating that "[w]e doubt that the police officers were conducting a valid inventory search themselves, but we do not reach this

---

[the Second Circuit] and the Supreme Court, namely: the decision to search or not to search an arrestee's belongings." *United States v. Bignon*, 813 F. App'x 34, 39 (2d Cir. 2020).

question"; affirming instead on the "sole basis" that "the evidence would inevitably have been discovered in a valid inventory search"). Since it was the routine and established procedure of the Altoona Police Department to perform inventory searches of the property of arrestees, that requirement is easily met here.[32]

## III. THE DEFENDANT'S STATEMENTS PROVIDING A FALSE NAME TO THE ALTOONA POLICE DEPARTMENT ARE ADMISSIBLE

### A. Applicable Law

It is well-established that "*Miranda*'s warning requirements apply only to 'custodial interrogation.'" *United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). In order to determine whether a defendant is in custody for

---

[32] In addition, the Government subsequently obtained a search warrant for the contents of the backpack, including for the contents of handwritten documents therein, as did the District Attorney of Blair County and the Manhattan District Attorney's Office. For this additional reason, the contents of the backpack would also be admissible under the inevitable discovery doctrine. *See United States v. Whitehorn,* 829 F.2d 1225, 1230 (2d Cir. 1987) (ruling that evidence found in illegal "bomb sweep" was admissible because the items would have been inevitably discovered pursuant to a search with a search warrant). To be sure, the Government's warrant application cited certain contents of the backpack, as did the applications for the warrants obtained by the District Attorney of Blair County and the Manhattan District Attorney's Office. However, the references to the backpack's contents in the warrant application do not alter the outcome of the inevitable discovery analysis here, because the warrant application would have been supported by probable cause even without those facts based on, among other things, the Altoona Police Department officers' identification of the defendant; the significant planning and premeditation that went into the commission of the murder—including elaborate efforts to avoid identification and apprehension—and the comments made by the defendant in public forums, including at the Pennsylvania courthouse at the time of his first appearance, all of which would have established probable cause to believe that the backpack would have contained items that were used in the commission of the murder, the stalking and killing of the victim, and/or the flight from New York and efforts to hide following the murder. *See id.* at 1231 (rejecting argument that the warrant affidavit "was tainted by its reference to or inclusion of information obtained from the [illegal] sweep" because "[w]here a court can conclude from the search warrant affidavit that probable cause for the search existed, without reference to the tainted information, the search remains valid" (internal citations and quotation marks omitted)).

purposes of *Miranda*, the Second Circuit "use[s] a two-step, objective test, that asks whether: (1) a reasonable person in the defendant's position would have understood that he or she was free to leave; and (2) there was a restraint of freedom of movement akin to that associated with a formal arrest." *United States v. Santillan*, 902 F.3d 49, 60 (2d Cir. 2018) (citing *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016)). "For the second step, relevant factors are whether the suspect is told that he or she is free to leave, the location and atmosphere of the interrogation, the language and tone used by the law enforcement officers, whether the subject is searched or frisked, and the length of the interrogation." *Id.* at 60–61. In particular, in the context of an investigative stop, courts "look to[] the amount of force used by police, the need for such force, and the extent to which the suspect's freedom of movement was restrained" in order to "determine whether a stop is so intrusive that it becomes a *de facto* arrest." *Id.* at 61; *see id.* (noting that the court considers "the number of officers involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether handcuffs were used"). "[T]he 'ultimate inquiry' is whether a reasonable person would have understood the law enforcement agents' restraint on his freedom to equal the degree associated with a formal arrest." *United States v. Schaffer*, 851 F.3d 166, 173 (2d Cir. 2017) (internal quotation marks omitted).

