Q19HManC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

       v.                          25 Cr. 176 (MMG)

LUIGI MANGIONE,

                             Conference
          Defendant.
------------------------------x
                             New York, N.Y.
                             January 9, 2026
                             11:10 a.m.


Before:

                 HON. MARGARET M. GARNETT,

                             District Judge


                      APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
BY:  DOMINIC A. GENTILE
     JUN XIANG
     ALEXANDRA S. MESSITER
     THOMAS JOHN WRIGHT
     Assistant United States Attorneys

AGNIFILO INTRATER LLP
     Attorneys for Defendant
BY:  MARC ANTONY AGNIFILO
     KAREN FRIEDMAN AGNIFILO
     JACOB KAPLAN
     -and-
MOSKOWITZ COLSON GINSBERG & SCHULMAN LLP
BY:  AVRAHAM C. MOSKOWITZ
     EYLAN SCHULMAN
     CHRISTOPHER R. NEFF
     PARESH PATEL

Also Present:
Sofia Agnifilo, Defense

1          THE DEPUTY CLERK:  United States v. Luigi Mangione,

2    case No. 25 Cr. 176, counsel, please state your appearances for

3    the record, starting with the government.

4          MR. GENTILE:  Good morning, your Honor.  Dominic

5    Gentile, Jun Xiang, Alexandra Messiter, and Thomas John Wright,

6    for the United States.

7          THE COURT:  Good morning.

8          MS. FRIEDMAN AGNIFILO:  Good morning.  Karen Friedman

9    Agnifilo, Marc Agnifilo, Paresh Patel, Avi Moskowitz, Jacob

10   Kaplan, Eylan Schulman, Chris Neff on behalf of Luigi Mangione.

11   Also at counsel table is Sofia Agnifilo.

12         THE COURT:  All right.  Good morning, everyone.  You

13   can all be seated.

14         MS. FRIEDMAN AGNIFILO:  Good morning, your Honor.

15         THE COURT:  So, just a couple of housekeeping matters

16   before we begin, and that's we do have a live feed to an

17   overflow room.  I just want to tell all counsel and

18   Mr. Mangione that the audio is very sensitive on the feed to

19   the overflow room.  So if you need to confer with one another

20   or, Ms. Friedman Agnifilo, if you need to confer with your

21   client, even if you think you're whispering, it's very

22   important that you mute your microphone and any microphones

23   that are near you if you need to confer in a way that should be

24   private between counsel or between counsel and Mr. Mangione.

25         We have a full house here today, so some of you may

Q19HManC

 1  not be familiar with how we do things here.  But this is a

 2  federal courtroom.  It's very important that decorum be

 3  maintained.  What does that mean?  That means there's not to be

 4  any outburst from the gallery.  No one is to stand unless

 5  they're instructed to stand.  There's a small number of you

 6  that are allowed to have electronic devices with you.  I would

 7  just ask everyone who's in that category to take a moment, make

 8  sure those devices are fully on silent.  If any device makes

 9  any noise during the proceeding, the device will either be

10  confiscated or you will be removed or both.  So just take a

11  moment to do that.

12        I apologize.  Like everyone in New York City, I seem

13  to be getting over a cold.  So I apologize for my raspy voice,

14  and a cough drop may have to be employed.

15        Pending before the Court, and our purpose for being

16  here today, are a number of defense motions: first, a motion to

17  order the government to provide additional information on the

18  aggravating factors it intends to prove at any potential death

19  penalty phase; second, a motion to strike the notice of intent

20  to seek the death penalty on a variety of grounds, both

21  constitutional and otherwise; third, a motion to dismiss Counts

22  Three and Four, which, in sum and substance, charge the

23  defendant with discharging a firearm in furtherance of a crime

24  of violence and committing murder with a firearm in furtherance

25  of a crime of violence on the ground that the charged predicate

Q19HManC

1    crimes of stalking do not qualify as crimes of violence as a

2    matter of law; and, fourth, motions to suppress statements the

3    defendant made at the time of his arrest and to suppress the

4    contents of his backpack seized at the time of his arrest.

5            I know we had discussed last time we were together

6    setting a trial date at this conference, but because the

7    outcome of the defendant's motion to dismiss Counts Three and

8    Four will significantly affect the timeline of any trial in

9    this matter, I don't think we can do that today.  And just to

10   add a little more color to that and explanation for the public

11   that is here, if I were to grant the defendant's motion to

12   dismiss those two counts, the defendant would still be facing a

13   potential sentence of life imprisonment, but this case would no

14   longer be capital eligible under federal law, which would, of

15   course, moot a number of the defendant's other motions and make

16   scheduling and conducting the trial significantly easier.

17   However, if I were to grant that motion, the government would

18   have the right to appeal that decision to the Second Circuit,

19   which could materially delay any trial on the remaining counts.

20   If I were to deny the defendant's motion to dismiss, I would

21   then proceed to decide his motions addressed to the potential

22   death penalty in this case, and then we would reconvene

23   promptly to set a date for the start of jury selection and for

24   the start of the trial.

25           So given the pivotal importance of the motion to

Q19HManC

1  dismiss Counts Three and Four, I have instructed counsel to be

2  prepared to argue that motion and to answer my questions today.

3       Now, before we turn to that, I just want to spend a

4  little bit of time on the suppression motions.  The defendant

5  originally filed two suppression motions: one to suppress his

6  statements made to law enforcement officers at the McDonald's

7  restaurant in Altoona, Pennsylvania, where he was arrested, and

8  one to suppress the contents of his backpack seized from the

9  McDonald's at the time of his arrest.

10       As to the first motion, in light of the government's

11  representation that it would only seek to offer at trial two

12  statements the defendant made identifying his name as Mark or

13  Mark Rosario and, in reliance on that representation, the

14  defendant has informed me that he intends to withdraw his

15  motion to suppress his statements, I just want to confirm with

16  you, Ms. Friedman Agnifilo, that that is still the defendant's

17  intent.

18       MS. FRIEDMAN AGNIFILO:  Yes, your Honor.

19       THE COURT:  All right.  So, accordingly, that motion

20  is denied as moot.

21       Turning to the second motion, in my December 31 order,

22  while I noted that I did not need oral argument on the legal

23  issues in the motion, I did ask counsel to provide the Court

24  with their views as to whether an evidentiary hearing was

25  necessary to address the government's arguments regarding two

Q19HManC

exceptions to the warrant requirement urged by the government:
a valid inventory search or the doctrine of inevitable
discovery or, of course, any other aspect of the defendant's
motion to suppress the contents of his backpack.

        I also asked counsel if they believed an evidentiary
hearing was necessary to identify the specific facts that were
either disputed or unknown but necessary to resolving the
motion.  In response, the government asserted that no hearing
was required because, at a minimum, the inevitable discovery
exception concerns a question of law that can be decided by the
Court on the present undisputed record.  The defendant,
however, asserts that a hearing is necessary, primarily, as I
understand, for three reasons: first, that there's a disputed
question of fact as to whether the backpack falls within the
Altoona Police Department's written policy on inventory
searches; second, because a hearing would illuminate whether
the Court can consider Government Exhibit 5 in deciding the
first question, because Exhibit 5 is an undated document from
training materials for probationary officers in the
Altoona Police Department; and, third, because the Court should
look at the actions actually taken during the purported
inventory search by Altoona police officers and determine that
those actions exceeded the bounds of a proper inventory search
primarily by reading some of the contents of a journal found in
the defendant's backpack.

Q19HManC

1          I'd like to take those in reverse order.  So starting

2    from the third issue, I don't see a basis for a hearing on that

3    issue because the *Mendez* factors specifically contemplate an

4    assessment of the hypothetical search that would have been done

5    pursuant to established procedures rather than looking at what

6    officers actually did.  In other words, what *Mendez* teaches and

7    the cases citing it in the circuit, is that the court has to be

8    very careful not to conflate the inventory search exception and

9    the inevitable discovery exception.  And here, looking at

10   inevitable discovery, what officers actually did is of limited,

11   if any, relevance.

12         And as to the contents of the journal, the government

13   also points out in their letter that later search warrants

14   allowed for access to the contents of the journal, and those

15   warrants were obtained without reliance on those contents to

16   establish probable cause to search the journal.

17         So without even getting into the government's waiver

18   argument in its January 8 letter, I don't see a basis for a

19   hearing on that particular issue.

20         Mr. Agnifilo, is there anything additional you would

21   like to say on that particular argument?

22         MR. KAPLAN:  Judge, just briefly.

23         THE COURT:  If you could identify yourself for the

24   record.

25         MR. KAPLAN:  Jacob Kaplan.

Q19HManC

1          In *Mendez*, the court was determining whether, if the

2    policy and procedures were followed, the evidence would be

3    recovered.  The purpose for our argument is to say is that if

4    those policies were followed in this case, they still would not

5    have had permission to go ahead and read the contents of the

6    journal.  It's no different if they recovered a laptop or a

7    phone.  Just based on the inventory rules which will allow them

8    to inventory the fact that they recovered it, that would not

9    give them permission to go and open the laptop or open the

10   phone.  It's no different here than the journal.  The inventory

11   procedure would allow them to mark the fact that they recovered

12   a journal.  It would not give them, under their guidelines, the

13   right to go ahead and read the journal, read the contents of

14   the journal.  So under *Mendez*, I would say——

15          THE COURT:  Let me just stop you for a minute because

16   I certainly understand that, but I think the point that I'm

17   trying to make is that, fine, they did that, and it appears

18   undisputed that some of the officers did read some of the

19   contents of the journal.  But the government is not relying on

20   the fact that those officers read through some parts of the

21   journal in the course of making their inventory search; rather

22   for the contents, they've explicitly said that those contents

23   were permissible by a court-authorized search warrant, the

24   affidavit of which made no mention of the contents of the

25   journal.

Q19HManC

1          So the question for the exclusionary rule is, what are

2     we trying to deter?  And normally, as I understand *Mendez* and

3     the other inventory search cases, there's kind of a presumption

4     that something improper has happened, right?  The only reason

5     you get to an inevitable discovery exception or inventory

6     search exception is because, at some point prior to that, the

7     evidence has been obtained in a way that arguably exceeds the

8     bounds of the Fourth Amendment.

9          So, given the government's argument about the journal

10    specifically, why do I need an evidentiary hearing to find out

11    in my own court, under oath, what those Altoona officers did

12    with the journal?

13          MR. KAPLAN:  To the extent that the government is

14    relying on this concept of inevitable discovery through a

15    search warrant, which they mention as a footnote, the question

16    would be——and what the Court needs to decide——is whether or not

17    there was enough evidence——enough allegations in the search

18    warrant absent the allegations relating to the search of the

19    backpack, because they've not provided the Court with the

20    search warrant, right?  If the Court reviews the search

21    warrant, the Court will see that they actually did reference

22    the illegal search of the backpack.

23          THE COURT:  Right, but we have to take each piece of

24    evidence separately, right?  So I understand the search warrant

25    referenced items recovered from the backpack, but as to the

Q19HManC

```
 1    journal specifically, the government has represented that the

 2    affidavit did not discuss anything that was written in the

 3    journal that arguably should not have been read in the course

 4    of an inventory search.

 5            MR. KAPLAN:  But that's not the question.  The

 6    question is, in the search warrant, absent reference to the

 7    illegal search of the backpack——forget the contents.  The

 8    question would be, is there enough in the search warrant?  Once

 9    you take out all the references to the illegal search of the

10    backpack——forget the contents of the journal, the actual

11    illegal search of the backpack——whether or not there's enough

12    left in that search warrant to justify a probable cause for

13    them to search the backpack and the journal.  So it's two

14    separate, really, issues here.

15            THE COURT:  Right.  But you're assuming that there's

16    no other valid exception that would apply to any aspect of the

17    backpack search because the government, yes, in a footnote,

18    argued that everything in the backpack would be inevitably

19    discovered because of the warrants, and I should parse the

20    warrant to remove any reference to its contents.  But what I'm

21    asking about now is just specifically about the journal.  I

22    don't think there's any dispute that the journal, the contents

23    of the journal, are not referenced in the search warrants

24    obtained by the government or by the Manhattan District

25    Attorney's Office.  Is that correct?
```

Q19HManC

1          MR. KAPLAN:  So in the search warrant——which, again,

2     the Court has not been provided with the search warrant——but in

3     the search warrant——

4          THE COURT:  I can solve that problem.

5          MR. KAPLAN:  Yes, hopefully, we can.

6          In the search warrant, there is reference to the fact

7     that law enforcement did obtain pictures of what was inside the

8     journal.  In other words, the Altoona Police Department took

9     pictures of every page of the journal.  They gave that to

10     federal law enforcement.  Federal law enforcement reviewed

11     those pictures.  And what they're saying is, yeah, we reviewed

12     it, but nothing in this warrant is relying on those contents,

13     right?  That's the assertion that they made.

14          You know, what my point is and what our point is is

15     that the Court can't simply focus on the contents of the

16     journal.  The Court should focus on whether, when we remove the

17     illegal nature, the illegal information that they had——in the

18     total search warrant, is there enough probable cause to support

19     it?  Only then, only if the Court finds that there was enough

20     probable cause absent not just the contents of the journal but

21     the contents of the backpack, if the Court determines that,

22     then the Court can say, OK, it's a valid search warrant.  That

23     valid search warrant will allow them to search the contents of

24     the journal.  But the Court can't jump to the final step and

25     say, well, they didn't rely on the journal contents; therefore,

Q19HManC

1    the search warrant's OK.  That's not the concern.  The concern

2    is they relied on the contents of the backpack, which, at the

3    end of the day, we have very good arguments to show that that

4    was illegal.

5            THE COURT:  Right.  But in analyzing any suppression

6    issue, don't I have to address each piece of evidence that the

7    government might want to offer at the trial?  I mean, because,

8    really, this is what——the only relevance of this question is if

9    the government has evidence that they intend to offer at trial

10   against Mr. Mangione, right?  So what officers did or didn't do

11   might be relevant to a civil lawsuit, but the question that a

12   suppression motion has to decide is, as to each piece of

13   evidence that the government might seek to offer at trial,

14   should that evidence be suppressed?

