USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/30/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

LUIGI NICHOLAS MANGIONE,

Defendant.

25-CR-00176 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Defendant Luigi Nicholas Mangione has moved to suppress the search of a black backpack recovered from him at the time of his arrest on December 9, 2024, and all items contained therein.[1]  For the reasons that follow, the motion is DENIED.

## BACKGROUND

### I.    RELEVANT FACTS[2]

The relevant facts are largely undisputed.  On December 9, 2024, the Defendant purchased food at a McDonald's restaurant in Altoona, Pennsylvania, and was seated at a table in a rear corner of the restaurant.  An employee of the McDonald's called 911 to report that a customer (the Defendant) resembled the person who had been featured in news reports as the

---

[1] The Defendant also moved to suppress statements made to the police at the time of his arrest. Dkt. No. 59. Based on the Government's subsequent representation that the only such statements they were seeking to admit at trial were the Defendant's alleged identification of himself as "Mark" and "Mark Rosario," the motion to suppress was withdrawn. *See* Dkt. No. 92 ("Oral Arg. Tr.") at 5:10–18.

[2] The parties agreed with the summary of undisputed facts provided by the Court at the January 9, 2026, oral argument. *See* Oral Arg. Tr. at 18:21–19:23. The facts described herein reflect the Court's previous recitation and the undisputed portions of the factual recitations contained in the parties' submissions, *see* Dkt. No. 59-1 ("Agnifilo Aff."); Dkt. No. 59-2 ("Def. Br.") at 30–34; Dkt. No. 71 ("Opp.") at 90–93, as well as bodyworn camera footage of Defendant's arrest, *see* Dkt. Nos. 71-1 ("Opp. Ex. GX 1"), 71-2 ("Opp. Ex. GX 2"), 71-3 ("Opp. Ex. GX 3"), an Altoona Police Department Incident Report regarding Defendant's arrest, *see* Dkt. No. 71-4 ("Opp. Ex. GX 4"), and an excerpt of an Affidavit of Probable Cause in support of a search warrant obtained by the District Attorney of Blair County, Pennsylvania, *see* Dkt. No. 71-7 ("Opp. Ex. 7").

possible killer of Brian Thompson, a health insurance executive who had been shot dead on a street in midtown Manhattan on December 4, 2024. A massive law enforcement operation to identify and locate the gunman had followed Thompson's murder, including release of video and still photographs depicting the potential shooter to the media.

Two officers of the Altoona Police Department initially responded to the McDonald's and approached the Defendant at the table where he was sitting. A black backpack (the "Backpack") was on the floor near the Defendant, leaning against the wall. The officers asked the Defendant if the Backpack was his, and he said that it was. As the officers proceeded to ask the Defendant a number of questions, such as his name and whether he had recently been in New York City, an officer moved the Backpack to a nearby table, out of the Defendant's immediate reach. When it became clear that the officers believed the Defendant likely was the person being sought in connection with the Thompson murder and was going to be taken into custody, one of the Altoona police officers did a cursory search of the interior of the Backpack for anything that could hurt or injure her during the transport to the police station.[3] In the course of that initial search, the officer found a loaded gun magazine. The Backpack was then transported to the police station in one car, while the Defendant was placed under arrest and transported in another car.

At the police station, the same officer conducted a more thorough search of the Backpack, recovering, among other things, a handgun, a silencer, a red notebook with writing inside, additional written materials, an iPhone, and various electronic storage devices.[4] The

---

[3] Defendant contends that this initial cursory search exceeded the bounds of a permissible safety search, after the magazine was found. *See* Def. Br. at 30–31. Even if the Court agreed that the examples cited by the Defendant likely exceeded that scope, that potentially overzealous conduct does not bar the admission of the evidence because of the doctrine of inevitable discovery, discussed further below.

[4] Again, Defendant contends that this search exceeded the bounds of a legitimate inventory search under the Altoona Police Department's standard policies for such searches. *See id.* at 33–34. For the

Backpack and its contents were eventually transported back to Manhattan, where Brian Thompson was killed and where local and federal authorities were investigating the murder. On December 16, 2024, the United States Attorney's Office for the Southern District of New York applied for a search warrant to search the entirety of the Backpack and its contents, including any written materials contained therein. The warrant application was based on a sworn affidavit submitted by FBI Special Agent Gary Cobb, and was approved by a Magistrate Judge in this District.[5]

On December 31, 2025, the Court issued an Order asking the parties to submit a letter indicating whether either party believed an evidentiary hearing was necessary to aid in the Court's evaluation of the Government's inventory search and inevitable discovery arguments, or any other aspect of the Defendant's motion to suppress the contents of the Backpack. Dkt. No. 79. In response, the Defendant argued, both in writing and at oral argument on January 9, 2026, that the written policies of the Altoona Police Department regarding searches incident to arrest or inventory searches did not clearly apply to detainee property other than that removed from the detainee's body or person.[6] After hearing argument, the Court ordered a hearing on the limited question of what were the policies and standardized practices of the Altoona Police Department in December 2024 regarding the securing, safeguarding, and inventorying of the personal property of a person arrested in a public place. Dkt. No. 90.

The Court held a suppression hearing on January 23, 2026. *See* Transcript of January 23, 2026, Hearing ("Hr'g Tr."). The Government called one witness, Deputy Chief Nathan Snyder

---

reasons discussed below, even if that were the case, the aspects of the search that the Defendant identifies as excessive or outside policy do not affect the inevitable discovery analysis.

[5] The warrant application and accompanying affidavit is attached hereto as Exhibit A.

[6] It is undisputed that the Backpack was not physically removed from the Defendant's body by the police.

from the Altoona Police Department, and introduced into evidence five exhibits, comprising

certain policies and procedures of the Altoona Police Department in effect as of December 2024:

General Order 3.1 (Hr'g Ex. GX 1), General Order 3.6 (Hr'g Ex. GX 2), General Order 3.5 (Hr'g

Ex. GX 3), a Probationary Officer Training Task Sheet regarding custodial arrest procedures

(Hr'g. Ex. GX 4), and a Probationary Officer Training Task Sheet regarding detention of

prisoners (Hr'g Ex. GX 5).  Deputy Chief Snyder did not participate in any way in the

Defendant's arrest on December 9, 2024 and has had no involvement in any investigation into

the Defendant.  Hr'g Tr. at 11:24–12:17.  Rather, he was presented as a person of suitable

authority and expertise regarding the written policies and regular practices of the Altoona Police

Department in December 2024.  *See* Dkt. No. 90.  Defendant called no witnesses and introduced

into evidence one exhibit, Altoona Police Department General Order 1.2 (Hr'g Ex. DX A).

