Q1NDManC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                 v.                        25 Cr. 176 (MMG)
 4
     LUIGI MANGIONE,
 5
                                           Conference
 6              Defendant.
     ------------------------------x
 7                                         New York, N.Y.
                                           January 23, 2026
 8                                         11:00 a.m.

 9
     Before:
10
                       HON. MARGARET M. GARNETT,
11
                                           District Judge
12

13                          APPEARANCES

14   JAY CLAYTON
          United States Attorney for the
15        Southern District of New York
     BY:  DOMINIC A. GENTILE
16        JUN XIANG
          ALEXANDRA S. MESSITER
17        THOMAS JOHN WRIGHT
          Assistant United States Attorneys
18
     AGNIFILO INTRATER LLP
19        Attorneys for Defendant
     BY:  MARC ANTONY AGNIFILO
20        KAREN FRIEDMAN AGNIFILO
          JACOB KAPLAN
21        -and-
     MOSKOWITZ COLSON GINSBERG & SCHULMAN LLP
22   BY:  EYLAN SCHULMAN
          CHRISTOPHER R. NEFF
23

24

25
```

Q1NDManC

|   |   |
|---|---|
| 1 | THE DEPUTY CLERK: *United States v. Luigi Mangione*, |
| 2 | Case No. 25 Cr. 176. |
| 3 | Counsel, please state your appearances for the record, |
| 4 | starting with the government. |
| 5 | MR. GENTILE: Good morning, your Honor. Dominic |
| 6 | Gentile, Jun Xiang, Alexandra Messiter, and Thomas John Wright |
| 7 | for the United States. Seated at counsel table with us is |
| 8 | paralegal specialist Ananya Sankar. |
| 9 | THE COURT: Good morning. |
| 10 | MS. FRIEDMAN AGNIFILO: Good morning. Karen Friedman |
| 11 | Agnifilo on behalf of Mr. Mangione. Also, Marc Agnifilo, Jacob |
| 12 | Kaplan, Eylan Schulman, and Christopher Neff on behalf of |
| 13 | Mr. Mangione. Bella Irwin will be seated at counsel table |
| 14 | doing exhibits during cross-examination. |
| 15 | Thank you, your Honor. |
| 16 | THE COURT: Thank you all. You can be seated. |
| 17 | A couple of reminders for everyone. The first is for |
| 18 | counsel, that, as I told you a couple of weeks ago when we were |
| 19 | last together, that we have a live audio feed to the overflow |
| 20 | room. The microphones are very sensitive, much more sensitive |
| 21 | than they are here in the courtroom, so if you need to confer |
| 22 | privately with each other or if you need to confer with |
| 23 | Mr. Mangione privately, just be very conscious of the |
| 24 | microphones. You can mute your microphone if you're going to |
| 25 | speak and you'd like it to be private. |

Q1NDManC

1          Also, if you are one of the handful of people who are
2     allowed to have a cell phone with you, just take a moment and
3     make sure that it is fully silent in all respects.  Off is
4     better.  If anyone's phone goes off during the proceeding, it
5     will be taken and you may be escorted out.
6          First, a couple of administrative notes before we get
7     to the evidence today.  As to trial scheduling, I'm going to
8     adopt the parties' suggestion that we begin in-person jury
9     selection on Tuesday, September 8, with the goal of beginning a
10    non-capital on Tuesday, October 13.  The Monday the 12th the
11    parties suggested is a court holiday.  So that would begin on
12    Tuesday, October 13.  If a capital trial is to happen, that
13    would begin -- we'd begin the presentation of evidence, opening
14    statements really, on Monday, January 11, 2027.
15         One thing that was absent from the parties' proposal
16    but is crucial to the Court's timing, in particular the timing
17    of the jury department's work, is any discussion of a jury
18    questionnaire, and, if one is used, how the administration of
19    that questionnaire would intersect with the timing of jury
20    selection.  Since we're together again next Friday to talk
21    about scheduling and other matters, I just ask counsel to
22    consider that issue, discuss it with each other, and then we
23    can take it up on next Friday when we're together.
24         Okay.  I also received the government's search warrant
25    affidavit.  Thank you Mr. Gentile.

Q1NDManC

1          Does that entire document need to be under seal?  In

2    other words, if I refer to that document in my suppression

3    opinion, is there any information that I need to be aware of

4    that may need to be sealed?

5          MR. GENTILE:  No, your Honor.

6          THE COURT:  All right.  Good.  I just want to make

7    sure.

8          Then, finally, just a word about today's hearing and

9    the government's letter.  As I previously stated, both orally

10   and in writing, the sole issue for today's hearing is to

11   receive evidence about the standard procedures being used by

12   the Altoona Police Department in September of 2024 relating to

13   the securing, safeguarding, and, if appropriate, inventorying

14   of the personal property of a person arrested in a public

15   place, all to inform the Court's evaluation of the government's

16   inevitable discovery arguments related to the contents of the

17   defendant's backpack.

18         The reason for the limitation, as I explained a little

19   bit the last time we were together, is that, in the Court's

20   view, the relevant facts that are necessary to deciding the

21   rest of the suppression motion and the government's arguments

22   and opposition to it are not in dispute.

23         Mr. Kaplan, are you going to be handling the

24   cross-examination?

25         MR. KAPLAN:  No, your Honor.  Mr. Agnifilo will.

1          MR. AGNIFILO:  It's going to be me, your Honor.

2          THE COURT:  All right.  Of course, Mr. Agnifilo, I

3     will give you some latitude on cross-examination to impeach,

4     but only if it is impeachment of this witness and his direct

5     testimony.  I'm not going to allow this to turn into some kind

6     of extension of the state hearing by proxy.  I'm confident that

7     you understand that, but it's good to make sure we're all on

8     the same page.

9          MR. AGNIFILO:  Thank you, Judge.

10          THE COURT:  So, with that understanding, as I said, in

11     its letter this morning, the government has asked me to

12     preemptively prevent the defense from using Defense Exhibit

13     Two, which appears on its face to be some kind of police log

14     document related to Mr. Mangione's arrest.  I'm not going to do

15     that at this point, because I don't know yet the questions that

16     Mr. Agnifilo might ask about that document and the relevance of

17     those questions, and I can't really assess that in a vacuum.

18          I certainly understand the government's concerns.  I'm

19     also confident that Mr. Agnifilo understands the scope of this

20     hearing.  Everyone should understand that if we begin to veer

21     beyond that scope on direct or cross, I won't hesitate to put a

22     stop to it in the interest of conserving the Court's time and

23     not having this turn into a circus that is not relevant to any

24     issue before the Court.

25          So, with that, before we call the witness, anything,

Q1NDManC

1    Mr. Gentile, that you'd like to raise?

2         MR. GENTILE:  Not from the government, Judge.  No.

3         THE COURT:  Mr. Agnifilo, anything?

4         MR. AGNIFILO:  Nothing from us, Judge.  No.

5         THE COURT:  All right.  Mr. Gentile, does the

6    government have a witness?

7         MR. GENTILE:  We do, your Honor.  The government calls

8    Deputy Chief Nathan Snyder.

9         THE COURT:  Great.

10        Mr. Snyder.

11        Okay.  We're getting him from the hall I assume.

12        Welcome, Mr. Snyder.  You're going to come right over

13   here, and when you get to the witness box, just remain standing

14   for the oath.

15        Thank you.

16        (Witness sworn)

17        THE DEPUTY CLERK:  Please state and spell your full

18   name for the record.

19        THE WITNESS:  Nathan Snyder, N-a-t-h-a-n, S-n-y-d-e-r.

20        THE DEPUTY CLERK:  Thank you.  You may be seated.

21        THE COURT:  You might want to lower that chair.  It

22   looks a little high.  But you do whatever is comfortable for

23   you.

24        Mr. Gentile.

25        MR. GENTILE:  May I inquire, Judge?

Q1NDManC                          Nathan Snyder - Direct

1              THE COURT:  You may.

2              MR. GENTILE:  Judge, before we begin, I just wanted to

3    point out that some of the exhibits that the government intends

4    to introduce today are duplicates of exhibits that were

5    attached to our motion papers.  We are re-numbering them for

6    purposes of this hearing, though.

7              THE COURT:  Okay.

8     NATHAN SNYDER,

9         called as a witness by the government,

10        having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. GENTILE:

13   Q.  Good morning, sir.

14   A.  Good morning.

15   Q.  By whom are you employed?

16   A.  The Altoona Police Department.

17   Q.  And what is your current position within the Altoona Police

18   Department?

19   A.  I am the deputy chief.

20   Q.  And how long have you been with the Altoona Police

21   Department?

22   A.  Since June of 2009.

23   Q.  Did you hold any law enforcement positions prior to your

24   employment with the Altoona Police Department?

25   A.  I worked in the state correctional institution for about

Q1NDManC                          Nathan Snyder - Direct

1    four years.

2    Q.  Can you briefly describe the positions you've held while

3    you've been with the Altoona Police?

4    A.  Sure.  When I was hired in 2009, I was a probationary

5    officer until about 2013.  I was promoted to corporal.  And

6    then about five years after that, I was promoted to sergeant;

7    and about three or four years after that, to lieutenant; and

8    then, most recently, as the deputy chief as of January 2nd.

9    Q.  Congratulations on your promotion.

10   A.  Thank you.

11            THE COURT:  That's January 2nd of this year?

12   A.  This year.  That's right.

13   Q.  Did any of the positions that you just described involve

14   the training of police officers?

15   A.  Yes, they did.  When I was a patrolman before I became a

16   corporal, I was designated as a FTO.  That's a field training

17   officer.  And then once I was promoted to corporal, I actually

18   oversaw our FTO program for a couple years.  And then, again,

19   as a lieutenant, I oversaw the program for a couple years then,

20   too.

21   Q.  Just briefly, what is a field training officer?

22   A.  So, a field training officer is responsible for training

23   probationary officers to become Altoona Police Officers and be

24   out on solo patrol.

25   Q.  And does that include training them on rules and procedures

Q1NDManC                         Nathan Snyder - Direct

1    of the police department?