There is an exception to the *Miranda* requirement, however, for "the solicitation of information concerning a person's identity and background," which the Second Circuit has held "does not amount to custodial interrogation." *United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir. 1988). Although such questions often arise in the context of post-arrest booking procedures, *see, e.g., United States v. Durand*, 767 F. App'x 83, 87 (2d Cir. 2019) (setting forth the prongs of the "booking exception to *Miranda*"), courts have also recognized that basic background questions outside of the booking context similarly do not amount to custodial interrogation requiring

*Miranda* warnings. *See United States v. Tavares*, No. 01 CR. 1115 (JFK), 2002 WL 31571662, at *6 (S.D.N.Y. Nov. 18, 2002) (finding that agents' questioning of defendant "on the street" and "before he was given Miranda warnings at the IRS Offices" fit within the "pedigree exception to *Miranda*" because such questioning, "designed to establish [the defendant's] true age and identity," does not amount to custodial interrogation); *United States v. Lavin*, No. 92 CR. 326 (JFK), 1992 WL 373486, at *1 (S.D.N.Y. Nov. 30, 1992) (where police approached defendant— who appeared similar to unidentified man recorded on video camera making unauthorized cash withdrawals—in parking lot and asked for "his name" and "identification," ruling that this "initial encounter" did not amount to custodial interrogation requiring *Miranda* warnings).

In order to determine whether information solicited in response to such questioning falls properly within the *Miranda* exception for pedigree information, courts look to whether the questions are "designed to elicit incriminating information." *United States v. Lopez*, 63 F. Supp. 2d 411, 413 (S.D.N.Y. 1999); *see Rosa v. McCray*, 396 F.3d 210, 222 (2d Cir. 2005) (in the context of statements to booking officer, stating that "[t]o determine whether the police abused the gathering of pedigree information in a manner that compels *Miranda* protection requires an objective inquiry: Should the police have known that asking the pedigree questions would elicit incriminating information?"). Moreover, the defendant's decision to provide false information in response to pedigree questions does not transform those questions into inquiries requiring *Miranda* warnings. *See United States v. Kadem*, 317 F. Supp. 2d 239, 242 (W.D.N.Y. 2004) (ruling that "[t]he fact that [defendant] allegedly lied and gave a false name and is now charged criminally with that is of no consequence in determining whether *Miranda* warnings should have been given"; recognizing that "[o]ne who makes false statements or commits perjury does so at his peril and the *Miranda* warnings were not designed to advise those in custody not to lie").

## B.  The Defendant's Statements Falsely Identifying Himself Are Admissible

With regard to the statements made by the defendant in McDonald's, the Government seeks to admit only the defendant's initial statements—made almost immediately upon being approached by Patrolmen Detwiler and Frye—providing his name, falsely, as "Mark" and "Mark Rosario." (GX 1 at 9:29).[33]  At the time that these statements were made—within approximately less than one minute of the defendant being approached by law enforcement—the defendant was clearly not in custody for purposes of the *Miranda* analysis and, accordingly, no *Miranda* warnings were required.

The circumstances of the defendant's interactions with law enforcement at the time of these initial statements provide no basis for concluding that "a reasonable person would have understood the law enforcement agents' restraint on his freedom to equal the degree associated with a formal arrest" such that *Miranda* warnings would be required.  *Schaffer*, 851 F.3d at 173 (internal quotation marks omitted); *see id.* at 60–61 ("relevant factors" include "the location and atmosphere of the interrogation, the language and tone used by the law enforcement officers, whether the subject is searched or frisked, and the length of the interrogation").  At the time of these statements, the defendant had been approached in McDonald's—a public place—by two law enforcement officers whose language and tone were calm and cordial.  *See United States v. Austin*, 729 F. Supp. 3d 396, 408 (S.D.N.Y. 2024) (where "Officers' language and questions reflect a cordial, calm demeanor," finding that "[t]he use of such language does not support a conclusion of an objective restraint of a degree associated with a formal arrest").  There had been, to that point, no physical

---

[33] The Government does not understand the defendant to be moving to suppress the false New Jersey identification that he produced from his pocket but, in any event, that identification would have been inevitably discovered during the search of the defendant's person incident to arrest and also during an inventory search of any property on his person.

contact between the defendant and law enforcement; he was neither frisked nor, crucially, restrained in handcuffs. *See Newton*, 369 F.3d at 676 ("Handcuffs are generally recognized as a hallmark of a formal arrest."). While in uniform, the officers never drew their weapons. *See United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011) (relevant circumstances include "whether weapons were present and especially whether they were drawn"). In fact, as indicative of the tone and tenor of the interaction, after falsely identifying himself, the defendant began preparing to eat his meal by unwrapping his food.