15           So I definitely understand that you have arguments

16   that that would lead to the conclusion, if I accepted them,

17   that the entirety of the contents of the backpack should be

18   suppressed.  I understand that.  But in terms of the analysis

19   and the need for any kind of evidentiary hearing, am I correct

20   that, assuming that I rule for the government on either

21   inventory search or inevitable discovery for everything else,

22   other than the contents of the journal, and then the government

23   is relying on the search warrants that were obtained, and I've

24   already decided that everything else was lawfully seized and

25   does not need to be suppressed, then isn't the proper question

Q19HManC

1    whether the contents of the journal were used to obtain the

2    search warrant?  And if they were, and I excise any reference

3    to that, if I think the search warrants still establish

4    probable cause, that that would be kind of a two-step

5    inevitable discovery for the journal?

6         MR. KAPLAN:  If the Court would follow that process by

7    which it would find that the contents of the backpack——forget

8    the journal, the contents of the backpack——would be admissible

9    under inevitable discovery plus inventory search, then I guess

10    what the Court is arguing or saying is that they, therefore,

11    can rely on the contents of the backpack in support of the

12    search warrant.

13         THE COURT:  Well, that's my question to you, if you

14    have a disagreement with how I have set out the analysis.

15         MR. KAPLAN:  So I think if the Court would find that,

16    based on the inevitable discovery based on the inventory

17    search, right, which I think the Court should have a hearing

18    on——

19         THE COURT:  Right we're going to get to that in a

20    minute.  One thing at a time.

21         MR. KAPLAN:  So, yes, if the Court finds that, then I

22    would agree with the Court's analysis that once the Court has

23    found that the contents of the backpack would be OK based on

24    some other reason and the only issue would be the contents of

25    the journal, then the Court would have to look at the warrant

Q19HManC

1    to see whether, taking out any reference——because there are

2    references to the journal——if there's probable cause.  So I

3    would agree with the Court on that.

4              THE COURT:  All right.  That's very helpful.  Thank

5    you.

6              Mr. Gentile, I don't mean to leave the government out

7    of this.  Is there anything on that specific issue that you'd

8    like to add, or Ms. Messiter?

9              MR. GENTILE:  Ms. Messiter's going to handle that

10   issue.  Thank you, Judge.

11             THE COURT:  Ms. Messiter, on that particular question,

12   anything that you'd like to add?

13             MS. MESSITER:  No.  As your Honor suggested, the

14   government is not relying on the inventory search or inevitable

15   discovery doctrines as to the contents of the notebook, but

16   rather on a traditionally authorized search warrant allowing

17   the government to search those contents.  And that warrant

18   application expressly disclaims reliance on the contents of the

19   notebook.  None of those contents were included in the warrant,

20   and so they weren't before the judge making the probable cause

21   analysis there.

22             And so, just as your Honor has suggested, as long as

23   there are, as we submit that there are, valid exceptions as to

24   which the other contents of the backpack fall, that warrant

25   would cover the contents of the notebook, and no hearing would

Q19HManC

 1    be necessary on that front.

 2              THE COURT:  All right.  Thank you, Ms. Messiter.

 3              MR. KAPLAN:  This may be a technical point, but it

 4    seems the government is relying on inevitable discovery through

 5    a search warrant.  So I think it's incorrect to say that

 6    they're just relying on the search warrant.  In their own

 7    motion papers, in the footnote they say it's inevitable

 8    discovery because of the search warrant.  So they're marrying

 9    the two together.  It's not independent, just a search warrant.

10              THE COURT:  Well, yes, I understand that.  I

11    understand that.  For many of these issues, there's multiple

12    steps required.  So thank you for raising that, but I think I

13    do understand that point.

14              But while I have you, Ms. Messiter, as to the second

15    argument, whether Exhibit 5 could be considered by the Court

16    without an evidentiary hearing, so let me just ask you whether

17    the government intends to rely on Exhibit 5 for your inevitable

18    discovery arguments or whether you think Exhibit 6 is

19    sufficient for that?

20              And just for those following along, Exhibit 5 is an

21    undated document from the Altoona Police Department related to

22    training of probationary police officers.  Exhibit 6 are

23    general orders from the Altoona Police Department.

24              Ms. Messiter.

25              MS. MESSITER:  Your Honor, Exhibit 6 is sufficient, in

Q19HManC

1    the government's view, to rely on to establish that the Altoona

2    Police Department had an inventory search procedure pursuant to

3    which all items taken from those arrested or detained would be

4    searched.

5            That said, your Honor, we do think that Exhibit 5,

6    it's clear from the face of the document, which sets forth

7    operational procedures, that it is the current procedures of

8    the department.  However, your Honor, we do think—

9            THE COURT:  I'm sorry to interrupt you, Ms. Messiter,

10   but on what basis am I supposed to know that that document

11   reflects the current procedures of the Altoona Police

12   Department or, more importantly, those that were in place in

13   December of 2024?

14           MS. MESSITER:  Your Honor, the document is headed at

15   the top "Custodial Arrest Procedures:  Summary, Misdemeanor,

16   and Felony Offenses," and the specific provisions on which we

17   are relying is within a section entitled "Operational

18   Procedures."  And so we think it is clear from the face of the

19   document that these were the procedures in place for the police

20   department.

21           THE COURT:  Well, I mean, I'm just struggling with

22   that a little bit, Ms. Messiter.  Because while I certainly

23   accept the government's representation, I can't make an

24   evidentiary finding based solely on the government's

25   representation, I think.  And it would be common for police

Q19HManC

1    departments to revise procedures, to have old things in a

2    drawer that have been superseded by other procedures, and so I

3    just want to press you a little bit on the basis on which I can

4    accept the government's representation that that document

5    reflects procedures that were in place in December of 2024.

6          MS. MESSITER:  So, your Honor, we would again

7    reiterate that we do think, to be clear, that the general

8    orders are sufficient to resolve the questions at issue.  If

9    your Honor needed further fact-finding as to the dates during

10   which this custodial arrest procedures document was in effect,

11   the government could, of course, call a single witness from the

12   Altoona Police Department, limited to that question of, was

13   this document the procedures in effect during the relevant time

14   period?  But, again, we don't think that exercise is necessary

15   because we think that the general orders are sufficient for

16   resolving the questions before the Court.

17         THE COURT:  Thank you, Ms. Messiter.

18         On that issue, Mr. Kaplan, anything you'd like to add?

19         MR. KAPLAN:  I agree with the Court about Exhibit 5.

20   But about the general orders, I would just say it's unclear

21   from just reading the face of the general orders that it would

22   apply to both the search——inventory search of the defendant's

23   person as well as any belongings he may have had.

24         THE COURT:  We're going to get to that.  That's

25   question number one.  But, again, just one thing at a time.

Q19HManC

1          So specifically on the things——my conversation with

2     Ms. Messiter about Exhibit 5, is there anything you'd like to

3     add about that?

4          MR. KAPLAN:  Just what we added in our filing, that

5     when it comes to guideline 3.1, it says specifically that it's

6     meant to govern this situation, and there's no equivalent thing

7     with Exhibit 5.  So, here, we know that 3.1 applies to this

8     situation.  There's no basis for us——for the Court to find,

9     absent an evidentiary hearing, that Exhibit 5 would do the

10    same.

11         THE COURT:  All right.  So now getting to, I think,

12    the meat of the question about a hearing, a need for a hearing,

13    and this is the first argument that I identified, so——you're up

14    again, Mr. Kaplan.  So just stay on your feet.

15         So I have a number of questions:  Exhibit 6, which

16    contains general order 3.1.10 of the Altoona Police

17    Department——I'm just turning to it now——says, and I'm going to

18    quote from the government:  "A documented, itemized inventory

19    of all items taken from the detainee must be completed at the

20    time of booking."

21         Here's the difficulty I'm having:  Based on the

22    factual record recited by both the government and the defendant

23    and my own review of the body-worn camera footage from the

24    McDonald's restaurant, it seems to me that it is undisputed

25    that the backpack was next to Mr. Mangione while he was sitting

```
 1    down at a table in the public seating area of the McDonald's.

 2    Am I correct so far?  That's undisputed, right?

 3         MR. KAPLAN:  It was next to him at the beginning.  At

 4    one point it was, yes.

 5         THE COURT:  Yes.  Second step, I think it's undisputed

 6    that officers initially moved the——during the initial

 7    conversation, police officers moved the backpack out of

 8    Mr. Mangione's immediate reach to a nearby table.  Am I

 9    correct?  That's an undisputed fact, right?

10         MR. KAPLAN:  That is correct.

11         THE COURT:  OK.  Third step, during the course of this

12    initial encounter, the officers asked Mr. Mangione if the

13    backpack was his, and he said yes, it was, correct?

14         MR. KAPLAN:  That's correct.

15         THE COURT:  This encounter ultimately culminates

16    roughly 15 to 20 minutes later with Mr. Mangione's detention

17    and arrest.  The backpack, additional clothing that was removed

18    from him as well are all taken to the police station, correct?

19         MR. KAPLAN:  Correct.

20         THE COURT:  So given those undisputed facts——and I

21    should just ask, Ms. Messiter, does the government agree with

22    the factual recitation I've set forth?

23         MS. MESSITER:  Yes, your Honor.

24         THE COURT:  So I'm a little bit confused by the

25    argument in your January 6 letter that the backpack isn't
```

Q19HManC

1    clearly within the category of "all items taken from the

2    detainee."  Because the backpack is clearly his person

3    property, right?  No one disputes that.  He said it was his.

4    It's with him when he's arrested in a public place.  The police

5    took it from his custody and control in a single course of

6    conduct that culminated in his arrest.  He's being detained and

7    then arrested, and the police have to safeguard his personal

8    property.

9            So what am I missing from that, my recitation of these

10   events?  What is disputed?

11           MR. KAPLAN:  Yes, so two things, two areas, which I

12   think the Court needs to focus on:  The Court's been citing

13   3.1.10 of the general orders.  If you look at 3.1.9, which is

14   right before it, it's talking specifically about searches of

15   the defendant's person——a detainee's person.  They're clearly

16   not talking about other property, backpacks or anything,

17   referring to——

18           THE COURT:  But it's in a separate section of the

19   orders talking about what happens when the prisoner is in the

20   police station.

21           THE DEFENDANT:  Yes, but that's the second point I'm

22   making, which is at the state suppression hearing, when this

23   issue came up and we asked officers about this, their testimony

24   was that 3.1.10 would cover anything that he had on him or——or

25   that he had at the time of his arrest.  It is our position that

1    at the time of his arrest, the backpack had been moved ten feet

2    away.  There'd been a number of officers in between then.  He

3    did not have custody or control of the backpack.  And if the

4    Court's going to read "from the defendant" to be so broad,

5    well, what's stopping them from going into his car?  It belongs

6    to the defendant also, so it's from the defendant.  So I'm

7    trying to limit——

8            THE COURT:  I don't think that's right, Mr. Kaplan,

9    because, I mean, he's being removed from a public place.  What

10   if he has a wallet with credit cards and hundreds of dollars in

11   cash sitting on the table at the McDonald's, and while the

12   police are talking to him, they move everything they haven't

13   searched away from his immediate grab area, which they're

14   entitled to do for their own safety and public safety?  Are

15   they supposed to leave the wallet——they can't take the wallet?

16   Or what about car keys or house keys or a cell phone that's

17   sitting on a park bench next to a person who's about to be

18   arrested?

19           I take your argument that they can't then——if a

20   defendant is arrested in his home, in a secured area, the

21   police are not permitted to just take anything they see.  They

22   can't, like, go into a locked car and say, well, this is his

23   property that's near him at the time of arrest.  But I don't

24   think it's really disputed that if you're arrested in a public

25   place, the police are supposed to safeguard your personal

Q19HManC

1    property.

2            So I guess I'm just not—even looking at the testimony

3    that you cited from the state hearing, the quote that's in that

4    letter—I'm quoting from page 2 of your January 6 letter:

5    Sergeant Jon Burns of the Altoona Police Department testified

6    that this order pertained to inventorying property that was

7    taken from the detainee's person and "any property that he had

8    with him at the time of being detained or arrested."  And just

9    in terms of ordinary English, I just am not following the

10   argument that the backpack is not personal property that he had

11   with him at the time of being detained or arrested.

12           MR. KAPLAN:  So I'm making the distinction between

13   personal property that he has on him versus personal property

14   that was no longer on him.  It was in a different area,

15   different section over here.  It's not as simple as it was on

16   the table in front of him.  This was ten feet away at the

17   point—the time of his arrest.  If the Altoona parole guide

18   wanted to say specifically that they can go into backpacks and

19   stuff, they could have said that.

20           THE COURT:  It's not about going into the backpack;

21   it's about taking the backpack to the police station so that an

22   inventory search can be done.  Let's not talk right now about

23   whatever they did with the backpack in the McDonald's.  That's

24   a separate issue.  The question is this general order, which

25   relates to inventory searches, that happens once they have the

1    backpack in the police station.  So as to that question, it's

2    his personal property in a public place that is with him at the

3    time he's approached by police.  No one else can take custody

4    of it.  He's by himself, and the police have to——I mean, the

5    difficulty I'm having, being sort of quite experienced with

6    what happens when someone is arrested, is I don't understand

7    the argument that there has to be some additional proof before

8    they can safeguard, when a defendant is being arrested in a

9    public place, the valuable personal property that he says is

10   his——a wallet, a cell phone, a bag, a purse, keys.

11          And just in the ordinary English meaning of "property

12   that is with him at the time of his detention or arrest," what

13   would a hearing——what might come out at a hearing that would

14   change that analysis?

15          MR. KAPLAN:  Yes, based on just the reading of the

16   patrol guide, the Court is right, it may give them the

17   opportunity to safeguard the property, but in order to go ahead

18   and inventory and actually go through the property, I think

19   that what 3.1.10 is talking about is not property that was not

20   on the defendant.  And I would agree with the Court.  They

21   would be allowed to safeguard it.  They can take it.  But I'm

22   saying that I don't think under 3.1.10 that would allow them to

23   actually inventory and go through it.  I think there are two

24   separate issues:  Can they safeguard it?  Yes.  Can they

25   actually go through it as part of inventory?  That's not what

Q19HManC

1    3.1.10 is doing.  And the purpose of the hearing would be to

2    have actual testimony.  We don't have to guess.  We don't have

3    to speculate.  We would have actual testimony from people in

4    the Altoona Police Department as to what their general

5    understanding is about these guidelines and whether or not

6    these guidelines would apply in this sort of situation.  And to

7    the extent that there was a state court hearing in which this

8    came up, it's not the same as the Court conducting its own

9    hearing and viewing actual witnesses.