Deputy Chief Snyder testified about his experience working as a Field Training Officer,

and later a supervisor of Altoona's field training program for new police officers.  Hr'g Tr. at

7:15–9:10.  Throughout his highly credible testimony, he demonstrated a thorough knowledge of

and facility with the written General Orders of the Altoona Police Department, as well as the

written materials used to train new police officers, and the standardized practices of the

Department regarding arrests in public places and the proper handling of a detainee's property,

whether property with him or her at the time of arrest or property removed from his or her person

while being processed at the police station.  *See generally id.*; Hr'g Exs. GX 1–GX 5.

In sum, the testimony and exhibits at the hearing established that it is the standardized

and regular practice of the Altoona Police Department to secure and safeguard the personal

property of a detainee arrested in a public place.  Officers are trained to search bags or closed

containers that could reasonably contain items dangerous to officers in a way consistent with

identifying and securing any such items before the bag is transported in a police vehicle. Hr'g
Tr. at 57:14–58:19; Hr'g Exs. GX 2 at 2, GX 4 at 2–3. When the property and the detainee
arrive at the police station, the detainee's person should be thoroughly searched, and all of a
detainee's property (whether taken from his or her person or secured at the time of arrest) should
be searched and logged to the degree necessary to prepare a thorough inventory. Hr'g Tr. at
58:20–60:19; Hr'g Exs. GX 1 at 6, GX 5 at 1. The searching and inventorying serve a range of
law enforcement purposes, including ensuring the physical safety of detainees and officers,
ensuring that accurate records are kept of any property that the department is responsible for
safeguarding, ensuring that any detainee property is returned to a released detainee or properly
transferred with a detainee going to another facility, ensuring integrity of operations so that
property cannot be stolen, and protecting the department and its officers against false allegations
of theft or loss. Hr'g Tr. at 48:19–49:04, 60:20–61:18. Deputy Chief Snyder testified that if
items that appear to be evidence of a crime are discovered during an inventory search, the best
practice would be to stop the inventory search and secure a search warrant, although Deputy
Chief Snyder acknowledged that the timing of that step could depend on the totality of the
circumstances and might not be done immediately or until after the inventory search was
completed. *Id.* at 61:24–63:16.

## DISCUSSION

In his motion to suppress the Backpack, the Defendant argues that the Backpack search
that occurred at the McDonald's was not a valid search incident to arrest because the bag was no
longer accessible to the Defendant at the time it was searched, and that the purported safety
search before transport was either a ruse or exceeded the permissible bounds of a pre-transport
safety search. *See* Def. Br. at 26–31. The Defendant also argues that the inventory search of the

Backpack done at the police station was not valid because the purported inventory search was in fact a ruse for an evidentiary search, exceeded the permissible scope of an inventory search by, for example, reading the contents of certain writings recovered from the Backpack, and otherwise did not follow established procedures. *See id.* at 31–34. Finally, the Defendant argues that the inevitable discovery exception should not apply because the exception would have to be based on a permissible inventory search and the officers of the Altoona Police Department did not conduct a proper inventory search. *See id.*

The Government, in turn, argues that the Backpack and its contents are admissible under several exceptions to the warrant requirement, including search incident to arrest, pre-transport safety search, an inventory search at the police station, and, in the alternative, inevitable discovery arising from a combination of an inventory search and the December 16 federal search warrant, which did not rely on any information gleaned outside of these permissible activities. *See* Opp. at 96–102.

While the Defendant likely has the better of the argument on search incident to arrest, the Court need not belabor that point, because, as explained more fully below, the entire contents of the Backpack fall squarely within several exceptions to the warrant requirement, most notably the inevitable discovery doctrine, through a combination of either a pre-transport safety search or an inventory search, followed by the federal search warrant, which plainly was supported by probable cause without reference to any information learned outside of the permissible bounds of either of these two precursor searches.[7]

---

[7] Although neither party argued this point, the contents of the Backpack would also likely be admissible under the good faith exception, based on the federal warrant. *See United States v. Ganias*, 824 F.3d 199, 221 (2d Cir. 2016) ("[T]he exclusion of evidence is inappropriate when the government acts 'in objectively reasonable reliance' on a search warrant, even when the warrant is subsequently invalidated.") (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)).

# I.    SAFETY AND INVENTORY SEARCHES

The Fourth Amendment protects individuals from unreasonable searches and seizures and, absent an applicable exception, the law generally presumes that a judicially-authorized warrant is required for a search to be "reasonable." *See, e.g., Katz v. United States,* 389 U.S. 347, 357 (1967) (outside of "established and well-delineated exceptions," warrantless searches are "per se unreasonable"); *Riley v. California*, 573 U.S. 373, 381–82 (2014) (the "ultimate touchstone of the Fourth Amendment is reasonableness," which "generally requires the obtaining of a judicial warrant").[8]  Two such exceptions to the warrant requirement are searches necessary for officer or community safety, and searches done to inventory property taken into police custody.[9]

While a safety search is most commonly applied to a search of a detainee's person when he or she is taken into custody, courts have also recognized that the exception can apply when officers have reason to believe that a bag or other closed container that must be transported in a police vehicle may contain some immediately dangerous object such as an incendiary device or noxious chemicals.  In such circumstances, officers may conduct a warrantless search of the bag to the extent necessary to confirm the presence or absence of immediate danger.  *See United States v. Chadwick*, 433 U.S. 1, 15 n.9 (1977) (abrogated on other grounds by *California v. Acevedo*, 500 U.S. 565 (1991)); *United States v. Morillo*, 2009 WL 3254431, at *7–8 (E.D.N.Y. Oct. 9, 2009) (police need not "carry a dangerous backpack in their police car, without either

---

[8] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

[9] As noted above, the parties' briefing devoted extensive attention to another established exception to the warrant requirement:  a search incident to arrest.  *See* Def. Br. at 26–31; Opp. at 96–97. The applicability of this exception presents the closest question under the facts of this case, but the Court need not resolve it because the Backpack and its contents are admissible under other applicable exceptions.

affirming or dispelling their [reasonable] suspicion"); *United States v. Matthews,* 532 F. App'x

211, 223, 225–26 (3d Cir. 2013) (upholding search to ensure officer safety before transporting

luggage defendant had in his possession at the time of his arrest in a public place); *United States*

*v. Hopewell*, 498 F. App'x 609, 612 (7th Cir. 2012) (holding that exigent circumstances justified

the search of a backpack left on a bus after an arrest where "officers reasonably believed that the

search was necessary to prevent serious injury to themselves or to the public"); *United States v.*

*Antonio*, 386 F. App'x 678, 680 (9th Cir. 2010) (upholding search of a backpack because

"property taken into police custody is routinely inventoried for any weapons before transport").