2    A.  Yes, it does.

3    Q.  For how long were you involved in the training of police

4    officers in Altoona?

5    A.  Since about 2012.

6    Q.  And approximately how long did you serve as a field

7    training officer specifically?

8    A.  So, once you're designated a field training officer, you're

9    always involved in the training and mentorship of probationary

10   officers.

11   Q.  Chief, does the Altoona Police Department maintain a

12   written set of written policies and procedures?

13   A.  Yes, they do.

14   Q.  And what is that collection of policies and procedures

15   called?

16   A.  They're referred to as general orders.

17   Q.  And are those general orders compiled in a larger manual of

18   some sort?

19   A.  Yes, they are.

20   Q.  And is that manual accessible to the officers of the

21   Altoona Police Department?

22   A.  Yes, it is, both electronically and in a hard copy, paper

23   copy.

24   Q.  So each of the officers has a manual; is that right?

25   A.  That is correct.

Q1NDManC                          Nathan Snyder - Direct

Q.  Approximately how many sworn officers are there in Altoona

Police?

A.  Currently, there are 70.

Q.  And how are these officers instructed on the rules and

procedures of the Altoona Police Department?

A.  So, initially, when they are brought in, the FTO will read

over the general orders with them, explain them to them.  They

will then take them out on the street and demonstrate how to

apply them, and then, at a later time, they're quizzed

basically by a supervisor as to their knowledge of that general

order.

        THE COURT:  I'm sorry, Mr. Gentile, to interrupt you.

        Can I just ask, does Altoona have its own police

academy, Mr. Snyder -- or Chief Snyder, or do you participate

in some kind of pool academy?

        THE WITNESS:  We do not have our own specific.  We

actually participate in a larger pool, which is governed by

MPOETC.

        THE COURT:  What is MPOETC?

        THE WITNESS:  MPOETC is the Municipal Police Officers

Education and Training Commission.  They're the governing body

for Municipal Police in Pennsylvania.

        THE COURT:  Okay.  So, the multiple departments pool

to have an academy, and this training that you've talked about,

the FTO portion, that's happening after officers come to you

Q1NDManC                          Nathan Snyder - Direct

1    from this pool academy?

2             THE WITNESS:  Yes, Judge.  That's correct.

3             THE COURT:  Thank you.  Go ahead, Mr. Gentile.

4             MR. GENTILE:  Thank you, Judge.

5    Q.  Just following up on what the Court's questions were, the

6    rules and procedures of the Altoona Police Department, are they

7    taught by the police academy that the officers attend, or just

8    by these field training officers and the department itself?

9    A.  By the field training officers and the department itself.

10   Q.  In addition to the general orders, are there any written

11   materials that the department uses to implement its policies

12   and procedures and to train the officers on?

13   A.  Yes, there is.  We call them task sheets.

14   Q.  And what are the training task sheets?

15   A.  Training task sheets are basically the building block for a

16   specific task that the probation officer needs to learn,

17   anything from searches or how to tow a vehicle, and how we do

18   those things.

19   Q.  Do the task sheets correspond to the general orders you

20   described earlier?

21   A.  Yes, they do.

22   Q.  And are the task sheets part of the manual?

23   A.  Yes.

24   Q.  We're going to get into those task sheets a little bit more

25   later.  Before we move on, Chief, I want to ask you, were you

Q1NDManC                    Nathan Snyder - Direct

1    involved in the arrest of the defendant on December 9, 2024, in

2    Altoona, Pennsylvania?

3    A.  No, I was not.

4    Q.  Were you even working that day?

5    A.  I was, but not in that area.

6    Q.  Were you in Altoona, Pennsylvania, on that day?

7    A.  No, I was not.

8    Q.  Have you spoken with the officers who did participate in

9    his arrest at the McDonald's in any substantive way about their

10   actions that day?

11   A.  No, I have not.

12   Q.  And have you had any involvement in the Altoona Police

13   Department's investigation of the defendant?

14   A.  No, I have not.

15   Q.  Have you reviewed any of the body-worn camera worn by the

16   officers who interacted with the defendant on December 9, 2024?

17   A.  No, I have not.

18   Q.  Let's talk a little bit about specific policies and

19   procedures of the Altoona Police Department, specifically,

20   those regarding the securing, safeguarding and inventorying of

21   detainee property.

22           Does the Altoona Police Department manual have

23   specific procedures which pertain to detainee property?

24   A.  Yes, we do.

25   Q.  And what are those policies and procedures?

Q1NDManC                          Nathan Snyder - Direct

1    A.  They are found in general orders 3.1, 3.5 and 3.6.

2    Q.  And are there any policies and procedures that are

3    discussed or referenced in those task sheets that you discussed

4    earlier?

5    A.  Yes, there are.

6    Q.  Let's start with general order 3.1.

7              With the Court's permission, I'm going to ask

8    Ms. Sankar to publish what's been marked as Government Exhibit

9    One to the Court, the witness and the parties.

10             THE COURT:  Yes.

11             Any objection, Mr. Agnifilo?

12             MR. AGNIFILO:  No, your Honor.  None.

13   Q.  Chief, do you recognize this document that's on the screen

14   in front of you?

15   A.  Yes, I do.

16   Q.  What is it?

17   A.  This is the Altoona Police Department's general order 3.1.

18   Q.  Is this a true and accurate copy of general order 3.1?

19   A.  Yes, it is.

20             MR. GENTILE:  The government offers Government Exhibit

21   One into evidence, Judge.

22             THE COURT:  Any objections, Mr. Agnifilo?

23             MR. AGNIFILO:  No objection, your Honor.  Thank you.

24             THE COURT:  All right.  Government Exhibit One is

25   received.

1              (Government Exhibit One received in evidence)

2    Q.   Chief, what is the title of general order 3.1?

3    A.   Cell area.

4    Q.   And which sections of general order 3.1 apply to detainee

5    property?

6    A.   3.1.9 and 3.1.10.

7    Q.   I'm going to direct your attention to section 3.1.9, which

8    is titled "Required Detainee Searches," and specifically

9    subsection A, which is titled "Inventory Search of the

10   Detainee."  And that's on page six, and paragraph one under

11   that subheading.

12              I'm going to ask you to take a look at that, and then

13   I'm also going to direct your attention to section 3.1.10,

14   which is titled "Secure Storage of Detainee Property," and it's

15   specifically subsection A and sub-subsection (a)(1).  Just look

16   at that briefly.

17              Chief, taken together --

18              THE COURT:  I'm sorry, Mr. Gentile.

19              Mr. Snyder, if at any time it's helpful to you to see

20   a paper copy of these documents, so you can see these things in

21   context -- I know you're very familiar with the things the

22   government is showing you, but if at any time you -- the screen

23   is fantastic, but you can't always see the whole document, so

24   please don't hesitate.  I have paper copies.  So does the

25   government.  If at any time it would be helpful for you to see

1  something in context in paper, you just tell me and we'll take

2  care of it.  Okay?

3              THE WITNESS:  Okay.  Thank you.

4              THE COURT:  Go ahead, Mr. Gentile.

5              MR. GENTILE:  Thank you, Judge.

6  Q.  Taken together, Chief, what do these two sections of the

7  general order 3.1 describe?

8  A.  They describe the process of when a detainee is brought to

9  station, that their property will be searched, that the

10  detainee will be searched, that the property will be

11  inventoried, and it will be safeguarded until a disposition of

12  the detainee.

13  Q.  Does this system of securing and inventorying detainee

14  property described in these particular sections apply only to

15  property that is found on a detainee's person, or does it apply

16  to all property belonging to a detainee?

17  A.  This would be for all property.

18  Q.  And do these procedures apply to the personal property of a

19  person arrested in a public place?

20  A.  Yes.

21  Q.  Let's turn to general order 3.6.

22              MR. GENTILE:  May we publish what has been marked as

23  Government Exhibit Two, Judge?

24              THE COURT:  Any objection, Mr. Agnifilo?

25              MR. AGNIFILO:  No objection, Judge.

1          THE COURT:  Yes.

2    Q.  Chief, do you recognize this document?

3    A.  Yes, I do.

4    Q.  And can you tell the Court what it is?

5    A.  It is the Altoona Police Department's general order 3.6.

6    Q.  And is it a true and accurate copy of general order 3.6?

7    A.  Yes, it is.

8          MR. GENTILE:  The government offers Government Exhibit

9    Two into evidence, Judge.

10          MR. AGNIFILO:  No objection.

11          THE COURT:  Okay.  Government Exhibit Two is received.

12          (Government Exhibit Two received in evidence)

13   Q.  Chief, what is the title of general order 3.6?

14   A.  "Property and Evidence Control."

15   Q.  I'm going to direct your attention to section 3.6.1 on page

16   2, which contains the heading "Receiving and Retention of

17   Evidence and Property."  I'm going to ask you to look at that

18   briefly.

19          Generally speaking, Chief, what procedure does 3.6.1

20   establish for property coming into the possession of the

21   Altoona Police Department?

22   A.  It states that all property that we receive must be

23   documented, inventoried and safeguarded until a disposition can

24   be made.

25   Q.  And it applies to those enumerated categories below

Q1NDManC                          Nathan Snyder - Direct

1  paragraph one; is that right?

2  A.  That is correct.

3  Q.  And does this system of safeguarding, securing and

4  inventorying property apply to all of a detainee's property or

5  only property that's found on his or her person?

6  A.  All of their property.

7          THE COURT:  Can I just ask you, Mr. Snyder, this

8  category B, all the other properties -- all the other

9  categories seem pretty self-explanatory to me, but category B,

10  "recovered property," based on your experience and involvement

11  with implementing these orders, what does "recovered property"

12  mean?