Under Second Circuit precedent, it is abundantly clear that questions asked in such circumstances do not constitute custodial interrogation for purposes of *Miranda*. *See, e.g.*, *Faux*, 828 F.3d at 138–39 ("two-hour interview" that "was conducted while" approximately 10 to 15 "officers swarmed about [the] home" not custodial for purposes of *Miranda*); *FNU LNU*, 653 F.3d at 154–55 (2d Cir. 2011) (secondary inspection at border not custodial even though interview "took place in a closed room, out of public view; armed guards escorted the defendant there and remained in the vicinity; it lasted for 90 minutes . . . ; [and the agent] took the defendant's fingerprints and did not inform her she was free to go").

The defendant argues that *Miranda* warnings were nonetheless required because "[f]rom the time they first approached Mr. Mangione, the officers intentionally placed themselves in such a way to ensure that Mr. Mangione could not leave," thus "ma[king] clear" to him that "he was not free to leave." (Suppress. Mot. at 45). As an initial matter, it is not evident that the presence of two law enforcement officers standing next to his McDonald's table—for, at that point, less than approximately one minute—would have made a reasonable person understand that he was not free to leave. But, in any event, this free-to-leave analysis alone cannot be dispositive for purposes of *Miranda*. *See Newton*, 369 F.3d at 670 (explaining that "[t]he free-to-leave inquiry

constitutes a necessary, but not determinative, first step in establishing *Miranda* custody" but that "[t]he ultimate inquiry" for determining *Miranda* custody" is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest" (internal citation and quotation marks omitted)); *see also Faux*, 828 F.3d at 135 (noting that "[a]lthough both elements" of the *Miranda* inquiry "are required," "the second is the 'ultimate inquiry' because a free–to–leave inquiry reveals only whether the person questioned was seized" and "[n]ot all seizures amount to custody"; "[A] seizure is a necessary, but not sufficient, condition." (internal citation and quotation marks omitted)).   Considering all of circumstances surrounding law enforcement officers asking for the defendant's name, it is clear that the defendant was not in custody for purposes of *Miranda* at the time he falsely identified himself.  *See Austin*, 729 F. Supp. 3d at 410 (finding no *Miranda* custody even "taking . . . as true" that "Officers physically blocked access to either of the exits in the garage" where the questioning occurred, in light of "the totality of the circumstances" considering, among other things, "the location, duration, and atmosphere of the interrogation," "the tone and language the Officers used," "the lack of any physical restraints" and the lack of any "display of weapons").

But, even if the defendant were in *Miranda* custody—and he was not—Patrolman Detwiler's questions regarding the defendant's name would fall within the exception to *Miranda* for soliciting basic, pedigree-type information.  *See, e.g.*, *Tavares*, 2002 WL 31571662, at *6.  That the defendant opted to provide false information in response to these pedigree questions, resulting in the Pennsylvania state charges pending against him, "is of no consequence in determining whether *Miranda* warnings should have been given."  *Kadem*, 317 F. Supp. 2d at 242.  Because the questions at issue were merely designed to establish the defendant's identity and not to elicit

incriminating information, *Miranda* warnings were not required. The defendant's motion to suppress his statements should be denied.

## **<u>CONCLUSION</u>**

For all of the reasons set forth above, the defendant's motions should be denied.

Dated:  New York, New York
         November 21, 2025

                                        Respectfully submitted,

                                        SEAN S. BUCKLEY
                                        Attorney for the United States Acting Under
                                        Authority Conferred By 28 U.S.C. § 515


                            By:     _____/s/_____
                                        Dominic A. Gentile
                                        Jun Xiang
                                        Alexandra S. Messiter
                                        Thomas John Wright
                                        Assistant United States Attorneys
                                        Tel.: (212) 637-2200