10            THE COURT:  No, I understand.  But it was your letter

11   that pointed me to that testimony, so I'm just following up

12   about what I think the plain meaning of that testimony is if

13   I'm to rely on it at all.

14            MR. KAPLAN:  I put it out there so the Court would

15   know what the purpose of a hearing would be.  We have testimony

16   about this——at a hearing on this we would have actual testimony

17   from an officer in front of your Honor discussing these issues

18   and the parameters of their answering of 3.1.10.

19            THE COURT:  OK.  Understood.  Thank you, Mr. Kaplan.

20            Ms. Messiter, anything you'd like to say about that?

21            MS. MESSITER:  No, your Honor.  In our view, the

22   policy is clear on its face.  The documented itemized inventory

23   of all items taken from the detainee must be completed.  It's

24   of no moment that a preceding section deals separately with

25   searches of the person, of the detainee.  That's not what we're

Q19HManC

```
 1    relying on here.  And we certainly agree that the arguments
 2    presented by the defense here would lead to absurd results by
 3    which either the police officers would have to leave the
 4    property of arrestees wherever they happened to find it at the
 5    time the person was arrested, or the property is somehow no
 6    longer the defendant's property and therefore is, I suppose,
 7    abandoned, in which case these arguments don't really arise
 8    anyway.  So we think that this policy is clear on its face and
 9    there is no hearing that's needed in this regard.
10            THE COURT:  All right.  Thank you both very much.
11            At present, I don't think a hearing is necessary.  I
12    want to give some additional thought to the arguments that the
13    defendant has made today.  And so if, upon reflection, I change
14    my view, I'll let you know promptly, and we'll schedule that
15    within the next couple of weeks.
16            All right.  So turning to our main task today, which
17    is to hear argument on the defendant's motion to dismiss Counts
18    Three and Four, I understand, Ms. Friedman Agnifilo, that
19    Mr. Patel is going to be making that argument for the
20    defendant.
21            MS. FRIEDMAN AGNIFILO:  Yes, your Honor.  Thank you
22    for accepting our *pro hac vice* motion on behalf of Mr. Patel.
23            THE COURT:  I'm happy to do that.
24            Mr. Patel, welcome.  We're happy to have you here as a
25    guess from Maryland.  Given the length of time, I think it
```

Q19HManC

1  would make more sense for you to speak from the lectern, if

2  that's all right.

3          MR. PATEL:  That would be great.  Thanks, your Honor.

4          THE COURT:  I've allotted 30 minutes to each side for

5  this argument.  And since it's your motion, Mr. Patel, would

6  you like to reserve any time for rebuttal?

7          MR. PATEL:  Yes, your Honor.  Can I reserve four

8  minutes for rebuttal, please?

9          THE COURT:  Just for everyone's planning and for the

10  sake of the court reporters, my expectation will be that we'll

11  take a brief break after Mr. Patel's argument before the

12  government argues, in case anyone needs a break and to give our

13  court reporters a brief rest.

14          Just before you start, Mr. Patel, I want to tell you,

15  in fairness, that you can use your time however you want.  You

16  should expect me to interrupt you a lot because I have many

17  questions.  But I just want to advise you, don't spend much

18  time on the divisibility of the statute between——

19          MR. PATEL:  I understand, your Honor.

20          THE COURT:  ——subpart A and B of parts 1 and 2.

21  Again, I'm happy to hear you, and you can use your time however

22  you want.  But it's only fair to tell you that I think it's

23  pretty clear that the statute is divisible and into at least

24  those four crimes.  So subpart——part 1 into subparts A and B,

25  part 2 into subparts A and B.  But, again, I'm happy to let you

Q19HManC

1    try to convince me otherwise, but I want you to use your time

2    in the way that would be most helpful to you and to the Court.

3    So that's my just starting advice, not to spend a lot of your

4    time on that issue.

5        MR. PATEL:  Thank you, your Honor, and that wasn't my

6    plan today.  I think that there's three arguments that we've

7    made, and the first one is about the divisibility.  So each

8    statute is indivisible and has at least one means, the

9    emotional distress subsection, that never qualifies.  That's

10   the first point.

11       THE COURT:  And I think the government doesn't——at

12   least as to whether subpart B of either part would qualify, I

13   don't think the government——I understand the government to be

14   conceding that the substantial emotional distress way of

15   committing this crime would not qualify.  So I think that's one

16   place of agreement.

17       MR. PATEL:  That's my understanding.  OK.  Yes.

18       Where I want to spend my time, your Honor, is on this

19   second argument that, even if the stalking statutes are

20   divisible between subsection B, the emotional distress

21   subsection, and subsection A, the reasonable fear of injury

22   subsection——that's what I'm going to call it.  There's so many

23   words here——it still fails to qualify as a crime of violence

24   because it can be committed by a threat of self-harm, i.e., by

25   the defendant threatening force against himself.

1          And then the third argument is that subsection A fails

2    to qualify as a crime of violence because it does not require

3    the purposeful or knowing threat of force.  But, again, like I

4    said, your Honor, what I want to really focus on today is that

5    second argument on the threat of self-harm, because I think

6    that's the easiest way, that's the cleanest way, for the Court

7    to give relief to Mr. Mangione today, because that argument is

8    supported by the plain language of the statute, directly

9    on-point authority, *United States v. Plunkett*, and there are no

10   cases to the contrary that exist.  So, your Honor, I will start

11   with that argument.

12          So turning to that argument, the plain language of

13   subsection A criminalizes the act of placing the stalking

14   victim in fear of injury to a family member, to a spouse, or

15   intimate partner of that stalking victim, which is referred to

16   as "that person" in the statute.  Because family member,

17   spouse, or intimate partner can be the defendant himself, your

18   Honor, this subsection A fails to qualify as a crime of

19   violence under the force clause, which, as you know, requires

20   threat of force against the person of another.

21          Now, your Honor, the two courts have agreed with us.

22   We have *United States v. Plunkett*, which is the written

23   decision, and then there's *U.S. v. Ali II*, and the government

24   referenced that.  I looked it up yesterday.  There's not a

25   written decision yet, so we just have the oral decision right

Q19HManC

1    now.  But my understanding is that the court is going to

2    wholesale adopt the *Plunkett* analysis, and, again, I just want

3    to repeat, there's no authority to the contrary.  Now, your

4    Honor, you should join that chorus because in *Plunkett*——I think

5    this is really key——the court explained that it had no

6    difficulty envisioning situations that could satisfy all the

7    elements of interstate stalking but not necessarily involve the

8    use, attempted use, and threatened use of physical force

9    against a person.  Now, I understand in *Plunkett* one difference

10   was there wasn't the death results factor, but that——

11            THE COURT:  Let's put a pin in that, and we'll circle

12   back to the death-resulting question.

13            MR. PATEL:  Yeah.  But, your Honor, what I wanted to

14   say is that there are very plausible ways here in which this

15   can happen, in which there can be a threat of self-harm.  We've

16   given some examples, and I don't think it changes with the

17   death results.  So I'm happy to give you more examples.

18            THE COURT:  No, I mean, I think the examples are sort

19   of self-evident.  It's relatively easy to imagine, in a literal

20   reading, in a domestic violence context, where an estranged

21   spouse or partner——or even a stranger, but I think more likely

22   a stranger wouldn't be within your example, right, because they

23   need to be one of the proxy individuals identified in the

24   romanette subparts.

25            MR. PATEL:  Absolutely.

Q19HManC

1          THE COURT:  So an estranged husband or partner who

2     gets the victim to do what they want in the past and in the

3     charged incident by threatening, I'll kill myself if you don't,

4     I'll cut myself, I'll jump off this bridge, I'll crash this car

5     right into the, you know, abutment.  So I don't think I need

6     the examples.  I think there's a couple of issues that I think

7     would be helpful to address, and maybe we'll start with the

8     death-resulting issue, because I guess my first question is, do

9     you agree that, as charged here, death resulting is an element

10    of the offense that must be proven to a jury beyond a

11    reasonable doubt?

12         MR. PATEL:  Your Honor, I am not disputing that.

13         THE COURT:  OK.  I didn't think you were, but it's

14    always good to make sure.

15         MR. PATEL:  Yeah.  Thank you.

16         THE COURT:  So assuming yes, does that element charged

17    here affect the crime of violence analysis, and if so, how

18    should it affect my thinking?  And if you could just talk a

19    little bit about *Tsarnaev* and *Runyon* and the views of those

20    courts that, in talking about those predicate crimes, their

21    conclusion was that death resulting made it impossible to

22    commit the crime as charged without the use of violence.

23         MR. PATEL:  Well, your Honor, yes, I'm happy to talk

24    about *Tsarnaev* and *Runyon*.  One thing to keep in mind, the

25    landscape was very different when *Runyon* came out.  *Runyon*

Q19HManC

1    relies on the realistic probability, right?  Since then we have

2    clear law, *Taylor v. United States*, which said we do no longer

3    rely on realistic probability for federal offenses, and *Elkins*

4    said that too.  In fact, in *Runyon II*, the Court said we can

5    imagine a situation, right, where death would result——and that

6    was, I believe, a conspiracy to murder for hire resulting in

7    death——but they really hinged the opinion on the realistic

8    probability.  So I don't think that case is apposite here.

9              THE COURT:  Can I just press you a little bit, while

10    we're talking about Taylor and realistic probability.

11              MR. PATEL:  Yes.

12              THE COURT:  Would you agree with me that there's two

13    ways to think about what the realistic probability test means

14    in *Taylor*'s context, right?  One way is the kind of test that

15    had grown up that is very clearly rejected in *Taylor*, which is

16    the notion that a defendant has a burden to show that there's a

17    realistic probability that his case——or some imagined

18    hypothetical case——that there's a realistic probability that

19    such a case would be charged and prosecuted and kind of some

20    empirical showing that that was a real danger that the court

21    had to worry about.  In *Taylor*, I agree with you, *Taylor* very

22    clearly says that, absolutely not, no defendant is required to

23    do that, and in fact, that's not even a relevant inquiry.

24              I think the question that is maybe left unanswered by

25    *Taylor* is whether realistic probability is viable still in the

Q19HManC

1    sense of where older statutes don't use the exact words of the

2    crime of violence definition, that a court has to look at the

3    words that are used and ask itself, do these words mean——given

4    the laws of physics and the nature of human interaction, do

5    these words mean that you couldn't do these words; it's a

6    practical impossibility to do these words without using,

7    attempting, or threatening to use violence?

8        MR. PATEL:  Your Honor, if it's an impossibility, I

9    agree with you, but if it is plausible, if there's any way that

10   it's plausible and it could be prosecuted, then the government

11   loses.  In fact, in *Taylor* itself, the court turned to

12   hypotheticals.  That's the way that we have to do the inquiry

13   now, because, you know, the government keeps saying, oh,

14   farfetched, this and that.  Even if it's farfetched, if it can

15   happen, if it's plausible, that's why *Taylor* really changed the

16   landscape.

17       But I want to go back to *Tsarnaev* and then *Runyon*,

18   too, because we have a very different situation.  Setting aside

19   the realistic probability problem that——they relied on that, in

20   *Runyon II*, I believe there was an intent to murder because it

21   was a conspiracy to murder for hire.  OK?  And so that's why

22   they really relied on that intent and said, you know, when

23   somebody's intending to murder somebody, we don't see a

24   realistic probability that, even though the death-results prong

25   doesn't require, doesn't have a mens rea, that it could happen

Q19HManC

```
 1    in a way where it's not intentional.  And the same thing in
 2    Tsarnaev, right, the crime——forgetting exactly what it was, but
 3    it was——
 4            THE COURT:  Placement of an incendiary device or
 5    arson.
 6            MR. PATEL:  Yes.  In fact, in Tsarnaev, they relied on
 7    that.  That intent was really important because Tsarnaev also
 8    found that there was another offense that was reckless, right,
 9    that didn't have that intent, right?  But here, your Honor, the
10    only intent is the intent to harass.  So where do we get
11    intentional murder from intent to harass?
12            THE COURT:  Right.  Of course, the statute speaks of
13    intent to kill, injure, harass, or intimidate.  But I agree
14    with you that, based on the case law, harass is kind of the
15    least serious way of committing the crime.
16            MR. PATEL:  Absolutely.
17            THE COURT:  And that's what we have to focus on.
18            MR. PATEL:  Yeah.  So, your Honor, getting to the
19    death results part, I think here it's very plausible that death
20    would result.  If a defendant is putting a gun to his head,
21    right, and he's out in public and——let's say there's a
22    drug-addicted brother who's demanding money from the victim,
23    and then she's like:  No, I'm not going to give you the money.
24    I'm not going to give you the money.  I'm not going to give you
25    the money.  And then he says, OK.  I'm just going to kill
```

1    myself because he's stressed out, he's mentally ill, he's

2    addicted, he needs his drugs.  She tries to wrestle the gun

3    from him——that's very plausible——and the gun misfires and it

4    kills her, or there's a first responder, there's a police

5    officer around who sees that, and tries to take the gun away

6    from him, and then it misfires and it hits a pedestrian——or,

7    your Honor, we know these things happen, what happened in

8    Minnesota recently, right?  A police officer sometimes see

9    things differently.  And they may see the gun and they may try

10   to shoot him, and then the sister gets in the way and gets

11   shot.  So it's really plausible here what we're talking about.

12          THE COURT:  As I read *Elkins* being the most recent

13   example, there seems to be a developing consensus that, at

14   least for this statute, the death resulting——there's no

15   intentionality required in order for the government to convict

16   a defendant on the death resulting enhancement, I'll call it.

17          MR. PATEL:  Yes.  There's no case——

18          THE COURT:  A jury does not have to find any intent or

19   even purposeful action that produces that on the part of the

20   defendant.  It's just probable cause.

21          MR. PATEL:  And particularly in this situation where I

22   think you agree with me that it's very plausible that this

23   threat of self-harm, it happens.  You know, it's a very common

24   occurrence as——

25          THE COURT:  I agree with you, it happens.  The

1    question is whether that is intended to be covered by the

2    statute.  Yes, but I agree with you that it could happen.

3            MR. PATEL:  Right.  And if that could happen, then I

4    think it's easy to get to the accidental death happening too.

5    So, you know, for that very reason, I think the *Plunkett*

6    decision, combined with what I just talked about with death

7    results, combined with the *Ali* decision, your Honor, you don't

8    need to tread new water here.  Like, it's already there for

9    you, I think.  This is the cleanest way to give relief to

10   Mr. Mangione.

11           Now, what I'd like to talk about is some of the

12   government's arguments.