    Such a search was reasonable under the facts of this case.  At the time of his arrest in the

McDonald's, the Defendant was suspected of being the person who had gunned down a stranger

on a street in midtown Manhattan, using a handgun equipped with a silencer, and leaving behind

shell casings that had been inscribed with the words "delay," "deny," and "depose" (an apparent

reference to the victim's work as the chief executive of a private health insurance company).

Agnifilo Aff. ¶ 4.  The circumstances clearly suggested at least the possibility of a political or

ideological motive to send a public message, through the use of violence, about the health

insurance industry, and little was otherwise known about the perpetrator, including whether he

had acted alone or as part of a group, and whether the Thompson murder was an isolated incident

or was part of a larger plot contemplating further violence.  Police need not have certainty or

even probable cause to take steps to protect themselves and the public, so long as their actions

and the suspicions that prompt them are reasonable.  Under these circumstances, police were

justified in conducting a safety search of the Backpack before it was transported.  *See Ross v.*

*California*, 2013 WL 2898066, at *10 (C.D. Cal. June 10, 2013) ("Officers were on the lookout

for someone matching plaintiff's description . . . [and] [t]he evidence that plaintiff was possibly

involved with other criminal activity, especially involving a concealed weapon, made the search of his backpack reasonable for purposes of officer safety."). Such a search would also be consistent with the established practices and training of the Altoona Police Department. *See* Hr'g Tr. at 58:04–19. Here, the Backpack was opened at the McDonald's before transport and a cursory search was conducted, as the officer can be heard on her body camera stating that she needed to be sure the bag did not contain a "bomb or anything" before she put it in her car. *See* Opp. Exs. GX 2 at 10:01–10:03, GX 3 at 10:16–10:17. While feeling around inside the bag for items that could be dangerous, the officer almost immediately pulled out a heavy metal item wrapped in an article of clothing, which turned out to be a loaded handgun magazine. *See* Opp. Ex. GX 2 at 10:01.[10] In sum, the loaded magazine is admissible as the product of a reasonable pre-transport safety search.

Inventory searches—meaning searches conducted of property in the custody of the police in order to identify and log anything the police are responsible for storing or safeguarding—are another "well-defined exception to the warrant requirement." *Illinois v. Lafayette*, 462 U.S. 640, 643, 648 (1983) ("it is not unreasonable for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures"). Inventory searches do not violate the Fourth Amendment because their goals are unrelated to the warrant requirement or the necessity of probable cause; rather, they "serve to protect an owner's property while it is in the custody of

---

[10] The Defendant argues that the safety search at the McDonald's should be disregarded because, even if some limited search was justified, officers exceeded the bounds of a reasonable safety search after the magazine was found when they, for example, cut open a small cardboard sleeve to reveal a computer chip inside. *See* Rep. at 39–40. The Government does not rely on any of the arguably excessive aspects of this safety search in opposing suppression, and, in any event, whatever may have been done after the discovery of the magazine does not void the applicability of the inevitable discovery doctrine, discussed below.

9

the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002); *see also United States v. Williams*, 930 F.3d 44, 53–54 (2d Cir. 2019).  To be valid, inventory searches must be conducted using "standardized criteria or established routine," *Florida v. Wells*, 495 U.S. 1, 4 (1990).  A police department's standardized procedures may be established by written rules and regulations or by testimony regarding the department's standard practices.  *See United States v. Thompson*, 29 F.3d 62, 65–66 (2d Cir. 1994); *Williams*, 930 F.3d at 54.

Here, Deputy Chief Snyder's testimony and the exhibits offered at the suppression hearing amply establish that the Altoona Police Department has written procedures and rules regarding the searching and inventorying of any property brought into the police station, and that officers are trained in these standard practices.  *See* Hr'g Tr. at 58:20–60:19; Hr'g Exs. GX 1 at 6–7, GX 5 at 1.  When the officer who transported the Backpack arrived at the station, she thoroughly searched the Backpack with her body-worn camera running for approximately 12 minutes.  She again identified the loaded magazine she had first found at the McDonald's, and then relatively quickly located a handgun and a silencer in the Backpack, along with a variety of other items, *see* Opp. Ex. GX 3 at 10:16–10:28, all of which were subsequently secured and logged, with evidentiary items separated from personal items and all items documented, *see* Opp. Exs. GX 4, GX 7.  The Government has established by a preponderance of the evidence that the search of the Backpack at the Altoona police department was consistent with the written regulations and standard practices for an inventory search, even if not done perfectly, and thus the contents recovered are admissible.  *See United States v. Lopez*, 547 F.3d 364, 369, 372 (2d Cir. 2008) (upholding district court's conclusion that "minor deviations from any required listing procedures would not invalidate an inventory search"); *United States v. Antonio Fabian*, No. 16-

10

CR-00131 (DLI), 2019 WL 3578226, at *7 (E.D.N.Y. Aug. 6, 2019) (holding that officers' "alleged departure from inventory procedures, without more, does not render the search unconstitutional" provided the search was conducted "in good faith pursuant to standardized criteria or established routine").