13          Give me some examples of what that refers to.

14          THE WITNESS:  So recovered property would be anything

15  that we find that we can't relatively quickly link to an owner,

16  that our guys find, where -- versus like a found property,

17  typically we're talking about somebody brings that to the

18  station or somebody stops an officer and says, hey, I found a

19  wallet, that type of thing.

20          THE COURT:  All right.  So "recovered property" is

21  intended to encompass things that police officers might find,

22  whether at a crime scene or in connection with some other

23  investigation?  Basically, anything that isn't found or

24  abandoned but is picked up by a police officer in some context

25  in the course of their duties?

Q1NDManC                          Nathan Snyder - Direct

1          THE WITNESS:  I would say that's accurate.

2          THE COURT:  Thank you.

3          Go ahead Mr. Gentile.

4          MR. GENTILE:  Thank you, Judge.

5   Q.  Following up on the Court's question, all of those

6   enumerated categories, this procedure applies to?  This

7   procedure applies to all those enumerated categories; is that

8   right?

9   A.  That is correct.

10  Q.  So, that means that any recovered property that's not

11  associated with anyone would also be inventoried as well; is

12  that right?

13  A.  That is correct.

14  Q.  Does this section include the personal property of a person

15  arrested in a public place?

16  A.  Yes, it does.

17  Q.  The third general order you mentioned, Chief, is general

18  order 3.5; is that right?

19  A.  That's correct.

20          MR. GENTILE:  May we publish what has been marked as

21  Government Exhibit Three?

22          MR. AGNIFILO:  No objection.

23          THE COURT:  Yes.

24  Q.  Chief, do you recognize this document?

25  A.  Yes, I do.

Q1NDManC                           Nathan Snyder - Direct

1   Q.  And what is this document?

2   A.  This is the Altoona Police Department's general order 3.5.

3   Q.  And is this a true and accurate copy of general order 3.5?

4   A.  Yes, it is.

5        MR. GENTILE:  The government offers Government Exhibit

6   Three into evidence.

7        MR. AGNIFILO:  No objection, Judge.

8        THE COURT:  Government Exhibit Three is received.

9        (Government Exhibit Three received in evidence)

10  Q.  Chief, can you read what the title of general order 3.5 is?

11  A.  "Collection and Preservation of Evidence."

12  Q.  Directing your attention to section 3.5.2, on page 2.

13       What does that section of 3.5 cover?

14  A.  Again, it states, all evidence and property received by a

15  member of our department will be documented, safeguarded and

16  secured until a disposition can be made with that.

17  Q.  And, again, it applies to those enumerated categories

18  underneath paragraph A; is that right?

19  A.  That is correct.

20  Q.  Generally speaking, what does section 3.5.2 instruct

21  officers to do with those categories of property?

22  A.  It says that we're going to document them, inventory and

23  secure them until we can get a disposition for that property.

24  Q.  Chief, the three general orders we just went through, were

25  they all in effect in December of 2024?

Q1NDManC                    Nathan Snyder - Direct

1    A.  Yes, they were.

2    Q.  Let's talk a little bit more about the task sheets you

3    discussed earlier.  How are the Altoona Police Department

4    officers instructed on the procedures described in the general

5    orders?

6    A.  So, again, with the task sheets, they're read to the

7    probationary officer, usually by the FTO.  The FTO can ask

8    questions -- or, I'm sorry, the probationary officer will ask

9    questions.  The FTO will clarify that, and then they'll

10    actually attempt to demonstrate that to show them in the field

11    how that applies.  Again, they'll be brought back to the

12    station at some point and quizzed by a supervisor as to their

13    knowledge of that task, and then they'll be signed off on it.

14    Q.  I believe you testified earlier that the task sheets

15    correspond to the general orders in the manual; is that right?

16    A.  That is correct.

17    Q.  Do instructions in the task sheets -- I'm sorry.  Since the

18    instructions on the task sheets correspond to the general

19    orders, does that mean that the instructions on those sheets

20    are followed by the Altoona Police Officers throughout their

21    careers?

22    A.  That is correct.

23    Q.  So it's not -- doesn't just apply to probationary officers;

24    is that right?

25    A.  That is correct.

Q1NDManC                    Nathan Snyder - Direct

1          THE COURT:  So let me just make sure I understand,

2   Mr. Snyder.  The purpose of what we are calling "task sheets,"

3   their purpose to exist is to assist in training new officers;

4   is that right?

5          THE WITNESS:  That is correct.

6          THE COURT:  But the concepts and instructions and

7   procedures that are reflected on those task sheets are

8   procedures that apply to any officer in the department, not

9   only probationary officers?

10         THE WITNESS:  That is correct.

11         THE COURT:  Okay.  Sometimes I just -- I want to make

12  sure I understand, so if I say something that's wrong, I want

13  you to correct me.  But the summary that I -- do I have a

14  correct understanding of these task sheets?

15         THE WITNESS:  That is correct.

16         THE COURT:  Great.  Thank you.

17         Go ahead, Mr. Gentile.

18         MR. GENTILE:  Thank you, Judge.

19         With the Court's permission, I'm going to ask

20  Ms. Sankar to publish for the Court, the witness and the

21  parties Government Exhibit Four.

22         MR. AGNIFILO:  No objection.

23         THE COURT:  You may publish Government Exhibit Four.

24  Q.  Chief, do you recognize this document?

25  A.  Yes, I do.

Q1NDManC                        Nathan Snyder - Direct

1   Q.  And can you tell the Court what it is?

2   A.  This is the Altoona Police Department task sheet for

3   custodial arrest procedures, summary, misdemeanor and felony

4   offenses.

5   Q.  And is this a true and accurate copy of the task sheet for

6   custodial arrest procedures?

7   A.  Yes, it is.

8           MR. GENTILE:  The government offers Government Exhibit

9   Four into evidence.

10          MR. AGNIFILO:  No objection, Judge.

11          THE COURT:  All right.  Four is received.

12          (Government Exhibit Four received in evidence)

13  Q.  I'm going to direct your attention to II.  It's on page 3,

14  operational procedures, section D, which is titled "In-custody

15  Arrests," and I'm going to ask you to focus on no. 7.

16          What procedure does this specific subsection address?

17  A.  This talks about prisoners and their property being

18  inventoried, and actually entering that information on an

19  Altoona Police Department prisoner log.

20  Q.  And does this inventory procedure apply to all property

21  that accompanies a person arrested by an Altoona officer --

22  A.  Yes.

23  Q.  -- or just property found on his person?

24  A.  All property.

25  Q.  Chief, the last item I want you to take a look at is what

1    has been marked as Government Exhibit Five.

2                MR. GENTILE:  May we publish, Judge?

3                THE COURT:  Yes.

4    Q.  Chief, do you recognize this document?

5    A.  Yes, I do.

6    Q.  And what is this?

7    A.  It is the Altoona Police Department "detention of

8    prisoners, adult" task sheet.

9    Q.  Is this a true and accurate copy of the task sheet

10   "detention of prisoners?"

11   A.  Yes, it is.

12               MR. GENTILE:  The government offers Government Exhibit

13   Five into evidence.

14               MR. AGNIFILO:  No, objection, Judge.

15               THE COURT:  Five is received.

16               (Government Exhibit Five received in evidence)

17   Q.  Chief, I'm going to direct your attention to II,

18   operational procedures, letter D.

19               Generally speaking, Chief, what procedure does this

20   specific section address?

21   A.  This is addressing personal belongings that are found with

22   a prisoner being inventoried and, again, safeguarded until a

23   disposition can be made for them.

24   Q.  Does this inventory procedure apply to an arrestee's

25   property that are going to be returned to the prisoner?

1    A.  Yes.

2    Q.  Does this specific procedure come into play after a search

3    of an arrestee is conducted and they've already identified what

4    property is personal and what property is evidence?

5    A.  Yes, that would be correct.

6    Q.  So how does this specific inventory procedure fit within

7    the broader set of procedures we've discussed previously?

8    A.  So, when we're inventorying property, we decide what's

9    going to be evidence, and that gets taken care of, documented,

10   and then placed into secure evidence.  Personal belongings that

11   are items that the detainee could get back, or that could

12   follow him to an institution, those things are also documented,

13   but they're documented on this form.  And then they are placed

14   into a secure locker that can be accessed once we have a

15   disposition of the prisoner.  So, that's how it works.

16   Q.  Is this simply an additional layer of the inventory

17   process?

18   A.  Yes, it is.

19   Q.  Chief, were the two task sheets that you just described for

20   us in effect in December of 2024?

21   A.  Yes, they were.

22   Q.  My last question, Chief:  Are the procedures you've

23   described here today the standardized procedures for the

24   Altoona Police Department when conducting inventory searches?

25   A.  Yes.

1          MR. GENTILE:  No further questions, Judge.

2          THE COURT:  Thank you, Mr. Gentile.

3          I just have one further question before

4  cross-examination.  Other than for items which are evidence,

5  which I understand the purpose, but from your perspective and

6  based on your training and experience, what's the purpose of

7  this safeguarding and inventorying procedure for the remainder

8  of a detainee's personal property?

9          THE WITNESS:  So, in my experience, I've had people

10  with heirloom necklaces from their grandmother, things like

11  that.  These are all their personal property, and we want to

12  make sure that we get them back to this detainee.  We're

13  responsible for taking them into custody, and that kind of goes

14  along with we're now responsible for your property, we want to

15  make sure you get it back.

16          Furthermore, I don't want to give back somebody's

17  property without inventorying, because somebody could say, hey,

18  my wallet had $10,000 in it, and I don't know that if I don't

19  search it.  And, obviously, one of the most important is also

20  that I'm not going to store any type of weapon or anything that

21  can maybe be accessed even upon release or anything like that,

22  so I want to make sure it's safe with the property.