13           THE COURT:  Yes, I was going to say I know the

14   government's primary response falls into two categories: one

15   meaning that the romanette parts are divisible, and then the

16   second meaning that reading the statute to apply to self-harm

17   is unnatural and could result in criminalizing conduct that is

18   not criminal.

19           MR. PATEL:  I will talk about all of that.  So, first,

20   your Honor, I just want to say sometimes, when it benefits the

21   government, they take another position.  So in *U.S. v. Garg*

22   that's cited to in our brief, in the Western District of

23   Washington, the government agreed to a jury instruction which

24   clumped all of those terms together in a single element.  So

25   the way it went to the jury, the jury didn't have to be

Q19HManC

1    unanimous on either of those.  And you know what, your Honor?

2    That benefits the government, right?  Because if we have six

3    jurors who are——who believe that the crime happened, but it was

4    with respect to a family member, and we have six jurors who

5    think it was with respect to the stalking victim, right, and

6    then they can't decide which one unanimously, but they all

7    agree that a crime happened, well, then the defendant gets to

8    go free.  That doesn't benefit the government.  That doesn't

9    benefit the stalkee.  So that's just one thing to keep in mind

10   about this concession.

11        But, your Honor, their change of heart here also has

12   no legal support.  The government cites to cases in which

13   courts have held that statutes with very particular subsections

14   were divisible or they cite to cases where the different

15   phrases were about varying substantive conduct, but we don't

16   have any of that here, your Honor.  What we have are a bunch of

17   terms, people, and it's all within one subsection.  But more

18   importantly, your Honor, these terms all refer back to a

19   singular victim——the stalking victim, right?  This is all about

20   the stalking victim.  That's what we're trying to protect here.

21   And the entire statute focuses on ways in which that person,

22   the stalkee, is harmed when that person is put in reasonable

23   fear of injury to his family, when that person is put in

24   reasonable fear of injury to his spouse, when that person is

25   put in reasonable fear of injury to his intimate partner.  So

Q19HManC

1    it's all going back to the stalking victim.

2            And one thing I find very helpful here too, your

3    Honor, on A it says "places that person in reasonable fear of

4    the death of or serious bodily injury to"——and then what do we

5    have?  An em dash.  The em dash means that everything is going

6    back to that, the stalking victim on A, because that's who this

7    statute is trying to protect.  It's not trying to protect the

8    family member or the intimate——there's different statutes for

9    that.

10            But even more compelling, your Honor, is——I was

11    looking at the definitions yesterday of "spouse" and I was

12    looking at the definitions of "immediate family member."  Well,

13    guess what?  They overlap because spouse includes the word

14    "spouse," and then you go to the immediate family member of an

15    individual, and it includes spouse again.  So it's not even

16    differing conduct, and that's a very telling sign that we have

17    an indivisible offense here.

18            Additionally, your Honor, when——I think that B helps

19    us here too, Section B, because the Section B clumps them all

20    together in one sentence, right, that's indicative of

21    alternative means, and then they refer back to A.  So it can't

22    be that one subsection has alternative means and one has

23    alternative elements.  That wouldn't make any sense.  So I

24    think, when we look at all of that, it's really helpful.

25            But in addition to that, your Honor, also, I think the

 1    legislative or the statutory history also helps us here,

 2    because in 2018 Congress added the pet service animal,

 3    emotional support animal language.  They didn't do that to

 4    protect the animal.  Again, that was emphasizing the singular

 5    nature, like to protect the stalking victim.  Because what

 6    Congress said is because victims of domestic violence often may

 7    be reluctant to leave an abusive relationship out of fear for

 8    the safety and welfare of their companion animals.

 9            THE COURT:  I think the idea is that the categories

10    represent people that are, in essence, proxies for the targeted

11    victim, a way to get to the targeted victim through some proxy

12    person: their child, their new partner, a beloved pet.

13            MR. PATEL:  But like you just said, they're a proxy

14    for who?  For the victim.  That's what this statute's about.

15    And if we're trying to protect the victim, then what do we

16    want?  We want them to be alternative means.  So if a jury is

17    in conflict about which way this happened, then the jury can

18    still convict so that a defendant doesn't go free, your Honor.

19    So, actually, it would help them in this case if they had

20    alternative elements and not alternative means.

21            THE COURT:  So talk a little bit, Mr. Patel, about the

22    government's second argument that the reading that would

23    include a reading that would include self-harm is counter to

24    the purpose of the statute and an unnatural reading of the

25    statute as a whole, and also risks criminalizing conduct that

1    is innocent or is not criminal.

2              MR. PATEL:  Right.  Your Honor, so I think what

3    they're——it's going to look at *Elonis v. United States*, right?

4    That case was very different because in that case——and I wrote

5    a 28——I don't know what you guys call it here, sorry.

6              THE COURT:  A supplemental letter.  I did read it

7    yesterday.

8              MR. PATEL:  This is not appellate court, but anyways,

9    I think——so, you know, let me talk a little bit about *Elonis*

10   first.  *Elonis* was the case where at issue was the threat

11   statute under 18 U.S.C. 875.  There, there was no scienter at

12   all, like no——nothing.  And so the court said that to make sure

13   that we're not criminalizing innocent conduct, we have to read

14   a mens rea into it, right?  But as a *Flory* court said, the

15   Eleventh Circuit said, we don't have that problem here because

16   we have an intent to harass, and you travel in interstate

17   commerce with an intent to harass.  So there's already criminal

18   conduct here.  You're not criminalizing innocent conduct.

19             Also, your Honor, if somebody's putting a gun to his

20   head and saying, like, if you don't give me money, I'm going to

21   kill myself, or, if you don't give me drugs, I'm going to kill

22   myself, you're manipulating the victim.  There's still somebody

23   being victimized.  That's not innocent behavior.  That is

24   criminal behavior.  So, your Honor, the innocent——I don't get

25   that argument in the context of this statute.

Q19HManC

```
 1          THE COURT:  What about the government's argument about

 2   the purpose of the statute is not intended, essentially, to

 3   give protected status to a defendant engaged in this activity

 4   and it's intended to protect victims?

 5          MR. PATEL:  Well, your Honor——

 6          THE COURT:  Their sort of unnatural reading argument.

 7          MR. PATEL:  Right.  Your Honor, but, again, here it is

 8   to protect the victim because it's often the case that the

 9   victim is being victimized by the——like, a relative, right?

10   And that's what Plunkett was talking about.  So if it's to

11   protect the stalkee, right, the person being victimized, then

12   this should be included in there because there's lots of

13   situations where you have a family member that's going to

14   manipulate the person being stalked.  So it's not an unnatural

15   reading at all.

16          And, your Honor, in order to say that an

17   interpretation is absurd, it has to shock the conscience.  It

18   doesn't shock the conscience here because you're trying to

19   protect the person being victimized, and the person being

20   victimized, that can happen with a family member, with a

21   spouse, with an intimate partner.  So there's nothing strange

22   about reading a threat of self-harm into this statute.  It

23   exists and it should exist because the ultimate goal here is to

24   protect the victim, the stalking victim.

25          THE COURT:  Well, unless there's something else you
```

Q19HManC

1    want to say about self-harm, Mr. Patel, I think we should move

2    on to talk about—

3              MR. PATEL:  Mens rea.

4              THE COURT:  —the mens rea argument.

5              MR. PATEL:  Yes.

6              THE COURT:  I guess my sort of starting question is is

7    there a way for a defendant to cause reasonable fear of serious

8    bodily injury or death that doesn't involve at least the

9    implicit threat of physical force?

10             MR. PATEL:  So can I give you an example, a better one

11   than we gave in our brief?

12             So imagine a brother travels from New Jersey to hike

13   with his sister in a New York State park—so that's the

14   interstate travel part, right—intending to harass her for his

15   money for the drug habit.  He's addicted to drugs.  He needs

16   drugs, so he's like, OK, I'm going to go on this hike with my

17   sister, and I'm going to harass her when I'm there on this

18   mountain cliff.  And he does so while they're on a narrow

19   precipice of the steep cliff, screaming, gesticulating wildly

20   because he's upset that she's not going to give him the money.

21             Now, she reasonably fears for her own death or serious

22   injury because he's, you know—but he doesn't want to harm his

23   sister, and he doesn't think he's doing anything to put her in

24   fear of injury, right?  But she feels—because sometimes, your

25   Honor, there's divergence of views, right, between the victim

Q19HManC

1    and the person being victimized.  So that can happen.  So

2    that's a situation that could happen.  And then she gets

3    distracted and falls off the cliff and dies.  So then there's

4    death resulting from that situation where all the elements of

5    subsection A are met and the death results provision, because

6    the brother traveled in interstate commerce with an intent to

7    harass the victim and, in the course of the travel, engaged in

8    conduct that placed the victim in reasonable fear of injury and

9    death resulted.  But you have an accidental death, and you

10   don't have an intentional or knowing threat of force.  So

11   that's an example.

12         THE COURT:  I think I'm very familiar with the *Flory*

13   decision in which——applying to subsection B, but focused on

14   this part about what does a defendant have to do to cause the

15   result, whether it's substantial emotional distress or fear of

16   injury.  So understanding that the *Flory* court has said that,

17   essentially, no mens rea is required, the government does not

18   have to ask a jury to find beyond a reasonable doubt any level

19   of intent related to that cause——I mean, that effect, excuse

20   me.  But in the government's brief, they argue that, even after

21   *Borden*, the kind of traditional criminal law concept that

22   criminal statutes should be read to presume at least a mens rea

23   of knowledge, what is your response to that argument?  How

24   should I be thinking about that question?

25         MR. PATEL:  So I think, again, we have to go back to

Q19HManC

*Elonis*, right, and I think *Flory* addressed this.  So if you

have a situation where there's no mens rea, right, then you may

have to add an additional mens rea.  But that's not the problem

here because we do have an intent to harass.  So I think there

is no additional mens rea that needs to be added here to

separate wrongful behavior from innocent conduct.

THE COURT:  So let's talk about these other district

court cases, Mr. Patel, because recognizing that they have——go

ahead——

MR. PATEL:  Oh, I'm sorry.  I wanted to talk——

THE COURT:  ——before we go to that.

MR. PATEL:  ——also about——I think this is so

compelling when we look at the statutory history, because

congress knew how to write an intent element into——or an intent

element——or intent mens rea into the reasonable fear of injury

prong, and they did right beforehand, and then they took it

out.  That is really compelling evidence that they didn't want

it in there anymore, and that makes sense because they want to

make the statute as broad as possible to protect the stalking

victim.  So I think that is really, really compelling evidence.

I'm sorry I interrupted you.

THE COURT:  No, that's OK.  Like I said, I have many

questions, but I also want to make sure that you have time to

make the points you want to make.

MR. PATEL:  Yes.

Q19HManC

```
 1                THE COURT:  But just recognizing the views of other
 2   district courts——and, certainly, magistrate judge opinions from
 3   other districts are not binding on me in any way.
 4                MR. PATEL:  Absolutely.
 5                THE COURT:  ——but it nonetheless is the case, as far
 6   as I can tell, that there are at least five——sorry, at least
 7   four district court decisions from other circuits that have
 8   looked at this statute and said it is a crime of violence, and
 9   that would include Johnson, Ali I——both from Southern District
10   of Florida——the Bacon case from Delaware and Griffin from
11   Eastern District of Michigan.  And if you could just kind of
12   walk me through, Mr. Patel, to the extent you haven't already
13   addressed it, why you think I should reject the reasoning of
14   those cases.
15                MR. PATEL:  Yes.  I think all of those cases are
16   deeply flawed for several reasons.  So, your Honor, these cases
17   don't use the word "realistic probability," but that's what
18   they're doing.  They use the word "legal imagination."  Where
19   does that come from?  That comes from Duenas-Alvarez, which is
20   all about realistic probability.  So maybe they're not using
21   the words "realistic probability," but that's, in effect, what
22   they're doing.  So that's one problem with these cases.
23                In the Griffin case, too, also it was a very strange
24   analysis.  They just said, oh, anytime death results, like, you
25   know, that just means that now there's going to be——it changes
```

Q19HManC

1    everything, without even explaining it.  I think they cited to

2    *Tsarnaev*, right, maybe, but there really was no other

3    explanation.  But I think I've given you an example where death

4    can result in this situation, so I——

5          THE COURT:  Let's talk about *Bacon* because I think the

6    analysis in *Bacon*, the Delaware opinion, is arguably the most

7    thoughtful.  And the court in *Bacon* says, on this question I

8    asked a little while ago, whether, when you put all of these

9    things together, is at least the threat of force implicit in

10   all parts of the statute put together?  And the *Bacon* court

11   says, well, if you intentionally set out to kill, injure,

12   harass or intimidate, then you do things that, in fact, have

13   the effect of creating reasonable fear of serious bodily injury

14   or death.  That all of those things put together must

15   necessarily involve at least a threatened use of physical

16   force.  And what's your response to that analysis?

17         MR. PATEL:  So I gave you the hypothetical.  I think

18   that there can be a divergence.  So the way I look at it is

19   intent to harass, that's where you look at the defendant's

20   perspective, right?  And then you look at reasonable fear of

21   injury; that's from the victim's perspective, right?  So that

22   situation where you have the brother gesticulating, like angry

23   because he's not getting the money from his sister, but he

24   loves his sister, he doesn't think that he's doing anything to

25   harm——he would never harm his sister, and so in that mindset he

1   can't imagine a situation where he's putting his sister in

2   reasonable fear of injury.

3          THE COURT:  And the argument is that in that——if a

4   case of your hypothetical went to trial, your argument is that

5   the government would want a jury instruction or be entitled to

6   a jury instruction that says all you need to find is that the

7   victim objectively had a reasonable fear of serious injury?

8          MR. PATEL:  Absolutely.  That's what they'd be asking

9   for.

10         THE COURT:  The government is not required to prove

11  that the defendant knew or intended to cause that result?

12         MR. PATEL:  Right, right.

13         THE COURT:  OK.

14         MR. PATEL:  Exactly, your Honor.

15         Does the Court have——oh, the one thing I wanted to

16  address, too, the government says, oh, this *Minners* case is

17  garbage.  That was different.  That was different language.  I

18  think that's really exaggerating how different the statute was

19  at that time, because the statute at that time didn't have the

20  "engaging in conducting" language.  So you just had to travel

21  and, in the course of the travel, you placed somebody in

22  reasonable fear of injury, whereas now there's the engaging in

23  conduct that places somebody in reasonable fear of injury.