In response, the Defendant originally argued that the Government had failed to demonstrate that Altoona Police Department had an established procedure for inventory searches of bags seized in connection with an arrest, Def. Br. at 33, but those policies were amply established at the hearing. Next, the Defendant noted that the Altoona policy for searches of impounded vehicles requires obtaining a warrant if evidence of a crime is discovered during an impounded vehicle inventory search, *see* General Order 1.2.3(C)(5)(c), Hr'g Ex. DX A at 8, and argued that a similar requirement should be imputed to all other inventory searches by analogy, *see* Def. Br. at 34. But the Altoona Police Department's written procedures for inventory searches of other property brought into the police station do not contain this provision. On reply, the Defendant further argued that the inventory search was invalid because the officer's "real" motive and conduct suggested that she was searching for evidence rather than conducting a "true" inventory search. *See* Dkt. No.76 ("Rep.") at 41–42. This argument is squarely foreclosed by *Williams*, 930 F.3d at 55–56 ("In general, an action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify the action."), and by *Lopez*, 547 F.3d at 372 ("When officers, following standardized inventory procedures, seize, impound, and search a car in circumstances that suggest a probability of discovering criminal evidence, the officers will inevitably be motivated in part by criminal investigative objectives. Such motivation, however, cannot reasonably disqualify an inventory search that is performed under standardized procedures for

11

legitimate custodial purposes."). Finally, the Defendant suggested through cross of Deputy

Chief Snyder at the hearing that Altoona's standard procedures required a search warrant be

obtained and no further searching be conducted if evidence of a crime was discovered during any

kind of inventory search. But Deputy Chief Snyder did not so testify and the written policies of

the Altoona Police Department do not support this argument. Deputy Chief Snyder was very

clear that any and all property being held by the Altoona Police Department, for any reason, must

be fully inventoried and logged. *See* Hr'g Tr. at 15:06–20, 16:19–18:16, 19:20–23, 22:13–24;

37:09–38:09. He also testified that, under certain circumstances, he viewed it as best practice

(and would so train new officers) to seek a search warrant for a bag once items that could be

evidence in a criminal investigation were found, but that the timing of that could vary

considerably depending on the circumstances. *See id.* at 61:24–63:16. At no point did he

suggest that the remaining contents of a bag would not have to be inventoried and logged, or that

immediately seeking a search warrant was *per se* required by the department's written policies or

standard procedures.

 The search of the Backpack at the Altoona Police Department falls within the inventory

search exception and therefore its contents are admissible on this basis as well.[11]

---

[11] In discussion of whether an evidentiary hearing was needed, the Defendant also argued that the officer exceeded the scope of a valid inventory search, after the magazine, firearm, and silencer were found in the course of that search, by reading certain passages from a red journal found in the Backpack and the content of other writings. *See* Dkt. No. 81 at 3. This argument was not raised in the Defendant's motion to suppress. First, as with the argument above at n.10, as a general rule, the fact that an officer may have, in some respects, exceeded the scope of an otherwise permissible search would not require the suppression of evidence lawfully obtained during the permissible scope of that search. *See, e.g., United States v. Rudaj*, 390 F. Supp. 2d 395, 400-02, 406 n.3 (S.D.N.Y. 2005) (police seized a number of items under a "plain view" theory, which is a permissible exception to the warrant requirement; fact that court suppressed some items because police exceeded the bounds of plain view when they seized them did not require suppression of other seized items that did fall within the exception); *United States v. Arango-Correa*, 851 F.2d 54, 59 (2d Cir. 1988) (holding that defendant's "contention that agents exceeded the permissible scope of the inventory search when they opened two notebooks, which defendant likens to closed containers, cannot stand in light of" Supreme Court precedent). And, second, the contents of the

## II.    INEVITABLE DISCOVERY

Finally, however, even if the Defendant were correct that it was not reasonable for officers to conduct a pre-transport safety search of the Backpack (and thus that the loaded magazine would not have been discovered at the McDonald's), or that under the established inventory search procedures of the Altoona Police Department any search should have stopped in favor of a warrant as soon as one or more of the loaded magazine, firearm, or silencer were discovered, the contents of the Backpack are still admissible in light of the December 15 federal search warrant under the inevitable discovery doctrine.

The "exclusionary rule" is a court-made doctrine that generally requires evidence obtained in violation of the Fourth Amendment's warrant requirement or a recognized exception to that requirement be suppressed and not offered as evidence at trial. *See, e.g., Davis v. United States,* 564 U.S. 229, 236–37 (2011). It is a prudential doctrine that is remedial and intended to "compel respect for the constitutional guaranty." *Id.* at 236. The doctrine of inevitable discovery is an exception to the exclusionary rule first recognized by the Supreme Court in *Nix v. Williams*, 467 U.S. 431 (1984), which identified the exception as "closely related" and "functional[ly] similar[]" to the independent source doctrine—another exception to the exclusionary rule, *id.* at 443–44. The independent source doctrine "allows admission of evidence that has been discovered by means wholly independent of any constitutional violation" because exclusion of such evidence would not serve the exclusionary rule's deterrent purpose. *Id.* at 443. Instead, exclusion would put the prosecution "in a worse position simply because of some earlier police error or misconduct," thereby upsetting the balance between "the interest of society in

---

written materials found in the Backpack are plainly within the scope of the federal search warrant, discussed below.

deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime." *Id.* In *Nix*, the Supreme Court applied the same reasoning to endorse the inevitable discovery doctrine as an extension of the independent source doctrine: "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense." *Id.* at 444.

The inevitable discovery doctrine allows the fruits of an illegal search or seizure to be nevertheless admitted at trial "if the government can prove that the evidence would have been obtained inevitably without the constitutional violation." *United States v. Heath,* 455 F.3d 52, 55 (2d Cir. 2006). The government bears the burden of proving inevitable discovery by a preponderance of the evidence. *Nix,* 467 U.S. at 444; *United States v. Cabassa,* 62 F.3d 470, 472–73 (2d Cir. 1995). Proof of inevitable discovery "involves no speculative elements but focuses on *demonstrated historical facts capable of ready verification or impeachment*," *United States v. Eng,* 971 F.2d 854, 859 (2d Cir. 1992), quoting *Nix,* 467 U.S. at 444 n.5 (emphasis in *Eng*). The focus on demonstrated historical facts avoids undue speculation by requiring the "district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred." *Id.* at 861 (emphasis in original). Evidence should not be admitted, therefore, unless a court "can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *Heath,* 455 F.3d at 60; *see also id.* ("Under the inevitable discovery exception, unlawfully seized evidence is admissible if

14

there is *no doubt* that the police would have lawfully discovered the evidence later."), quoting

*United States v. Romero*, 692 F.2d 699, 704 (10th Cir.1982) (emphasis in *Heath*).