23          THE COURT:  Just taking a step back to arrest

24  procedures, let's say I'm arrested on a public bus and I have

25  my purse or backpack like on the seat next to me and the

Q1NDManC                        Nathan Snyder - Direct

1    officers come, ma'am, stand up, and in that standing up and

2    handcuffing of me, I'm separated from my purse, with my wallet

3    and cell phone and all that.  What is the property procedure to

4    be followed in Altoona?  If you were training an officer, what

5    are they supposed to do with that purse that's on the seat on a

6    public bus?

7              THE WITNESS:  So they'll start by asking, ma'am, is

8    this your purse?  And if you say yes, we'll take that property

9    with you.  If you say, no, it's not my purse, in a public place

10   like that, we'll go ask whoever owns the -- or who's

11   responsible for that area, hey, does this purse belong here, is

12   it yours?  If no, then we will take custody of that purse,

13   because it is somebody's purse.  And then we will inventory it

14   and try to get it back to its owner.

15             THE COURT:  Why not just leave it there?  You've

16   arrested me and you're taking me away.  Why not just leave the

17   bag?

18             THE WITNESS:  Our duties are sometimes a little broad.

19   Even though we're trying to accomplish one thing, we may

20   encounter something else, and we can't turn a blind eye to it.

21   We still have to handle that while we're there, also.

22             THE COURT:  What if I say, yes, it is my bag?  Why not

23   leave it there?  I'm being arrested.

24             THE WITNESS:  Well, because you want to bring it with

25   you. You probably have valuables in there like your ID.  You

Q1NDManC                    Nathan Snyder - Cross

1    might need money to take a bus home or anything like that.

2    More importantly, nowadays, everybody has their phone

3    somewhere.  I know I wouldn't want to be separated from those

4    items.

5              THE COURT:  Thank you.

6              Mr. Agnifilo.

7              MR. AGNIFILO:  Yes.  Thank you very much.

8    CROSS-EXAMINATION

9    BY MR. AGNIFILO:

10   Q.  Chief Snyder, it's very nice to meet you.  My name is Marc

11   Agnifilo.  I'm going to ask you a few questions.  It won't be

12   very long.  We'll get you back to Altoona before ice and snow

13   reclaim the earth.

14   A.  Thank you.

15   Q.  So one thing I want to go over with you, the differences

16   between these general orders you talked about with my

17   colleague, and what were the other things called, task sheets?

18   A.  That's correct.

19   Q.  Okay.  And just what -- who writes the task sheets, if you

20   know?

21   A.  So, before me, I believe the training coordinator, prior to

22   me, had written out these task sheets.

23   Q.  Okay.  And the general orders, the order is from the police

24   chief of the Altoona Police Department; am I right?

25   A.  That would be correct.

Q1NDManC                         Nathan Snyder - Cross

1   Q.  Okay.  And do you have any hard copies of the orders in

2   front of you or no?

3   A.  I do not.

4   Q.  If you -- I repeat what the judge said, if you want the

5   hard copy orders, I'll give them to you, and that's fine.

6           THE COURT:  Mr. Agnifilo, do you want him to have

7   them?  I see Mr. Gentile is --

8           MR. AGNIFILO:  If we could get them easily, that would

9   be great.  We have them, too.  I think we have them, too.

10          THE COURT:  Okay.  If it would be easier just to have

11  them --

12          MR. AGNIFILO:  It might be.

13          THE COURT:  -- for Chief Snyder to have them in front

14  of him --

15          MR. AGNIFILO:  We can use one as an example.  This is

16  Government Exhibit One.  Can I approach the --

17          THE COURT:  Yes, of course.

18  Q.  If we're able to -- it's already in evidence.  This is

19  Government Exhibit One.  If we can go to the last page of this

20  and put this up on the screen for everyone.

21          All right.  If we can go to the last page?

22          So, when you get yourself situated, Chief, this is the

23  last page of Government Exhibit One, and what you see here,

24  this one is not signed, but you see a place where it would be

25  signed by -- is that a police chief whose name you're familiar

Q1NDManC                          Nathan Snyder - Cross

1    with?

2    A.  Yes, it is.

3    Q.  Okay.  And this name, it's Janice Freehling?  Am I saying

4    that right?

5    A.  Yes, that's correct.

6    Q.  Okay.  And Chief Freehling was the chief of the Altoona

7    Police Department at some point in the past; am I right?

8    A.  That is correct.

9    Q.  Okay.  She's no longer the chief?

10   A.  No longer.

11   Q.  All right.  And is it your understanding with these general

12   orders that these are actually signed by the chief of police?

13   A.  Yes.

14   Q.  This one doesn't happen to be, but there's a place for a

15   signature?

16   A.  That is correct.

17   Q.  Okay.  And, in your experience, if we were in the Altoona

18   Police Department and we were looking at the general orders,

19   would we see these general orders signed by the police chief?

20   A.  That is correct.

21   Q.  All right.  And that's true for all the general orders; am

22   I right?

23   A.  I would say that would be correct.

24   Q.  Okay.  Just to give an example, let's just pull up, just as

25   another example, Government's Exhibit Two.  It's already in

1    evidence.  We'll go to the last page.  We can give you that

2    hard copy as well.

3              MR. AGNIFILO:  May I approach the witness, Judge?

4              THE COURT:  Yes.

5              MR. AGNIFILO:  Thank you.

6    Q.  All right.  This is Government's Exhibit Two.  We're going

7    to go to the last page.

8              And we see this same sort of signature block there,

9    right?

10   A.  That is correct.

11   Q.  Okay.  And now, in regard to these task sheets, let's go to

12   what is already in evidence, for example, as Government's

13   Exhibit Five, if we can pull it up for the chief.  It's a

14   two-page document.

15             Chief, we're going to show you both pages.  So, this

16   is the first page of Government's Exhibit Five.

17             Do you see that there on your screen?

18   A.  I do.

19   Q.  Okay.  And let's go to the second page.

20             Do you see that on your screen?

21   A.  Yes, sir.

22   Q.  All right.  So one of the differences -- and tell me if

23   this is right -- between the general orders and these task

24   sheets is that the general orders are actually signed by the

25   chief of police, correct?

1    A.  That is correct.

2    Q.  All right.  And tell us again, who prepares the material in

3    the task sheets?

4    A.  Before me, I believe it was the training coordinator.

5    Q.  All right.  So am I right that one has the sort of force of

6    an order -- it's called an order, signed by the police chief --

7    and then one does not?  Am I right?

8    A.  So the task sheet is meant to be broken down, because,

9    again, it's the first exposure that a probationary officer has

10   to this task, so it's really broken down.  Whereas, when you

11   saw in the general orders that were mentioned and that we

12   talked about, there was maybe only four or five lines on these

13   talking about maybe in the same task, you're now broken down

14   into two pages of explanation, because, again, we're not

15   dealing with a 10-year veteran who may understand the lingo and

16   that type of thing.  This is a brand new guy fresh out of the

17   academy.  So --

18   Q.  Got it.  Let's go to the first page of this document.  If

19   you can -- so the point -- this is really a summary.  This is a

20   summary of corresponding parts of the general order; is that a

21   fair way to put it?

22   A.  I would say if you look at the training task sheet itself,

23   like Roman numeral I there has reference material, so that's

24   also explaining to the probation officer, we're not just

25   telling you what to do.  We're going to show you where that

Q1NDManC                    Nathan Snyder - Cross

1    came from, also, because that is part of the task sheet for the

2    actual probationary officer, an FTO, to go over that reference

3    material, to show them how we got to this is why we do that.

4    Q.  Got it.  All right.  I'm going to direct your attention to

5    Government's Exhibit One.  I think you have a hard copy.  You

6    went over it with my colleague from the government.

7         I want to direct your attention to 3.1.9, which is on

8    the sixth page, and when you get there, just look up and let me

9    know you're there.

10   A.  Yes.

11   Q.  All right.  So this is entitled "required detainee

12   searches," right?

13   A.  That is correct.

14   Q.  Okay.  So you agree with me, we're going to go step-by-step

15   through this section.  In terms of the title, there's no

16   reference to a bag, there's no reference to a car, there's no

17   reference to anything other than the three words, "required

18   detainee searches;" am I right?

19   A.  That is correct.

20   Q.  And then, A, it says, "inventory search of the detainee."

21   Do you see that?

22   A.  I do.

23   Q.  Okay.  Again, no reference to anything other than the

24   detainee, the person in custody, correct?

25   A.  Correct.

Q1NDManC                          Nathan Snyder - Cross

1    Q.  And let's look at the first sentence.  "All detainees

2    placed in the cell block area shall be thoroughly searched by

3    the processing officer regardless of any prior searches that

4    occurred in the field."  That's the first sentence there,

5    right?

6    A.  That's correct.

7    Q.  All right.  So, this is talking about a search of, by its

8    own words, the detainee in the cell block area, correct?

9    A.  That is correct.

10   Q.  All right.  So this is telling us that the search of the

11   detainee has to be in a particular area, specifically, the cell

12   block area, correct?

13   A.  It's saying, in that first sentence, that the detainee

14   placed in the cell block shall be searched thoroughly by the

15   officer.  That's prior to putting them in that cell block.

16   Q.  Correct.  Okay.  So what this is telling us is that the

17   detainee is supposed to be searched prior to the detainee being

18   put in the cell?

19   A.  That is correct.

20   Q.  All right.  If we go to the second paragraph, it says,

21   whenever possible, a search of the detainee, shall be conducted

22   by an officer or other member of the same -- of the same sex as

23   the detainee; am I right?

24   A.  That is correct.

25   Q.  And that's because this contemplates a physical search of

1    the person of the detainee; am I right?

2    A.  Yes, that's correct.

3    Q.  All right.  If we were talking about a search of a bag or a

4    backpack, the sex of the person searching the bag or the

5    backpack wouldn't matter, would it?

6    A.  Not that I'm aware of.

7    Q.  Right.  This is somewhat of a privacy concern that we want

8    male detainees searched by male officers; we want female

9    detainees searched by female officers; am I right?