24         But I don't think that changes the analysis because,

25  like the example I gave you, yes, the brother's engaging in

Q19HManC

conduct——like, he's gesticulating, he's whatever, and that

happens to place the victim in reasonable fear of injury.  So I

just think that the *Minners* case, I agree, I don't think the

hypotheticals were the best there.  I think I've given you

better ones than that, but there is a court that has recognized

that this can happen.

So I think one thing, too, in some of these cases——the

bad cases, I call them.  There's not this——they haven't

considered the hypothetical that I gave you.  I don't even know

if that was put before them.  And the other thing is in those

cases, they didn't look at the legislative——the statutory

history that we've given you.  They didn't look at the *Flory*

decision, right, which, by the way, the Second Circuit has

approvingly cited to.

THE COURT:  Right, although I looked at that——

MR. PATEL:  I know it's a bit different.

THE COURT:  The citation is not quite for the point

that I think is really the heart of our issue here.

But I know I have kept you over your time, Mr. Patel,

but I just have a couple of other questions that I want to ask

you.

There are other criminal statutes that use similar

language about fear of injury.  And I think, most notably,

Hobb's Act robbery, one of the ways you can accomplish a

robbery is by creating a fear of injury, which is very similar

Q19HManC

1   language to what we have here.  And the courts have

2   consistently held that a completed Hobbs Act robbery, even if

3   accomplished by fear of injury, is a crime of violence.  And so

4   why is this statute and the language here that talks about

5   reasonable fear of injury, why should I view that differently

6   than courts have viewed that language in the Hobbs Act?

7           MR. PATEL:  So, your Honor, in those cases, I think

8   there's——"intimidation," I believe, is the language that's

9   used.  Also, I think those cases are different where you're

10  talking about robbery where here have an intent to harass,

11  right, and then happens to place somebody in reasonable fear of

12  injury.  Actually, there's two cases I wanted to talk about

13  that where you have this "reasonable fear of injury" language.

14  It's almost identical to what we have.  It was in the *Carter*

15  case——this was a Georgia assault statute——and then the Garner

16  case from the Fifth Circuit.  It was also a Louisiana statute.

17  And the exact language we're talking about, the "reasonable

18  fear of injury," was in those cases, in those statutes, and the

19  Court said, look, all that requires is that the defendant

20  intentionally engaged in the act that happens to put somebody

21  in fear of injury.

22          THE COURT:  I apologize, Mr. Patel.  I'm not expecting

23  you to track the Second Circuit's summary orders, but there was

24  a summary order this fall, in September, in a case called

25  *U.S. v. Williams*——

Q19HManC

1          THE DEFENDANT:  Yeah.

2          THE COURT:  ——addressing the Vermont simple assault

3    statute which also uses the "fear of imminent serious bodily

4    injury" language.  Now, that statute, the full language is

5    "attempt by physical menace to put another in fear of imminent

6    serious bodily injury."

7          MR. PATEL:  Yeah, "by physical menace," I think, makes

8    that different.  I'm not familiar with that case, but also,

9    your Honor, I think you have to keep in mind——again, we have to

10   go back to the statutory history, which we don't have this with

11   the Hobbs Act robbery, where Congress contemplated the intent

12   language.  They put it in there, "intent to place somebody,"

13   and then they took it out.  That, to me, is really powerful.

14   It has to be.

15         THE COURT:  All right.  We've gone over your time,

16   Mr. Patel, but I'm still going to give you your four minutes on

17   rebuttal.

18         MR. PATEL:  Thank you.

19         THE COURT:  Anything else you'd like to say before we

20   take a break?

21         MR. PATEL:  No, that's it.  Thank you.

22         THE COURT:  All right.  Thank you very much.

23         All right.  So it's 12:20.  We'll just take a

24   ten-minute break.  We'll resume at 12:30 with the government's

25   arguments.  Thank you.

Q19HManC

1           (Recess)

2           THE COURT:  You can all be seated.  Thank you.

3           OK.  Mr. Gentile.

4           MR. GENTILE:  Your Honor, as you can see, the

5    prosecution team has divided its responsibilities.  Mr. Xiang

6    is going to handle the crime of violence argument.

7           THE COURT:  OK.  Great.

8           Mr. Xiang, you want to use the lectern?

9           MR. XIANG:  Yes, your Honor.

10          THE COURT:  So I'll just begin, Mr. Xiang, I think the

11   great difficulty for the government is that the statute is

12   written, it seems to me, intentionally as broadly as possible

13   to cover a wide range of conduct, and that's a very

14   understandable and laudable goal of Congress, given the history

15   of domestic violence in this country, in that prior to some of

16   these statutes, there was essentially a world in which a woman

17   could go to the police and say:  He is calling me at all hours

18   of the day and night.  He's sending flowers, unwanted things,

19   to my work, to my home.  When I come out of the grocery store,

20   I see that his car is there and follows me home, and you've got

21   to do something, and the typical police response would be that,

22   well, there isn't anything we can do, right?  If he actually

23   tries to hurt you, you can get a restraining order, and if he

24   actually tries to hurt you or get inside the house, then you

25   should call 911, and then we'll do something.  But until that,

1    until he actually tries to hurt you, there's nothing we can do.

2              And to a significant degree, I think, the statutes

3    that are at issue here were designed and have been revised

4    multiple times over the years to try to create a remedy and a

5    law enforcement option before anyone is actually hurt or dead,

6    right?  And that goal and that statutory design, if I'm right,

7    is really in a lot of tension with what the Supreme Court is

8    telling me I have to do to conclude that this crime can be a

9    predicate for a 924(c).

10             So I guess, first, I'll invite you to tell me why I'm

11   wrong about that kind of framing, if there's something you want

12   to say particularly about that, and then we can start from

13   there wherever you'd like to start.

14             MR. XIANG:  Sure, your Honor.  So I would certainly

15   agree with the first part of your Honor's framing as to the

16   purposes of the statute and its revisions over time, and I

17   would agree with your Honor that the sort of scenario that your

18   Honor described about, well, I'm receiving all of these threats

19   or communications that I perceive to be threatening, and the

20   police saying, well, he hasn't followed through on them;

21   therefore, we can't do anything, that's something that the

22   statute is intended to address.  However, I would say, sticking

23   with that just core or heartland scenario for a second, that

24   comes within the elements clause, right?  Because, keep in

25   mind, the elements clause is not solely about the actual use of

Q19HManC

1    force; it is also about the attempted or threatened use of

2    force.  And as we've argued and as the Supreme Court made clear

3    in *Borden*, it need not even be about the intentional or

4    purposeful threatened, attempted, or actual use of force; it

5    would be sufficient if there is the knowing, right, knowing but

6    not purposeful, attempted threatened or actual use of force.

7    And so I would say that, actually, the fact that the statute

8    wants to cover those scenarios is not in tension with the

9    notion that it fall under——that it categorically fall under a

10   crime of violence.

11        But I think the other point I want to make here real

12   quick, your Honor, is that even though the statute has been, of

13   course, broadened, the government's position is not all aspects

14   of the statute are crimes of violence.  As your Honor pointed

15   out, there is no dispute between the parties that what we call

16   the emotional distress subsections of the statute are not

17   crimes of violence.  And I would say that part of the

18   broadening of the statute is to cover that aspect, right, where

19   the conduct by the stalker does not rise to the level of

20   someone reasonably fearing I'm about to die or suffer serious

21   bodily injury, something less than that is what that was

22   intended to cover.  And I think, as the Court suggested early

23   on——and there wasn't much argument because it seems like we're

24   all seeing where this is headed——those parts of the statute

25   are, at a minimum, divisible.  So I think that would be my

1    response to your Honor's thematic point.

2         THE COURT:  Before we move on, just very briefly on

3    divisibility, what is your response to the defense argument

4    that you should be bound by concessions that the government may

5    have made in *Plunkett*, the case in the Western District of

6    Virginia, or in *Garg*, the case in the Western District of

7    Washington, about divisibility?

8         MR. XIANG:  We don't agree.  Individual positions

9    taken by individual AUSAs in other districts do not bind our

10   office, do not bind this prosecution.  There's no indication

11   that those positions reflected any sort of considered opinion

12   by, for example, the Solicitor General or the Criminal

13   Appellate Division.  And as your Honor knows from looking at

14   those submissions, one of those, the one in *Plunkett*, was a

15   response to a 2255 in which the AUSA basically said, with no

16   analysis at all or engaging with any of the relevant statutes

17   or any of the relevant authority, it appears the statute is not

18   divisible.  And the one in *Garg* is——it was a jury instructions

19   issue, and I think later on it was a footnote in the context of

20   a sentencing submission about restitution, and the divisibility

21   issue came up in the context of that footnote.

22        So, needless to say, in neither of those cases was the

23   issue sort of teed up in quite the way it is here, and in any

24   event, it does not bind the government in this prosecution.

25        THE COURT:  OK.  Well, I mean, I have my order of

1    questions, but I don't know——I don't want to control things too

2    much, Mr. Xiang, from what you'd like to talk about.  But just

3    to stay kind of in the order that I was focusing on with

4    Mr. Patel, just to close off a few things that I think aren't

5    disputed, right, I know the government has argued that death

6    resulting is an element of the offense that must be proven to a

7    jury beyond a reasonable doubt.  That's right, correct?

8              MR. XIANG:  That's correct, your Honor.

9              THE COURT:  And assuming that, what's the government's

10   view about how a case that has charged death resulting as an

11   element, what weight should I give to that?  What role should I

12   give to that charge in assessing whether the predicate crime is

13   a crime of violence?

14             MR. XIANG:  So the government's position is this:  We

15   are not making the argument, Judge, look at this element.  This

16   is the thing that satisfies the elements clause.  We're not

17   making that argument.  What we are saying is what the cases

18   invite the Court to do in categorical analysis is to look at

19   the minimum conduct necessary to satisfy all of the elements,

20   and under *Mathis*, a penalty-enhancing provision like 2261(b)(1)

21   counts as an element.  And so what we're saying is, in

22   considering whether the other elements require the government

23   to prove the actual threatened or attempted use of force, it's

24   further constrained by the fact that, as charged here, there's

25   this additional death resulting element; that is, as we're

Q19HManC

1  thinking through about the plausibility of——or whether these

2  hypos work or don't work, these hypos must necessarily include

3  some story about the death resulting because that's something

4  that the government's going to need to prove anyway.

5          THE COURT:  And, again, just in terms of trying to

6  narrow what is in dispute, do you agree that, at least for this

7  statute, the death that results need not have been intended by

8  the defendant; it can be an accident or something that arises

9  from reckless conduct?

10          MR. XIANG:  We agree with that, your Honor.

11          THE COURT:  All right.  I thought so, but I'm just

12  trying to close things down.

13          So maybe, if it's all right with you, Mr. Xiang, let's

14  start with the defense argument about self-harm.

15          MR. XIANG:  Sure.  And if it's all right with the

16  Court, I'd first like to start with what I'll call the

17  romanette divisibility argument.

18          THE COURT:  Sure.

19          MR. XIANG:  Look, I think our argument that the

20  romanettes are divisible largely tracks our arguments and the

21  case law for why the reasonable fear of death and bodily injury

22  subsection is divisible from the emotional distress, which

23  is——what the Second Circuit has largely said in these types of

24  cases is, look, it's not really dispositive, but if it's a

25  disjunctive list, and if the items on that disjunctive list are

1    separately enumerated, meaning with letters or romanettes or

2    whatever, that's a very strong signal that Congress intended

3    these to be elements rather than means.  And I think the

4    primary response from the defense today has been, no, no, no,

5    they're means rather than elements because they're intended to

6    achieve kind of a common statutory purpose, right, the

7    protection of victims.

8         THE COURT:  I mean, in order for something to be

9    divisible, one of the tests for divisibility is to ask whether

10   you could be separately charged in the same indictment with

11   multiple crimes based on a separation between whatever the

12   thing is that we're asking, if it's divisible.  And I think

13   that the government is on pretty firm ground, as I said at the

14   outset with Mr. Patel, with regard to subpart——parts 1 and 2

15   and within those subparts A and B because on that question, do

16   you have a multiplicity or double jeopardy argument, courts

17   have been uniform, as far as I can tell, in saying, no, you can

18   be charged in the same instrument with multiple crimes for the

19   same course of conduct as to those four parts.

20        But I have a somewhat greater difficulty imagining——

21   let's take a scenario where the threat at issue or the

22   defendant's conduct at issue is a threat to, like, I swear I'll

23   burn down this house, and I don't care if I kill everyone

24   inside.  And inside the house is the estranged romantic

25   partner, maybe her new partner, and a child or the family pet.

Q19HManC

1    It's difficult for me to imagine that that scenario is then

2    chargeable in three separate counts as three different crimes

3    because that threat does——I think would place the former

4    partner in reasonable fear of serious bodily injury or death to

5    herself, to the new partner who she knows is also in the house,

6    and to the dog.

7           And so what's your response on that?  If a threat or

8    course of conduct is directed at multiple people that are in

9    these enumerated categories, to think that that is chargeable

10   as separate crimes for each person who might——who the victim

11   might fear is at risk of injury or death?

12         MR. XIANG:  So your Honor is right that the natural

13   consequence of the government's position here is that the

14   romanettes are chargeable as separate counts, and that if they

15   were charged in a single count, that that count would be

16   multiplicitous.  I think on the hypo that your Honor mentioned,

17   I think the government has a different intuition, which is

18   actually those would be chargeable separately.  And the same

19   way, for example, that in the context, say, of a gang shooting,

20   right, where someone sprays a whole bunch of gunfire and three

21   people are killed.  It is not only common practice but legally

22   necessary that each of those murders be charged separately even

23   though it's a single course of conduct.  And I would say that

24   if that house burning scenario were charged separately, the

25   government's burden would be different, right, because the

Q19HManC

1    government's——the other aspect of the government's

2    argument——and this goes to the mens rea point a little bit——is

3    that there needs to be——the statute should fairly be read that

4    the defendant at least knows or intends that the defendant be

5    placed in reasonable apprehension.  So as to the different

6    occupants of the home——

7          THE COURT:  Right, we'll get to that issue because I

8    think that's fairly in dispute.  But I think your intuition is

9    correct in the sense——like take the *Elkins* case, right, where

10   the issue there was a defendant had targeted for harassment

11   both a long-ago romantic partner, if I'm remembering correctly,

12   like a girl he had briefly dated in high school——they are now

13   adults——and her husband, and both of them were the target of

14   the harassment, right?  And the *Elkins* court, the Fifth

15   Circuit, says the unit of prosecution is the intended victim of

16   the harassment or intimidation.  And in that case both the

17   woman and her husband——like multiple counts were charged with

18   both the woman and her husband identified as the targeted

19   victim.