In this case, the first violation the Defendant alleges is that the pre-transport "safety search," in which the loaded magazine was recovered, was not justified.  However, the record clearly establishes that the Backpack was taken from the McDonald's by the Altoona Police Department as part of their standard safeguarding procedures for the personal property of a person arrested in a public place, and there is no doubt that the Backpack would have been transported to the police station even if the pre-transport safety search had not occurred or the initial cursory search had failed to turn up the loaded magazine.  *See, e.g.*, Hr'g Tr. at 25:23–27:4.  Once at the station, the record also clearly establishes that the standardized procedures of the Altoona Police Department would have required that the Backpack be opened and its entire contents inventoried and logged.  The *Mendez* factors govern when inventory search procedures can establish the grounds for inevitable discovery:  "(1) that the police had legitimate custody of the . . .  property being searched, so that an inventory search would have been justified; (2) that when the police in the police agency in question conducted inventory searches, they did so pursuant to established or standardized procedures; and (3) that those inventory procedures would have inevitably led to the discovery of the challenged evidence."  *United States v. Mendez*, 315 F.3d 132, 138 (2d Cir. 2002).[12]  Even if the Defendant is correct that the standardized procedures of the Altoona Police Department would have *required* that any inventory search stop in favor of a search warrant once the loaded magazine, the handgun, and/or

---

[12] The Defendant's arguments regarding the *Mendez* factors conflate the inventory search exception and the inevitable discovery exception, by arguing that the factors cannot be met because the inventory search actually conducted was not proper.  But, even assuming the Defendant were correct, that is not the test.  In any inevitable discovery analysis, the premise is that some unlawful search has been conducted, and the Court is assessing whether the exclusionary rule need not be applied because the evidence *would have been* inevitably discovered through some predictable and near-certain lawful means.

the silencer were found in the Backpack in the course of that inventory search, a search warrant was in fact obtained, first by local authorities and then, more importantly for our purposes, by the federal authorities prosecuting the instant case.[13]

The federal search warrant for the contents of the Backpack, authorized by a magistrate judge in this District on December 16, 2024, is based almost entirely on evidence gathered independent of searches conducted by the Altoona Police Department that the Defendant now claims were unlawful.[14]  Even accepting Defendant's premise that any inventory search should have ceased in favor of a warrant once the firearm (recovered first in the search at the police station) had been found, and removing from paragraph 10 of the search warrant the reference to the silencer, the US passport and currency also found in the Backpack; and references in paragraphs 11, 12, and 13 to the exterior of written materials seen in the Backpack, the warrant affidavit still contains overwhelming probable cause to search the entire contents of the Backpack in service of the federal investigation into Brian Thompson's murder.  Taking all of these facts together, the Court has little difficulty concluding that, whether characterized as inevitable discovery or independent source, the contents of the Backpack are not subject to the

---

[13] Even assuming the Defendant is correct that any inventory search should have ceased once evidence of a crime was found, given Pennsylvania's gun laws it is not clear that point would be reached merely by finding a loaded magazine or a handgun, as opposed to the silencer, which is clearly unlawful and, in the sequence of the inventory search actually conducted, was the third of these items found. However, the Defendant did not explore this issue with Deputy Chief Snyder and the record is not well developed on this question.

[14] Here, the December 14 federal search warrant could also support denial of the suppression motion under the "independent source" doctrine, since the warrant plainly supported probable cause even without any reference to items that the Defendant argues exceeded the bounds of permissible earlier searches, and the decision to seek the warrant was not prompted by information gleaned from any improper police conduct.  *See, e.g., United States v. Mulholland*, 702 F. App'x 7, 10–11 (2d Cir. 2017) (applying independent source doctrine to warrant obtained over a year after initial search of laptop, which was done on mistaken belief that proper consent had been given).  However, the Government did not expressly argue independent source as a basis, and for the reasons stated herein, the Court need not rely on this exception as denial of the motion is amply supported on other bases.

exclusionary rule under applicable precedents and the evidence contained therein should not be suppressed.

This case is strikingly similar to *United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013), in which the Second Circuit upheld an inevitable discovery ruling where evidence obtained through a warrant later found to be invalid due to overbreadth was subsequently obtained through a grand jury subpoena. Similar to this case, no great feat of imagination or resolving fuzzy contingencies in favor of the government was required, because the court could "be confident that this sequence is what would have happened, because it *did* happen. This case presents the unusual scenario where the actual events played out exactly as they would have 'but for' the over-breadth of the warrant, because the government actually obtained the evidence through alternative means that did not depend on any invalidity of the warrant. . . . The record, therefore, confirms that the government would have validly discovered the documents produced pursuant to the subpoena 'but for' the over-breadth of the warrant." *Vilar*, 729 F.3d at 84–85 (and going on to reject the defendant's argument that *Eng* does not allow for using legal process to "cure" faulty prior police action).

## CONCLUSION

In sum, numerous exceptions to the warrant requirement (as well as the federal search warrant actually issued) preclude suppression of the Backpack and its contents in this case, whether through the discovery of the loaded magazine during a pre-transport safety search, the recovery of the remaining items in the course of an inventory search at the police station, or the inevitable discovery of all of the contents through the federal search warrant, even excising references to any items found or seen after the magazine, firearm, and/or silencer were found. Accordingly, the motion to suppress the Backpack and its contents is DENIED.

Dated: January 30, 2026
      New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge

18

# EXHIBIT A

AO 106 (SDNY Rev. 01/17)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

24 MAG 4342

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Black Backpack Identified in Attachment A Hereto and Any Written Materials Contained Therein

Case No.

## APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Black Backpack Identified in Attachment A Hereto and Any Written Materials Contained Therein

located in the _____ Southern _____ District of _____ New York _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attached Affidavit and its Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

X evidence of a crime;

X contraband, fruits of crime, or other items illegally possessed;

X property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section(s) | Offense Description(s) |
|---|---|
| 18 U.S.C. §§ 924(j), 18 U.S.C. § 924(c) 18 U.S.C. §§ 2261A | Murder through use of a firearm, aiding and abetting Firearms possession and discharge Interstate Stalking and Stalking by use of interstate facilities |

The application is based on these facts:

See Attached Affidavit and its Attachment A

☑ Continued on the attached sheet.