10   A.  You would be correct.

11   Q.  Okay.  And that same concern would not exist if the search

12   was of a shoulder bag or a backpack or some other object; am I

13   right?

14   A.  Not that I would find any reason for.

15   Q.  Right.  Okay.  And then it goes on to say, the search

16   should be conducted in a safe and discrete manner.  Along the

17   same lines, we want the search of the person to be conducted in

18   a safe and discrete manner.  Am I correct?

19   A.  Correct.

20   Q.  Okay.  Because what we're talking about in these two

21   paragraphs is the search of a person; am I right?

22   A.  I would say that would be correct.

23   Q.  Okay.  So let's go to the third paragraph.  The third

24   paragraph says, "special attention shall be given to search

25   those areas where items could be hidden."  And then there's a

Q1NDManC                      Nathan Snyder - Cross

1   comma.  We're going to get to what's after the comma in a

2   minute.  "Special attention shall be given to search those

3   areas where items could be hidden."

4           That's what it says before the comma; am I right?

5   A.  Correct.

6   Q.  Now, certainly, items can be hidden in bags, correct?

7   A.  Correct.

8   Q.  Items could be hidden in backpacks, right?

9   A.  Yes.

10  Q.  But let's now look at what's after the comma.  Such as

11  jacket, jacket linings -- I'm sorry, jacket linings, hidden

12  pockets, hats, belts, footwear, clothing seams, pant waists,

13  and/or cuffs.

14          Do you see that there?

15  A.  I do.

16  Q.  Okay.  Each of those eight things relate to the search of a

17  person, correct?

18  A.  They do.

19  Q.  Okay.  A hat obviously would be on a person, correct?

20  A.  Possibly.

21  Q.  Yeah.  Belts, footwear, these are items that you associate

22  with the search of a person, correct?

23  A.  Correct.

24  Q.  Okay.  And, again, you don't see any reference to bags or

25  backpacks or anything like that?  At least what we've looked at

Q1NDManC                         Nathan Snyder - Cross

1   so far in this section; am I right?

2   A.  Correct.

3   Q.  So number four, just so we hit all the different sections,

4   number four says, "officers shall exercise special attention to

5   detail to ensure that no detainee is placed in a cell while in

6   possession of any items which may be used to harm themselves or

7   others or otherwise be used for the purposes of escape."

8           Do you see that there?

9   A.  I do.

10  Q.  Okay.  And then let's go to number five.  Number five talks

11  about strip searches and body cavity searches.

12          Do you see that there?

13  A.  I do.

14  Q.  Okay.  In regard to that, we're talking about specifically

15  and exclusively to the search of a person's body, correct?

16  A.  Correct.

17  Q.  Okay.  So, again, there's no reference, and we're already

18  up to paragraph five here, there's no reference to a bag or a

19  backpack or anything other than the search of a person, right?

20  A.  I believe on number three, after you listed the clothing

21  seams, the hats, the belts, the footwear, the next sentence,

22  "the searching officer shall remove all personal property and

23  itemize the property," when we went over that -- "all personal

24  property."

25  Q.  Okay.

1   A.  So that would then include everything.

2   Q.  All right.  I'm glad you brought that up.  Let's talk about

3   that for a second.

4        All right.  So the sentence before it, you agree with

5   me, is eight different things that you associate with a search

6   of a person, right?  We just talked about that a few minutes

7   ago?

8   A.  Yes.

9   Q.  Now, what this sentence is saying, and correct me if I'm

10  wrong, is that the personal property and items of property are

11  supposed to be put on a detainee property receipt, correct?

12  A.  That is correct.

13  Q.  So then this sentence introduces a new concept for us,

14  which we haven't seen so far, that being the detainee property

15  receipt, correct?

16  A.  Correct.

17  Q.  And just very briefly, we don't need to belabor the point,

18  what's the detainee property receipt?

19  A.  So, it is referred to as the prisoner property log.  It's

20  just another name for it.

21  Q.  Okay.  And this is -- and just describe it to us very

22  briefly.  It's a document?  It's a physical document; am I

23  right?

24  A.  Correct.

25  Q.  I would imagine it has the name of the prisoner, correct?

Q1NDManC                    Nathan Snyder - Cross

A.  Correct.

Q.  I would imagine it would have a different list of entries
of different items of property that are on that log; am I
right?

A.  Correct.

Q.  Okay.  And so what paragraph three is telling us is that
this property that you've recovered, you have to put all that
on a detainee property receipt; am I right?

A.  Correct.

Q.  Okay.  All right.  Now, so let's go to -- so, five, I think
you agreed with me that strip search, body cavity searches are
uniquely concerned with the search of a person's body, correct?

A.  Correct.

Q.  All right.  Now let's go to the last paragraph here.  All
property removed from the detainee shall be itemized using a
prisoner property form.

        Do you see that there?

A.  I do.

Q.  Okay.  So the phrase that's used here is "removed from the
detainee;" am I right?

A.  Correct.

Q.  Okay.  Again, there's no reference -- and now that we've
gone through this entire section, and you tell me if I'm
missing it, there's no reference anywhere in this section to a
bag, correct?

1  A.  No, I do not see anything that says "bag" specifically.

2  Q.  Okay.  There's no reference to anything other than a search

3  of the person?

4  A.  Not in this general order, no.

5  Q.  Okay.  So we're just talking the minimum -- 3.1.9, there's

6  no reference to anything other than the search of a person,

7  right?

8  A.  Right.

9  Q.  Okay.  Let's go 3.1.10.

10        Now, 3.1.9, as we talked about, was called "required

11  detainee searches," right?

12  A.  Correct.

13  Q.  And 3.1.10 is called "secure storage of detainee property;"

14  am I right?

15  A.  Correct.

16  Q.  Okay.  Now, tell me if this is right, these two sections

17  work in conjunction with each other in that, under 3.1.9,

18  property is going to be collected, and then at 3.1.10, property

19  is going to be stored in a secure fashion; am I right?

20  A.  That would be correct.

21  Q.  Okay.  What we see is we have some of the same phrases.

22  Let me show you what I mean.  So, in 3.1.9(6), it says, "all

23  property removed from the detainee."

24        Do you see that there?

25  A.  I do.

Q1NDManC                        Nathan Snyder - Cross

1    Q.  Okay.  Then if we go down to 3.1.10 -- it's the last

2    paragraph.  I think it's a -- no, I'm sorry, it's 2(a).  Do you

3    see that at the bottom?

4    A.  Yes.

5    Q.  Okay.  And it uses that same phrase again, "contraband,

6    evidence and/or illegal weapons removed from the detainee."  We

7    have that same phrase, "removed from the detainee," right?

8    A.  Correct.

9    Q.  And, again, in those sections -- and feel free to take a

10   look at the whole section 3.1.10 -- there's no reference to a

11   bag or a backpack or something other than the search of a

12   person?

13   A.  I do not see anything there.

14   Q.  Okay.  Now, I think Her Honor was asking you some

15   questions, and I wanted to follow up on a few of them.  The

16   idea of safeguarding property -- let me back up a second.

17            Inventory searches are to safeguard personal property;

18   am I right?

19   A.  That is correct.

20   Q.  This, these two sections, are not sections explicitly about

21   evidence per se, things that are going to be used in a

22   courtroom?

23   A.  They're not specific about that, correct.

24   Q.  Right.  So, you're familiar with not only the three general

25   orders that my colleague showed you a few minutes ago, you're

Q1NDManC                        Nathan Snyder - Cross

1    familiar with all of them; fair to say?

2    A.  Yes.

3    Q.  Okay.  We have one I wanted you to take a look at.  It's

4    general order 1.2.  It would be -- it's proposed as Defense

5    Exhibit A.

6            What I'm going to do is I'm going to give you a copy.

7            THE COURT:  Do you have a copy for me, Mr. Agnifilo?

8            MR. AGNIFILO:  Yes.  Yes, of course, Judge.

9            All right.  Yes, Judge.  Can I approach?

10           THE COURT:  You can hand my copy to Ms. Verneus.

11   Thank you.

12   Q.  All right.  So before we talk about this document, just

13   tell us briefly what it is.

14   A.  It is the Altoona Police Department's general order 1.2.

15   Q.  Okay.  And if we can go to the last page.  Feel free to

16   flip to the last page of it.  It's page 15.

17           And we see the same name of the same police chief,

18   Chief Janice Freehling.

19           Do you see that?

20   A.  That is correct.

21           MR. AGNIFILO:  Your Honor, we offer this as Defense

22   Exhibit A.

23           MR. GENTILE:  No objection.

24           THE COURT:  All right.  Defense A is admitted.

25           (Defendant's Exhibit A received in evidence)

Q1NDManC                    Nathan Snyder - Cross

1    Q.  So, Defense Exhibit A, if we look at -- I've been meaning

2    to ask you -- I'm meeting you for the first time, so I've been

3    meaning to ask you a lot of things -- on the first page, you

4    see it states "index words?"

5    A.  Yes.

6    Q.  It says "index words," but those are basically the

7    different types of information that's going to be in that

8    general order; am I right?

9    A.  That would be correct.

10   Q.  All right.  So if we look at the third entry here, it says,

11   "statutory authorizations."

12        That's the first thing, right?

13   A.  Right.

14   Q.  Then it says "in-custody procedures," the second thing,

15   right?

16   A.  That's correct.

17   Q.  And then it says, "search and seizure procedures," right?

18   A.  Correct.

19   Q.  So is it fair to say this is a general order that deals

20   with the procedures around search and seizure?

21   A.  Correct.

22   Q.  All right.  So let's go through this and just -- we're not

23   going to belabor, just a little bit more detail.  We're going

24   to look on page 2.  We're going to look at the top of page 2,

25   1.2.1.