20         So I agree with you as to that, that it's possible,

21   where the harassment is intentionally directed at multiple

22   people such that each of those people falls into the "that

23   person" definition, that that's the unit of prosecution, and

24   they could be charged in multiple counts.  I think the

25   difficulty is on the divisibility question, imagining a

Q19HManC

1    situation where there's only one "that person."  There's the

2    targeted victim of the harassment or intimidation, and then the

3    question is the last element can be satisfied if that victim

4    fears, reasonably fears, bodily injury to herself or any one of

5    a list of other people.  And that seems to me a little bit

6    different than a situation like *Elkins* where the defendant is

7    intentionally targeting his harassing or intimidating behavior

8    at more than one person who——and each of those people then

9    qualifies as a person who can be an identified victim.

10           Does that make sense?  Are you following me,

11   Mr. Xiang?  Does it make sense what I'm asking?

12           MR. XIANG:  I think so, your Honor.  Let me respond in

13   a couple ways.

14           THE COURT:  OK.

15           MR. XIANG:  First, this is, I think, pretty clear.

16   This degree of divisibility, the argument that the government

17   is advancing, the government recognizes is not really an

18   argument that has been teed up in this way before.  And so it's

19   not surprising that, say, in jury instructions in other

20   prosecutions that this granularity or slicing the onion this

21   fine hasn't been done before.  So if it wasn't in *Elkins*, I

22   think that's probably why it wasn't.

23           But if your Honor's concern is, well, what if there's

24   just a single unitary conduct that occurs, but it has

25   ramifications for reasonable apprehension as to different of

Q19HManC

```
 1     the categories?  I guess the government's response to that is,
 2     well, that's not unusual in criminal statutes.  And returning
 3     to the gang example——I'm just familiar with gang examples——say
 4     this is a gang hit against the intended occupant of a house,
 5     right, or a residence.  And so what they're trying to do is
 6     they're trying to kill that person, and they toss a grenade in,
 7     right, and the thing blows up and it kills three or four other
 8     people.  We wouldn't say, well, the unit of prosecution is the
 9     tossing of the grenade.  The unit of the prosecution are the
10     people who get harmed by it.  And I think just to go back to——I
11     think there is a connection between this point and the mens rea
12     point.
13            THE COURT:  I was just going to ask you that question,
14     Mr. Xiang.  Some of this analysis, right, I wouldn't say turns
15     on, but is influenced by this other question that we kind of
16     put to the side for the moment about what is the mens rea that
17     the government's required to prove for this "cause reasonable
18     fear of serious bodily injury."
19            MR. XIANG:  Right.  So the government's answer to
20     that, just to preview that part of the argument, is that the
21     defendant needs to know that his conduct will place the
22     interstate stalking victim in reasonable fear of death or
23     serious bodily injury to those various enumerated categories.
24     And so as to his knowledge of the reasonableness of the fear as
25     to any specific category, that is a different element on which
```

Q19HManC

1    the government bears the burden of proving beyond a reasonable

2    doubt, and therefore, those are separate crimes under the

3       *Mathis* analysis.

4            THE COURT:  How do you square that argument with the

5    Eleventh Circuit ruling in *Flory* in which they said very

6    explicitly——again, it was at the substantial emotional distress

7    prong, but it's the same statutory structure, right, the

8    subparts A and B are about the effect that your behavior

9    produces in a victim——and in *Flory* the one Eleventh Circuit

10   says quite clearly——there a different kind of argument was

11   advanced, right, not accidental, but the defendant had a

12   cognitive impairment such that the defense wanted the jury

13   instructed that the defendant had to intend or at least know,

14   have purposeful awareness, knowledge, that what he was doing

15   would cause substantial emotional distress.  And the Eleventh

16   Circuit said no, for that, for the relationship between the

17   defendant's actions and the effect that makes out the last

18   element, the government is not required to prove even

19   knowledge.  If they've proved intent to harass, intimidate,

20   kill, or injure, the travel or interstate communications and a

21   course of conduct, then it is enough that we then turn to the

22   effect on the victim with no mens rea required for that

23   element.

24            MR. XIANG:  So, look, your Honor, we recognize there's

25   some tension between what *Flory* says and our position.  What I

Q19HManC

1    will say is there's other legal kind of layers in *Flory* that

2    influence that analysis that are not present here, right?  That

3    was a case about a threat, right, true threats and the First

4    Amendment, and that aspect of the analysis.  I believe what the

5    court said there is, look, part of what we're not interested in

6    doing is displacing the specific intent that's enumerated by

7    statute with the kind of true threat-type language.

8            THE COURT:  Right, a desire to try to create a

9    distinction between the place where the true threats analysis

10   is supposed to be applied and then the rest of the statute.

11           MR. XIANG:  Correct, your Honor.  Look, at bottom,

12   what *Flory* is, right, is simply a decision about the adequacy

13   of the jury instructions.  I mean, at a certain level, that's

14   what that aspect of the decision was about.  And I think on

15   this footnote 8 of that decision is instructive because—and

16   I'll just read it very quickly—the Eleventh Circuit says:

17           "Notably, the court's jury charge defining the

18   subjective intent to harass or intimidate required the specific

19   intent for purpose of causing an adverse reaction in a specific

20   person or of putting a person in fear or apprehension of injury

21   inflicted by a particular person.  Thus, in addition to the

22   requirement that the content of the message had to be a true

23   threat, the court charged that Flory must have had the specific

24   intent to cause an adverse emotional reaction or to cause

25   fear."

Q19HManC

         Now, obviously, *Flory* was about the emotional distress

subsection, so we can kind of strike or ignore that language,

but if one strikes that language and says, look, part of why

we're comfortable with this is because the district court, the

trial court, in fact, charged that Flory must have had the

specific intent to cause fear.  Well, that's not their

argument, right?  Their argument is the reasonable apprehension

piece is basically strict liability.  They're basically saying,

look, as long as there's interstate travel and subsequent to

the interstate travel there's conduct, the foreseeability that

that conduct would cause reasonable apprehension or fear in the

victim of death or serious bodily injury, that doesn't matter.

Even if that were completely unforeseeable, you'd be on the

hook under 2261A, and the government's view is that's just not

a natural reading of the statute.

         THE COURT:  Let me give you a hypothetical.  Let's say

I'm the estranged spouse of a woman, and I've been trying to

guilt her to talk to me about some aspect of our divorce

proceedings: the alimony, whether we ought to——whether she will

withdraw certain allegations against me.  And I've tried.  I've

emailed.  I'm calling, maybe to an extreme, and she doesn't

respond and won't talk to me.  So one day I drive my car to the

public street where her house is, and I park my car on the

public street.  So I'm not on her property but entirely

blocking the driveway, and I'm texting.  Like, I'm sitting out

Q19HManC

1    here, and I'm staying here until you agree to talk to me about

2    this issue.  Let's say my prior communications have been

3    sufficient to amount to intent to harass.

4            Unbeknownst to me, inside the house is my former

5    wife's child who has severe asthma, and the stress of the

6    situation prompts an asthma attack in the child.  And my

7    estranged wife now does, because of my actions, reasonably fear

8    that the child might be seriously injured or die.  And let's

9    take it one step further and imagine, in fact, the child does

10   die.  Is that course of conduct sufficient to meet every

11   element of a 2261A(1)(A) charge?

12           MR. XIANG:  No, your Honor.

13           THE COURT:  Why not?

14           MR. XIANG:  Because I have not knowingly engaged in

15   conduct that I know will place the victim in reasonable fear of

16   death or serious bodily injury.

17           THE COURT:  But where is that "knowingly" coming from,

18   right?  Because it's not in the statute.  I think we all agree

19   that it's not in the statute.  There's no words there that you

20   can read that get you there.  So why should I read those words

21   into the statute?

22           MR. XIANG:  OK.  So this is the *Elonis* point, right,

23   and I think what the *Elonis* line of cases——and this goes all

24   the way back to *Morrisette* and cases like that——is that where a

25   statute is silent as to the state of mind that accompanies an

Q19HManC

1    actus reus, what courts do is not say, all right, well, there's

2    no state of mind requirement here.  What courts must do is read

3    into the statute a sufficient state of mind requirement that

4    would distinguish innocent conduct from culpable conduct.  And

5    I think the defendant's primary response to this is, well,

6    there is an intent requirement; it's this intent to harass

7    requirement.

8        But that doesn't work, and here's why:  Number one, if

9    we look dramatically at the statute, that specific intent

10   requirement modifies solely the word "travels," right?  It's

11   travels in interstate or foreign commerce, etc., etc., comma,

12   with intent to kill, injure, harass, etc., close comma, and in

13   the course of or as a result of such travel or presence engages

14   in conduct——so there's a separate word "engages" that

15   grammatically is not modified by the specific intent

16   requirement, and then that's what leads to reasonable fear of

17   death and serious bodily injury.

18       THE COURT:  Right, and I think courts have generally

19   agreed, and I think it's a natural reading, the course of

20   conduct has to be some purposeful conduct and more than one

21   event, right, and that it has to be purposeful.  I think the

22   gap that you're trying to bridge, right, because *Taylor* and

23   *Davis* and *Delligatti* all tell me that I have to identify the

24   element that is——requires the use, attempted use, or threatened

25   use of physical force.

1          So I think, really, so much of the action, right, is

2     right where we are talking about right now, which is what is

3     the bridge, whether primarily a mens rea bridge, between my

4     purposeful conduct and the effect that is produced by that

5     purposeful conduct, which is either that a person is placed in

6     reasonable fear of death or serious bodily injury or that I'm

7     causing substantial emotional distress, which is not at issue

8     here, but—

9          MR. XIANG:  Yes, I think the bridge is the *Elonis*

10     principle that you have to include mental state requirements

11     that distinguish between innocent and non-innocent conduct.

12          And just to jump real quick back to your Honor's

13     originally hypo, that does not strike the government as a

14     crime, what your Honor has described, and the government can

15     certainly construct other hypos like that, right, where there

16     is interstate travel with an intent to harass, and say it's

17     established by journals or whatever, and say—say, the stalker

18     checks into a hotel, right?  It's not a hotel near the victim.

19     It's not—just check into a hotel.  Interstate travel.  Before

20     I start my course of harassment tomorrow, I'm going somewhere

21     to stay, and the victim sees the defendant, right, check into

22     the hotel.  And we can construct, for purpose of the hypo, all

23     sorts of historical facts that make it reasonable for the

24     victim to fear, oh, he's come back to town to kill me.  I don't

25     think the statute reaches that conduct, right?  Because

Q19HManC

basically what we're talking about at that point——forget about

*Borden* and *Leocal* and negligence and reckless, that's straight

up strict liability, and that is not something that, absent

very clear congressional intent, should be the natural

interpretation of this Court.

And I really want to make this point about the *Elonis*

problem does not get solved simply if there is a specific

intent.  Here's a pretty simple statute that I think

illustrates that.  Say a state passes a statute that says

whoever transports, with intent to earn fee, cocaine shall be

guilty of a crime, right?  And what is the mens rea that needs

to apply to knowledge that cocaine is being transported?

Because, on the face of that statute, a regular cab driver who

picks up a fare with the intent to earn a fee, right, and the

passenger ends up being a drug trafficker who's arrested by the

DEA on the back end, that cab driver would be guilty of this

offense, and no court would interpret the statute that way,

right?  The court would say there's a knowledge requirement as

to the drugs.

THE COURT:  But, Mr. Xiang, isn't that sort of like

right at the argument that Mr. Patel was making about his

interpretation of *Elonis*?  The difficulty you have in that

hypothetical is that until——the thing that tips innocent lawful

conduct into criminal conduct is the driver's knowledge that

the passenger has cocaine and that the purpose of the trip is

Q19HManC

```
 1    transporting the cocaine.  Here, I think Mr. Patel's argument
 2    is that their interpretation of the statute doesn't create an
 3    Elonis problem because, even with the kind of strict liability
 4    like if you——if you have purposeful conduct that produces a
 5    certain effect, you're on the hook.  There's no Elonis problem
 6    because you already have engaged in conduct that is
 7    criminalized in various ways, in all kinds of state and federal
 8    statutes, which is engaging in purposeful conduct with an
 9    intent to harass or intimidate.
10            MR. XIANG:  So I would disagree with that, your Honor.
11            THE COURT:  OK.
12            MR. XIANG:  I think if we're going to map those
13    analogies on, I think what your Honor's saying, look, the
14    intent as to the drugs does all the work in that drug, right,
15    hypothetical drug statute.
16            THE COURT:  At least in terms of dividing innocent
17    from criminal conduct.
18            MR. XIANG:  Understood.  I guess what the government
19    would say is that the intent to harass cannot do all the work.
20    Pretend there was a version of 2261A that just stopped at the
21    travel, whoever travels with the intent to harass, you know,
22    the enumerated categories, shall be guilty of a felony.  That's
23    an edgy statute, right?  That's just someone traveling who does
24    nothing post-travel, does nothing vis-a-vis the victim, but
25    harbors dark and malicious thoughts in the course of travel.
```

Q19HManC

 1    That's not what 2261A is about, right?  The travel element is

 2    in some sense——you know, it's the federal nexus hook to where

 3    the action is, which is the conduct vis-a-vis the victim.  So

 4    to say that, well, there's this intent requirement that does

 5    the work as to the travel, and so don't worry about the *Elonis*

 6    issue as to the conduct doesn't make sense.  What we're trying

 7    to get at is intentional targeted conduct vis-a-vis the victim.

 8          And going back to my hypo from before, you can

 9    construct hypos where the defendant has engaged in conduct

10    that, due to weird Rube Goldberg-like circumstances, leads to

11    some fear by the victim, or even death, that are completely

12    unforeseeable and could not possibly be foreseeable to the

13    person who traveled.  I don't think the statute is meant to get

14    at that.

15          THE COURT:  So assuming that you're correct and that I

16    should read the statute to require at least knowledge that my

17    purposeful conduct would place a reasonable person in fear of

18    serious bodily injury or death, does that necessarily mean

19    that, in the language of *Taylor*, that the government is

20    required——that in order to find someone guilty of this crime,

21    to convict them a jury is required to find beyond a reasonable

22    doubt that they used, attempted to use, or threatened the use

23    of violence——of physical force?