☐ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Gary Cobb
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 12/16/2024 _____

_____
*Judge's signature*

City and state:  New York, NY

Honorable Katharine H. Parker
*Printed name and title*

24 MAG 1342

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>In the Matter of the Application of the United States of America for a Search Warrant for the Black Backpack Seized from LUIGI NICHOLAS MANGIONE on or about December 9, 2024, Identified in Attachment A Hereto and Any Written Materials Contained Therein</td><td>**TO BE FILED UNDER SEAL**<br><br>**Agent Affidavit in Support of Application for Search and Seizure Warrant**</td></tr>
</table>

SOUTHERN DISTRICT OF NEW YORK) ss.:

    GARY COBB, being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

    1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI" or "Investigating Agency"). I have been a Special Agent with the FBI for approximately five years. I have participated in numerous investigations of shootings, murders, and other violent crimes and have become familiar with the ways that perpetrators of these crimes use of firearms and the methods they employ to plan, execute, and conceal their crimes. In the course of those investigations, I have conducted or participated in surveillance operations, undercover operations, debriefings of informants, and reviews of taped conversations and cellular phone data. Through my training and experience, I have also become familiar with the manner in which individuals who commit violent and other crimes, prepare for their criminal activities, including using handwritten notes and letters, along with other measures these individuals employ to avoid detection by law enforcement. I have participated in the execution of search warrants, including search warrants for physical evidence such as that described below.

    2.    I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the item specified below (the "Subject

Backpack") and review any written materials contained therein for the items and information described in Attachment A. This affidavit is based upon my personal knowledge; my review of documents and other evidence; and my conversations with other law enforcement personnel; and my training, experience and advice received concerning the commission of violent and firearms related offenses. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### B. The Subject Backpack

3.    As depicted below, the Subject Backpack is a black backpack that was seized incident to the arrest of LUIGI NICHOLAS MANGIONE on or about December 9, 2024. As discussed further below, I believe the Subject Backpack contains evidence, fruits, and instrumentalities of MANGIONE's participation in the murder of Brian Thompson (the "Victim") on December 4, 2024 in New York, New York.



4.      The Subject Backpack is presently located in the Southern District of New York.

## C.  The Subject Offenses

5.      For the reasons detailed below, I believe that there is probable cause to believe that the Subject Backpack contains evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2261A(1) (interstate stalking), 2261A(2) (stalking by use of interstate facilities), 924(j) (murder through use of a firearm), and 924(c) (firearms possession in relation to a crime of violence) (the "Subject Offenses").

## II.  Probable Cause

### A.  Probable Cause Regarding the Commission of the Subject Offenses

6.      Based on my participation in this investigation, my conversations with other law enforcement officers, my review of documents prepared by others, and my review of security camera video, I have learned, among other things, the following:

a.  On December 4, 2024, at approximately 6:45 a.m., Brian Thompson ("the Victim"), the Chief Executive Officer of a nationwide health insurance company ("Company-1"), was shot

and killed by a masked assailant (the "Shooter") while walking on East 54th Street toward a hotel in Midtown Manhattan (the "Midtown Hotel"), where a Company-1 investor meeting was scheduled to commence later that morning. Security camera video captured the Shooter, who was wearing a gray backpack (the "Gray Backpack"), and hiding between two parked cars, walk-up behind the Victim and shoot the Victim several times in the leg and back outside of the Midtown Hotel's entrance on East 54th Street. The firearm the gunman used appeared to have a sound suppressing device or "silencer" attached to the front of its barrel. A still image of the surveillance video from the shooting is provided below:



    b. Responding law enforcement personnel recovered, among other items, several spent 9mm shell casings and at least one live 9mm round of ammunition. The words "deny," "delay," and "depose" were written on the side of the some of the casings using black marker. Based on my training, experience, and review of publicly-available information, I know that the words "deny" and "delay" are words commonly associated with the health insurance industry, and a prominent book about the health insurance industry was published in or about 2010 titled "Delay, Deny, Defend: Why Insurance Companies Don't Pay Claims and What You Can Do About It."

Responding law enforcement personnel also recovered a cellphone in the vicinity of the location where the shooting had occurred (the "Shooter Cellphone").

The Investigation

7.     Based on my participation in this investigation, my conversations with other law enforcement officers, my review of documents prepared by others, and my review of security camera video, I know that over the course of the next several days, investigators retrieved hundreds of hours of security camera video from nearby establishments and residences in an effort to capture the Shooter's movements both before and after the murder. Through a review of the security camera video, investigators were able to formulate the following timeline of the Shooter's movements from November 24, 2024 up to and including December 4, 2024:

*November 24, 2024*

a. At approximately 10:11 p.m., the Shooter arrived in New York City on a Greyhound bus at the Port Authority bus terminal in Manhattan. The bus originated in Atlanta, Georgia. The Shooter took a taxi to the area around the Midtown Hotel and stayed in the area for approximately one hour before taking another taxi to a hostel located in the Upper West Side of Manhattan (the "Upper West Side Hostel").

b. The Shooter registered at the Upper West Side Hostel under the name "Mark Rosario" and used a false New Jersey driver's license as a form of identification (the "False New Jersey ID").



c.  While checking in at the Upper West Side Hostel, the desk clerk asked the Shooter to remove his mask, which he did, revealing his face to a security camera, as shown below.



d.  Other than this interaction with the desk clerk, the Shooter consistently kept his mask on throughout his time in New York, including while at the Upper West Side Hostel.

*December 4, 2024*

e.  At approximately 5:35 a.m., the Shooter left the Upper West Side Hostel wearing the Gray Backpack and used an electric bicycle to travel down Central Park West to the area of the Midtown Hotel.



f.  At approximately 5:41 a.m., the Shooter walked around the area of the Midtown Hotel and at one point purchased items from a nearby coffee shop.  The Shooter then returned to a bench in the vicinity of the Midtown Hotel. On at least one occasion, prior to the murder, the Shooter was depicted using the Shooter Cellphone.

g.  At approximately 6:45 a.m.—after waiting in the vicinity of the Midtown Hotel for approximately an hour—the Shooter approached the Victim, shot the Victim multiple times, and then fled on foot to East 55th Street, where the Shooter got on the electric bicycle and rode towards Central Park. After disappearing inside the park for a period of time, the Shooter was picked-up on video again exiting the park and riding north on Central Park West. However, after coming out of the park, the Shooter was no longer carrying the Gray Backpack.

h.  Surveillance video stills of the Shooter riding the electric bicycle towards Central Park while wearing the Gray Backpack, and then departing Central Park without the Gray Backpack appear below:





i. At approximately 6:58 a.m., the Shooter passed another camera in the Upper West Side of Manhattan on West 85th Street and Columbus Avenue riding the electric bicycle. Two minutes later, at approximately 7:00 a.m., the Shooter was filmed walking on foot on West 86th Street and Columbus Avenue without the electric bicycle.