Q1NDManC                          Nathan Snyder - Cross

1              Do you see that there?

2    A.   Yes.

3    Q.   It says, "agency statutory authorizations."

4              Do you see that?

5    A.   I do.

6    Q.   Okay.  And it says, under A, "United States Constitution,

7    the Constitution of the Commonwealth of Pennsylvania, the

8    Pennsylvania Rules of Criminal Procedure, Title 234, and the

9    Third Class City Code define the legal authority granted to the

10   Altoona Police Department as it pertains to the enforcement of

11   codified laws, statutes and ordinances."

12             It says that there, right?

13   A.   Correct.

14   Q.   Okay.  Now, is it right, is it your understanding of that

15   paragraph and the rules generally that the Altoona Police

16   Department is saying that, our general orders are going to be

17   in accordance with, for instance, the Constitution of the

18   United States of America?

19   A.   That is correct.

20   Q.   And the Constitution of the Commonwealth of Pennsylvania,

21   right?

22   A.   Correct.

23   Q.   And these other legal laws and rules that are listed here,

24   correct?

25   A.   Correct.

Q1NDManC                        Nathan Snyder - Cross

1    Q.  All right.  Let's look very briefly on page 3.  I think

2    this is subsumed by what we just talked about.

3           On the top there it says, "policy."  Do you see that

4    on the top of page 3?

5    A.  Yes, I do.

6    Q.  Okay.  And it says, "it is the sworn responsibility of all

7    members of the Altoona Police Department to comply with the

8    constitutional requirements regarding in-custody situations,

9    including but not limited to" -- then there are a number of

10   entries, and one of them is "search and seizure," right?

11   A.  Correct.

12   Q.  Okay.  So one of the obligations of the officers and other

13   folks who work for the Altoona Police Department is that their

14   procedures have to follow the U.S. Constitution; am I right?

15   A.  Correct.

16   Q.  And the other laws that were outlined in that paragraph we

17   just looked at a little while ago, right?

18   A.  Correct.

19   Q.  Okay.  Now, there are a number -- if we look on page 5, so

20   we get to page 5 -- and just look up at me when you're done.

21   Okay.  Thank you.  So, it's 1.2.3, and it says "search and

22   seizure without a warrant procedures."

23           Do you see that?

24   A.  I do.

25   Q.  Okay.  There are a number -- and I'm going to -- we're

Q1NDManC                    Nathan Snyder - Cross

1    going to go sort of -- I'm going to have you thumb through

2    pages 5, 6 and 7.  There are a number of different types of

3    searches that are listed under there, and we're going to talk

4    about them one by one.  We're not going to talk about a lot of

5    them in great detail at all.

6           The first one on the bottom of page 5, "search by

7    consent," that's A, right, search by consent?

8    A.  Correct.

9           MR. GENTILE:  Objection, your Honor.  We're going

10   beyond the scope of the very narrow lane of inquiry the Court

11   set out for this, the securing and inventorying of property of

12   an arrested person in a public place.  We're now venturing into

13   search and seizure law and consent and probable cause, and that

14   is not the focus of today's hearing, at least from the

15   government's perspective.

16          THE COURT:  Understood.

17          Where is this going, Mr. Agnifilo?

18          MR. AGNIFILO:  So, where we're going is I believe that

19   the direct examination does not capture the entirety of what

20   the obligations of the Altoona Police Department are, and this

21   is where I'm getting to with the Chief, is that what we see in

22   the inventory procedures later in the general orders, in

23   chapter three of the general orders, are all informed by the

24   earlier chapters of the general orders, including this one in

25   the first section.

1          THE COURT:  So let's try to get to that point a little

2     bit faster.

3          MR. AGNIFILO:  Yes.  Very good.

4          THE COURT:  I mean, we can assume Deputy Snyder is

5     familiar with these orders.  He said that a number of times.

6          MR. AGNIFILO:  Yes.

7          THE COURT:  I don't think you have to orient him.

8     Just get to the part that's relevant to this.

9     BY MR. AGNIFILO:

10    Q.  Let's get right to it.  Let's go to page 8.  Page 8 talks

11    about "impound inventory search."

12          Do you see that there?

13    A.  Yes, I do.

14    Q.  All right.  And this is talking about impounded vehicles;

15    am I right?

16    A.  That is correct.

17    Q.  Which we don't have in this case, correct?  I mean, as far

18    as you know?

19    A.  I am unaware.

20    Q.  Very good.  All right.  But in the section on impounded

21    vehicles, this particular order, for instance, talks about how

22    to deal with closed containers, correct?

23    A.  Where is that --

24    Q.  Let me not make you look for it.  Fourth line down.  It

25    says, "when inventorying a vehicle, all closed containers will

1    be searched unless the contents can easily be ascertained."

2          Do you see that there?

3    A.  I do.

4    Q.  Okay.  So here now I want to get back to what we were

5    talking about a few minutes ago.  When I asked you before, in

6    the two sections you reviewed on direct examination and then

7    with me on cross, there was no mention in those sections, for

8    instance, of a backpack.  I asked you that a few times, right?

9    A.  Right.

10   Q.  Or a bag of any sort, correct?

11   A.  Correct.

12   Q.  Or "any closed container" was not mentioned in that section

13   we spoke about a few minutes ago, correct?

14   A.  Correct.

15   Q.  But you'll agree with me that when the chief, when the

16   police chief who signed these orders wants closed containers to

17   be able to be searched, that could be written into the order as

18   it is here?

19   A.  I am unaware of what she wanted at that time.

20   Q.  Okay.  But you agree with me that there is a provision for

21   searching closed containers in the impound section having to do

22   with vehicles, correct?

23   A.  Correct.

24   Q.  Now, the idea of an inventory search is safeguarding a

25   prisoner's property pending whatever's going to come next in

Q1NDManC                    Nathan Snyder - Cross

1   that person's situation, whether they be released, whether they

2   go to prison, whatever the situation may be, correct?

3   A.  Correct.

4   Q.  Okay.  It is not -- tell me if this is right.  It is not a

5   typical inventory situation when all of the items are going to

6   be given to another police department, for instance, in a

7   murder investigation?

8           MR. GENTILE:  Objection.

9           THE COURT:  Is there a difference, Deputy Snyder, in

10  your inventory practices if you're going to hand something over

11  to another department or if you know that Altoona is keeping

12  the investigation?  Does that have any effect on your practices

13  with regard to inventorying bags or things of that nature?

14          THE WITNESS:  As far as the inventory, no.

15  Q.  Fair to say, the inventory process does not contemplate

16  that this is all going to be used as evidence; am I right?

17  A.  I'm not sure I understand.

18  Q.  Let me ask you a better question.  That's fair enough.

19          The purpose of inventorying, I think you've identified

20  three different purposes, and I want to make sure I have this

21  right.  You want to make sure that the person's property is

22  returned to them and it's not lost, correct?

23  A.  Correct.

24  Q.  You want to make sure that it's not damaged, right?

25  A.  Correct.

Q1NDManC                          Nathan Snyder - Cross

1   Q.  And you want to make sure that the police personnel and

2   others who might be in close proximity with that property are

3   safe; am I right?

4   A.  Correct.

5   Q.  Okay.  None of those purposes relate to the handling of

6   evidence to be used in a criminal case; am I right?

7   A.  Correct.

8   Q.  Bear with me one second, Chief.

9         MR. AGNIFILO:  Your Honor, just give me one second,

10  please.

11  Q.  Chief, I think we talked a little bit ago about a prisoner

12  log, right?

13  A.  Correct.

14  Q.  I'm going to show you a copy.

15        You're familiar with them generally I imagine, right?

16  A.  Yes.

17  Q.  I'm going to show you a copy, and I'm just going to ask you

18  some specific questions.  You can refer to it or, if you

19  remember independently, you can answer that way.

20        MR. AGNIFILO:  So, if your Honor is okay, I'll

21  approach the chief and just give him a sample department

22  prisoner log.

23        THE COURT:  Is there a copy for me, also?

24        MR. AGNIFILO:  Yes, Judge.

25        This is actually the one in this case, but we're not

Q1NDManC                        Nathan Snyder - Cross

1   looking to put it into evidence.

2           THE COURT:  Okay.  So it's just, in effect, as a

3   demonstrative, Mr. Agnifilo?

4           MR. AGNIFILO:  Yes.

5           THE COURT:  Just for the record, the witness has been

6   handed an exhibit marked as Defense Exhibit B for

7   identification.

8           MR. AGNIFILO:  Yes, Judge.  Thank you.  This is

9   Defense B for identification.

10  Q.  Okay.  So, this is an Altoona Police Department prisoner

11  log; am I right?

12  A.  That is correct.

13  Q.  Okay.  I really just want to look down about one-third from

14  the bottom where it says "prisoner property."

15          Do you see that there?

16  A.  Yes.

17  Q.  Now, correct me if I'm wrong, there are a number of entries

18  on this particular prisoner log, which are belt, wallet,

19  jacket, hat, purse, watch, rings, necklace, and earings.

20          Do you see those there?

21  A.  I do see them.

22  Q.  Okay.  There's no reference anywhere in this document, am I

23  right, to bags, backpacks, or things of that nature?

24  A.  That would be under "other items."

25  Q.  Okay.  Other items?

1    A.   Yes.  Correct.

2    Q.   But there's nothing specifically to reflect bags or

3    backpacks or things like that?

4    A.   No.

5    Q.   Okay.  Now, in terms of an inventorying procedure, correct

6    me if I'm wrong, there would be no reason to read entries in,

7    for instance, a notebook or a journal; am I right?

8    A.   Typically, not something that would be done.

9    Q.   Okay.  It's something that you might want to photograph the

10   entirety of the journal to see what condition it's in, but

11   there would be no reason to read each page, correct?

12   A.   I'd say that's correct.

13   Q.   And we're getting to the end.  I want to go through some of

14   the other sections that you went through with my colleague

15   here.