24          If I accept your view that you have to at least have

25    knowledge that your actions would cause a reasonable person to

Q19HManC

1    fear, is there any way to accomplish that?  Like, could the

2    government prove that case without requiring a finding that a

3    defendant used, threatened, or attempted the use of physical

4    force?

5          MR. XIANG:  No, we couldn't.  There's no delta, and

6    that's why we succeed under the categorical approach.  I mean,

7    every one of the hypos that the defense has offered, including

8    the hiking hypo today, they all fail for one of two reasons.

9    And depending on——the devil's in the details.  Depending on

10   what set of facts, details can be tinkered, it could be one of

11   the two:  Either it's the case that it wouldn't be reasonable

12   for the victim, all things considered, to fear death or serious

13   bodily injury, right——and the word "reasonable" is doing a lot

14   of work there——but also death or serious bodily injury as

15   opposed to being generically scared or harassed or emotional

16   distraught.  Either that's not reasonable or there are facts

17   that make belief and fear from the victim reasonable, in which

18   case those same facts are the facts that make it so that the

19   defendant at least knows that that is——that that reaction from

20   the victim are the natural consequences of his actions.

21          And *Borden*, of course, reminds us that it sort of

22   doesn't matter whether the defendant intends subjectively in

23   his heart to follow through, right?  And he could even——I think

24   in the reply brief they say what if he really reassures her,

25   hey, I'm not about to kill you?  That actually legally doesn't

Q19HManC

1    matter.  What the legal inquiry there is, based on what the

2    defendant, all the facts that he knows, including all their

3    backstory and history and all of that, does he know that the

4    victim's reaction, the belief as to the conduct that's

5    occurring, is that it would be reasonable for the victim to

6    fear death or serious bodily injury?  And if that's the case,

7    then the defendant is at least knowingly engaged in the actual,

8    attempted, or threatened use of force.  He's not intending the

9    threatened use of force, but he's knowingly engaging in conduct

10   that he knows, from the victim's perspective, constitutes a

11   threatened use of force and that's sufficient to satisfy the

12   elements clause.

13          THE COURT:  And you'd agree with me, Mr. Xiang, that

14   if I were of the view that that element could be satisfied with

15   recklessness or negligence, that under *Borden*, it's game over.

16          MR. XIANG:  It's game over, yes, your Honor.

17          THE COURT:  OK.  I thought you would concede that.  I

18   just wanted to make sure.

19          I guess part of what—just to make sure I understand

20   your argument, Mr. Xiang, it's sort of the flip side of a

21   question I think I put to Mr. Patel where a number of the other

22   district court cases kind of, in an analysis that I think is

23   maybe not necessarily correct, but they look at, when you put

24   all of these things together, all the parts of the statute

25   together, there's no way for that entire course of behavior to

1    happen without at least the threat, the implied threat, that

2    force will be used.  And first, I guess do you think that's

3    right; and, second, do you think that I'm permitted to do that

4    under Supreme Court precedent?  Do I have to go element by

5    element and identify where is the element that could

6    potentially satisfy the crime of violence definition and

7    analyze that element in isolation, or am I permitted to look

8    at, well, when you put all of these elements together, you end

9    up at place X?

10           MR. XIANG:  You can look at all the elements together,

11   and here's why, your Honor.  I think the formulation—and I

12   apologize, I don't have the precise cite here—a common

13   formulation, including in the Second Circuit, is what is the

14   minimum conduct that the government needs to prove in order to

15   prove up the statute?  The minimum conduct is conduct that

16   includes all the elements.  And I think part of what your Honor

17   is getting at is, well, what if the thing that makes it a crime

18   of violence is split across different elements or is the kind

19   of interstitial space, shall we say, between two elements?  And

20   the government's view is that's good enough, right?  I don't

21   think the analysis turns on whether the crime of violence kind

22   of qualifying piece of the statute is in one element or a

23   couple different elements.

24           An analogy that we've been thinking through to think

25   this through—and I know this is silly—say we're not talking

1    about crimes of violence and say, you know, a statute is a

2    certain kind of crime.  If it requires, as an element, that you

3    own a square, right, and say the statute under consideration

4    is, well, element one is that you have a four-sided shape.

5    Element two is that that four-sided shape has sides of equal

6    length.  And element three is that that four-sided shape have

7    four right angles.  I don't think it would make sense to say,

8    look, it's not categorically a square because the square-making

9    thing is split across three elements as opposed into one

10   element.

11          As your Honor knows, how courts list elements, whether

12   a particular statute has three elements, five elements, that

13   can even vary across jury instructions.  There's no magic to

14   that.  I think the analysis——and I think the Second Circuit and

15   I believe the Supreme Court cases make clear——is what we're

16   looking at is what the bare minimum conduct that the government

17   must prove in order to carry its burden as to the statute?

18   Obviously, because it's categorical, not just in this case but

19   in any case.  So in a divisible statute where we've charged the

20   death resulting, it's going to include all the elements,

21   including the death resulting element.

22          So to go back to the original original question, the

23   government's not saying the death resulting element is doing

24   all the work by itself, but it certainly should be taken into

25   account in that kind of all-elements analysis.

Q19HManC

1          THE COURT:  I know I've taken you over your time also,

2     Mr. Xiang, but I have a few more questions just to the question

3     that I put to Mr. Patel about *Taylor* and the effect of *Taylor*

4     on the realistic probability test.  And I think when I was

5     pressing Mr. Patel on this, I sort of said, well, you know,

6     there's——what *Taylor* clearly is prohibiting, I think, is a

7     version of realistic probability that puts a burden on a

8     defendant to identify instances or to demonstrate that the

9     hypothetical that wouldn't require the use of force is

10    something that was likely to be prosecuted, such that a court

11    needs to worry about the situation.  And I think it arguably

12    leaves open the question of whether a different way that courts

13    have used realistic probability, which is this kind of——the

14    hypotheticals exercise basically.  Can you imagine a way,

15    consistent with the laws of physics and normal human

16    interaction, where a scenario——a factual scenario——could play

17    out that would be prosecutable regardless of what any

18    particular AUSA might think about the merits of the case?  So

19    what is your view on that?  What is the teaching of *Taylor*, and

20    what should I think remains of the realistic probability test?

21         MR. XIANG:  So the government is certainly not relying

22    on the realistic probability test in the way——in the way

23    forbidden by *Taylor*.  And the government's not taking the view

24    that, well, some of these hypos are too farfetched; therefore,

25    ignore them in the categorical analysis test.  I mean, we've

Q19HManC

 1    been happy to indulge all the hypos.  The hypos fail not

 2    because they're farfetched but because they don't accomplish

 3    what they need to accomplish in order to count as a

 4    counterexample, right, which is to simultaneously be conduct

 5    that fails the elements clause, but that also puts the victim

 6    in reasonable fear.  I mean, that's the government's position,

 7    not that the hypos are too convoluted and off the wall.

 8         I do think what——I don't know that I would call this

 9    the realistic probably test, but I do think what remains fair

10    game is for courts, in considering the scope of the statute and

11    how the statute should be interpreted in terms of what it

12    criminalizes and what it does not, to think about what makes

13    sense.  So the sort of arguments, for example, that the

14    government has made to address the self-harm separate from

15    divisibility, is the arguments about, look, on their reading,

16    these things would be crimes.  These things are obviously not

17    crimes.  They love to talk about examples of people blowing

18    their brains out with a gun.  Let's set those aside, right?

19    Some of the government's hypos are not farfetched at all,

20    right?  Someone with a terminal illness saying to a

21    spouse——maybe this is to hurt the spouse, to harass, to cause

22    emotional pain——look, the only reason I was going through with

23    these painful medical treatments to keep myself alive were

24    because of our marriage, and so if you're not going to get back

25    together with me, I see no reason to do that.  That

conversation meets——on their self-harm argument meets literally

every single element of the statute, and I don't think

anyone——and this is not about realistic probability, but about

what makes sense in interpreting the statute——I don't think

anyone would interpret 2261A reaching that conduct, and they've

never responded to, by the way, that argument in their papers

or today.

        Realistic probability also——again, not the doctrine

instead itself but that mode of thinking——is relevant to what's

the logical upshot of their *Plunkett* self-harm argument?  Well,

it means not only that there's a problem with 2261A; it means

that there's a problem with all these other statutes which we

list in our brief, which are statutes criminalizing literal

murders and assassinations and kidnappings of high-up

government officials.  And in many of those statutes, the

statutes protect not only the government official but the

government official's family.  And so, on their view, all those

statutes are no good because it's possible for a member of

those government officials' families to be, say, a kind of

troubled child who says, in a way that sometimes happens with

troubled children, you know, if X, Y, and Z are not X, Y, and

Z, I'm going to take a bottle of pills; I'm going hurt myself.

        Clearly, (a) that's not what those statutes were

intended to cover, that type of factual scenario.  Not that

those factual scenarios are not realistic; they are realistic.

Q19HManC

1   But the separate analysis is should the statute be interpreted

2   to cover that kind of conduct?  And (b) it would be

3   extraordinary if, as a result of their argument, not only is

4   the Court finding that 2261A, a statute that Congress clearly

5   intended to protect, to the maximum extent possible, interstate

6   stalking, domestic violence victims, among others, that those

7   other statutes are no good as crimes of violence and can't

8   serve as 924(c) or 924(j) predicates.  That's an extraordinary

9   result and a reason not to read the self-harm possibility in

10  the way that they suggest.

11          THE COURT:  Well, I mean, if absurdity were the test,

12  we wouldn't be here.  We wouldn't be where we are, I think,

13  with this doctrine, right?  Because I think any reasonable

14  observer of the application of the Supreme Court's doctrine on

15  categorical approach for these crimes would say that it

16  produces absurd results.  So I don't know how much weight I can

17  give to the idea that the real-world consequences would be

18  absurd.

19          Let me ask you just a couple more questions,

20  Mr. Xiang, and then I want to be fair to Mr. Patel.

21          Setting aside, for the moment, your argument that a

22  defendant has to intend or know that his conduct will place the

23  victim in reasonable fear, if I don't agree with that, and many

24  of the other cases—*Johnson*, *Ali*, *Bacon*, *Griffin*—don't really

25  engage with that question and, rather, they do more of a like,

Q19HManC

well, I am thinking about the ways that this crime could be

committed, and I just think any way that it could realistically

be committed would have to involve at least an implied threat

of violence.  And my question is, isn't that, in part, what

*Taylor* prohibits?  Justice Gorsuch in *Taylor* has a lot of

criticism for what he views as efforts by the government to

backdoor what the residual clause used to accomplish.  Let me

look at the ways this crime is typically accomplished and

assess whether the ways that people do this crime in real life

create a substantial risk of force.  And in *Taylor*, the court's

opinion is extremely critical of those arguments that the way

to think about this is to look at the ways the crime is

typically committed, and that rather a very strict textualist

approach, element by element, what are the words of the

statute, is what is required.

          And so, again, setting aside the point, if I don't

agree with you that a defendant has to intend or know the

reasonable fear, do you think the *Taylor* court would look at

these cases──*Johnson*, *Ali*, *Bacon*, and *Griffin*──and say they're

doing it wrong?  That's maybe not a fair question to put to

you, Mr. Xiang, but, I mean, do you understand my──the analysis

they seem to be undertaking seems to me the analysis that was

criticized heavily in *Taylor*.

          MR. XIANG:  So I don't know that I would quite agree

with that.  And, look, your Honor's certainly right that they

Q19HManC

1    did not go into the level of statutory parsing that we're going

2    through in this case, but I think, in fairness to those courts,

3    they did fundamentally the right analysis, right, which

4    is—actually, with one or two exceptions.  There's variations

5    in terms of the language of those decisions—but the core

6    decisions, say, *Johnson*, right, that type of decision, those

7    judges say, look, I can't think of an example, right, which is

8    exactly the categorical approach question, not—I can't think

9    of a realistic example—or I can think of an example, but it's

10   not realistic.  But I can't think of an example in which the

11   defendant places the victim in reasonable fear and causes death

12   and it's not intentional, attempted, or threatened use of

13   force.  Look, did they kind of go into this whole *Elonis*

14   question about, well, what is the mens rea that attends to the

15   word "engages"?  They didn't articulate it in quite that way

16   but I think that is the analysis that they're engaged in.

17          Look, your Honor is, of course, right that *Taylor* was

18   very clear about we're not doing the residual clause thing

19   anymore, and to be clear, that's not the government's position

20   here.  The government's not saying, has not argued, and should

21   not be interpreted as arguing, look, it would be ridiculous if

22   2261A were not a crime of violence; therefore, find it to be a

23   crime of violence.  That's the old style of argument.

24          I think what we are saying is, separate from the

25   categorical approach question about looking at the elements and

Q19HManC

1     the language of the statute, there's also an *Elonis* principle.

2     Before you even get to, is this a proper predicate, you have to

3     be interpreting what does the underlying statute require or not

4     require, and that's the question that *Elonis* gets to, which is

5     when interpreting certain statutes, there may be unarticulated

6     mens rea requirements that need to be read into the statute for

7     it to make sense.  And that's not an absurdity argument about

8     the categorical approach; that's a different thing.  That is an

9     absurdity argument about just meat-and-potatoes statutory

10    interpretation, which is something that pre- and post-*Taylor*

11    courts must do because we have to instruct the jury, for

12    example, properly as to what the government needs to prove and

13    not prove.