j. At approximately 7:04 a.m., the Shooter got into a taxi that drove him to the George Washington Bridge Bus Terminal in the vicinity of West 179th Street and Fort Washington Avenue in Upper Manhattan. The Shooter's face was captured in the back seat of the taxi.



k. At approximately 7:30 a.m., video footage from the George Washington Bridge Bus Terminal captured the Shooter entering the facility. The Shooter was then not seen exiting the bus terminal, suggesting that the Shooter left New York City.

l. On or about December 6, 2024, law enforcement officers searching Central Park found a gray backpack matching the appearance of the Gray Backpack worn by the Shooter, as depicted below:



The Arrest and Identification of the Shooter

8.    Based on my participation in this investigation, my conversations with other law enforcement officers, my review of documents prepared by others, and my review of security camera video, I know the following, among other things:

a.  On December 9, 2024, at approximately 9:14 a.m., a worker at a fast-food restaurant in Altoona, Pennsylvania called the police about a male customer later identified as LUIGI NICHOLAS MANGIONE, the defendant, who the worker believed bore similar features to the photos of the Shooter that had been broadcast in the media in the days following the Victim's murder. At the time, MANGIONE was carrying the Subject Backpack.

b.  Members of the Altoona Police Department responded and conducted a field investigation. The responding officers also found that MANGIONE matched the appearance of the Shooter. When approached by the officers and asked for identification, MANGIONE offered the

False New Jersey ID used by the Shooter to check into the Upper West Side Hostel. MANGIONE was then placed under arrest by the responding officers.

## B. Probable Cause Justifying Search of the Subject Backpack and the Written Materials Contained Therein

9.    Based on my participation in this investigation, my conversations with other law enforcement officers, my review of documents prepared by others, and my review of security camera video, and my training and experience, I know that the Altoona Police Department officers who arrested MANGIONE also conducted a search incident to arrest and an inventory search of MANGIONE's personal property, including the Subject Backpack, which MANGIONE possessed at the time of his arrest.

10.    Inside the Subject Backpack, law enforcement officers recovered, among other things: (1) a loaded 9mm pistol and silencer consistent with the weapon used to kill the Victim; and (2) a US passport and approximately $10,000 in cash, approximately $2000 of which was in a foreign currency. Photographs of the firearm and firearm suppressor recovered from the Subject Backpack are depicted below:



11.   Law enforcement officers searching the Subject Backpack also observed, among other things, a note with the words "To the Feds" written on the top (the "Feds Letter"), a note that appeared to be addressed to MANGIONE's family (the "Family Letter"), and a notebook (the "MANGIONE Notebook") with several handwritten pages contained therein that appeared to be written in the same handwriting as the Feds Letter.[1]

12.   As described above, the Shooter appeared to intentionally leave behind shell casings and live ammunition with the words "deny," "delay," and "depose" at the scene of the murder of the Victim. *See supra* ¶ 6(a).  As a result, I believe that the Feds Letter, the Family Letter, the MANGIONE Notebook, and other handwritten materials in the Subject Backpack will also serve as handwriting exemplars that further confirm that MANGIONE was the Shooter.

13.   Based on my review of reports published in various media outlets, I know that MANGIONE was a member of Goodreads, which is an online platform that allows authors and readers to find and discuss books they have read. In early 2024, MANGIONE posted a favorable review of Ted Kaczynski's, a/k/a the "Unabomber," manifesto as the work of a "political revolutionary." MANGIONE's review went on to promote the use of violence "when all other forms of communication fail" concluding that the quote "'violence never solved anything' is a statement uttered by cowards and predators." These comments establish that, prior to murdering the Victim, MANGIONE read and wrote about the use of violence to achieve political and social goals. Moreover, MANGIONE's possession of letters to "the Feds" and to his family—along with a notebook—demonstrates that MANGIONE was writing in the days and months prior to the

---

[1] Law enforcement officers photographed the Feds Letter, the Family Letter, and pages of the MANGIONE Notebook. Other law enforcement personnel and I have reviewed those photographs, however, I am not relying on the contents of these documents as probable cause for purposes of this search warrant affidavit.

murder, when it is highly probable that he would have discussed what he planned to do, or had done, and whether there were additional acts that were being contemplated. And because MANGIONE has a proven interest in the writings of at least one known terrorist, I submit there is probable cause to believe that the Subject Backpack—and any notes found therein—will contain evidence of MANGIONE's mental state before, during, and after the Subject Offenses. Based on these comments, I believe that the Subject Backpack and the written notes found therein will contain evidence of the motivation behind the Subject Offenses.

14.    On December 10, 2024, the day after MANGIONE was arrested, he was brought to a Pennsylvania courthouse for his first court appearance. As MANGIONE was being led into the courthouse, he turned to the media assembled outside of the courthouse and yelled "It's completely out of touch and an insult to the intelligence of the American people." This comment is another example of MANGIONE's state of mind and an effort to influence the public about his stated goals. This is further proof that the written materials in the Subject Backpack are likely to contain evidence of MANGIONE's plans to murder the Victim and possibly commit other acts of violence in furtherance of his agenda.

15.    Based on the significant premeditation and planning that went into the commission of the Subject Offenses—including MANGIONE's interstate travel, planned movements within New York City, the surveillance and tracking of the Victim, the elaborate efforts to avoid identification and apprehension, and the public comments made by MANGIONE on public forums—I believe that the Subject Backpack will contain the following items, all of which were either used in the commission of the murder (e.g., a gun and ammunition), would be carried and used to plan and carry out the stalking and killing of the Victim (e.g., electronic devices and co-

conspirator information), and would assist in the flight from New York and efforts to hide following the murder (e.g., financial and travel information):

   a.  Firearms;

   b.  Ammunition;

   c.  Electronic devices, including cellphones, laptops, tablets, and photographic equipment;

   d.  Clothing worn during the commission of the Subject Offenses;

   e.  All written materials regarding the preparation, planning and execution of the Subject Offenses (and any photocopies of those materials);

   f.  Bank records, checks, credit card bills, account information, and other financial records relating to the Subject Offenses (and any photocopies of those materials);

   g.  Calendar or other scheduling information relating to the Subject Offenses (including but not limited to travel itineraries and meetings with co-conspirators);

   h.  Evidence concerning the identity or location of co-conspirators involved the Subject Offenses and/or individuals involved in purchasing, selling, transporting, or storing firearms or ammunition;

   i.  Diary and notebook entries pertaining to the Subject Offenses (and any photocopies of those materials);

   j.  Handwriting exemplars (and any photocopies of those materials);

   k.  Any documents pertaining to the travel and stay in New York City from November 24, 2024 up to and including December 4, 2024 (and any photocopies of those materials).