16            All right.  Let's look at general order 3.6.  Do you

17   have that in front of you?

18   A.   I do.

19   Q.   You do.  Can you take a look at it for a second?

20            THE COURT:  Just for the record, that's Government

21   Exhibit Two.

22            MR. AGNIFILO:  It is Government Exhibit Two.

23   Q.   So, here it talks -- in the "index words," it says,

24   evidence, found and/or abandoned property, recovered property.

25            Do you see that there?

Q1NDManC                           Nathan Snyder - Cross

1   A.  I do see that.

2   Q.  Okay.  Now, if we look at pages 6 and 7, under 3.6.6, it

3   talks about documented inspections, inventory, and audits

4   required.

5            Do you see that there?

6   A.  Yes, sir.

7   Q.  Okay.  And then the first thing it talks about is "annual

8   inspection."

9            Do you see that there?

10  A.  I do.

11  Q.  What's an annual inspection?

12           Let me read, just so you don't -- if you know what it

13  is, you can give an answer.  If not, I'm happy to read it to

14  you.

15  A.  I do.  So, it's an annual inspection of the evidence room.

16  Q.  Okay.  So that has nothing to do with an inventory per se,

17  in regard to a specific person?

18  A.  Not that I am aware of.

19  Q.  Okay.  Now, is this section here, 3.6.6, is this a section

20  that has to do with the auditing and sort of self, you know,

21  regulation of the evidence room?

22  A.  Yes.

23  Q.  All right.  So this is basically a principle of quality

24  control that the Altoona Police Department uses to make sure

25  that everything in the evidence room is kept in good order?

1    A.  Correct.

2    Q.  All right.  Let's look at general order 3.5, which is

3    Government Exhibit Three.  Do you have that in front of you,

4    Chief?  If not, we can get you --

5    A.  I do not.

6    Q.  Yes.  Let me get it to you.  Let me get it to you.

7            MR. AGNIFILO:  Does your Honor want a copy of 3.5?

8            THE COURT:  I have it.  Thank you, Mr. Agnifilo.

9    Q.  Okay.  Let me approach the witness.

10           Take a look at it, and I have just a couple questions

11   for you.  We're really winding down.

12           So, in that first section, under "purpose," it talks

13   about the integrity of the chain of custody of evidence.

14           Do you see that there in the second -- that second

15   line there?

16   A.  Yes, I do.

17   Q.  All right.  And tell me if this is right.  Chain of custody

18   is a principle where pieces of evidence will always be able to

19   know who had it, that it was logged properly, so if you want to

20   use it in a court proceeding, it can be admissible; is that

21   basically right?

22   A.  Sounds like a basic principle.

23   Q.  All right.  It sounds like something a lawyer would say.

24   So, now, if we look at page 3, under "physical evidence," under

25   (2), it says -- tell me, are you there?

Q1NDManC                    Nathan Snyder - Cross

1    A.  Yes.

2    Q.  Okay.  It says, "when an officer receives physical

3    evidence, he or she shall maintain a secure chain of custody."

4    You see that phrase again, right?

5    A.  Yes.

6    Q.  Okay.  So this is a section that has to do with the

7    collection of evidence; am I right?

8    A.  Correct.

9    Q.  All right.  And the maintenance of a chain of custody of

10   collected evidence, correct?

11   A.  Correct.

12   Q.  Okay.  So that could be used and admitted someday in a

13   court proceeding if it gets to that?

14   A.  If that's where it goes, yes.

15   Q.  All right.  One second, Chief.

16         MR. AGNIFILO:  One second, Judge.

17   Q.  All right.  A few more questions, Chief, and then I'll be

18   done.

19         Fair to say -- I think we talked about it at the

20   outset -- the general orders, the general orders are a much

21   more thorough discussion of the different subject matters

22   covered than are the task sheets; is that fair to say?

23   A.  They're a little deeper into that -- I'm not understanding.

24   Q.  Yes.  Sure.  The general orders that we've been covering

25   cover these different subjects in great detail; am I right?

Q1NDManC                    Nathan Snyder - Cross

1    A.  Not as -- I would disagree, when we're talking about the

2    task sheets, like I explained before, for new probationary

3    officers, we try to break it down a little better for them.

4    Again, they don't know -- they're not a 10-year veteran officer

5    that understands maybe the lingo or some of the terminology

6    used.  So, for the new guys, I would say the task sheets are

7    broken down a little bit better.

8    Q.  But the task sheets are essentially -- they're not issued

9    by the police chief, correct?

10   A.  They're issued as part of our manual to the new guys, and

11   it is something they have to pass in order to continue on in

12   the training program.

13   Q.  Right.  But whereas the general orders are actually orders

14   from the police chief, the task sheets are not.

15   A.  The general order is an order.  Yes.  Correct.

16   Q.  And the task sheets are not an order in the same way; am I

17   right?

18   A.  I guess it depends on what you mean.  Like I said, you

19   can't -- in order for probationary officers to get off

20   probation, he has to complete those task sheets and show that

21   he has knowledge on those task sheets.  If he does not sign off

22   on the task sheet, he will not move further in the FTO program.

23   Q.  And just so I understand --

24          THE COURT:  Go ahead, Mr. Agnifilo, and then I'll ask

25   my question.

Q1NDManC                         Nathan Snyder - Cross

1    Q.  Sure.  When you say "sign off," I'm not clear on what

2    you're saying.  He signs off on the task sheets.  Just tell us

3    what that means.

4    A.  Oh, basically, when the task sheet is presented to the

5    probationary officer and the FTO explains it and the probation

6    officer reads it and everything, they go out and do the

7    demonstration, show how it's applicable in the field, come

8    back.  Then a supervisor -- their kind of last step as a new

9    guy, their supervisor would quiz them on that task sheet.

10            Once the supervisor feels, hey, this probational

11   officer is proficient in this task, he or she will sign it.

12   That piece of paper will be training paperwork for the day, and

13   we will check that off as one of their completions of task

14   sheets required for them for that step in the training program.

15   Then they can continue to move forward.

16   Q.  All right.

17            THE COURT:  Can any random person in the Altoona

18   Police Department prepare those task sheets and check them off

19   and sign them?

20            THE WITNESS:  So, we require our probationary officers

21   to only sign them off with supervisors who have been FTOs.

22            THE COURT:  Those are people designated by the chief

23   of the department to conduct this training, right?

24            THE WITNESS:  That is correct.

25            THE COURT:  Go ahead, Mr. Agnifilo.

Q1NDManC                          Nathan Snyder - Cross

1          MR. AGNIFILO:  Yes.  Thank you, Judge.

2   Q.  Do you know how the general orders are prepared?

3   A.  As far as typed up or --

4   Q.  Is there a meet -- because now you're a deputy chief.  Are

5   there meetings to refine them as time goes on?  Have you ever

6   had any input into what goes into a general order?

7          I'm just trying to figure out how they get to be what

8   they are.

9   A.  I do not.

10  Q.  Fair enough.  Give me one second.

11         MR. AGNIFILO:  Sir, thank you.  It was very nice

12  meeting you.  Safe travels back to Pennsylvania.

13         THE WITNESS:  Thank you.

14         THE COURT:  Chief, I just have a question.  I want to

15  make sure I understand.  Let's go back to my example where

16  you're arresting me on a public bus, right?  So, for purposes

17  of the example, there's maybe a probationary police officer.

18  You're the field training officer making sure that they follow

19  all the procedures.

20         You approach me.  Ma'am, stand up, please.  What's

21  this all about?  You say, ma'am, I need you to stand up.  I

22  stand up.  I'm handcuffed, and I'm told I'm going to be placed

23  under arrest.  On the seat next to me, towards the window, is a

24  purse, a large one for these purposes, and the officer asks me,

25  as we went over before, ma'am, is that your bag.  I say, yes.

Q1NDManC                        Nathan Snyder - Cross

1          Walk me through everything that happens next if you

2    are teaching a probationary officer what to do in that

3    situation.  What's the next thing that's going to happen?

4          THE WITNESS:  So, I'm going to instruct the

5    probationary officer, okay, now that you are secured, go ahead

6    and let's pat her down, make sure there's no obvious weapons,

7    anything like that that can obstruct or hurt us or them.  I'm

8    going to have him or her do that.  We're going to take the bag.

9    We're probably going to move off the bus, because it's not

10   really a controlled environment.  Preferably -- we're being

11   hypothetical -- on the street, move to the patrol car, where

12   that way we can secure you in the car.  At that time, we'd do

13   probably a very brief check through the bag to make sure we're

14   not -- you know, in our neck of the woods, there's a lot of

15   drugs, so I wouldn't want anything that could pass through the

16   system and we could smell or inhale or anything like that.  And

17   I would teach him or her that.  This is what we're doing.

18   We're checking to make sure there's nothing in here that can

19   hurt us or hurt her while we're transporting it.

20          Once we go back to the station, once we go to the

21   station, we'd bring you in the alley door.  We'd then secure

22   you there.  We have a place we secure people we bring in.

23          THE COURT:  Is that the holding cell or --

24          THE WITNESS:  It's actually like an intake area.  It's

25   got like a shackle to the floor, and that's where we would

1    secure them.

2              THE COURT:  Then what happens to my bag?

3              THE WITNESS:  It's brought with you into the station,

4    and we have a big table that's sitting right there when you

5    come in the door.  So we set the bag down, and I would tell the

6    probationary officer, I'd say, okay, go ahead, give her

7    instruction, uncuff her, and then let's begin with our search.

8              And we'd focus on you first.  So we'd uncuff you.

9    Hand me your jacket.  Hand me your shirt, your gloves.  You

10   need to take your jewelry off.  Go through that whole thing.

11   If there's a female there, we'd have a female come out and pat

12   you down further.

13             In the meantime, we're placing all the things on this

14   big table, all the items that we've seized.