14            And, for example, in this case, the government is

15    prepared to consent to, and I think would propose, jury

16    instructions that require the government to prove that the

17    defendant knew or intended to place the victim in reasonable

18    fear of death or serious bodily injury.  That is consistent, in

19    the government's view, with what the statute on its face and

20    logically requires, because otherwise you're going to have

21    these scenarios of strict liability causation, like the hotel

22    checking-in scenario that I mentioned or the one your Honor

23    mentioned where, whatever the intent in his head, driving

24    outside and saying, I'm right outside, and that's setting off

25    an asthma attack or a death from an asthma attack.  That's not

Q19HManC

```
 1    what the statute was intended to capture.  It's intended to
 2    capture targeted activity toward the victim, right?  That was
 3    what *Borden* was trying to police, right?  On one end,
 4    negligence and recklessness, which are about irresponsibility
 5    as to risk.  Ultimately, that's what those states of mind are:
 6    I'm engaging in risky behavior, and I'm being legally
 7    irresponsible about the risk that I'm putting out there in the
 8    world, but not specifically targeting specific victims.  And
 9    that's why it doesn't fall under the elements clause and the
10    word "against."  But, on the other side, knowledge and purpose,
11    I am targeting the victim.  And I think it's very difficult to
12    conceive of 2261A as having a *Borden* problem where the
13    prerequisite to the statute is that there is a specific victim
14    that the stalker is intending to victimize.
15            THE COURT:  All right.  Before you sit down,
16    Mr. Xiang, and I give Mr. Patel his chance, can you just
17    briefly address the argument in the defendant's January 8
18    supplemental letter and that Mr. Patel made about Congress
19    stripping the words "intend to cause" out of this, the pairing
20    of action and effect when the statute was amended in 2013.
21            MR. XIANG:  So I don't think it's fair to characterize
22    what Congress did as stripping anything out.  I mean, when the
23    government looks at the statute, it was structured
24    fundamentally differently.  I mean, the current statute has a
25    sort of branching four-part structure with (1)(A), (1)(B),
```

Q19HManC

```
 1   (2)(A) and (2)(B), and at least when the government read

 2   current version of that statute, it looked different.  And

 3   also, just as a matter of logic, the government agrees that

 4   that prior statute satisfies the elements clause and has the

 5   requisite intent requirement.  It doesn't follow from the fact

 6   that the current language of the statute is different that, at

 7   least the divisible subsections of the statute that the

 8   government has charged here, that they remain crime of violence

 9   because they continue to require at least knowledge, if not

10   intent, that the defendant's conduct would cause reasonable

11   fear of death or serious bodily injury.

12            THE COURT:  All right.  Thank you, Mr. Xiang, very

13   much.

14            Mr. Patel.

15            MR. PATEL:  Thank you, your Honor.

16            OK.  So, first of all, I just wanted to start where my

17   colleague left off.  It's really difficult for them here to say

18   that there's——or to get the Court to say that there's an

19   intentional mens rea because, again, that legislative history

20   is really important.  They knew how to put that in there, and

21   just because there's different subsections now——there were

22   different subsections then——just because the structure's

23   different, it's bizarre.  It would have taken one word to say

24   "intentionally put somebody in fear of injury," and they didn't

25   do that.
```

1              And also, I'm not understanding, how do you get all
2      the way to knowing, right?  Like, why isn't it reckless?  Why
3      isn't it negligent?  That wouldn't make it strict liability.
4      So even if they're right that something else had to be put in
5      there, I don't understand, when the Congress had intent in
6      there and they take it out and now we're just going to go
7      almost to that again because, again, what *Borden* said is
8      knowledge.  Knowledge is a practical certainty that the
9      defendant knows the consequence of his action.  And so, in
10     fact, I encourage you to go back and look at what *Borden* said
11     about knowledge.  What the court said is that there's a very,
12     very fine line between knowledge and intentional conduct, and
13     the court said most of the time it's going to be
14     inconsequential because it's so close, right?

15             So the example that was given in *Borden* is there's a
16     getaway driver.  He sees a pedestrian in the street, and he
17     still goes forth and runs into him.  That's almost certainty,
18     right?  He knows.  And so it's basically he's deliberately
19     targeting harm effectively.  So that's the type of knowledge
20     that they were talking about, and I don't know how the
21     government gets there when there's not a single word in the
22     statute.  So maybe at most—give them the benefit of the
23     doubt—why isn't it reckless?  Why does it have to get to
24     knowledge?  I just don't know where they get that argument
25     from, your Honor.

1          And also, one other thing I wanted to address is this

2     parade of horribles that this is going to result in, like,

3     other statutes having the same consequences.  The ones they

4     cite in their brief—it's 18 U.S.C. 115—it says threat to

5     assault, kidnap, or murder, and it looks like it's indivisible.

6     And you can't kidnap yourself, so I don't think that's going to

7     happen there.  The other one they cite also says threats to

8     kill, kidnap, or inflict bodily harm.  Well, you can't kidnap

9     yourself, so I don't think that works either, your Honor.

10          THE COURT:  Can you just address, Mr. Patel,

11    Mr. Xiang's argument about *Flory* and that *Flory* justifies the

12    jury instructions that explicitly told the jurors that they did

13    not have to find that the defendant knew that his actions would

14    cause the statutory effect?  And I think Mr. Xiang's argument,

15    in part, was that in the context of *Flory*, because *Flory*

16    involved only communications and therefore true threats

17    doctrine had to be applied, that there already was, kind of in

18    the package of what the jury was being asked to do, a finding

19    of knowingly creating a fear of injury.

20          What do you make of that argument that I shouldn't

21    take from *Flory* that, in the context of the subpart of the

22    statute that's at issue here, where a true threats inquiry

23    doesn't have to happen, that *Flory* doesn't necessarily mean

24    that the proper instruction here would be an instruction that

25    the defendant doesn't have to know or intend the statutory

1   effect of his actions?

2         MR. PATEL:  Well, I mean, I think what *Flory*'s making

3   clear is that you don't need anything more than was put in the

4   jury instructions, right?  And what was put into the jury

5   instructions, I think, was——the instruction that was given is a

6   true threat is a serious threat, not idle talk or careless

7   remark or something said jokingly, that is made under

8   circumstances that would place a reasonable fear——person in

9   fear of being kidnapped, killed, or physically injured.  So,

10  again, they were referring back to the reasonable person

11  standard.  They weren't saying that it had to be knowingly.  It

12  wasn't in there in the jury instruction.  That's the way I read

13  it, your Honor, so I don't think that's of consequence there.

14        Let me see if I have anything else to add.

15        Oh, the other thing I just wanted to point out, your

16  Honor, is, like, the government saying, oh, well, we can take

17  different positions.  We're different United States Attorney's

18  Offices.  But it's one Department of Justice.  And also, if you

19  find today, your Honor, that the statute is divisible between

20  subsections or even between the different people enumerated in

21  subsection A, then if I was the defendant in *U.S. v. Garg*, I'm

22  going to say my conviction's invalid.  These guys, you know,

23  think it's an element.  And it was not a unanimous verdict

24  then.  So that's going to be the consequence with all the cases

25  where they have agreed that it's indivisible when it benefits

Q19HManC

1  them.  Well, if I was a defendant, I'm going to call up these

2  guys and say, OK, let's get your conviction vacated now because

3  there's a decision by a very smart judge who says that it's

4  wrong.

5          THE COURT:  I don't know that anyone would say that,

6  but thank you, Mr. Patel.

7          MR. PATEL:  Anyways, that's my argument, your Honor.

8  Thank you.

9          THE COURT:  All right.  Thank you very much.  Thank

10  you all.

11          So, obviously, as you can tell by the time expended, I

12  think this is a difficult issue and one that much in this case

13  turns on.  So I'm not going to rule on the motion while we're

14  here together.  I want to think about it and issue a written

15  decision.  But I would like to set a next conference date on

16  the presumption that all of the pending motions that have to be

17  resolved will have been decided by then and so that we're in a

18  position to talk about next steps.  I would propose Friday,

19  January 30, at 11 a.m. if all counsel are available at that

20  time.

21          Mr. Gentile?

22          MR. GENTILE:  That works for the government.

23          MS. FRIEDMAN AGNIFILO:  Yes, your Honor, that works

24  for the defense too.

25          THE COURT:  OK.  So we'll set a next conference date.

Q19HManC

1    Again, that will be Friday, January 30, at 11 a.m.  And of

2    course, if, on reflection, I think an evidentiary hearing is

3    needed, I'll reach out to counsel promptly, and we'll schedule

4    that within the next couple of weeks.

5          Mr. Gentile, while, of course, time will automatically

6    be excluded under the statute during the time the motions

7    remain pending, in the event that the decisions issue well

8    before our next scheduled conference, does the government seek

9    to exclude time under the Speedy Trial Act from today until——

10         MR. GENTILE:  We do, your Honor.

11         THE COURT:  ——January 30?

12         MR. GENTILE:  We do, your Honor, yes.

13         THE COURT:  On what basis?

14         MR. GENTILE:  On the basis of allowing the defendant

15   and his counsel to continue to review the voluminous discovery

16   that we've produced so far to date and also to contemplate any

17   other additional motions they may seek to make.

18         THE COURT:  Ms. Friedman Agnifilo, does the defendant

19   consent to the extension of time?

20         MS. FRIEDMAN AGNIFILO:  Yes, your Honor.

21         THE COURT:  I will exclude the time from today until

22   January 30.  I find the ends of justice served by excluding

23   such time outweigh the interests of the public and the

24   defendant in a speedy trial because the capital-eligible status

25   of this matter renders it unusually complex and because the

1      potential outcome of the pending motions will require

2      significant consideration by counsel for both the government

3      and the defense of appropriate next steps in this matter,

4      including the possibility of interlocutory appeal or,

5      alternatively, an assessment of the time needed to prepare for

6      a capital trial.  Accordingly, time's excluded.

7              Mr. Gentile, anything further from the government?

8              MR. GENTILE:  Yes, your Honor.  With respect to

9      scheduling, before your Honor took the bench today and even

10     during the break, both parties conferred.  We were prepared to

11     propose a set of dates for trial and pretrial deadlines.  We

12     understand what the Court said at the beginning of the

13     proceeding.  However, we do want to let the Court know

14     that—and I'll let defense counsel speak for themselves—that

15     we feel it's important to set a date even if it's something

16     that has to be moved at some point.

17             The government, and I'm sure defense counsel as well,

18     has a number of witnesses that are traveling from out of state.

19     We have people—we have expert witnesses that we're going to

20     look to talk to and schedule different matters with them.  So

21     if we could put something on the schedule now, even if it has

22     to be moved eventually because of the Court's ruling in one way

23     or the other, I think that's the parties' preferred course of

24     action.

25             THE COURT:  OK.  Well, tell me what you had in mind.

1    Just talking about the——I do think that if it's going to be a

2    capital trial, I think the preferred course of action, one that

3    I've described with the jury department already, is that we set

4    a date for the beginning of jury selection and then a firm date

5    for the start of the trial so that we're able to tell

6    prospective jurors this is when the trial will begin rather

7    than, as has happened in some other cases where we're telling

8    jurors that the trial will begin when jury selection is over.

9    I don't think that's advisable.  So I'm not sure, Mr. Gentile,

10   what the nature of your discussion was, but why don't you tell

11   me what the parties have in mind.

12        MR. GENTILE:  Certainly, Judge.  And we considered

13   that very issue that the Court just pointed out.  Our proposal

14   is to begin jury selection on the 1st of September, with a

15   noncapital trial to begin in early October, October 12.  Should

16   it be a capital trial, we would propose continuing the jury

17   selection and the voir dire, and all of that, and with trial

18   scheduled to begin in early January.

19        THE COURT:  Well, to the extent I can control the

20   process, I don't intend jury selection to take three months in

21   this case.  I'm well aware of the time that jury selection took

22   in the *Saipov* case, but I don't think, given the procedures I

23   intend to use, that we need three months.  But the parties'

24   suggestion is very much in line with what I had in mind.  I

25   think what I had in mind was one of two alternatives: either

Q19HManC

| | |
|---|---|
| 1 | beginning the jury selection process in July with the |
| 2 | expectation that we'd start trial in mid-September or, |
| 3 | alternatively, beginning the jury selection in September with |
| 4 | the expectation that we'd begin trial potentially the first |
| 5 | week of December, if it's a capital trial. |
| 6 | So it sounds like we're——I assume, Ms. Friedman |
| 7 | Agnifilo, that you think June or July to begin jury selection |
| 8 | is too soon if it's a capital trial? |
| 9 | MS. FRIEDMAN AGNIFILO:  Yes, your Honor. |
| 10 | THE COURT:  OK.  And I think, on reflection, given the |
| 11 | pretrial filings that would need to be made, if we are |
| 12 | proceeding as a capital trial, that that probably is a little |
| 13 | bit compressed.  So while I won't give a specific date while |
| 14 | we're here in court, because I do want to look at the calendar |
| 15 | and look back at my notes of my discussion with the jury |
| 16 | department, I'm happy, if both parties consent, to issue a |
| 17 | scheduling order that bakes in an alternative for a capital or |
| 18 | noncapital trial on the merits, with the expectation that we'll |
| 19 | begin the jury selection, if not September 1, it may make more |
| 20 | sense to begin September 8——it's a very late Labor Day this |
| 21 | year, Monday, September 7——but, generally, in the first working |
| 22 | week of September, and then with a trial to begin later in the |
| 23 | fall or in the early winter. |
| 24 | So let me just look at the specific dates, but it |
| 25 | sounds like we're all kind of very much on the same page as to |

Q19HManC

1    how we might proceed, and I'm happy to, at the parties'

2    request, issue that scheduling order so that everyone can plan

3    the remainder of their year.

4            MR. GENTILE:  Thank you, Judge.

5            THE COURT:  OK.  Anything else, Mr. Gentile, from the

6    government?

7            MR. GENTILE:  Not from the government, Judge, no.

8            THE COURT:  Ms. Friedman Agnifilo, anything else the

9    defendant would like to raise?

10            MS. FRIEDMAN AGNIFILO:  No, your Honor.  Thank you

11    very much.

12            THE COURT:  All right.  Thank you all very much.  I

13    found this——oh, yes, Mr. Moskowitz.

14            MR. MOSKOWITZ:  Judge, just with respect to the start

15    date of a capital trial, in addition to counsel, we have

16    mitigation specialists, jury specialists that are engaged.  So

17    the January date that we were proposing to start was

18    considering their schedules.  They're involved in the Gendron

19    which is going to begin over the summer in Buffalo and likely

20    to last, if not through the end of the year, close to that.  So

21    that was the reason we were suggesting a January start date for

22    a trial.

23            THE COURT:  OK.  So just to make sure I understand,

24    Mr. Moskowitz, the January sort of trial on the merits if it's

25    a capital trial is not based on an assumption that it will take

Q19HManC

1   us three months to select a jury, but rather ensuring that,

2   when the trial on the merits begins, all necessary personnel

3   are available?

4              MR. MOSKOWITZ:  That's correct, your Honor.

5              THE COURT:  OK.  That's very helpful.  Thank you.

6              So, again, as I was saying, thank you all very much.

7   I found this very helpful.  I'm always appreciative of

8   excellent advocacy just as a matter of craft, and so I have

9   enjoyed this.  I found it very helpful, and I'm very

10  appreciative of the time you've given.

11             And with that, we are adjourned.  Mr. Mangione is to

12  remain in the custody of the Marshals Service.

13             Thank you all.

14             (Adjourned)

15

16

17

18

19

20

21

22

23

24

25