16.    Based on my training and experience, I know that individuals who engage in highly-premeditated acts of violence designed to get public attention—like the murder of Company-1's CEO outside of an investor meeting in New York City—frequently maintain and keep logs and notes of their plans for these acts of violence, their motivations for committing these acts of violence, and their plans for how to evade law enforcement detection. These logs and notes can contain, among other things, to-do lists for tasks to complete in advance of the act of violence, lists of schedules for how to commit the act of violence, and potential escape plans and routes from the scene of the crime.

17.    Based on the foregoing, I respectfully submit there is probable cause to believe that evidence of the Subject Offenses, including evidence that MANGIONE committed the Subject

Offenses, is likely to be found in the Subject Backpack, including in closed containers and handwritten materials contained within the Subject Backpack.

## III. Conclusion and Ancillary Provisions

18.    For all of the foregoing reasons, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

19.    In light of the confidential nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

GARY COBB
Special Agent, FBI

Sworn to before me this
16th day of December, 2024

HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE

### Attachment A

### I. Items to Search and Seizure

The items that are the subject of this search and seizure warrant (the "Subject Backpack") are described as follows:

a. The black nylon backpack (pictured below) seized by the Altona Police Department

on December 9, 2024 incident to the arrest of LUIGI NICHOLAS MANGIONE and any containers

or written materials contained therein.



### Attachment B

I.    **Items to Be Seized**

A.  **Evidence, Fruits, and Instrumentalities of the Subject Offenses**

The items to be seized from the Subject Backpack consist of the following evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2261A(1) (interstate stalking), 2261A(2) (stalking by use of interstate facilities), 924(j) (murder through use of a firearm), and 924(c) (firearms possession in relation to a crime of violence) (the "Subject Offenses").

1.    Firearms;

2.    Ammunition:

3.    Electronic devices, including cellphones, laptops, tablets, and photographic equipment;

4.    Clothing worn during the commission of the Subject Offenses;

5.    All written materials regarding the preparation, planning and execution of the Subject Offenses (and any photocopies of those materials);

6.    Bank records, checks, credit card bills, account information, and other financial records relating to the Subject Offenses (and any photocopies of those materials);

7.    Calendar or other scheduling information relating to the Subject Offenses (including but not limited to travel itineraries and meetings with co-conspirators);

8.    Evidence concerning the identity or location of co-conspirators involved the Subject Offenses and/or individuals involved in purchasing, selling, transporting, or storing firearms or ammunition;

9.    Diary and notebook entries pertaining to the Subject Offenses (and any photocopies of those materials);

10    Handwriting exemplars (and any photocopies of those materials);

2

11.    Any documents pertaining to the travel to and from and his and stay in New York City from November 24, 2024 up to and including December 9, 2024 (and any photocopies of those materials).

AO 93 (SDNY Rev. 01/17) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

In the Matter of the Search of ) 
*(Briefly describe the property to be searched* ) 
*or identify the person by name and address)* ) 
 ) 
Black Backpack Identified in Attachment A Hereto and ) 
Any Written Materials Contained Therein )

Case No.

24 MAG 4342

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Southern_____ District of _____New York_____ *(identify the person or describe the property to be searched and give its location):*

Black Backpack Identified in Attachment A Hereto and Any Written Materials Contained Therein

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*

Black Backpack Identified in Attachment A Hereto and Any Written Materials Contained Therein

The search and seizure are related to violation(s) of *(insert statutory citations):*

18 U.S.C. §§ 2261A(1) ((interstate stalking), 2261A(2) (stalking by use of interstate facilities), 924(j) (murder through use of a firearm), 924(c) (firearms possession and use)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____December 30, 2024_____

*(not to exceed 14 days)*

☐ in the daytime  6:00 a.m. to 10 p.m.     ☑ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the Clerk of the Court.

☑ Upon its return, this warrant and inventory should be filed under seal by the Clerk of the Court. ___KHP___

*USMJ Initials*

☑ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☑ for ___30___ days *(not to exceed 30).*

☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     12/16/2024
5:44 p.m.

Judge's signature

City and state:     New York, NY

Honorable Katharine H. Parker
*Printed name and title*

AO 93  (SDNY Rev. 01/17) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the Court.


Date: _____                    _____
                                                        *Executing officer's signature*

                                                        _____
                                                        *Printed name and title*

## Attachment A

## I. Items to Search and Seizure

The items that are the subject of this search and seizure warrant (the "Subject Backpack") are described as follows:

a.  The black nylon backpack (pictured below) seized by the Altona Police Department

on December 9, 2024 incident to the arrest of LUIGI NICHOLAS MANGIONE and any containers

or written materials contained therein.



**Attachment B**

I. **Items to Be Seized**

A. **Evidence, Fruits, and Instrumentalities of the Subject Offenses**

The items to be seized from the Subject Backpack consist of the following evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2261A(1) (interstate stalking), 2261A(2) (stalking by use of interstate facilities), 924(j) (murder through use of a firearm), and 924(c) (firearms possession in relation to a crime of violence) (the "Subject Offenses").

1. Firearms;

2. Ammunition:

3. Electronic devices, including cellphones, laptops, tablets, and photographic equipment;

4. Clothing worn during the commission of the Subject Offenses;

5. All written materials regarding the preparation, planning and execution of the Subject Offenses (and any photocopies of those materials);

6. Bank records, checks, credit card bills, account information, and other financial records relating to the Subject Offenses (and any photocopies of those materials);

7. Calendar or other scheduling information relating to the Subject Offenses (including but not limited to travel itineraries and meetings with co-conspirators);

8. Evidence concerning the identity or location of co-conspirators involved the Subject Offenses and/or individuals involved in purchasing, selling, transporting, or storing firearms or ammunition;

9. Diary and notebook entries pertaining to the Subject Offenses (and any photocopies of those materials);

10 Handwriting exemplars (and any photocopies of those materials);

11.    Any documents pertaining to the travel to and from and his and stay in New York City from November 24, 2024 up to and including December 9, 2024 (and any photocopies of those materials).