15             THE COURT:  So as you're removing my jewelry, my

16   jacket, that's all going on the same table?

17             THE WITNESS:  Correct.

18             THE COURT:  Okay.

19             THE WITNESS:  If it was just the case of me and a

20   probationary officer, which typically there's always two people

21   there, I would then take that probationary officer and say,

22   okay, we've got her taken care of.  Now, this is the form.

23   This is what we need to fill out.  She had a necklace.  See

24   right here down at the bottom?  Necklace.  Boom.  And we'd go

25   through those items.  She has a backpack.  It's not listed

1  there, because we can't hardly list everything possible.  You

2  know, that form would be 20, 30 pages long.

3          But then we would start inventorying what you have in

4  that bag.  Okay.  She has two pair of socks, you know, she's

5  got a radio, she's got this, that.  We'd inventory all that on

6  the sheet.  As long as we didn't pull out anything that was

7  contraband or evidentiary, that we'd deem evidentiary -- like,

8  if you had drugs, obviously, that would be contraband.

9  Everything else is going to get shoved back into that bag, all

10  that personal property.  We try to put necklaces and things

11  that could be lost in like a folder.  We explain this to them

12  as I'm doing it.  You'd be standing there watching it all.

13  Obviously, body cams and station video is on.

14          Then we'd take that, and right beside where we're at,

15  there are eight, nine lockers, and they have locks on them.

16  We'd take that property, put it in there, and I'd say, okay,

17  it's important, locker number one, and he would write that on

18  the sheet, one.  So then we would know locker one is your

19  property for when you get released or transferred or whatever.

20          THE COURT:  If my bag is zipped closed, why not just

21  take the bag and just put that in a locker without opening it?

22          THE WITNESS:  Again, I don't know what is in that bag

23  to, A, safeguard. I don't know if there is something in there

24  that could hurt any of the officers walking by that locker.  I

25  don't know what you're capable of.  I just met you.  So, you

Q1NDManC                    Nathan Snyder - Cross

1    know, for our safety, for your safety in that facility we're

2    going to check and inventory those things.

3          THE COURT:  What if there's money or other valuables

4    inside the bag that aren't evidence or that are valuables?  Why

5    do you need to identify and inventory those things?

6          THE WITNESS:  Well, again, those are your personal

7    belongings, and they're of value to you.  We don't ever want to

8    be accused of taking anything.  We want you to get all your

9    stuff back.  And since it's your belongings, you need it back,

10   so we will document that on there.

11         There's a money total.  I think we break it down into

12   bills and changes.  And, you know, I would hate for you to come

13   up with $2,000 missing, and that might not even be our

14   department.  If we're transferring you, we have no way of

15   knowing what another place or facility may or may not lose, so

16   that's why we also have a place for people taking custody of

17   the prisoner to sign for that personal property, so that way

18   they know what they're getting, too.

19         THE COURT:  Thank you, sir.

20         MR. AGNIFILO:  Your Honor, can I ask a follow-up

21   question?  It will be very brief.

22         THE COURT:  Well, yes.  Yes.

23   BY MR. AGNIFILO:

24   Q.  Chief, if you found something illegal, cocaine, a firearm

25   magazine, would you do anything other than continue with the

1   inventory search?

2   A.  In this specific instance --

3   Q.  Yes.

4   A.  -- that she said?

5   Q.  Yes.

6   A.  No.  We would stop at that point, in her instance.

7   Q.  And what would you do?

8   A.  At that point we'd probably go get a search warrant.

9   Q.  Okay.  And so that's the procedure?

10  A.  That specific instance, yes, with that set of facts.

11  Q.  Okay.  So if you had a bag, you were prepared to inventory

12  the bag, you found something illegal, like a firearm magazine

13  or something like that, you would stop and get a search

14  warrant?

15  A.  Again, in this specific incident that the judge just

16  outlined --

17  Q.  Yes.

18  A.  Yes, in her case.

19  Q.  Got it.  That's all I need to know.  Thank you.

20          THE COURT:  Mr. Gentile.

21          MR. GENTILE:  Briefly, your Honor.  Thank you.

22  REDIRECT EXAMINATION

23  BY MR. GENTILE:

24  Q.  Chief, I just want to pick up where Mr. Agnifilo left off

25  regarding the inventory search process.  If you found a

Q1NDManC                        Nathan Snyder - Redirect

1   magazine in someone's purse or bag, if you found contraband,

2   drugs or gambling records or something like that, would you

3   stop the search and then apply for a search warrant in that

4   situation?

5   A.  That would be correct.

6   Q.  But if you found something that was dangerous, like a

7   magazine or firearm, would you stop searching then, even though

8   there might be a gun attached to that or something even more

9   harmful?

10  A.  No, not necessarily.

11  Q.  Would you continue searching to see if there were any other

12  dangerous items that would expose other officers or the

13  community to danger?

14  A.  Sure.

15          THE COURT:  I'm sorry.  What was that answer?

16          THE WITNESS:  Sure.  Yes.  I'm sorry.

17  Q.  Chief, we went through several categories of property in

18  your direct examination, including found property, abandoned

19  property, evidence and personal property.

20          Do you recall that?

21  A.  Yes.

22  Q.  And Mr. Agnifilo went through one specific section of the

23  general order that applied to personal property, right?

24  A.  Correct.

25  Q.  In all those categories of property, do they all require

Q1NDManC                          Nathan Snyder - Redirect

1    some sort of securing or inventorying of that property, whether

2    it's found, abandoned, evidentiary or personal?

3    A.   Correct.

4    Q.   With respect to the task sheets, in order for the -- you

5    said that the task sheets are part of the manual; is that

6    right?

7    A.   That is correct.

8    Q.   In order for the task sheet to be part of the manual, does

9    the chief have to authorize that?

10   A.   Can you ask that again, please?

11   Q.   In other words, doesn't someone in authority have to

12   provide some sort of approval for anything that's entered into

13   the manual?

14   A.   Correct.  Yes.

15   Q.   And the inventory process, I believe you spoke -- you

16   answered some questions from Mr. Agnifilo about -- or,

17   actually, from the judge regarding the purposes of the

18   inventory search.  It's not just to give or to account for a

19   detainee's personal property, is it?  It's also about a safety

20   issue, right?

21   A.   Correct.

22   Q.   Is it also about an accountability issue for the

23   department, that you know what property you're in possession

24   of, and this way, if you're going to give some of that property

25   back, you know how much and what type of property you're

1   returning?

2   A.   Correct.

3          MR. GENTILE:   Thank you, Judge.

4          MR. AGNIFILO:   Your Honor, I have two questions, just

5   following up.

6   RECROSS EXAMINATION

7   BY MR. AGNIFILO:

8   Q.   Chief, do you still have Defense Exhibit A in front of you?

9   It's general order 1.2, already in evidence.

10  A.   Which general order?

11  Q.   It's 1.2, Chief.

12         THE COURT:   It has a big A on it.

13  Q.   Yes.   It has a big A on the first page at the bottom.

14  A.   Got it.

15  Q.   Do me a favor and go to page 8.   And I'm going to direct

16  your attention to the last two lines on page 8.

17         Do you see that there?

18  A.   I do.

19  Q.   I'm going to read it to you.   "If during an inventory

20  search, evidence of a crime is discovered, the officer shall

21  stop the inventory search and secure a search warrant prior to

22  continuing."

23         Is that what it says?

24  A.   That is what it says.

25  Q.   Thank you.

1          MR. GENTILE:  Your Honor, I just want to -- one

2    question.

3    REDIRECT EXAMINATION

4    BY MR. GENTILE:

5    Q.  That section that you just read for Mr. Agnifilo, that's

6    under "impound inventory search;" is that right?

7    A.  That's right.

8    Q.  Does that pertain to vehicles?

9    A.  That is correct.

10   Q.  Thank you.

11   RECROSS EXAMINATION

12   BY MR. AGNIFILO:

13   Q.  Is there anything in any general order that says that the

14   rules are different for vehicles as opposed to other property?

15   A.  I would have to look through our general orders.

16   Q.  Thank you.

17   A.  I don't want to give you false information.

18   Q.  Okay.  Thank you.

19          MR. GENTILE:  Nothing further from the government.

20   Thank you.

21          THE COURT:  All right.  You are excused, sir.  Thank

22   you very much.

23          Mr. Gentile, anything else from the government while

24   we're all here together?

25          MR. GENTILE:  No, your Honor.

Q1NDManC                        Nathan Snyder - Recross

1              THE COURT:  Mr. Agnifilo?

2              MR. AGNIFILO:  I don't believe so.  Thank you, your

3    Honor.

4              THE COURT:  Thank you all very much.  I've found this

5    very helpful.  I'll see you in a week.

6              (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    NATHAN SNYDER

 4   Direct By Mr. Gentile  . . . . . . . . . . . . 7

 5   Cross By Mr. Agnifilo  . . . . . . . . . . . .27

 6   Redirect By Mr. Gentile  . . . . . . . . . . .62

 7   Recross By Mr. Agnifilo  . . . . . . . . . . .65

 8   Redirect By Mr. Gentile  . . . . . . . . . . .66

 9   Recross By Mr. Agnifilo  . . . . . . . . . . .66

10                        GOVERNMENT EXHIBITS

11   Exhibit No.                               Received

12    One   . . . . . . . . . . . . . . . . . . . .14

13    Two   . . . . . . . . . . . . . . . . . . . .16

14    Three   . . . . . . . . . . . . . . . . . . .19

15    Four   . . . . . . . . . . . . . . . . . . . .22

16    Five   . . . . . . . . . . . . . . . . . . . .23

17                        DEFENDANT EXHIBITS

18   Exhibit No.                               Received

19    A  . . . . . . . . . . . . . . . . . . . . .41

20

21

22

23

24

25
```